# Exhibit "J"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------x

DAVID EDMOND, CAROL EDMOND and
TOM EDMOND,
                                Docket No.
                                 2:16-cv-2871
              Plaintiffs,

            -against-

LONGWOOD CENTRAL SCHOOL DISTRICT,
SUFFOLK COUNTY, SUFFOLK COUNTY POLICE
DEPARTMENT, SUFFOLK COUNTY POLICE
OFFICER EDWARD ZIMMERMAN, in his individual
and official capacities, SUFFOLK COUNTY
POLICE OFFICERS "JOHN AND JANE DOES 1-10,"
In their individual and official capacities,
LONGWOOD SUPERINTENDANT MICHAEL R. LONERGAN
in his individual and official capacity,
PRINCIPAL MARIA CASTRO in her individual
and official capacity, LONGWOOD ASSISTANT
PRINCIPAL SCOTT REESE, in his individual
and official capacity, LONGWOOD SECURITY
GUARD SCOTT, in his individual and official
capacity, LONGWOOD SECURITY GUARDS "JOHN
AND JANE DOES 1-10," in their individual
and official capacity, and JOHN AND JANE
DOE #1-10, in their individual and official
capacities,

             Defendants.

-------------------------------------------x

                33 Walt Whitman Road, Suite 310
                Dix Hills, New York 11746

                November 27, 2017
                10:55 a.m.

         (PARTLOW - CONTINUED ON NEXT PAGE)

---

Examination Before Trial of the Defendant, SCOTT PARTLOW, pursuant to Court Order, before Rich Moffett, a Notary Public of the State of New York.

Rich Moffett Court Reporting, Inc.
114 Old Country Road, Suite 630
Mineola, New York 11501
516-280-4664

---

APPEARANCES:

LAW OFFICES OF CORY H. MORRIS, P.C.
Attorneys for Plaintiffs
    33 Walt Whitman Road, Suite 310
    Dix Hills, New York 11746
BY:   CORRY H. MORRIS, ESQ.

SILVERMAN & ASSOCIATES
Attorneys for Defendants
    445 Hamilton Avenue, Suite 1102
    White Plains, New York 10601
BY:   CAROLINE LINEEN, ESQ.

---

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

         - oOo -

Scott Partlow

5

SCOTT PARTLOW, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

*        *        *

EXAMINATION BY
MR. MORRIS:

Q    Please state your full name for the record.

A    **Scott Partlow.**

Q    What is your address?

A    **100 Longwood Road, Middle Island, New York, 119 53.**

MS. LINEEN:  I'm going to note on the record it's 10:56 a.m.  The deposition was scheduled to start at 11:00 a.m.

MR. MORRIS:  Thank you, Counsel.

Q    Good morning, Mr. Partlow.

A    **Good morning.**

Q    Do you understand why you're here today?

A    **Yes.**

Q    Do you understand what a deposition is?

A    **Yes.**

MR. MORRIS:  I'd like to state for the record at the outset, we reserve the right to recall this witness.  We still have outstanding document production.

Q    My name is Cory Morris.  I represent the Edmond family:  Tom Edmond, Carol Edmond and David Edmond.

I'll be taking your deposition today.

Have you ever been deposed before?

A    **No.**

Q    Within this deposition I'll be asking you questions.  Mr. Moffett here will record my questions and your answers.

Do you understand that you need to speak up and answer so that the reporter can hear you when you give answers?  Do you understand that?

A    **Yes.**

Q    He won't be able to record a nod

Scott Partlow

7

or a shake of your head or a grunt.

Mr. Moffett also might have trouble if we talk over each other.  Therefore, it is very important that you wait until I finish my question before you begin answering, even when you think you know what the rest of the question will be.  Will you do that?

A    **Yes.**

Q    You have just taken an oath; it requires you to tell the truth, the whole truth, and nothing but the truth.  Do you understand that?

A    **Yes.**

Q    This is the same oath that you would take if you were to testify in court.  Do you understand that?

A    **Yes.**

Q    We're interested in finding out everything you know about the events and facts that underlie this lawsuit.

For that reason, we are looking for full and complete answers to each question I'm going to ask.

Scott Partlow

8

In other words, we're looking for the whole truth of the oath that you just took.  Do you understand that?

A    **Yes, I do.**

Q    On occasion I may ask a question that I don't state very well, or for some reason you don't understand it.

If you don't understand my question for any reason, please don't answer it.  It is my job to ask understandable questions.  If you say you don't understand it, I'll ask a better question.  Okay?

A    **Okay.**

Q    If you need a break at any time, for any reason, tell me, or tell your attorney, and I'll finish my line of questioning if we're in the middle of it, then see what we could do about a break.  Do you understand that?

A    **Yes, I do.**

Q    We have water for you here in case you need it.  You're free to get up whenever you need it during the deposition.  I'll just ask that you answer any

Scott Partlow

9

outstanding questions.

Sometimes it happens that you give an answer as completely as you can, but later on, maybe five minutes later or maybe two hours later, you remember some additional information, or perhaps some clarification of response to an earlier question.

If that happens to you, please tell us that you would like to add something to the earlier answer, and we will do that right then, while it's on your mind, and on the record.

Will you do that?

A    Yes, I will.

Q    Sometimes when you're answering you may think of some document that might remember help you remember the answer, might give you a more accurate answer.  If you do, please tell us.  We may have those documents right here.  We may be able to get those, to help you answer completely and accurately.

Will you do that?

A    Yes, I will.

---

Scott Partlow

10

Q    Are you taking any medication or drugs of any kind, or consumed any cough syrup or medicine, or something containing alcohol that might make it difficult for you to answer my questions here today?

A    No.

Q    Are you sick at all today?

A    No.

Q    Is there any reason you can't give full and complete and accurate testimony here today?

A    No.

Q    Did you review any documents in preparation for this deposition?

A    No.

Q    Did you make any notes?

A    No.

Q    How many times have you met with your attorneys prior to today?

A    Twice.

Q    On what dates?

A    I'm not sure of the dates.

Q    What year?

A    2017 and 2016.

---

Scott Partlow

11

Q    Same attorney or different attorneys?

A    Same.

Q    Have you met with a union representative before today?

A    No.

Q    Have you met with the union representative at all in regard to the events of this lawsuit?

A    Not that I'm aware of.

MR. MORRIS:  Off the record for just a moment.

(Whereupon, a discussion was held off the record.)

MR. MORRIS:  Back on the record.

Q    Mr. Partlow, what is your current address?

MS. LINEEN:  You can give the school address.

A    100 Longwood Road, Longwood, New York 11953.

Q    Do you have your license on you today?

A    Yes.

---

Scott Partlow

12

Do you want it?

Q    Please.

MS. LINEEN:  Why do you need his license?

MR. MORRIS:  We're asking for his home address.

MS. LINEEN:  Why do you need his license?

MR. MORRIS:  We're asking --

MS. LINEEN:  So ask him for his home address.

MR. MORRIS:  Okay.

Q    Could I have your home address?

█████████████████████

Q    Mr. Partlow, starting with high school, would you go through your education for us, please?

A    I graduated high school. That's as far as I went in my education.

Q    When did you graduate high school?

A    Longwood.

Scott Partlow

13

Q   When?
A   1997.
Q   Aside from Longwood High School, did you have any other education beyond that?
A   I did.
    Half a semester online, Kaplan.
Q   Anything aside from Kaplan?
A   No.
Q   Aside from a New York State driver's license --
    And you do hold a New York State driver's license?
A   Yes.
Q   May I see your license?
A   Yes.
Q   Do you hold any other licenses?
A   New York State security license.
Q   Any other license besides that security license?
A   No.
Q   Starting with your first job, can you give us your work history, please?
A   As when I was a teenager.

Scott Partlow

14

Q   First job?
    MS. LINEEN:  First job ever, or after high school?
Q   Do you understand the question.
A   I had jobs when I was in high school; I had jobs after high school.
Q   If you could give us your first job, first job you held?
A   I was at Walmart, Middle Island.
Q   What dates did you hold that job?
A   I don't remember the dates.
Q   Do you know when you left employment at Walmart?
A   I left, and I actually I went back to it after I graduated high school.
Q   Why you did you first leave Walmart, before you came back?
A   Why did I leave?
    I quit.
Q   Why did you quit?
A   I wanted to go to school.
Q   You wanted to go to --
A   Stay in school.

Scott Partlow

15

Q   What school?
A   Longwood High School.
Q   Were you a teenager at the time?
A   Yes.
Q   When did you return to Walmart?
A   1999.
Q   How old were you at that point?
A   19, 20.
Q   What did you do at Walmart?
A   I was night stock man.
Q   Did you hold any other positions at Walmart?
A   I went to -- I can't remember the name -- I wasn't an assistant manager; it was right below that, the title.
    I don't remember.  I don't know.
    MR. MORRIS:  If we leave a blank in the transcript, can you fill that in?
    THE WITNESS:  Sure.
INSERT:_____
Q   How long did you work at Walmart?
A   Just about five years.

Scott Partlow

16

Q   Is that until 2004?
A   I would say that.  I don't know the exact year.
Q   Why did you leave employment at Walmart?
A   Started working installing pools.
Q   What company did you work for?
A   All Jay Pools.
Q   If you could spell that for the court reporter?
A   A-L-L, space, Jay Pools.
Q   When did you start with All Jay Pools?
A   The exact date, I don't remember.  It was right after I left Walmart.
Q   How long did you work for All Jay Pools?
A   Three years, four years.
Q   What did you do for All Jay?
A   Just a laborer.
Q   Anything else beside labor?
A   No.  That's it.

Scott Partlow

17

Q   Why did you leave All Jay Pools?

A   **I needed a steady job.**

Q   Did you quit?

A   **I quit.**

Q   Do you remember what year you quit?

A   **No.  I'm not sure.**

**It was on and off.  It was summer work.**

Q   Where did you work after All Jay Pools?

A   **Long Island Compost.**

Q   What did you do for Long Island Compost?

A   **Scale attendant.**

Q   Do you remember what year you started at Long Island Compost?

A   **No.  Years -- I don't remember the years.**

Q   Do you remember how old you were?

A   **Not exactly, no.**

Q   How long did you work for Long Island Compost?

Scott Partlow

18

A   **Two years.**

Q   Why did you leave Long Island Compost?

A   **That was another seasonal job.**

Q   What did you do after Long Island Compost?

A   **That's when I started at Longwood High School.**

Q   When did you start at Longwood High School?

A   **2008.**

Q   When did you obtain your security license?

A   **Same year, year before, before I started work at Longwood.**

Q   Have you ever been terminated from any job position?

A   **No.**

Q   Are you married?

A   **No.**

Q   How did you receive employment at Longwood High School?

MS. LINEEN:  Note my objection to form.

Scott Partlow

19

A   **I just went and applied.**

Q   How?

A   **I went to the director's office, in Yaphank, asked for an application to fill out.**

Q   Who was the director?

A   **At the time, it was -- I don't remember his first name, but his last name was Nieder.**

Q   When you say applied to the director, what did you do, exactly?

A   **I went in and asked for the director's office, I asked for an application, applied for a security position.**

Q   This is after you had your license?

A   **Yes.**

Q   It was a written application?

A   **Yes.**

MR. MORRIS:  Ask for production of that application.

MS. LINEEN:  Follow up in writing.

Scott Partlow

20

We'll take it under advisement.

Q   Anything else aside from that written application?

A   **No.**

Q   Did you undergo a background check?

A   **Yes.**

Q   Anything else?  Background check, something along those lines, to obtain employment at Longwood High School?

A   **Fingerprints.**

MS. LINEEN:  Objection to form.

A   **Fingerprints.**

Q   Anything else?

A   **No, not that I can think of right now.**

MR. MORRIS:  I'm going to call for the production of the background check, fingerprints and all the documentation with the employment application.

MS. LINEEN:  Follow up in writing.

We'll take it under advisement.

Scott Partlow

21

Q    So after you applied for the job with the director, you said it was Nieder; is that right?

A    Right.

He was the director of that department.

Q    Did you have to undergo an interview or anything else as part of the employment at Longwood?

A    Yes.

Q    What did you have to do?

A    I had an interview with James Perada.

Q    Who is James Perada?

A    He was the director of security.

Q    What was he doing?

A    Chief of security.

Q    Tell me about that meeting. What occurred?

A    The interview?

Typical interview. Asked for my background. Where I got the license, what I learned in the licensing. My background, work background.

Scott Partlow

22

Q    What were your responses to the licensing, or where did you get your license?

A    The school I went to, I don't recall the school.

Q    You went to a school to obtain your security license?

A    Yes. It was a course I found online.

Q    Any in-person training?

A    Yes. That was the --

I found a school online, but the training was in person.

Q    Where was the school?

A    Wisconsin, I believe.

I'm not sure of the town it was in.

Q    Were you finished answering the question?

A    I'm not -- I'm not sure of the town, where it was actually located.

Q    Did you receive a certificate, anything to acknowledge your completion of that school?

Scott Partlow

23

A    I don't remember that.

Q    Did you submit an application to New York State for your license?

A    I believe I -- it went through the school.

Q    When you say school?

A    Where I went for the license.

MR. MORRIS:  We're going to leave a blank had in the transcript. If you could fill in the blank of that school.  We're going to call for the production of what you submitted to New York State to obtain your security license.

INSERT:_____.

MS. LINEEN:  Please follow up in writing.

We'll take it under advisement.

Q    You were saying you met with James Perada, and you interviewed with him?

A    Yes.

Q    Anything else to obtain your employment at Longwood High School?

A    That was the license and the

Scott Partlow

24

interview.

Q    Background check?

A    Backed check and fingerprints.

Q    Anything else?

A    Not that I recall.

Q    Anything that would refresh your recollection?

A    Not that I'm aware of.

Q    Is there any notes made?  Did you meet with anyone else?

A    There was two supervisors I met with.

Q    What were the names?

A    Letty Quintanilla --

MS. LINEEN:  I'll try --

Q-U-I-N-T-A-N-I-L-L-A.

A    And Kenneth Schall.

Q    When did you meet with these two supervisors?

A    Same time I was with James.

Q    There were three people in the meeting altogether?

A    Right.

Q    Did you know anyone in Longwood

Scott Partlow

25

High School?

A      My ex-mother-in-law.

MS. LINEEN:  Just make sure he gets his question out.  Sometimes we take a break before asking the question.  Make sure he gets his question out.

Q      Did you reach out to anyone before you applied to this job position at Longwood High School?

MS. LINEEN:  Note my objection to the form.

You can answer.

A      No.

Q      You started to say something about your mother, or something along those lines?

A      She was a teacher there.

Q      Anyone else you know -- related, friend -- who worked within Longwood High School?

A      I know someone who worked there; he wasn't working there at the time.

Q      Before you applied, did you

Scott Partlow

26

reach out to anyone in regard to your application with Longwood High School?

A      No.

Q      Did you ask anyone for a reference for your job at Longwood High School?

A      Who worked for Longwood, or just in general?

Q      Do you understand my question?

Did you ask anyone for a reference for your application to Longwood High School?

MS. LINEEN:  He is trying to clarify.

A      Yes.

Somebody who worked there?

Q      Did you use any job references?

A      Yes.

Q      Who?

A      Josh Razill.

Q      Who was that?

A      That was my boss at All Jay Pools.

Q      Anyone else?

Scott Partlow

27

A      Joe Hammarth, H-A-M-M-A-R-T-H.

Q      Who was that?

A      Friend.

Q      Anyone else?

A      That's all I remember.

Q      Any of these individuals have any connection with Longwood High School?

A      Joe went there.

Q      Joe related to the anyone that worked in Longwood High School?

A      Not that I'm aware of, no.

Q      Do you know if your mother gave a reference for you to work at Longwood High School?

A      I don't believe she did.

When I mentioned her name, James didn't know who she was.

Q      How long did she work at Longwood High School for?

A      I don't know how long she was there.

Q      Do you know when she stopped working for Longwood?

A      Exact year, no.

Scott Partlow

28

Q      Do you know the approximate time she stopped working at Longwood High School?

A      2013.

Q      Fair to say that your mother --

A      That's estimating.  I honestly don't know the year.

Q      Would you agree with me that your mom worked at Longwood High School when you worked at Longwood High School.

A      My ex-mother-in-law, yes.

Q      Thank you for clarifying.

When you say your ex-mother-in-law, were you married?

A      Yes, and divorced.

Q      Let's go back to that question.

How long were you married?  When were you first married.  When were you first married?

A      2006.

Q      To who?

A      Jennifer Hofmiester, H-O-F-M-I-E-S-T-E-R.

Q      Is that the same Hofmiester related to Joe?

Scott Partlow

29

A    That's Hammarth, Joe Hammarth.

Q    How long were you married to Jennifer for?

A    Five years.

Q    Why did you divorce?

MS. LINEEN:  Objection.

Don't answer that.

Why he got divorced has nothing to do with this.

MR. MORRIS:  Counselor, this a deposition.

MS. LINEEN:  I understand.

Nothing to do with anything.

Call the Court, if you want.

Q    Any complaints of domestic violence while you were married?

MS. LINEEN:  Objection.

Don't answer that.

MR. MORRIS:  Let's call the Court.

I'm going to ask that you excuse yourself.  It's about 11:15.

(Whereupon, Mr. Morris called the Court.)

Scott Partlow

30

MS. LINEEN:  If you want to ask did his divorce arise out of his employment, that's a different question.

But the personal reasons for their divorce --

MR. MORRIS:  I'm not going to ask those questions.

We could bring him back here.

MS. LINEEN:  We'll say we made a call to the judge to get a ruling, the judge was not available.  We'll try to call at the end.  Otherwise, we'll move on.

(Whereupon, the witness entered the room.)

MR. MORRIS:  It's 11:25.  We're back on the record after a conference call with the Court, which we will later seek a ruling.

Q    Mr. Partlow, your mother-in-law; what was her name, again?

A    Marcy Sobel.

Q    Ex-mother-in-law?

Scott Partlow

31

A    Yes.

Q    Anyone else a part of that family worked in the school district?

A    My ex-wife worked there.  She worked in the high school.  She worked in the elementary schools.

That was after, I believe, I started.

Q    Your ex-wife, is that the one that we were just discussing, Jennifer?

A    Jennifer.

Q    Why did Jennifer have a different name than her mother, Marcy?

A    She had her father's name.

Her mother and father were divorced.

Q    Father work in Longwood?

A    No.

Q    Anyone else as part of that family, your ex-in-laws, work in the Longwood School District?

A    Not that I am aware of.

Q    What did your ex-wife do in Longwood school district?

Scott Partlow

32

A    She was a one-on-one aide.

Q    What is that?

A    One-on-one aide.

MS. LINEEN:  One-to-one.

A    One-to-one.

Q    What is that, exactly?  What is a one-on-one?

A    She works one on one with a student with special needs.

Q    Someone on the autism spectrum?

A    Right.

Q    How did you meet with your ex-wife, Jennifer?

A    When I was working at Walmart.

Q    Did she attend Longwood High School with you?

A    Yes.

Q    When did your ex-wife start working at Longwood Central School District?

A    I'm not sure of the date, but it was after I started, yes.

Q    Do you remember the year?

A    The year?  I'm not positive on the year.

Scott Partlow

33

Q      Before or after 2010?

MS. LINEEN:  Note my objection. You can answer.

A      I'll say before, but I'm not clear on that.

Q      When did you start again?

A      2008.

Q      Before 2010.
Sometime after 2008; is that right?

A      Yes.

Q      To be clear, your ex-wife started working at Longwood Central School District after 2008, right?

A      Right.

Q      She always held a job as a one-on-one aide?

MS. LINEEN:  Objection to form.

Q      Did she always hold that position as a one-on-one aide at Longwood Central School District?

A      Until she left, yes.

Q      When did she leave?

A      Again, I'm not sure of the

Scott Partlow

34

years.

Q      Did she leave before or after your divorce?

A      Before.

Q      Was it a year?  Was it more? Was it less?

A      I would say more.

Q      So, your ex-wife left more than a year before your divorce, left working at Longwood Central School District; is that right?

A      To my knowledge.
I'm not sure.

Q      When you say you're not sure, were you married to her when she stopped working at the Longwood Central School District?

A      I do -- yeah, I believe I was.

Q      You were married when she stopped working at the Longwood School District, correct?

MS. LINEEN:  Objection.

A      As far as I remember, yes.

Q      Were you speaking to her at that

Scott Partlow

35

time?

A      Yes.

Q      You don't know, as you sit here today, why she left the Longwood Central School District?

A      She went back to school.

Q      What did she do?

A      Teaching.

Q      Do you know if she returned to Longwood Central School District since leaving?

A      No.

Q      Have you ever been convicted of a crime?

A      No.

Q      Have you ever been arrested?

A      No.

Q      Is your family in law enforcement?

A      No.

Q      You have family in Longwood School District?

A      No.

Q      You have friends in law

Scott Partlow

36

enforcement?

A      No.

Q      Do you have friends who work with the Longwood School District?

A      Yes.

Q      Who?

A      Basically, everybody I worked with.
I've been there nine years.

Q      Prior to your hire, did you have friends who worked at the Longwood School District?

A      No.

Q      Do you hold any certificates post High School education?

A      For the training -- our annual training for security, and a CPI training.

Q      Do you hold a gun license?

A      No.

Q      Any other license in the State of New York, other than a driver's license and security license?

A      No.

Q      Have you ever given sworn

Scott Partlow

37

testimony before?

A   Traffic court, if that counts.

Q   On whose behalf?

A   On mine.  I mean --

Q   What was the traffic infraction?

A   Speeding, cell phone.

MS. LINEEN:  You can answer, over my objection.

Q   I'm sorry?

A   Speeding, cell phone.

Q   When did this occur?

A   Actual, dates I'm not positive.

Q   Do you know the year?

A   2015.

Q   Have you given sworn testimony other than that time of which you've mentioned?

A   No.

Q   Have you ever been sued before?

A   When -- no.  I wasn't -- I don't -- when I was a kid, my parents' death.

I don't think I was actually being sued.  I was named.

Scott Partlow

38

Q   If you could clarify.

You said you were named in --

A   As far as I recall -- I thought I remember me being -- when I was 15, after my parents' death, I might have named on behalf of the estate.

Q   Aside from that, have you ever been sued before?

A   No.

Q   Have you ever testified in court before, aside from traffic court?

A   No.

Q   Anyone ever accuse you of discrimination?

A   No.

Q   Harassment?

A   No.

Q   Sexual harassment?

A   No.

Q   Have you ever seen the plaintiff, that being David Edmond here, before the events related to this lawsuit?

A   Before the events?

Q   Yes, before.

Scott Partlow

39

A   I might have seen him passing in the hall.

Q   Anything other than that?

A   Not that I recall, no.

Q   Have you signed any written statements, made any recorded statements, or spoken to anyone, including reporters, about the events related to this lawsuit?

A   I have written statements, but I haven't talked to reporters.

Q   To who?

A   To the school and Suffolk County PA.

Q   Anyone else?

A   No.

Q   Have you given any interviews?

A   No.

Q   When did you give those statements, the ones you just mentioned earlier?

A   I believe one was on the date it occurred, June 4th.

Q   2015?

A   Yes.

Scott Partlow

40

Suffolk County PA.  I don't remember if it was that day or after, few days after.

Q   Did you meet with anyone before giving those statements?

A   No.

Q   Before you gave a statement to the School, you did not meet with anyone; is that right?

A   Not on that actual situation.

Q   What did you meet on?

A   Probably everyday stuff.

Q   Everyday stuff have anything to do with the senior prank?

MS. LINEEN:  Objection.

A   Afterwards?  I'm not sure.  I don't remember.

Q   Why did you write a statement to the School?

A   Because the situation like that, we always write a necessary report.

Q   Did you collaborate with anyone on your statement?

A   No.

Scott Partlow

41

Q       How did you write your statement?

A       **I'm not clear on that.**

Q       Did you type it?  Did you hand write it?

A       **Handwritten.**

Q       To whom did you give that statement?

A       **The security office.**
        **I don't know who was the exact person I gave it to.**

Q       When you say security office, is that a receptionist that you gave it to, or something else?

        MS. LINEEN:  Objection.
        You can answer.

A       **Dispatcher.**

Q       Is that something you do as a regular course of your duties?

A       **Yeah.  That's who we gave our reports to.  Then they'll give them to the supervisor, shift supervisor.**

Q       Do you remember who the shift supervisor was on June 4, 2015?

Scott Partlow

42

A       **Kenny Schall.**

Q       Could you spell that for the court reporter?

A       **S-C-H-A-L-L.**

Q       Did you speak with anyone about your statement on June 4, 2015 that you gave to the School that day?

A       **What I wrote, no.**

Q       Did you talk about your statement at the Suffolk County Police Department?

        When did you give a statement to the Suffolk County Police Department?

A       **I don't remember the exact date, but it was -- I don't remember if it was that day or few days after.  I don't remember.**

Q       Did you meet with anyone before giving that statement?

A       **No.**

Q       Did you speak with an attorney before giving that statement?

A       **Not that I recall.**

Q       Did you speak to -- I'm sorry?

Scott Partlow

43

A       **No.**

Q       Did you speak to a union representative before giving that statement?

A       **No.**

Q       Did you speak with James Perada before giving that statement?

A       **I don't recall.**

Q       Did you make any notes before giving that statement?

A       **No.**

Q       Did you review anything before giving that statement?

A       **No.**

Q       To be clear, I'm referring now to the Suffolk County Police Department statement.

A       **Okay.**

Q       Did you review any statement or speak to anyone before giving that statement?

A       **No.**

Q       Do you remember who you gave that statement to?

A       **Suffolk County PD.**

Scott Partlow

44

Q       Do you remember who, specifically?

A       **No.**

        MR. MORRIS:  Call for the production of all statements given by this deponent as it relates to the Suffolk County Police Department and the School.

        MS. LINEEN:  Please follow up in writing, clarifying the specific nature of your request.

        We'll take it under advisement.

        MR. MORRIS:  To be clear, the statement of which deponent is now referring.

        MS. LINEEN:  Those have been produced.

        MR. MORRIS:  We don't have the redacted statement from the Police Department.

Q       So, you gave a statement to the Suffolk County police; is that right?

A       **Right.**

Q       Did you swear to that statement?

Scott Partlow

45

A    Yes.

Q    Did you approach the police, did they approach you, or something else?

A    I remember them coming to me.

Q    Where did they come?

A    To the High School.

Q    Who was present?

A    Just the detectives.

Q    Detectives just came to you. Where did they come to you?

A    I was called to the main office, to come there.

Q    Who was at the main office?

A    The detectives.

Q    Anyone else?

A    No.

Q    Was there one Suffolk County police officer, two, or something else?

A    I believe it was -- I don't remember, but I think one.

Q    Were you scheduled to work that day?

A    Yes.

Q    Did the officer explain to you

Scott Partlow

46

why he was there?

A    Yes.

Q    It was a male officer?

A    Male, yes.

Q    What did he say?

A    Exact words, I don't remember.

Q    In sum and substance?

A    That about the event that happened.

Q    What event that happened?

A    The event that happened with David Edmond.

Q    What did he say?

A    He just wanted to talk about -- get my statement on what happened.

Q    I'll like to double back. Tell me everything that you did to get ready for this deposition?

A    Spoke to my attorney, the school's attorney. That's about it.

Q    The attorney sitting to the left of you?

A    Yes. She informed me about that.

Scott Partlow

47

MS. LINEEN:  Don't go into anything we talked about.

THE WITNESS:  Letting me know when it was going to --

MS. LINEEN:  When the deposition was.

THE WITNESS:  Yes.

Q    Sorry about that. To be clear, I'm not going to ask you for any conversation that you had with her. That would be improper. Aside from meeting with the attorney that sits to the left of you now, did you do anything else to get ready for today's deposition?

A    No.

Q    Have you ever met with Longwood Central School District in regard to your being indemnified in this lawsuit?

A    No, not that I recall.

Q    Were you told that you were going to be indemnified in this lawsuit?

A    I don't know what that means.

Q    Were you told that if you're

Scott Partlow

48

found guilty of civil misconduct, and if a money damage or award is issued against you, were you told that the School would cover that by insurance?

MS. LINEEN:  Note my objection to the form. And by anyone other than counsel?

MR. MORRIS:  Do you understand the question?

MS. LINEEN:  No, no. I want to clarify that you're not asking what counsel may have told him about any possible indemnification.

MR. MORRIS:  I'm not asking for attorney --

Q    Just to be clear, going forward, I'm never going to ask you what the attorney to the left or any attorney said to you.

A    Yes.

Q    Do you understand my question?

A    Did anybody tell me that?

Q    Yes?

Scott Partlow

49

A    No, no one told me that.

Q    As you sit here today, you don't know if you're going to be indemnified by the school's insurance policy?

A    No.

Q    Has anyone told you that the school's insurance policy may or may not cover certain damages; for instance, intentional torts?

A    I wasn't told anything like that.

Q    Did you sign a retainer agreement or some sort of agreement for the attorney in this lawsuit to represent you?

A    I would have to sign something. I don't recall signing anything. That's a few years ago.

Q    I'm sorry. You said you signed something?

A    I might have. I don't remember. It's been a few years now, so I'm --

Q    Do you remember paying for legal counsel in this matter?

A    No.

Scott Partlow

50

Q    Do you remember the School paying for legal counsel in this?

A    I wouldn't know.

MR. MORRIS: I'm going to call for the production of these agreements and anything indicating whether insurance is covering him or indemnifying him.

MS. LINEEN: Please follow up in writing, clarifying the specific nature of your request, and we will take it under advisement.

Q    When you worked for Longwood School District, what, if any, policies were you bound to adhere to as part of your employment?

MS. LINEEN: Objection to form.

A    Can you clarify that?

Q    Any policies that you were supposed to adhere to as a Longwood High School security guard?

A    Code of conduct.

Q    Anything else?

A    That's all I think of.

Scott Partlow

51

Q    To be clear, did you hold any other position at Longwood High School other than a security guard?

A    Over the summers I worked as a custodian.

Q    Can you tell us what a summer custodian is?

A    It's just a custodian during the summer.

Q    What were your job duties?

A    Moving furniture.

Q    Anything else?

A    That's basically it.

Q    Have you ever received any complaints in the course of your duties at Longwood Central School District?

MS. LINEEN: Objection to form.

A    Not that I'm aware of. There was one. There was one.

Q    What complaint receive?

A    From a parent.

Q    When?

A    The date? I don't remember.

Q    Do you remember the year an?

Scott Partlow

52

A    No.

Q    Do you remember the substance of the complaint?

A    What I told him?

Q    What did you tell him?

A    That I'm not a babysitter.

Q    Why did you say that?

A    Because he wanted his son to be escorted every day by one guard.

Q    Do you know if the son was subject to bullying or something else?

A    I'm not sure. I didn't get into detail.

Q    When you made that statement, did you know that?

A    No.

MS. LINEEN: Objection.

Q    You don't know if that person was subject to physical harassment before you made that statement?

A    No, I didn't.

Q    I'd like to hand you what was previously marked as Plaintiff's Exhibit 1. It bears Bates stamps Longwood

Scott Partlow

53

CSD 1 to Longwood CSD 23.

Are you familiar with this code of conduct?

A    I've read it.

Q    Do you recognize this document, Plaintiff's Exhibit 1?

A    This exact document?  No.

I might have seen it, but I don't remember exactly this is what it said.

Q    What is Plaintiff's Exhibit 1?

A    Looks like a code of conduct of some sort.

Q    How do you recognize this document as a code of conduct of some sort?

A    Because it's saying what -- talking about -- employees, agenda, illicit drugs, student responsibilities, dignity act.

Q    When you say code of conduct, is this the Longwood High School code of conduct?

A    The high school -- I assume it's the whole District.

Q    Were you obligated to comply

Scott Partlow

54

with this code of conduct?

A    Yes.

Q    How do you recognize this as Longwood Central district code of conduct?

MS. LINEEN:  Objection.

A    I know it's Longwood, the logo on top.  It says Longwood on top.  I'm not sure word by word.

Q    Do you know when this document was created?

A    No, except for the date on top.

Q    Do you know if this document was in force during your tenure at Longwood High School?

A    I'm sure it was.

Q    How did you receive the code of conduct throughout your employment?

A    We get them in the beginning of the year.

Q    How do you get them?

A    At a class, in the mailbox, if you don't have it.

Q    When you say a mailbox, you have a mailbox at Longwood High School?

Scott Partlow

55

A    I did, yes.

Q    Have when you say, I did?

A    I was moved to the junior high.

Q    When were you moved?

A    This past September.

Q    Why were you moved?

A    My schedule.

Q    Could you explain that?

A    I worked 6:15 to 2:15.

Q    What hours did you work previously?

A    6:30 to 2:30 and 7:00 to 3:00.

Q    What is the difference between the times?

A    I have to be at my other job.

Q    What is your other job?

A    Nature's Bounty.

Q    How long have you worked at Nature's Bounty?

A    Five years.

Q    When did you first obtain employment at Nature's Bounty?

A    2012.

Q    What do you do at Nature's

Scott Partlow

56

Bounty?

A    I drive a forklift in a warehouse.

Q    Do you require a license or something else to drive a forklift?

A    We get annual training from them.

Not actually a license; it's a certificate.

Q    How many hours would you work at Nature's Bounty?

A    40 hours a week, full time.

Q    Is that on top of your employment at Longwood High School?

A    Yes.

Q    How long have you done that for?

A    Five years.

Q    You work two full-time jobs; is that right?

A    Yes.

Q    How many hours do you work at Longwood High School?

A    40.

Q    How long have you worked for

Scott Partlow

57

40 hours at Longwood High School?

A    Since 2008.

Q    Is it fair to say, for the past five years, you worked at Nature's Bounty and Longwood High School, working 40 hours at both jobs?

A    Yes.

Q    Have you ever been subject to discipline at Nature's Bounty?

A    For attendance.

Q    Have you ever been the subject of discipline at Longwood High School?

A    The incident that we spoke about earlier.

Q    Aside from those two incidents, one being attendance one being the incident with the parent, have you ever subjected to discipline in either job?

A    No.

Q    Where is Nature's Bounty?

A    Ronkonkoma.

Q    I want to get back to what you were saying earlier.  You were moved to the Junior High School as a security guard at

Scott Partlow

58

Longwood;  is that right?

A    Right.

Q    You did that to accommodate your second full-time job; is that right?

A    Right.
       Also asked to come down there.

Q    By who?

A    School principal, Mr. DeWitt.

Q    How did he do that?

A    Talked to James Perada.

Q    Was there anything besides the talking to James Perada?

       MS. LINEEN:  Note my objection.

A    I'm not sure.

Q    Did you receive anything in writing?

A    No.

Q    Do you maintain an e-mail account at Longwood High School?

A    Yes.

Q    What is that, that username?

A    Scott.partlow@lsd, Scott Partlow.  I don't remember the actual spelling of it.  I don't use it that much.

Scott Partlow

59

Q    Do you receive e-mails at that electronic mailing address?

A    Yes.

Q    How long have you maintained an e-mail address for?

       MS. LINEEN:  Note my objection to form.

A    I don't remember what year it was.  I rarely use it.

Q    Was it before or after 2014?

A    I'm going to say after.

Q    You're saying you didn't receive an e-mail address until after 2014?

A    They might have gave it to me. I never like went onto -- I never went on and set it up, password or anything.

Q    Were you instructed on how to use that e-mail address at Longwood High School?

A    Was I instructed how to use it?

Q    Yes?

A    Yes.

Q    By whom?

A    I don't know the name.

Scott Partlow

60

       I needed help getting onto it, to activate it.

Q    Was it male, female, something else?

A    Female.

Q    Do you remember when you received that instruction?

A    No.

Q    Do you remember what year you received that instruction?

A    No.

Q    Can you explain how she instructed you?

A    She told me how to get started, what password to use to get started, how to, I think, change the password.

Q    I want to go back to the code of conduct.
       Were you expected to abide by this code of conduct?

A    Yes.

       MR. MORRIS:  It's approximately 11:55.  I'm changing the battery.
       (Whereupon, a brief recess was

Scott Partlow

61

taken.)

MR. MORRIS: Back on the record. It's approximately 11:56.

Q You were saying you received this code of conduct.

Did you have to acknowledge the receipt of this code of conduct?

A I signed something. I signed for the test.

I don't think I signed for this, for the class.

Q What did you sign?

A I signed when I take my course, I signed for the eight-hour course.

I'm not sure if I signed for this.

Q Did you receive this as part of your eight-hour course?

A Yes.

Q Is it the same as when you initially received the code of conduct and signed for your eight-hour course?

MS. LINEEN: Objection to form.

A I don't know.

Scott Partlow

62

Q Is this document the same as the code of conduct that you received?

A It doesn't look the same.

Q What's different about it?

A Just the cover, it looks different.

But I could be mistaken for other pamphlets we have.

Q You did receive a code of conduct; is that right?

A Yes.

MR. MORRIS: I'm going to request all documents signed and the code of conduct that this deponent received for the 2014-2015 school year.

MS. LINEEN: Please follow up in writing.

We'll take it under advisement.

Q Mr. Partlow, were you aware of the policy on corporal punishment at Longwood High School?

A Yes.

Q What is that policy?

Scott Partlow

63

A There's no physical -- above or beyond physical punishment.

Q When you say, above and beyond?

A Like, no unnecessary physical punishment.

There is no physical punishment.

Q Would you agree with this statement at the bottom of LCSD 1, corporal punishment is an act of physical force upon a student for the purpose of punishing that student?

MS. LINEEN: Objection to form.

You can answer.

A Yes, I agree with that.

Q Is a staff member at Longwood high School ever permitted to touch a student?

A Only if he is in harm of himself or others.

And only if necessary, as a last resort.

Q Where did you learn that information?

A I think that's in the CPI

Scott Partlow

64

training.

Q Who determines whether force should be used against a Longwood High School student?

MS. LINEEN: Note my objection to form.

A I think it's our own discretion, what we believe we need to do.

If we believe he is going to be in harm of himself or others, that's a last resort.

Q Were you allowed to employ deadly force against Longwood High School students?

A No.

Q Were you at the point a Longwood High School student if he or she was meeting you with deadly force?

A No.

Q Why not?

A Because that's -- we're not trying to hurt the student.

Q For that, you took certain classes, correct, to make sure you did not

Scott Partlow

65

hurt the student?

A    CPI.

Q    Anything else?

A    As in, any other courses we took?

Q    Yes?

A    CPI class.

Q    Anything other than the CPI class?

A    No.

Q    Are you allowed to employ choke holds against a student?

MS. LINEEN:  Objection to form.

A    No.

Q    What was your answer?

A    No.

Q    Why not?

A    Because that's almost deadly force.

I'm not trying to hurt the student.

Q    I'd like to direct your attention to LCSD 8.

Once you're there, just ask you

Scott Partlow

66

to read Section B to yourself.

Look up once you're done, please.

A    Okay.

Q    Mr. Partlow, it goes on from LCSD 8 to LCSD 9.  You see that list?

A    Yes.

You want me to read that, too?

Q    Please.

A    (Looking up)

Q    Do you know of any Longwood employee that's been reprimanded for violating, quote, obstruct the free movement of any person, place, in any place, end quote?

A    Do I know of anybody who's done that?

No.

Q    Have you ever been reprimanded for, quote, obstruct the free movement of any person in any place, end quote --

A    No.

Q    -- at Longwood High School?

A    No.

Scott Partlow

67

Q    You might know the answer to the question before.

A    I'm sorry?

Q    What was your answer to that?

A    No.

Q    Have you ever been reprimanded for altering records?

A    No.

Q    Have you ever been reprimanded for interfering with the safe, healthy and ordinary environment at Longwood High School?

A    No.

Q    Do you know of anyone, a Longwood High School employee, being reprimanded for the interference with the safe, healthy and ordinary environment at Longwood High School?

A    No.

Q    Have you been reprimanded for subsection 13B of LCSD, that being, quote, intimidate, harass or discriminate against any person on the basis of race, color, weight, creed, national origin, ethnic

Scott Partlow

68

group, religion, religious practice, age, gender, sex, sexual orientation or disability, end quote?

A    Do I know of anybody?

No.

Q    Have you ever been reprimanded?

A    No.

Q    You've read all of Section B; is that right?

A    Correct.

Q    Do you know of any Longwood High School employee who suffered a reprimand for violation of any of these categories?

A    No.

Q    Do you know of any accusation against any Longwood high School employee for violations of any one of these enumerated?

A    No.

Q    Have you ever been the subject of an accusation for violating any of the enumerated policies on LCSD 8?

A    No.

Q    I direct your attention to LCSD

Scott Partlow

69

11.

If you have look under Section 9, student disciplinary penalties, and read Subsection B, possible methods of dealing with prohibited student behavior, if you could read that to yourself, please.

A   Okay.

Q   Mr. Partlow, is force a possible method of dealing with prohibited student behavior at Longwood high School?

MS. LINEEN:  Objection to form.

A   No.  It does not say that on there.

Q   To your knowledge, are you allowed to use force when dealing with prohibited student behavior?

A   If you're going to be a harm to himself or others.

That's the last resort.

Q   Can you utilize choke hold if one is going to be a harm to oneself or others?

A   No.

Q   As a Longwood security guard,

Scott Partlow

70

are you equipped with any gear, any utilities, as part of your uniform, as a Longwood High School security guard?

A   We have latex gloves.

Q   Anything else, other than latex gloves?

A   No.

Q   Why do you have latex gloves?

A   If there's a situation where a person is bleeding, we should be putting them on.

Q   Aside from latex gloves, are you equipped with anything else; for instance, a uniform?

A   Uniform, yes.  Radio.

Q   You started to say uniform, radio.

Anything else, along with latex gloves, as part of your uniform at Longwood High School?

A   If we're doing parking, we have a vest and a baton.

Q   Anything else?

Lighted baton?

Scott Partlow

71

A   No.

Q   You've explained latex gloves.

Could you explain why you're equipped with a radio?

A   So we can speak to other guards and staff around the school.

Q   Are you trained in the use of a radio?

A   Yes.

Q   Do Suffolk County police have access to this radio?

A   Not that I'm aware of.

Q   Radio recorded in any fashion?

A   Not that I'm aware of.

Q   Do you receive any policies or guidelines as to the use of that radio?

A   I believe there in the eight-hour training, he goes over it.

Q   I'm sorry.  Eight-hour training?

A   Eight hours refresher training.

Q   To what are you referring?

A   The eight-hour course we take. It's like license renewal.

Q   Is that your New York State

Scott Partlow

72

license?

A   Yes.

Q   You said that's an annual course?

A   Yes.

Q   Who conducts such annual course at Longwood High School?

A   James Perada.

Q   Anybody else?

A   No.

Q   Does that eight-hour course detail the use of force against Longwood High School students?

A   That's in the CPI.  He goes over it briefly.

Q   When you say he goes over it briefly?

A   James Perada.

Q   What does he do?

A   He just speaks about the CPI briefly.  That's not the CPI class.

Q   Does he discuss the use of excessive force?

MS. LINEEN:  Note my objection

Scott Partlow

73

to form.

A     That's part of it, yes.

Q     Are you trained on what is excessive force?

A     The exact definition of it? I don't know the exact definition of it, but I am aware of it.

Q     You say you're aware of it. Explain your awareness of excessive force.

A     Force that's -- using too much force.  That's not warranted.

Q     Did James Perada explain to you how to determine what use of force is warranted?

A     If somebody's in harm of either themselves or others, if they're going to hurt themselves or somebody else, that's the last resort.

Q     For instance, were you explained on what level of force you may utilize against Longwood High School students?

MS. LINEEN:  Note my objection to form.

Scott Partlow

74

A     The exact use?  The exact amount?

Q     Do you understand my question?

A     No, I don't.

Q     Was it explained to you what would be excessive, in dealing with High School students, in terms of force?

A     The exact amount? No.

Q     So for instance, were you ever explained that it would be improper to punch a student in the face?

A     Absolutely.

Q     Along those lines, was there anything else explained would be improper in terms of the use of force against a student?

MS. LINEEN:  Note my objection to form.

A     That's basically it.  You're not supposed to harm the student. Where it's going to harm the student is excessive force.

Q     Was it explained to you what excessive force was?

Scott Partlow

75

MS. LINEEN:  Objection.

A     Explained to me. I can't give you a definition of it.

Q     How did they do that?

A     He explained it.

Q     Who is he?

A     James.  When you take the CPI course.

Q     He uses materials to do that, or he just explains it verbally?

A     When we take the CPI classes, there's demonstrations.

Q     In other words, there are demonstrations on what is the excessive use of force; is that right.

MS. LINEEN:  Objection to form.

A     No.

Q     What are the demonstrations?

A     He shows us how we restrain a kid, and intervene in physical situations.

Q     During your tenure as a Longwood High School security guard, has anyone ever reprimanded you for the improper restraint

Scott Partlow

76

of a student?

A     Not that I'm aware of.

Q     Any documents or records that might refresh your recollection?

A     For myself?

Q     For anyone?

A     I'm not aware of anything like that.

Q     Have you ever received training, after June 4, 2015, on what the use of excessive force?

A     In our eight-hour class.

Q     Aside from the eight-hour class?

A     In the CPI class.

Q     Aside from the CPI class?

A     No.

Q     I'd like to direct your attention to LCSD 20, specifically the Roman numeral XII, type of corporal punishment. If you could read that to yourself, please; look up when you're done.

A     Okay.

Q     Do you understand that policy?

A     Yes.

Scott Partlow

77

Q	Were you expected to comply with that policy?

A	Yes.

Q	Was anyone ever reprimanded for failing to comply with that policy?

A	Not that I'm aware of.

Q	You say you understand this policy, correct?

A	Right.

Q	What is the reasonable physical force to which this policy refers?

MS. LINEEN: Objection to form.

A	There's no limit, just protect oneself or another.

It doesn't specify the actual limit.

Q	Says here, the District will file all complaints about the use of corporal punishment with the Commissioner of Education in accordance with the Commissioner's regulation.

To your knowledge, have you or any other Longwood High School security guard been the subject of such a complaint

Scott Partlow

78

to the Commissioner of Education?

A	I guess now this, because I'm here.

Q	Rather you not guess.

MS. LINEEN: No one wants you to guess.

A	Yes.

MS. LINEEN: Just what you know.

Q	I'm sorry?

A	Yes.

Q	How do you know that?

A	Because I'm here.

Q	Has anyone spoken to you from Longwood High School, aside from your student, in regard to the complaint, or any complaint, filed with the Commissioner of Education?

A	No.

Q	Aside from your being here, do you have any other independent knowledge as to a complaint or complaints filed with the Commissioner of Education in regard to use of force?

A	Not to my knowledge.

Scott Partlow

79

Q	Are you aware of whether Longwood High School has had more than one complaint regarding the use of force that was filed with the Commissioner of Education?

MS. LINEEN: Objection to form.

A	No, I'm not aware of.

Q	I'd like to direct your attention to LCSD 21. Last line in that page, B, enforcement.

If you could read that to yourself, and please look up when you're done.

It does continue on, LCSD 22.

A	Okay.

Q	Were you aware of this policy?

A	Administration? Yes.

Q	Are you aware of the District pursuing a civil lawsuit against anyone violating this code of conduct?

A	Do I know of any?

Q	Yes?

A	No.

Q	Are you aware of the School

Scott Partlow

80

District pursuing a criminal legal action against anyone violating the code of conduct?

A	Not that I'm aware of.

Q	Are you aware of the School District, at any time, enforcing the code of conduct against an employee of Longwood School District?

MS. LINEEN: Objection to form.

A	Not that I'm aware of.

Q	Are you aware of the School District enforcing the code of conduct against a student?

A	Yes.

MR. MORRIS: Ask that we take a couple of minute break for our expert court reporter here, at 12:15.

(Whereupon, a break was taken at this time.)

MR. MORRIS: Back on the record The time is 12:28.)

Q	Mr. Partlow, we just went through the code of conduct.

Were you trained by anyone,

Scott Partlow

81

during your tenure at Longwood High School, about discrimination?

A     That comes -- we do all that in the eight-hour course.

Q     What, if any, training did you receive on discrimination?

A     It's just during the course, we talked about it.

Q     Have you ever been the subject of a complaint of discrimination?

MS. LINEEN:  Objection to form.

THE WITNESS:  Not that I'm aware of, no.

Q     Any other security guard been the subject of a complaint of discrimination at Longwood High School?

A     That I'm not aware of.

Q     You ever receive notice or anything in writing regarding discrimination or complaint of discriminates lodged against a Longwood High School security guard?

A     No.

Q     Anything aside from the eight-hour course on discrimination?

Scott Partlow

82

A     No.  That's it.

Q     Were you ever made aware of something called the Dignity For All Students Act?

A     Yes.

Q     Did you receive training on that?

A     That comes during the eight-hour course, yes.

Q     Who taught the Dignity For All Students Act training?

A     I think it's still James. James.

First time was -- I'm not aware of her name.  It was a social worker in the High School.

Q     What did she tell you about the Dignity For All Students Act?

A     Just about the bullying. Nobody should be bullied. Nobody should be discriminated against.

Q     Did she explain to you what forms of bullying were?

A     Verbal, physical.

Scott Partlow

83

Q     Do you know what, if any, were your responsibilities as it relates to violations of the Dignity For All Students Act?

A     I'm sorry?

Q     Do you know --

A     Like what I should do? Yes.  I take it if I see it happening, I inform administration about it. If someone tells me about it, I inform administration about it.

Q     Have you had the opportunity to do that, within your tenure at Longwood High School?

A     No.

Q     Have you encountered any bullying, whether it be yourself experience or anyone else, at Longwood High School?

A     No, I never have been involved personally.

Q     Did you notice anyone else being bullied at Longwood High School?

A     No.

Q     Aside from the eight-hour

Scott Partlow

84

course, any other training on Dignity For All Students Act, or what I'll refer to as DASA?

A     No.

Q     I'm going to show you what's been marked Plaintiff's Exhibit 15.

(Whereupon, Plaintiff's 15 for identification was so marked.)

Q     Mr. Partlow, I provided you with what's been labeled LCSD 233 to LCSD 235.

Do you recognize this document, Plaintiff's Exhibit 15?

A     No, I don't recognize it.

Q     Do you know what Plaintiff's Exhibit 15 is?

A     Looks like the Dignity Act, I guess.

Q     How do you recognize it?

A     I don't know.  I don't know. I'm sorry.

Q     How do you recognize this document as the Dignity For All Students Act?

MS. LINEEN:  Objection.

Scott Partlow

85

A      I see the bullying and the cyber bullying on here.

Q      You received this document as a part of your tenure at Longwood High School?

A      I don't remember.

Q      Would it be in your personnel file, if you did receive it?

A      That, I wouldn't know what's in there.

Q      Were you expected to know the policies from Longwood High School as it relates to the Dignity For All Students Act?

A      Yes.

Q      Do you see the bottom of this document, where it says -- it contains that URL hyperlink?

A      All the way at the bottom? Yes.

Q      Yes?

A      Yes.

Q      Do you know if that document is public?

A      That, I'm not aware of.

Q      Would you agree with me that you

Scott Partlow

86

were expected to comply with all this document?

A      Yes.

Q      That being the policy and Dignity For All Students Act?

A      Yes.

Q      I'd like to read a little bit from this LCSD 233, quote, harassing behavior may be based upon?

MS. LINEEN:  Okay.  Top number. I think it's the first page.

Q      Bates number at the top, LCSD 233, I'm going to read from the second paragraph on the last advised.  Quote, the harassing behavior may be based upon the individual's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sex, sexual orientation or gender, including a persons's actual or perceived sex, gender identity, end quote.

Did you receive this policy as it relates to the harassing behavior I've just denoted?

Scott Partlow

87

MS. LINEEN:  Objection to form.

A      I do remember getting it. I don't remember the last time seen it.

Q      Are you aware that there's a complaint of discrimination filed in this lawsuit?

A      No.

Q      Were you approached by a Dignity For All Students Act employee in any form at Longwood High School in regard to the complaint in this lawsuit?

MS. LINEEN:  Objection to form. You can answer.

A      I don't understand.

Q      I'll rephrase. Did a Dignity For All Students Act DASA coordinator approach you about the complaint in this lawsuit?

A      No.

Q      Did anyone in the school approach you about the complaint of discrimination as filed in this lawsuit?

A      No.

Scott Partlow

88

Q      Anyone so much as have conversation with you that a complaint of discrimination was filed in this lawsuit?

A      Not that I remember.

Q      When you say not that you remember, is there anything that would refresh your recollection?

A      No. So much goes on.

Q      I understand.  And probably difficult, working two jobs. As you sit here today, do you have any recollection of there being any mention of this lawsuit as it related to discrimination?

MS. LINEEN:  Objection to form.

A      From a Longwood employee, no.

Q      What about from anyone?

MS. LINEEN:  Including counsel?

Q      Do you understand the question?

A      From anybody?

Q      Yes?

A      No.

Q      I'd like to look further down

Scott Partlow

89

that same page, LCSD 233, quoting from that last paragraph, quote, the school district strictly prohibits all forms of bullying, harassment, discrimination by School District employees or students on School District property, or at School District functions, regardless of whether they are conducted on the premises of the school District, end quote.

Are you familiar with that policy?

A     Yes.

Q     Does this policy apply to you?

A     Yes.

Q     Does it apply to all Longwood School District employees?

A     Yes.

Q     Were you approached about a complaint of discrimination as it relates to this lawsuit in violation of the Dignity For All Students Act?

MS. LINEEN:  Objection to form.

A     No.

Q     I'd like to go to the next page,

Scott Partlow

90

LCSD 234.

Look at that third paragraph down.

If you could read that to yourself, please.

A     Okay.

Q     Do you believe that you were responsible for taking action if you became aware of any bullying?

A     Yes.

Q     Do you believe that you were responsible for taking any action if you become aware of any discrimination at Longwood High School?

A     Yes.

Q     Did anyone take any action after the events of June 4, 2015, as it relates to this policy?

MS. LINEEN:  Objection to form.

A     Yes.

Q     Who reported any action of discrimination, harassment or bullying, as it relates to the policy we just discussed?

MS. LINEEN:  Objection to form.

Scott Partlow

91

A     I'm not aware who made the complaint.

Q     Do you know if you were the subject of that complaint?

MS. LINEEN:  Objection to form.

A     I would say yes.

Q     How do you know that?

A     Because of what we're going through right now.

Q     Anything done by the school aside from what we're going through right now?

A     I don't understand.

Q     Were you ever approached by the School District, whether it be the superintendent, Dignity For All Students Act coordinator, anyone, in regard to the complaint of discrimination that we're here for now?

A     No.

Q     Going on -- do you believe that you had a duty for reporting complaint of bullying, harassment, discrimination?

A     Yes.

Scott Partlow

92

Q     Did you report any complaint of bullying as it relates to the events of June 4, 2015?

MS. LINEEN:  Note my objection to form.

A     Towards somebody?

Yes.

Q     What complaint did you make?

A     I didn't make a complaint; I just wrote a statement about it.

Q     Did you report any student complaints on June 4, 2015?

A     No.

Q     Do you know if any staff members of Longwood High School reported any student complaints on June 4, 2015?

A     To my knowledge, no.  I don't know.

Q     Were you ever approached about a student complaint that was reported on June 4, 2015?

A     No.

Q     I'd like to go further down the page.

Scott Partlow

93

Fifth paragraph, down if you could read that to yourself. Look up once you're done.

A    Okay.

Q    Who, if anyone, investigated the complaint of which you referenced earlier?

MS. LINEEN:  Objection to the form.

A    Who investigated?

I don't know.

Q    Were you the subject of an investigation of a complaint made pursuant to this policy?

MS. LINEEN:  Objection to form.

A    Complaint against me?

Q    Do you understand the question?

A    No.

Q    Do you understand that question?

A    No, I don't.

Q    Do you know if someone made a report of discrimination on June 4, 2015 at Longwood High School?

A    Discrimination?

No.

Scott Partlow

94

Q    Do you know if anyone made a report of bullying on June 4, 2015 at Longwood High School?

A    No.

Q    Do you know if anyone made a report of harassment on June 4, 2015 at Longwood High School?

A    No.  I don't know -- the situation that we in involved in, but I don't know what was described as.

Q    Was there an investigation regarding, as you say, the situation that we're involved in, conducted by Longwood High School in Longwood Central School District?

A    Conducted by Longwood? I'm not aware of any.

Q    To be clear, Longwood High School and Longwood Central School District did not conduct an investigation?

MS. LINEEN:  Objection to form.

A    I don't know.

Q    Did anyone approach you from Longwood High School or Longwood Central

Scott Partlow

95

School District after you submitted your statement?

MS. LINEEN:  Objection to form.

A    I don't remember.

Q    Is there anything that would refresh your recollection?

A    Only thing I remember about that is what I wrote.

Q    Aside from that.

A    I wasn't spoken about it, no.

Q    I'd like to go further down that page.  I'm going to read it to you.

Quote, the school district will create guidelines for training and will provide training to staff in accordance with the requirements of state law and the regulations of the Commissioner of Education to raise awareness and sensitivity to acts of bullying, harassment or discrimination, to enable staff to prevent bullying, harassment and discrimination and to provide intervention and reporting, end quote.

What, if any, training did you receive in regard to raising awareness to

Scott Partlow

96

acts of bullying?

A    Exact training? I couldn't tell you. We cover a lot of that.

Q    Anything other than the eight-hour course?

A    No.

Q    What about training to raise sensitivity to acts of bullying?  Did you receive that, at Longwood High School?

A    That part of the thing there.

Q    Aside from the eight-hour course, did you receive any training with regard to the Dignity Act?

A    No.

Q    Did you receive any training to enable staff, that being you, to prevent bullying, harassment, discrimination?

A    Same eight hours.

Q    Anything aside from that eight-hour course?

A    Dignity Act.

Q    Was that contained within the eight-hour training?

Scott Partlow

97

A    Yes.

Q    What, if any, instruction did you receive in order to provide intervention and reporting attacks relating to the Dignity For All Students Act?

MS. LINEEN:  Objection to form.

A    **What training I got in reporting it?**

Q    Yes?

A    **All training is within the eight-hour course.**

Q    Anything aside from the eight-hour training?

A    **No.**

Q    To be clear, in the school year of the 2014 to 2015 school year, you're referring to the annual eight-hour training that you received that year; is that right?

A    **Yes.**

Q    Put that aside for now, please.

You started to say that you received certain training by CPI.

What is CPI?

A    **Crisis prevention.**

Scott Partlow

98

Q    Who conducted that training?

A    **James Perada.**

Q    During your tenure at Longwood High School, anyone aside from James Perada act as an instructor from Longwood High School or Longwood Central School District?

A    **No.  Not that I believe.**

Q    You would agree with me if I told you that James Perada was the only instructor who trained you in the policies an provisions of Longwood High School; is that right?

MS. LINEEN:  Objection.

A    **Correct.**

Q    Nobody else taught any of those eight-hour classes, correct?

MS. LINEEN:  Objection to form.

A    **No.**

Q    What did CPI teach you, if anything?

A    **How to intervene in a situation, a crisis situation.**

Q    What is a crisis situation?

A    **Anything that's not, in my**

Scott Partlow

99

**words, normal, that's out of control.**

Q    Did CPI teach you excessive force, or what excessive force is?

A    **No.**

MS. LINEEN:  Objection.

You can answer.

A    **No.**

**How to restrain a student, an unruly student.**

Q    I'd like to present you with what's been previously marked as Plaintiff's Exhibit 7.

(Handing to the witness.)

Bears LCSD 108 to LCSD 118.

Are you familiar with this document?

A    **Yes.**

Q    Do you recognize this document, Plaintiff's Exhibit 7?

A    **Yes.**

Q    What is Plaintiff's Exhibit 7?

A    **It's crisis intervention CPI training.**

Q    How do you recognize this

Scott Partlow

100

document as the CPI action training which you just mentioned?

A    **It's non-violent crisis intervention, on top.**

Q    When was this document created?

A    **I'm not sure.**

Q    Is this document the same or substantially the same as when you initially received it?

A    **Yes.**

Q    I'd like to direct your attention to the second page, LCSD 109.

Would you agree with this statement contained within the second paragraph, quote, if one does not have the necessary skills to manage violence, he naturally reverts to instinctive responses, end quote?

MS. LINEEN:  Objection.

A    **Yes.**

Q    I'd like to go to the page after that, LCSD 110.

If we go to reading from LCSD 110, quote, therefore, the first principle

Scott Partlow

101

which must be established is an avoid over-reaction and under-reaction. Use verbal intervention skills to intervene with a verbally acting out person.

However, when the aggression becomes physical, you must also have in your repertoire of skills, safe physical intervention techniques to control the physical acting out behavior, end quote.

Do you agree with that?

A    Yes.

Q    Are you allowed to use force for non-physical acting out behavior?

MS. LINEEN: Objection to form.

You can answer.

A    No.

Q    Why not?

A    **Because if it's verbal, it's not physically threatening.**

Q    When does something become physically threatening?

MS. LINEEN: Objection.

You can answer.

A    **When I see someone about to be**

Scott Partlow

102

**hurt. When they going to harm themselves or someone else.**

Q    Also, reading off that same page, LCSD 110, quote, occasionally one will see staff over-reacting attempt to use a, inside quote, 'hands-on', inside quote, strategy in an attempt to calm down the individual, end quote.

During your tenure at Longwood High School have you ever seen such a staff over-reaction?

A    **No.**

Q    Have you ever seen a staff member initiate physical contact with a student?

A    **Yes.**

Q    When?

A    **Breaking up fights.**

Q    To be clear, have you ever seen a staff member at Longwood High School initiate physical contact with a student when that student was not engaging in any physical reaction themselves?

A    **No.**

Scott Partlow

103

MS. LINEEN: Objection to form.

Q    Would it be fair to say that, as we sit here today, you've never seen a member of Longwood High School staff approach a student and initiate physical contact without there being a fight; is that right?

MS. LINEEN: Objection to form.

A    **Physical where --**

**I don't understand.**

**No.**

Q    To be clear, absent a fight, you have never seen a Longwood Central School District employee initiate a physical contact with a student, correct?

A    **I've seen them put their hand up to stop them from going into a fight.**

**To actually physically grab someone?**

Q    Explain to me what you mean by that?

A    **By putting their hand up so the person can't walk towards the other student.**

**So they'll get in the middle of**

Scott Partlow

104

**them, put their hands up.**

Q    Perhaps you didn't understand my question.

Absent a fight, have you ever seen an Longwood Central School District employee initiate contact with a Longwood High School student?

MS. LINEEN: Objection to form.

A    **No. No.**

Q    Do you recognize the stages contained within this document as it relates to the type of person and physical non-violent physical crisis intervention?

MS. LINEEN: Objection to form.

A    **Ask you to explain that.**

**I don't understand the question.**

Q    Sure.

This document, Plaintiff's Exhibit 7, denotes the times that you are allowed to use physical forth against a Longwood High School student?

A    **Yes.**

Q    Did it explain to you what excessive force was?

Scott Partlow

105

MS. LINEEN: Objection.

You can answer.

A        This document -- does this document explain it?

I don't remember. I don't know.

Q        Does this document explain to you what, if any, physical contact you're allowed to have with a Longwood High School student?

A        Yes.

Q        What physical contact are you allowed to have with a Longwood High School student?

A        During the -- if they are physically acting out, sometimes you physically have to restrain them.

Q        When you say, physically acting out, are those your own words, or is that the CPI?

A        I'm reading it right here.

Q        When you say reading it right here, what are you referring to?

A        On LCSD 110 it says figure one, physical acting out, physical intervention.

Scott Partlow

106

Q        Could you explain that physical acting out is?

MS. LINEEN: Objection.

You can answer.

MR. MORRIS: What's the objection, Counsel?

MS. LINEEN: Because I think that's fact dependent. You're asking him to explain very physical -- varying circumstances.

Q        Do you understand the question as I asked you?

A        No.

Q        Were you trained by CPI?

A        Yes.

Q        Were you trained in the non-violent crisis intervention training program?

A        Yes.

Q        Did they explain to you what verbal acting out was?

A        Yes.

Q        Did they explain what physical acting out was?

Scott Partlow

107

MS. LINEEN: Objection to form.

A        No.

MS. LINEEN: I'm allowed to object to the form.

You can roll your eyes at me all you want.

MR. MORRIS: How would you want me to phrase that?

MS. LINEEN: Did I direct him not to answer?

MR. MORRIS: Just for the record, because, I don't want to, you know --

MS. LINEEN: I don't have --

MR. MORRIS: I don't want to have you fester.

MS. LINEEN: I'm not festering; believe me.

MR. MORRIS: How would you like me to ask that q2uestion?

MS. LINEEN: I think your question is a very general question, what is physically acting out.

I think that can be a number of

Scott Partlow

108

different things, in any circumstance. That's why I'm objecting to form.

He can answer it.

MR. MORRIS: I'm concerned when you object beyond just objection. Sometimes I feel like you signal the witness.

I'm going to request that you keep it objection, okay?

MS. LINEEN: I'm going to make my objection to form, and I'll direct him not to answer when I see appropriate.

MR. MORRIS: We will address this and other things with the Court later.

MS. LINEEN: Great.

MR. MORRIS: Again, I'm going to reserve our right to recall this witness.

Let's start again.

Q        Non-violent crisis intervention training program, you were expected to be trained in this program, correct?

Scott Partlow

109

A    Correct.

Q    Expected to follow this program, correct?

A    Correct.

Q    This program describes two types of acting out behavior, correct?

A    Yes.

Q    One of those types of acting out behavior is verbal acting out, right?

A    Right.

Q    Other type is physical acting out?

A    Yes.

Q    Do you understand the difference between the two?

A    Yes, I do.

Q    Can you explain verbal acting out?

A    When somebody is screaming, yelling, cursing.

Q    Could you explain physical acting out?

MS. LINEEN:  Objection to form.

A    When somebody is being physical

Scott Partlow

110

on another person.

Q    Can you explain physical with another person?  What do you mean?

A    Put their hand on them in some way, one way or another.

Q    Absent putting their hands on them, does that include physical acting out?

MS. LINEEN:  Objection to form.

A    If it looks like they're going to.

Q    So in other words, you could anticipate acting out?

A    It's possible, if you see them.

Q    I want you to answer my question.

MS. LINEEN:  That was his answer.

You don't have to like his answer.

MR. MORRIS:  Counselor, he's testifying.

MS. LINEEN:  He testified.  He gave you the answer.

You don't have to like it.

Scott Partlow

111

Q    Do you understand that question?

A    Yes, it's possible.

Q    To be clear, you could anticipate physical acting out by a Longwood High School student?

A    Yes.

Q    How do you do that?

A    With the way they're acting.

Q    The acting out person, how would you define that.

MS. LINEEN:  Objection to form.

A    Physical acting out?

Q    Sure.

A    If they're running towards somebody, if they're jumping towards somebody, in somebody's face.

Q    Would you agree -- I'm reading from LCSD 112 -- I quote, "This behavior level is defined, end quote?

MS. LINEEN:  In a specific area?

MR. MORRIS:  The acting out.

Q    Do you understand my question?

A    Yes.

MS. LINEEN:  I just want to give

Scott Partlow

112

him a chance to see where you're reading from.  It's a big page.

You can go.

Q    LCSD 112, quote, this behavior level is defined as a total loss of control, which usually involves physical aggression.  The individual is no longer in control of himself.  And verbal aggression turns into physical assault.  Person may assault staff, other people, or even intend to harm himself, end quote.

Do you agree with that?

A    Yes.

Q    You could anticipate that behavior?

A    I think so, yes.

Q    What, if any, training allows you to anticipate such behavior?

A    It's not this training.

Q    What is it?

A    Just knowing.

Being around it.  I've seen it.

Q    Have you ever seen any teacher initiate such behavior?

Scott Partlow

113

A    No.

Q    Have you ever seen a student respond to a teacher's physical intervention in such a manner?

MS. LINEEN:  Objection to form.

A    Physical, no.

Q    Anything in this training manual discussing choke holds?

A    No.

Q    Anything in that training manual discussing body slams?

A    No.

Q    What is your understanding, if any, as to when can utilize a body slam against a Longwood High School student?

A    You can't.

Q    Any Longwood High School employee, any high school employee, lay on top of a Longwood high student?

MS. LINEEN:  Objection to form.

A    No.

Q    Any Longwood High School employee -- any Longwood High School employee, sit on a Longwood High School

Scott Partlow

114

student?

MS. LINEEN:  Note my objection to form.

A    I think it depends on the situation.

Q    In what situation can one sit on an Longwood High School student?

A    Maybe if they're out of control.

Q    Any other physical behavior one could do to a Longwood High School if they're physically out of control?

A    Results of the CPI training, restraints.

Q    Are you allowed to slam a student if they're physically out of control?

A    No.

Q    Are you allowed to choke a student if they're physically out of control?

A    No.

Q    Are you allowed to put a student face down if they're physically out of control?

Scott Partlow

115

MS. LINEEN:  Objection to form.

A    No.

Q    I'll take that back, if you don't mind.

I'd like to hand you what's been previously marked as Plaintiff's Exhibit 8. That is Bates stamped LCSD 119 to LCSD 130.

Do you recognize this document?

A    Yes.

Q    What do you recognize Plaintiff's 8 to be?

A    Looks like the CPI training.

Q    Did you receive this training?

A    Yes.

Q    How do you recognize this document to be CPI training?

A    It just looks very familiar.

Q    When was this document created?

A    I don't know.

Two thousand five it says on the bottom.

Q    Is Exhibit 8 the same or substantially the same as when you received it?

Scott Partlow

116

A    I'm sorry?

Q    Is Exhibit 8 the same or substantially the same as when you received it?

A    Yes.

Q    What did this document teach you, if anything?

A    It's on how to restraint a student and how to intervene in a situation.

Q    To be clear, was this taught by James Perada or someone else?

A    James Perada.

Q    I'd like to direct your attention to LCSD 120.  Read from that first paragraph.

A    Quote, while considered a last resort, physical intervention procedures are taught as part of the program to provide staff and skills with confidence to safely manage emergency situations, end quote.

Q    Do you agree with that statement?

A    Yes.

Q    Do you consider a physical

Scott Partlow

117

Q    intervention a last resort?

A    Yes.

Q    But yet you'd use physical intervention in anticipation of a student using physical force; is that right?

MS. LINEEN:  Objection.

A    If I see him going to be physical, yes.

Q    You'd use physical intervention in anticipation of a student going to be physical, as you say?

MS. LINEEN:  Objection.

A    Correct.

Q    Read down a little further there, quote, any physical intervention should only be used when all other options have been exhausted, and when an individual is a danger too self or others, end quote.

A    I'm sorry.  Where were you reading from?

MS. LINEEN:  Here.

You need to read it.  Go ahead.

Q    You agree with that?

A    Yes.

Scott Partlow

118

Q    Reading on a little further, LCSD 120, that same paragraph, quote, even in those moments, assessment is still necessary to determine the best course of action, to maintain the care, welfare, safety and security of all, end quote.

Do you agree with that?

A    Yes.

Q    Do you agree that assessment is still necessary when you're anticipating physical intervention?

A    Yes.

Q    Do you believe assessment is still necessary when you might anticipate a student might become physical?

MS. LINEEN:  Objection.

A    Yes.

Q    Do you agree that, quote, specific laws or regulations may govern the use of restraints, end quote?

A    I'm sorry.  Where are you reading from?

Q    The top quadrant, fourth paragraph, on the right-hand side.

Scott Partlow

119

A    Okay.

MS. LINEEN:  You can read it, if you need to.

A    Do I agree with that?

No.

Q    You don't agree that specific laws or regulations may govern the use of restraint?

A    It's not clear what restraint.

Q    Were you ever trained in what law or regulation may govern the use of restraint by the Longwood Central School District?

A    Trained, the CPI training.

Q    Were you ever explained, beyond the CPI training, what specific laws or regulations may govern the use of restraint by New York State?

A    Not that I recall.

Q    Were you ever told that excessive force or deadly force may result in civil or criminal charges?

A    Yes.

Q    By who?

Scott Partlow

120

A    James Perada.

Q    Did he explain what he meant by that?

A    Specifically, I don't remember how he explained it.

Q    Were you  explained that a choke hold might resulted in civil liability?

A    Not that specifically, no.

Q    Were you ever explained that a choke hold might result in criminal liability?

A    Not that specifically.

Q    Were you ever explained that slamming a student to the ground might result in civil liability?

A    Not that specifically.

Q    Were you ever explained that slamming a student to the ground might result in criminal liability?

A    No.

Q    After the events on June 4th, 2015, did anyone explain to you the civil and criminal consequences of excessive force against a Longwood High School student?

Scott Partlow

121

A      Just what we learned in the eight-hour course.

Q      Do you understand, as denoted on LCSD 120, there are certain dangers in the use of restraints?

A      Yes.

Q      Were you explained that there's a psychological danger in using restraints?

A      I don't recall.  I don't recall the explanation.

Q      Have you had the opportunity to use restraints during your tenure at Longwood High School?

MS. LINEEN:  Objection to form.

A      Yes.

Q      When?

A      Breaking up fights.

Q      On how many occasions?

A      I don't know.

I couldn't tell you.

Q      Were you required to fill out any sort of form when you used physical force?

A      We fill out SC reports.

Scott Partlow

122

Q      Did you do that every time you used physical force?

A      Not every time.

If I wasn't the first one there, I would write the report, if I came to help break up a fight.

Q      So there would be certain instances that you wouldn't document your use of physical force against a Longwood High School student?

MS. LINEEN:  Note my objection to form.

A      I'm sorry?

Q      So there would be certain instances that you wouldn't document the use of force against a Longwood High School student?

A      Every time it's done, it's reported, but not specifically by me.

Q      Would it report that you were involved?

A      Yes.

MR. MORRIS:  I'm going to call for the production of all uses of

Scott Partlow

123

force, whether they be SCs or something else, where this deponent, Mr. Partlow, is present or utilized force.

MS. LINEEN:  Please follow it up in writing, specify the nature this request.

We'll take it under advisement.

Q      Do you know what psychological danger there was in using restraints?

A      Yes.

Q      What are they?

A      They can agitate the kid, student, the person, individual.

Q      Are you aware some restraints are more dangerous than others?

A      Yes.

Q      Would you agree that, quote -- I'm reading off LCSD 120, the right-hand side, towards the bottom of the page -- for example, face down floor restraints and positions in which a person is bent over in such a way that it is difficult to breathe are extremely dangerous, end quote.

Scott Partlow

124

Would you agree with that?

MS. LINEEN:  Note my objection.

A      Yes.

Q      Was David Edmond face down on the floor on June 4, 2015?

A      Yes.

Q      I'd like to go towards the end of the page, restraint related positional asphyxia.

Do you know what that is?

A      I'm sorry?

Q      Restraint related positional asphyxia, A-S-P-H-Y-X-I-A?

A      No.  I don't know that.

Q      Were you ever trained on what restraint related positional asphyxia is?

A      I'm sure I was.  I don't remember.

Q      As you sit here today, do you not know what it is?

A      No.

Q      Would you agree that restraint related positional asphyxia, quote, occurs when a person being restrained is placed in

Scott Partlow

125

a position in which he cannot breathe properly and is not able to take in enough oxygen. Death can result from this lack of oxygen and consequent disturbance in the rhythm of the heart, end quote?

MS. LINEEN: Objection.

MR. MORRIS: What's the objection?

MS. LINEEN: You said, would you agree.

Q    Would you agree with that?

MS. LINEEN: Note my objection.

MR. MORRIS: What's the objection?

MS. LINEEN: My objection is that he is not someone who is an expert to testify as to the physical effects of positional asphyxia.

You asked him to agree to something which was prepared as a training material conveying this information.

MR. MORRIS: He is trained it this.

Scott Partlow

126

MS. LINEEN: Trained in this doesn't mean he has to agree with what the writer says.

Q    Were you trained in the non-violent crisis intervention program, understanding what you were training in?

A    Yes.

Q    Did you voice any disagreement to the instructor when you were trained in this?

A    **We had comments and spoke about, from what I remember.**

Q    Are you obligated to comply with this?

A    Yes.

Q    When it says, restraint related positional asphyxia, is that something you were expected to know, as per this training?

A    **Yes, if it's in the training.**

Q    Were you expected to not conduct yourself in a manner that would put a Longwood High School student in restrained positional asphyxia?

A    Yes.

Scott Partlow

127

Q    So is it fair to say that you would know that death can result from a lack of oxygen if someone is placed in restraint related positional asphyxia, right?

MS. LINEEN: Objection to form.

A    **Yes.**

Q    So for instance, putting someone face down on the floor might make it difficult for that person to breathe, correct?

A    **That's what it says, yes.**

Q    Those restraints are dangerous, correct?

MS. LINEEN: What restraints?

Q    Do you understand the question?

A    **Yes, I do.**

**Yes.**

MS. LINEEN: Note my objection to form.

Q    Do you understand that hat death can occur from the lack of oxygen for face down full restraint, correct?

A    **I can understand that, yes.**

Q    Can we go on to the next page.

Scott Partlow

128

LCSD 121, as we discussed before, there are several positions on LCSD 121; do you see them?

A    Yes.

Q    Were you expected to know not to engage in such positions?

A    Yes.

Q    Was that position demarcated with a large circle with a slash around these positions; is that right?

A    Yes.

Q    I'd like to read this document into the record.

Do you disagree with any of the positions here as being unsafe?

MS. LINEEN: Note my objection.

You can answer.

A    **I mean, any position can be unsafe.**

Q    So to be clear, other positions might be unsafe, but these in particular.

Do you find any of these six positions safe?

A    **They could be.**

Scott Partlow

129

Q   To be clear, a position where the man is placed on top of the other man, that being the first position, you would consider that safe, for you to engage in that conduct, along with high school students?

MS. LINEEN:  Objection to form.

A   **It could be.**

Q   So to be clear, the man is -- looks like two figures.  One gentleman has a solid colored shirt, the other one has a white colored shirt.

The gentleman with the solid colored shirt has his chest on top of the back of the gentleman with the white colored shirt.

You would consider that a position that could be safe?

MS. LINEEN:  Objection.

A   **Yes, if -- depending on the picture; the picture is saying it's unsafe because technically he's laying on the person.**

**He can be just over him.**

Scott Partlow

130

Q   Would you agree that these are examples of high risk positions for restraint related positional asphyxia?

A   **Yes.**

Q   So when you say it could be safe, is it that you understand that this is a high risk for restraint related positional asphyxia, but you think it could be safe?

A   **You're looking at a picture that doesn't describe how a person -- he's on top of him, but it doesn't say he is laying on him, he's putting all his pressure on him.**

Q   So this person says it's all right to engage in that position?

A   **In this picture, how they're describing it, it's not safe.**

Q   Are there certain instances where you can engage a Longwood High School student by placing your chest on that person's back?

MS. LINEEN:  Objection to form.

A   **No.**

Q   Why.

A   **Because we don't put them face**

Scott Partlow

131

**down.**

Q   Looking at the text on LCSD 121, the first paragraph there, would you agree that, quote, staff members must be especially careful not to use their own bodies in ways that restrict a retrained person's ability to breathe, end quote?

A   **Yes.**

Q   Going on, quote, this includes sitting or lying across a persons's back or stomach, end quote.

Do you agree with that statement?

A   **Yes.**

Q   In other words, you're not, as a Longwood High School security guard, to sit or lie across a Longwood High School student's back or stomach; is that correct?

MS. LINEEN:  Objection.

A   **Correct.**

Q   Reading further, quote, when someone is lying face down, even pressure to the arms and legs can impact that person's ability to breathe effectively, end quote.

Scott Partlow

132

Do you agree with that statement?

MS. LINEEN:  Objection.

A   **Correct.**

Q   And you were trained, pursuant to this policy, contradict?

A   **Right.**

Q   You were told, when someone is lying face down, you should not put pressure on their arms or legs, correct?

A   **Right, in those situations.**

Q   Moving forward, right past that, LCSD 121, quote, all of these positions may interfere with a persons's ability to breathe, end quote.

Do you believe that the top six positions here, as read into the record, may interfere with a person's ability to breathe?

MS. LINEEN:  Objection to form.

A   **Yes, it could.**

Q   Do you agree that, again, reading from the same  page, quote, when confronted with an emergency situation,

Scott Partlow

133

always consider the option of disengaging, end quote?

A    Yes.

Q    Did you see anyone hold David Edmond's legs or arms, on June 4, 2015?

A    No.

Q    Going to the next page, LCSD 122, could you read that paragraph, the first two paragraphs to yourself.

Look up once you're done, please.

A    Okay.

Q    Could you agree that, quote, LCSD 122, quote, the very best way to avoid injury is to avoid the need to restrain in the first place, end quote?

A    Yes, I do."

Q    Would you agree that, quote, a physical restraint is an emergency procedure, comparable to CPR or first aid. As with any emergency response procedure, staff members need to practice these skills on a regular basis, end quote?

A    Yes, I agree.

Scott Partlow

134

Q    Did you practice these skills, that being physical restraint, on a regular basis?

A    We do it yearly, yes.

Q    Who is we?

A    Whoever signed up for the class. We try to do the whole staff.

Q    Is it mandatory, or whoever signs up?

A    We sign up.

Q    To be clear, is this a mandatory training, or not?

A    I take it every year.
If he makes it mandatory, I don't know.

Q    When you say, take it every year, are you referring to the eight -- hour course?

A    No, the CPI.

Q    Were you ever trained in the use of choke holds?

A    No.

Q    Were you trained in the prohibition of choke holds?

Scott Partlow

135

A    No.

Q    Were you trained in the use of body slams?

A    No.

Q    Were you trained in the prohibition of body slams?

A    No.

Q    Have you ever trained lying across another student?

A    No.

Q    Were you ever trained in the prohibition of lying across another student?

A    No.

Q    Were you trained in the key elements of non-violent physical crisis intervention responses?

A    Yes.

Q    You were trained in CPR, right?

A    I'm sorry?

Q    Were you trained in CPR?

A    I was trained in it, but I haven't done any refresher course on it.

Q    Are you allowed to conduct CPR on a Longwood High School student?

Scott Partlow

136

A    No.

Q    Before, we read what a physical restraint is comparable to.
You would agree that a physical restraint is an emergency procedure, correct?

A    Correct.

Q    Not something to be used in anticipation of something else; correct?

MS. LINEEN:  Objection.

A    Correct.

Q    Put that document aside, please.
Show you what's been previously marked Plaintiff's Exhibit 9.
At the top of Plaintiff's 9 it says, Longwood CSD security new hire orientation.
Do you recognize this document, Plaintiff's Exhibit 9?

A    No.

Q    Do you know what is?

A    It's been a while.

Q    You say it's been a while?

A    Since I was hired.

Scott Partlow

137

Q    To be clear, although Plaintiff's Exhibit 9 does have a Bates stamp on the front cover, the second page denotes LCSD 132 at the top left corner, spanning to LCSD 141 on the last page.

Did you ever receive a security new hiring orientation at Longwood High School?

A    It's been a while, like I said. I don't remember if I got this.

Q    Do you recall being oriented, along with high school security?

A    Yes.

Q    Was there any written documentation provided to you as part of that orientation?

A    Not that I remember.

Q    Is it that you don't remember? Is there anything --

A    I don't remember.

Q    Anything that would refresh your recollection?

A    No.

Q    In other words, you're not

Scott Partlow

138

familiar with this document that sits before you here today?

A    I don't remember, it's been so long.

Q    Were you ever trained to deal with law enforcement agencies, as part of your training at Longwood High School?

A    Just the bare minimum, like if they show up.

Q    Could you --

A    Not to work side by side with them.

Q    Could you explain by bare minimum?

A    Like if they come to get the reports -- to get the numbers for reports, to hold, to bring them where they need to go.

That's basically it.  I never had to work side by side with them.

Q    Even the school resource officer?

A    They're there, but I don't work directly with them.

Scott Partlow

139

Q    What school resource officer was there on June 4, 2015?

A    I don't know if they were there that day.

Q    I'm sorry.  Which school resource officer was in the school in the 2014 - 2015 school year?

A    I don't know. They changed a couple of times.

Q    Do you have any training in how to deal with the school resource officer?

A    I don't work with them directly.

Q    Perhaps you don't understand my question.

Did you ever receive any training?

A    No.

(Whereupon, a lunch break was taken at this time.

MR. MORRIS:  Go back on the record.

It is 1:54 p.m.  We're back on after a short break.

Q    Mr. Partlow, did you discuss

Scott Partlow

140

your testimony with anyone over the break?

A    No.

Q    We were reviewing Plaintiff's Exhibit 9.

Do you still have that in front of you?

A    Yes, I do.

Q    Before, were indicating that you were not familiar with this document; is that right?

A    Correct.

Q    Would you agree that from time to time, Longwood High School might encounter a student who is subordinate and refuses to listen?

Do you agree that that might occur?

A    Yes, correct.

Q    Would you agree that our job is to try to encourage a student to behave properly, but never restrain, verbally assault or demean a student in any way?

A    Yes.  Correct.

Q    Would you agree that the best

Scott Partlow

141

course of action is to simply attempt to obtain the student's name so he/she can be referred to an administrator for discipline at a later time?

A    Yes.

Q    In other words, you wouldn't physically intervene in that situation?

A    In what situation?

Q    In a situation in which a student is insubordinate?

A    Verbally, no.

Q    Physically?  Would you physically intervene if a student was insubordinate?

A    If he is being physical with another person.

Q    So do you know what I mean by insubordination?

A    Yeah.  He's not cooperating.

Q    If a student doesn't cooperate, but is not physical, are you allowed to use physical restraint against that Longwood high School student?

A    No.

Scott Partlow

142

Q    That's because physical restraint is a last resort, correct?

A    Yes.

Q    That includes insubordination?

A    Correct.

MS. LINEEN:  Objection.

A    Correct.

Q    Let's put that aside for that now.

You were indicating, I recall, before the break, you had an annual training.

Is anything required for you to maintain your security license within New York State?

A    Yes.  The training is it.  We take our eight-hour training.

Q    How often was that required, for New York State?

A    Once a year.

Q    Once a year, you were required to take an eight-hour training?

A    Yes.

Q    Do you recall taking a New York

Scott Partlow

143

State mandated security training?

A    Yes.

Q    That was taught by James Perada?

A    Correct.

Q    I'd like to show you what has been marked as Plaintiff's Exhibit 10.  It bears Bates stamp LCSD 157, it runs all the way through LCSD 215.

Do you recognize this document, Plaintiff's Exhibit 10?

A    Yes.

Q    What do you recognize this document to be?

A    This is something that we use for the eight-hour course.

Q    How do you recognize this document that was used for the eight-hour course?

A    I just recognize it.  I've taken taking it so many times.

Q    Do you know when this document was created?

A    Exact date, no.

Q    Is there anything to acknowledge

Scott Partlow

144

receipt of this document, signature or sign-in or something else?

A    Yeah.  We have to sign in for it.

Q    Did you, in fact, sign in for this training?

A    Yes.

Q    Do you know what year that was?

A    Every year.

So my last one was 2017.

MR. MORRIS:  Counsel, we call for the production of all signatures acknowledging receipt of eight-hour trainings or any security training conducted where this deponent was a participant in such training.

MS. LINEEN:  Follow up in writing.

We take it under advisement.

Q    James Perada taught this, right?

A    Yes.

Q    Do you remember what year this was taught?

A    It's every year.

Scott Partlow

145

Q      I'd like to direct your attention to LCSD 160.

Do you agree that this page, LCSD 160, are the roles of a security guard, the functions and responsibilities of a security guard?

A      **Yes, I do.**

Q      Do you believe that you're supposed to protect people from harm, destruction and theft?

A      **Yes.**

Q      Is that all people within Longwood High School?

A      **All people, yes.**

Q      Did that apply to David Edmond on June 4, 2015?

A      **Yes.**

Q      I'd like to direct your attention to LCSD 171.

Were you trained to utilize a hard approach, at Longwood High School?

A      **No.**

Q      Could you explain that a hard approach is?

Scott Partlow

146

A      **It's a training that they have; hands-on, I believe.**

Q      Which approach were you utilized to employ at Longwood High School?

MS. LINEEN:  Note my objection to form.

A      **We try to use a soft approach.**

Q      Explain what a soft approach is, please?

A      **This is what they wear.**

Q      It's just a uniform?

A      **Yes.**

**You know, we don't try the hands-on, hard approach.**

Q      So to be clear, the hard approach and the soft approach differentiate in many respects?

A      **Yes.**

Q      One of them being the use of force?

A      **Right.**

Q      I'd like to direct your attention to LCSD 172.

Did you complete this section,

Scott Partlow

147

as outlined here?

MS. LINEEN:  Note my objection.

MR. MORRIS:  Let me rephrase that for Counsel.

Q      Why did you complete this section here, as denoted in LCSD 172, legal powers and limitations, part two?

A      **Yes.**

Q      In that, were you trained to, quote, explain justification of the use of force, including deadly physical force, by a security guard/private citizen, citing to New York State Penal Law Article 35, end quote?

A      **Yes.**

Q      Were you trained to, quote, list the elements of specific crimes when deadly force is authorized for a security guard/private citizen, end quote?

A      **Yeah.  Yeah, yes.**

Q      You were trained how to use deadly force; is that right?

MS. LINEEN:  Objection to form.

A      **No.**

Scott Partlow

148

Q      Were you trained to justify your use of force, including deadly force?

MS. LINEEN:  Note my objection to form.

A      **We don't use deadly force.**

Q      So, explain to me what you learned when it says, number two, LCSD 172.

A      **Use of force is when only last resort, when it's necessary, to protect somebody from themself or others.**

Q      What about deadly force?

A      **We don't use it.**

Q      So, you're telling me they told you not to use the deadly use of force, in Plaintiff's Exhibit 10; is that right?

MS. LINEEN:  Objection to form.

Q      In this training?

A      **We don't -- it's -- we don't use it.**

Q      Explain to me what you were trained, when it says here, quote, list the elements of specific crimes where deadly physical force is authorized for a security guard/private citizen, end quote?

Scott Partlow

149

A    If that's the same force that's being used on us.

Q    So you're allowed to respond with deadly physical force?

MS. LINEEN:  Objection to form.

A    As a guard?

Q    Do you understand the question?

A    I understand, yes.

Q    Are you allowed to use deadly physical force?

MS. LINEEN:  Objection.

A    I would say, no.

Q    Is a choke hold, deadly physical force?

MS. LINEEN:  Objection.

A    I would say so.

Q    When you say, I would say so, is that a yes or no?

A    If it's potentially harmful -- deadly force.

Q    Is a choke hold deadly physical force?

MS. LINEEN:  Objection.

A    Yes.

Scott Partlow

150

Q    You were told you can never use deadly physical force, by this training; is that right?

A    As a guard.

I mean, if our life is in danger.

That says security guard or private citizen.

Q    So you're allowed to use deadly physical force?

MS. LINEEN:  Objection.

A    If my life in danger.

Q    Is that yes, if my life is in danger, I'm allowed to --

A    That describes security guard or private citizen.

Q    So I understand what you're saying here today, are you saying that you're allowed to use deadly physical force?

A    If deadly force is being used upon me.

Q    Understood.

Does that include if deadly force is being used upon you by Longwood

Scott Partlow

151

High School students?

MS. LINEEN:  Objection.

You can answer.

A    If my life is in danger.

Q    You could use deadly physical force against a Longwood High School student?

A    If my life in danger; if they're trying to use deadly force against me.

Q    Has that ever happened to you?

A    No.

Q    If we go to the next page, LCSD 173.

You can read that page, and look up once you're done, please.

A    (Looking up)

Q    Did you learn these factors which may expose a security guard, employer security guard, to civil liability?

A    Yes.

Q    Were you aware that failure to train, or improper training, could expose, for instance, Longwood High School, to a civil lawsuit?

Scott Partlow

152

A    Yes.

Q    Were you aware that the failure to supervise or properly supervise could expose Longwood High School to a civil lawsuit?

A    Yes.

Q    Were you aware that a civil rights violation could expose Longwood High School to a civil lawsuit?

A    Yes.

Q    Were you aware that failure to address health and safety concerns could expose Longwood High School to a civil lawsuit?

A    Yes.

Q    Did you report any of these things during your tenure at Longwood High School?

A    Report any of the --

How do you mean?

Q    Any of the things that I just mentioned to you.

A    Have I reported?

I didn't have them, no.

Scott Partlow

153

Q    As you sit here today, are you aware of a civil rights violation lodged against Longwood High School?

A    No.

Q    I'd like to move on.
Were you ever trained that you had arrest authority, as a Longwood High School security guard?

A    No.

Q    Were you told that you should not arrest, as a Longwood High School security guard?

A    **We don't have the right to arrest.**

Q    Were you ever explained the Penal Law, as it relates to the use of force or deadly force?

A    **They might have been explained. I'm not clear on them.**

Q    When you say you're not clear --

A    **It might have been explained.**

Q    Do you understand the law, as it relates to the use of force and/or deadly force?

Scott Partlow

154

A    No.

Q    Are you aware that Longwood High School has a zero tolerance for bullying?

A    **Yes.**

Q    Are you aware of the definition of bullying, as it is promulgated by this manual?

A    **Word for word, no.**

Q    Let's go to LCSD 204.
Does that refresh your recollection?

A    **Yes.**

Q    Would you agree that pushing is a form of bullying?

A    **Yes.**

MS. LINEEN:  Objection to form.

Q    If one was to push a Longwood High School student, would that be considered bullying?

MS. LINEEN:  Note my objection.

A    **Yes.**

Q    Have you ever seen a Longwood School District employee push a Longwood High School student?

Scott Partlow

155

A    **No.**

Q    If you did see a Longwood High School employee push a Longwood High School student, would you report the same?

A    **Yes.**

Q    Why?

A    **Because it's bullying.**

Q    Are you aware of the complaint or allegation that a student was pushed by a Longwood High School employee on June 4, 2015?

A    **No.**

Q    Has anyone approached you about such an allegation?

A    **No.**

Q    I'd like to direct your attention to LCSD 217.
You can peruse that page.
Look up when you're done, please.

A    **(Looking at document.) I can't read part of it.**

Q    I'd like to ask you a specific question as to LCSD 217.

Scott Partlow

156

Do you believe the excessive use of force is an unethical practice, as promulgated by this policy?

A    **I'm sorry.  Can you repeat that.**

(Whereupon, the last question was read back by the court reporter.)

A    **Is it unethical? Yes.**

Q    Is false arrest and detention unethical for a Longwood security guard?

A    **False? Yes.**

Q    What about not false arrest?

MS. LINEEN:  Note my objection.

A    **I can't answer that.**

Q    Why can't you answer that?

A    **We don't do arrests.**

Q    So arrest, in any sense of the word, is unethical at Longwood High School; is that right?

MS. LINEEN:  Objection to form.

A    **Can you clarify arrest?**

Q    Sure.
If you hindered the person's

Scott Partlow

157

ability to move, say, a Longwood High School student?

A    Sometimes you have to restrain them.

Q    Understood.
Would you agree that a failure to report a criminal act and/or violation of policy and rules, is an unethical practice for a Longwood High School security guard?

A    Yes.

Q    Would you agree that falsifying reports is an unethical practice for a Longwood High School security guard?

A    Yes.

Q    On to the next page, LCSD 218.
I'm reading about eight lines down. Do you agree that, quote, we have a zero tolerance policy for unprofessional conduct and behavior, end quote?

A    Yes. I agree with /THRA.

Q    Are you subject to that policy?

A    Yes.

Q    Have you seen anyone reprimanded as part of this zero tolerance policy?

Scott Partlow

158

A    No.

Q    Do you know who's responsible for enforcing this zero tolerance policy?

A    I can't tell you with certainty.
I would say James Perada, supervisor for security.

Q    In your tenure at Longwood High School, have you ever seen James Perada reprimand anybody?

A    For that one incident we spoke about earlier.

Q    Besides that one incidence?
MS. LINEEN:  Note my objection to form.

A    I wouldn't know.

Q    Have you heard of anyone being reprimanded for the use of force at Longwood High School?

A    No.

Q    Move on to what's been previously marked as Plaintiff's Exhibit 11.
Plaintiff's 11 is a document -- first page bearing the Bates stamped LCSD 84, last page bearing Bates stamp LCSD 107.

Scott Partlow

159

Mr. Partlow, are you familiar with that document?

A    Looks familiar, yes.

Q    What do you recognize this document as?

A    Looks like part of the CPI training.

Q    How do you recognize this document as part of the CPI training?

A    CPI on it.

Q    Do you know when this document was created?

A    No, I don't.

Q    Were you named in that document?

A    Yes.

Q    By whom?

A    James Perada, CPI training.

Q    As part of this training, did you sign anything or receive any written acknowledgement of that?

A    We do a certificate.
MR. MORRIS:  Respectfully call for the production of said certificate.

Scott Partlow

160

MS. LINEEN:  Follow up in writing.
We take it under advisement.

Q    What did this document train you in the use of?

A    Non-violent intervention.

Q    When you say non-violent intervention, that is intervention without physical force; is that right?

A    Yes.

Q    As you denoted earlier, physical force was a last resort, right?

A    Right.

Q    In other words, did this training manual teach you how to utilize non-physical force in de-escalating situations at Longwood High School?

A    This particular one?

Q    Yes?

A    I remember the pamphlet.
I don't remember what was trained in this one.

Q    See if this refreshes your recollection.

Scott Partlow

161

LCSD 90.

If we could flip to that page, please.

I'm looking under Unit 83, quote, demonstrate physical control and restraint positions to be implemented when physical control is necessary as a last resort due to an individual's dangerous behavior, end quote?

Did you learn how to utilize physical control as a last resort?

A    Yes.

Q    That was in response to dangerous behavior, correct?

A    Correct.

Q    Not the anticipation of dangerous behavior?

MS. LINEEN:  Objection.

A    Correct.

Q    If you peruse this document, you'll notice that's there's various blanks.

Did you complete this document?

A    Yes, I did.

MR. MORRIS:  We would

Scott Partlow

162

respectfully call for the production of this document as completed by this deponent.

MS. LINEEN:  Please follow up in writing.

We'll take it under advisement.

Q    If you look a little further, I see you perusing LCSD 97.

What you see on LCSD 97, which stands for another page -- were these acceptable uses of force?

A    These are what we do when somebody is coming towards us, if somebody is trying to hurt us.

Q    For instance, if you see LCSD 98, the front choke release?

A    Right.

Q    And you would agree, again, that a front choke is a deadly physical force, correct?

A    Correct.

That showed us how to get away from it.

Q    Not use deadly physical force,

Scott Partlow

163

correct?

MS. LINEEN:  Objection to form.

A    Correct.

Q    If we go on to LCSD 100, were you familiar with Figure A?

I'll ask to read this in the record, that being the restraint of a child, using the CPI children's control position.

MS. LINEEN:  Are you done?

I'm going to object to the form of that question.

A    I'm sorry.  I didn't hear the question.

Q    Were you trained in this children's control position?

A    Yes.

Q    Have you had opportunity to utilize such control position?

A    No, because I'm not with smaller kids.

Q    You work now with a junior high?

A    Yes.

Q    Are those kids, smaller kids?

A    Yes.

Scott Partlow

164

I have not used them.

Q    Have you had the opportunity to use any of these other CPI control positions?

MS. LINEEN:  Note my objection to form.

A    I might have used them.  I don't recall.

Q    Would that be documented anywhere?

A    I don't recall using them.

Q    Is there anything in the CPI training, that being Plaintiff's Exhibit 11, in which you disagree?

A    I disagree with?

Q    Yes?

A    In the whole book -- in the whole packet?

MS. LINEEN:  Note my objection.

A    No.

Q    Put that aside.

MR. MORRIS:  Ask that this be marked 16.

(Whereupon, Plaintiff's 16 for

Scott Partlow

165

identification was so marked.)

MS. LINEEN:  Was this document produced?

MR. MORRIS:  In any case, let's continue with the deposition.

MS. LINEEN:  Well, did you produce this, or did you get it from some other source, that you know of?

MR. MORRIS:  Hold on.

We're deposing him.

MS. LINEEN:  I understand.

I have a right to ask the question.

MR. MORRIS:  You do, after the deposition.

MS. LINEEN:  No, no.  I can ask.

MR. MORRIS:  I'm going to ask that we go off -- we are going to stay on the record and ask that you please excuse yourself.

(Whereupon the witness left the room.)

MS. LINEEN:  I'm trying to figure out, did you produce this?  Did you pull it from somewhere else?

Scott Partlow

166

MR. MORRIS:  It's about 2:20.

MS. LINEEN:  If you're video recording, the deposition should be recorded.

MR. MORRIS:  We're keeping this on the record.

We obtained that document.

MS. LINEEN:  From whom?

MR. MORRIS:  That's our source.

MS. LINEEN:  No, no.

MR. MORRIS:  You produced everything.

MS. LINEEN:  Did you obtain it from a source other than the school district?

MR. MORRIS:  I can't -- off the top of my head, I can't recall where this document came from.

But this is our document.  We're going to now proceed in the deposition, unless you have some objection.

MS. LINEEN:  You don't know where this document came from?

Scott Partlow

167

MR. MORRIS:  Counsel, again.

MS. LINEEN:  It's a simple question.

MR. MORRIS:  We're going to ca. the Court, if you want to let me proceed with this deposition.

MS. LINEEN:  I'm not saying --

I just want to know about the exhibit before you question him on it, and I have a right to ask that question.

MR. MORRIS:  Again, we're not answering --

I'm not under oath.

MS. LINEEN:  Right.

You are showing the witness an exhibit --

MR. MORRIS:  Counsel, if you are objecting --

MS. LINEEN:  I'm not objecting.

MR. MORRIS:  We're going to continue here, or we're going to call the Court.

MS. LINEEN:  Call the court.

Scott Partlow

168

As the defense attorney, I have a right to understand where the document came from.

I'm not saying you can't question him about it.  I just want to know.

And if you can't answer that --

MR. MORRIS:  We're going to call the court.

MS. LINEEN:  Okay.

I don't understand why you can't give me a simple answer.

MR. MORRIS:  We're going to call the Court.

MS. LINEEN:  Okay.

Are you going to give the Court an answer?

I'm not telling the witness he can't answer.

MR. MORRIS:  I'm calling the Court if you are not allowing me to proceed.

Do you understand me?  Yes or no?

Scott Partlow

169

MS. LINEEN: Excuse me. Don't lecture me. Don't speak to me like you're my father.

MR. MORRIS: I'm going to call the Court.

MS. LINEEN: You said that 18 times.

MR. MORRIS: Please be quiet while I'm calling.

(Attorney dialing the Court, unavailable.)

MR. MORRIS: We're unable to contact the Court right knew.

We will meet and confer later on today.

I'm respectfully requesting that we proceed in this deposition.

All answers that you have for Counsel will be addressed at that time.

MS. LINEEN: Let me just ask you this.

Can you answer where this came from?

MR. MORRIS: We're going to put

Scott Partlow

170

this aside.

MS. LINEEN: Why can't you answer the question?

MR. MORRIS: Again, I'm not under oath here.

MS. LINEEN: You don't have to be under oath to answer a question about a document that you're showing a witness. That's not how a deposition works.

I'm sorry you don't understand that.

MR. MORRIS: Call the witness back in.

We'll put this aside.

MS. LINEEN: Do you know where the document came from?

MR. MORRIS: When there is an order --

MS. LINEEN: I don't need an order saying I'm entitled to know where a document came from.

MR. MORRIS: Please call the witness back in, counsel.

Scott Partlow

171

MS. LINEEN: Mr. Morris, your behavior is inappropriate. You're wrong about how you're conducting the deposition. And I'm sorry you don't realize that.

We don't need to meet and confer about where a simple document came from. I don't understand why you can't answer that question.

I don't understand why you have to make everything a big fight in the case, other than the fact it appears you don't understand how this works.

(Whereupon, the witness returned to the room.)

(Whereupon, Plaintiff's 17 for identification was so marked.)

MS. LINEEN: I want to note for the record that I was not instructing the witness not to answer Any question. I was not saying that the deposition could not go forward.

MR. MORRIS: We're going to continue, now.

Scott Partlow

172

Q    Do you understand what has been placed in front of you?

A    **I'm not sure what it is.**

MS. LINEEN: Note my objection to form.

Q    Do you recognize this document, Plaintiff's Exhibit 17?

A    **Looks like something I've seen.**

Q    What is Plaintiff's Exhibit 17?

A    **Looks like the Dignity Act.**

Q    How do you recognize this document as the Dignity Act?

A    **Just by what it says.**

Q    Do you know when the document was created?

A    **I do not.**

Q    Did you utilize this document in any sort of training that you received at Longwood High School?

MS. LINEEN: Note my objection to form.

A    **I don't remember.**

**I'm not clear on when we seen it.**

Scott Partlow

173

Q    Plaintiff's Exhibit 17 bears Bates stamp LCSD 710; it spans to, I believe, LCSD 771.

Do you understand that the Dignity For All Students Act applies to all public schools?

A    Yes.

Q    Do you understand that the Dignity For All Students Act prevented the creation of a hostile environment?

A    Correct.

Q    Do you understand that Longwood High School employees were subject to this policy, as well as students?

A    Yes.

Q    Would you agree that, quote, Longwood is committed to continue to provide a safe, supportive, nurturing school climate and culture, end quote?

A    Yes, I agree with that.

Q    Directing your attention to LCSD 752, would you agree that, quote, no student shall be subjected to harassment, discrimination or bullying by employees or

Scott Partlow

174

students, end quote?

A    Yes, I would agree.

Q    Have you ever seen the Dignity For All Students Act enforced at Longwood School District?

MS. LINEEN:  Note my objection to form.

A    In specific, no.

I've known we follow this; we believe in it.

Q    Are you aware that this lawsuit alleges discrimination against Longwood High School?

A    Yes.

Q    Were you ever the subject of an investigation of that discrimination complaint?

A    By anybody specific?

Q    Anybody?

A    Not that I'm aware of.

Q    Anyone from Longwood High School approach you about the complaint of discrimination lodged against Longwood High School in the case here?

Scott Partlow

175

A    No.

Q    I'd like to put that document aside, please.

(Whereupon, Plaintiff's 18 for identification was so marked.)

Q    Mr. Partlow, I just handed you Plaintiff's Exhibit 18.

Do you recognize this document?

A    Yes.

Q    What is this document?

A    Looks like one of the manuals we used in the eight-hour course.

Q    How do you recognize this document as one of the manuals you used in the eight-hour course?

A    Looks like one of those we used.

Q    Do you know when this document was created?

A    No, I don't.

Q    Did you acknowledge receipt of this document?

A    Yes.

Q    Did you sign any paperwork or receive any documentation acknowledging the

Scott Partlow

176

completion of such course?

A    Yes.  This is the eight-hour course we take every year.

MR. MORRIS:  Respectfully request the production of that acknowledgement, Counsel.

MS. LINEEN:  Please follow up in writing.

We will take it under advisement.

Q    This manual explains a number of things, including ten-month staff.

Were you considered ten-month staff?

A    Yes.

Q    Are you still ten-month staff?

A    Yes.

Q    Since working at the Junior High School -- that being moved from the Longwood High School -- have you received any diminution in duties, or pay, anything along those lines?

A    I don't understand that.

Q    Did you receive a pay cut when

Scott Partlow

177

Q you went to Longwood Junior High?

A No.

Q Did you receive less hours or lest overtime when you went to Longwood Junior High School?

A No.

Q I'd like to direct your attention to Exhibit LCSD 810.

A I'm sorry. 810?

Q Yes.

Longwood High School security monitor, Longwood High School students' social media pages?

A Not that I'm aware of.

Q Did you ever have the opportunity to monitor a Longwood High School students' social media web page?

A No.

Q Do you, yourself, maintain social media?

A Yes.

Q Have anything on your social media post been the subject of this lawsuit?

A No.

Scott Partlow

178

Q Anybody ever contacted you on social media about a video depicting you on June 4, 2015?

A No.

Q What social media platforms are you on?

A Instagram and Facebook.

Q Anything else?

A That's it.

Q Is there anything in this policy with which you do not agree?

MS. LINEEN: Note my objection.

A In the whole book?

Q Yes.

A I mean, I haven't read the whole thing. I can't tell you yes or no because I haven't read the whole thing recently.

Q Let's back up for a bit.

When you were trained, did you read the whole thing?

A Yes.

Q Did you agree with it, when you were trained?

MS. LINEEN: Note my objection.

Scott Partlow

179

THE WITNESS: As far as to my knowledge, yes.

Q Were you expected to be bound buy this policy, when you were trained?

MS. LINEEN: Note my objection.

A Yes.

Q Did you, in fact, abide by this policy?

MS. LINEEN: Note my objection.

A Yes.

Q Specifically, I'd like to refer you to LCSD 838, physical de-escalation CPI.

Could you explain how you were trained in physical de-escalation CPI?

A I was shown different ways of intervening and res training students.

Q Who showed you that?

A James Perada.

Q Did James Perada show you how to utilize the appropriate restraint?

A Yes.

Q Did James Perada show you what not to utilize, in terms of restraint?

A Explained to us, yes.

Scott Partlow

180

Q Did he show you what not to do?

A I don't recall if he showed us.

Q Did this satisfy your New York State security license requirements?

A This course here?

I think it might be the same as the one other one, what you showed us earlier.

Q Did this satisfy your New York State security license requirement?

A I don't know if this is the actual one.

You might have showed me the one earlier, the New York State one.

Q Who else was present, to the best of your recollection, except attorneys?

A It's the staff, the whole staff.

Q You say the whole staff.

All the security guards?

A I don't know every single one. It was security guards.

Q Any teacher present?

A In the eight-hour course, no.

Q Were you aware that Suffolk

Scott Partlow

181

County Police Department could access Longwood High School cameras?

A   I did not know that.

Q   I'd like to direct your attention to Exhibit LCSD 878.

Does reviewing this document refresh your recollection as to whether law enforcement can access cameras from outside of the school?

A   I don't recall.

Q   Does reviewing this document, that being LCSD 878, does that refresh your recollection?

A   Yes.

Q   Does Suffolk County Police Department have the ability to access Longwood High School cameras outside of the School?

A   That, I don't know.

Q   I'd like to direct your attention to LCSD 880.

Do you recall what this was, when you were presented?

A   No.  It's so unclear.

Scott Partlow

182

Q   Do you recall if you were shown video on the use of proper restraints?

A   I believe so, yes.

Q   When you say you believe so, was it done as part of this presentation?

A   Right.

MR. MORRIS:  We call for the production of the video utilized to show proper restraint.

MS. LINEEN:  Please follow up in writing.

Take it under advisement.

Q   Do you recall what this video depicted?

A   No.

Q   Do you recall if a student was being restrained in this video?

A   I don't recall.

Q   Anyone come to occasion to tell you they improperly restrained a student at Longwood High School?

A   Has anybody ever said that to me?

Q   Yes?

Scott Partlow

183

A   No.

Q   Take that document back.

(Whereupon, Plaintiff's 19 for identification was so marked.)

Q   I'd like to show you what has been marked 19.

Do you recognize this document?

A   Yes.

Q   What is this document?

A   It's a certificate for completion of an eight-hour course.

Q   How do you recognize Plaintiff's Exhibit 19 as that document?

A   Eight-hour annual, it says right here.

Q   When was this document created?

A   I don't know when it was created, but it was -- the course was conducted on August 27th.

Q   Is Plaintiff's Exhibit 19 substantially the same as when you signed it -- when you received it?

A   I'm sorry?

Q   Is Plaintiff's Exhibit 19 the

Scott Partlow

184

same, substantially the same as when you received it?

A   When it was made?

Q   Yes?

A   I don't know.

Q   Do you know who at the school direct, who signed it?

A   James Perada.

Q   How do you know that?

A   Because he is the one that gives it to us.  He is the school director.

Q   Put that aside.

MR. MORRIS:  Like to have this marked as Plaintiff's 20.

(Whereupon, Plaintiff's 20 for identification was so marked.)

Q   Mr. Partlow, do you recognize document Plaintiff's Exhibit 20?

A   Yes.

Q   What is Plaintiff's Exhibit 20?

A   It's another eight-hour completion certificate.

Q   How do you recognize this document as another eight-hour --

Scott Partlow

185

A    It says right here.  It has the date on the bottom.

Q    Document unsigned; is that right?

A    That's correct.

Q    Did you successfully complete the eight-hour annual in-service training course for security guard in August 2013?

A    Yes.

Q    Do you have receipt of a signed certificate acknowledging that you have?

A    I don't have it.

There might be one.

But they wouldn't renew my license, if I didn't have this.

MR. MORRIS:  Respectfully call for the production of this signed document, as witness testified, all documentation evidencing completion of the August 12, 2013 course.

MS. LINEEN:  Follow up in writing.

We take it under advisement.

Q    Do you know why this is

Scott Partlow

186

unsigned?

A    No.

I have no knowledge of that.

Q    I'm handing you what's been marked as Plaintiff's Exhibit 21 on the top left corner, bearing the date 11/26/2017.

Do you recognize this document?

A    Yes.

Q    What is this document?

A    It's letting me know that my training and my license has been renewed.

Q    Do you see the bottom of this document, it acknowledges certain training?

A    Yes.

Q    Where do you complete your eight-hour assignment training?

A    I don't remember the place where I took it.  I don't remember the name of it.

Q    Was that before or after you started working at Longwood High School?

A    That was before.

Q    You see this here, it says 16 hour on the job?

A    Yes.

Scott Partlow

187

Q    Where did you complete that training?

A    That was while at Longwood.

Q    Who conducted that training?

A    The 16-hour?

Q    Yes.

A    I don't know.

That might have been at Longwood.

Q    Do you recall, as you sit here today?

A    No, I don't.

When you first get your license, it's a 16-hour -- takes 16 hours.

Q    You have documentation evidencing the completion of these assignment and training, correct?

A    Do I have that -- I would have to look.

I don't know if I have.

Q    Did you present these trainings, the completion of these trainings, to Longwood High School prior to your hire?

A    I showed it to show that I had a

Scott Partlow

188

security license.

Q    Did you have to show Longwood High School the eight-hour pre-assignment completion?

A    I don't remember.

I know I had to prove that I had a New York State security license.

Q    See unarmed here.

You weren't licensed to carry a firearm at any point?

A    No.

Q    I hand you what's been marked as Plaintiff's Exhibit 22.

Do you recognize this document, Plaintiff's Exhibit 22?

A    Yes.

Q    What is Plaintiff's Exhibit 22?

A    Eight-hour certificate of completion.

Q    To be clear, this is Bates stamped LCSD 16.

A    Yes.

Q    Is that right?

A    Yes.

Scott Partlow

189

Q     Do you know when this document was created?

A     I do not.

Q     Is Plaintiff's Exhibit 22 the same as -- substantially the same as when received it?

A     Yes.

Q     Did this satisfy the minimum criteria recommended by the New York State security guard advisory counsel?

A     Yes.

Q     Who conducted this training?

A     James Perada.

Q     I'd like to move on to Plaintiff's Exhibit 23.

I'll take 22 back.

What is Plaintiff's Exhibit 23?

A     This is the eight-hour course.

Q     How do you recognize it to be an eight-hour course, that Plaintiff's Exhibit 23, Bates stamped LCSD 1637?

A     It says eight-hour re-assignment course on top.

Q     Did this satisfy your criteria

Scott Partlow

190

required by New York State?

A     I think this is first one I took; so yes.

Q     Do you know who signed this document?

A     I do not know.

Q     Was it James Perada?

A     No.  I didn't take it with him.

This is before I got hired by the Longwood High School.

Q     Do you know who conducted this training?

A     No, I do not.

Q     Do you know if you took a training course conducted by an Excelsior, E-X-C-E-L-S-I-O-R, Security Protection?

A     That sounds familiar, yes.

Q     Did you receive any written documentation as part of your completion of that security training?

A     It might have been just this.

I don't know if I have this anymore.

Q     Is this what allowed you to

Scott Partlow

191

obtain your security are license?

A     Yes, the class.

I had to take the eight-hour class.

Q     Did you take any other classes by this vendor?

A     No.  This is it.

Q     Did this vendor instruct you on the use of force and deadly force?

A     I don't recall.

Q     As you sit here today, is there anything that would refresh your recollection?

A     Not that I have here.

Q     Did you take any notes?

A     No.

Q     Was anyone else with you there?

A     There was -- yeah, there was other people.  I don't know who they were.

Q     Let's put that side.

Show you what's been marked Plaintiff's Exhibit 24.

Do you recognize Plaintiff's Exhibit 24?

Scott Partlow

192

A     Yes.

Q     What is Plaintiff's Exhibit 24?

A     That's the 16-hour course of training, on-the-job training.

Q     Do you know who conducted this course?

A     James Perada.

Q     Just to be clear, Plaintiff's Exhibit 24, bearing Bates stamp LCSD 1638, how do you recognize this as a 16-hour completion?

A     That's what it says.

Q     Do you know when this document was created?

A     I do not.

Q     Is Plaintiff's Exhibit 24 the same, substantially, as when you received it?

A     To the best of my knowledge.

Q     Did you complete any tests as a part of this training?

A     I don't recall.

Q     Did you take any notes as part of this training?

Scott Partlow

193

A    No.

Q    Were you required to undergo this training as part of becoming a Longwood High School security guard?

A    No, but I had to take this to get -- to finish the licensing, I believe.

Q    When you say the license; the security license?

A    I believe.  I'm not completely clear on that.

Q    To be clear, James Perada conducted this training?

A    Right.

Q    Did you receive written materials as a part of this training?

A    Like a book?

Q    Written material?

A    I believe it was one of the ones we look at, I recall.

Q    If you could identify that later, I'd appreciate that.

MR. MORRIS:  I respectfully request production of all training materials for the 16-hour on-the-job

Scott Partlow

194

training course for security guards, as this witness has testified in Plaintiff's Exhibit 24.

MS. LINEEN:  Please follow up in writing.

We will take it under advisement.

Q    Did you take any notes as part of this 16-hour training course?

A    Not that I recall.

Q    Anything that might refresh your recollection?

A    Not of so long ago.

Q    Let's put that aside.

I'll ask you if you could take a look at what was marked Plaintiff's Exhibit 25.

Do you recognize what Plaintiff's Exhibit 25 is?

A    Yes.

Q    What is Plaintiff's Exhibit 25?

A    It's the eight-hour training course certificate.

Q    To be clear, Plaintiff's

Scott Partlow

195

Exhibit 25 bears the Bates stamp LCSD 1639.

Who conducted this course?

A    James Perada.

Q    How do you recognize this document, Plaintiff's Exhibit 25, as the eight-hour training course certificate?

A    By what it says on it.

Q    Is that Mr. Perada's signature at the bottom?

A    Yes.

Q    Is exhibit Plaintiff's Exhibit 25 the same -- substantially the same as when you received if?

A    Yes.

Q    Did this satisfy the minimum criteria recommended by New York State security guard advisory council?

A    Yes.

Q    Is it fair to say that James Perada conducted all the security exams required at Longwood High School for you?

MS. LINEEN:  Objection to form.

A    Yes, that's correct.

Q    Because counsel objected, who

Scott Partlow

196

conducted all the security guard training at Longwood High School?

MS. LINEEN:  Objection to form.

A    James Perada.

Q    Did anyone else conduct these trainings?

A    No.

MS. LINEEN:  Objection to form.

Q    I think we might have already gone through this.

I'm going to hand you Plaintiff's Exhibit 26.

Again, did you receive a document dated August 12th of 2013 that bore the signature of the school director?

A    I think this is what I got.

Q    This is what satisfied the minimum criteria recommended by the New York State security guard advisory counsel for the 2013 year?

A    Correct.

Q    Put this aside.

Hand you as what's been marked Plaintiff's Exhibit 27.

Scott Partlow

197

What is Plaintiff's Exhibit 27?

A    It's the eight-hour training course certificate for 2014.

Q    Do you recognize this document as the eight-hour training course for -- you said 2014?

A    Yes, 2014.

Q    How do you recognize it?

A    It says on there.  It has the date on the bottom.

Q    To be clear, this document bearing Bates stamp LCSD 1641, whose signature is that at the bottom of this document?

A    That looks like James Perada.

Q    Was this the same or substantially the same as when you received it?

A    Yes.

Q    Put that aside as well, please.
Hand you what's been marked Plaintiff's Exhibit 28.
What is Plaintiff's Exhibit 28?

A    That's the eight-hour training

Scott Partlow

198

course certificate for 2015.

Q    It bears Bates stamp LCSD 1642.
How do you recognize this document as that?

A    What it says, and the date on the bottom.

Q    Do you recognize the signature on the bottom?

A    Looks like James again.

Q    Is Plaintiff's Exhibit 28 the same -- substantially the same as when you received it?

A    Yes.

Q    For each of these trainings conducted by Mr. Perada, did you receive any sort of training material or instruction?

A    The materials we've gone through, what we've gone through earlier.

Q    Is that yes?

A    Yes.

Q    Did those training materials instruct you in the use of force, or excessive force?

A    What it was; yes, what it is.

Scott Partlow

199

Q    Again, force as a last resort measure?

A    Correct.

Q    I'd like to show you what's been marked as Plaintiff's Exhibit 29.
I'll ask for 28 back, please.
Do you recognize Plaintiff's Exhibit 29?

A    Yes, I do.

Q    What is Plaintiff's Exhibit 29?

A    Eight-hour course of training certificate for 2016.

Q    How do you recognize it as the eight-hour training course for 2016?

A    What it says, and the date.

Q    This document, Plaintiff's Exhibit 29, it bears Bates stamp LCSD 1643, do you know whose signatures that is on the bottom right?

A    I don't recognize it.
It looks likes James'.

Q    Did James Perada teach the course conducted on August 26, 2016?

A    Correct.

Scott Partlow

200

Q    Did you make any notes during the August 26, 2016 training?

A    No.

Q    Like other trainings, did you receive documentation that was part of this August 26, 2016 training?

A    Just the booklets we get.

Q    Thank you.  Put that aside.
I'm going to hand you what's been marked Plaintiff's Exhibit 30.
Do you recognize Plaintiff's Exhibit 30?

A    That's the eight-hour pre-assignment course.

Q    How do you recognize Plaintiff's Exhibit 30 as the eight-hour pre-assignment course?

A    What it says on there.

Q    To be clear, Plaintiff's Exhibit 30 bears Bates stamp LCSD 1644.
Do you know who signed this?

A    I do not.
Instructor in that school -- Excelsior Security.

Scott Partlow

201

Q    Did you conduct any other training by Excelsior Security?

A    **No.  This is it.**

Q    To be clear, you've not conducted any other training aside from the eight-hour pre-assignment course for security guards conducted by Excelsior?

MS. LINEEN:  Objection.

A    **Correct.**

Q    Is this document the same -- substantially the same as when you received it?

A    **Yes, to my knowledge.**

Q    Put that aside.

I'm going to hand you what's been marked as Plaintiff's Exhibit 31.

Do you recognize Plaintiff's Exhibit 31?

A    **Looks like something -- statement referring to my not completing my eight-hour course.**

Q    I know we've gone through a lot.

Do you recognize this document, Plaintiff's Exhibit 31, bears Bates stamp

Scott Partlow

202

LCSD 1645?

A    **I do not.**

Q    Do you know who William Lieder is?

A    **He used to be a director of grounds maintenance, operation and maintenance.**

Q    Do you see that it says, quote, registration cannot be issued because neither the Division of Criminal Justice Services nor the Department of State records show completion of the required training, end quote?

A    **Yes, I see that.**

Q    Were you aware, or did you have any reason to know that you were delinquent in training for 2014 to 2015?

MS. LINEEN:  Note my objection to form.

A    **I believe I missed the date, but I did -- it was -- I believe it was -- Social Security number was written down wrong here.**

**I did complete it.**

Scott Partlow

203

Q    How do you know the Social Security number was written down wrong?

A    **I was told it wasn't -- when we looked at it, it was wrong.**

**I reviewed it.**

Q    Who did you have that discussion with?

A    **Denise Gibbs.**

Q    Do you have any communication in regard to this correspondence showing that you did complete this course?

A    **I didn't get anything.  I don't have can anything on it.**

Q    Do you know if anyone submitted anything on your behalf?

A    **I would believe, security.**

Q    Did you eventually register your license as per this letter?

A    **Yes.**

Q    Do you see how, in the bottom left, it says CC, indicating carbon copy?

A    **Yes.**

Q    Employee?

A    **Yes.**

Scott Partlow

204

Q    Are you indicating you did not receive this letter?

A    **I don't recall getting it.**

**I don't remember.**

**I might have.**

Q    If you did get this letter, where would you have received it?

A    **At the school.**

Q    Where?

A    **In security.**

Q    When you say, in security?

A    **They would probably give it to me in my mailbox.**

Q    Is your mailbox secured?

A    **It's in the dispatcher's office.**

Q    How do you know you complied with the registration for this year?

A    **I wouldn't have had my license back.**

**License was renewed.  It wouldn't have been renewed without that.**

MR. MORRIS:  I'm going to call for all documentation responsive to this letter of renewal of his license

Scott Partlow

205

for 2015-year.

MS. LINEEN:  Please follow up in writing.

We'll take it under advisement.

Q     Did you ever speak to William Lieder in regard to this letter?

A     No.

Q     Put this aside.

Hand you what's been marked as Plaintiff's Exhibit 32.

Do you recognize Plaintiff's Exhibit 32?

A     Yes.

Q     What is Plaintiff's 32?

A     Looks like something telling me my license is renewed for the date at the top of the e-mail.

Q     To be clear, it bears Bates stamp LCSD 1646.

At this point, do you know when this was printed?

A     No.

Q     Do you notice the business name is not applicable?

Scott Partlow

206

A     Correct.

Q     Is there any time that you had a lapse in employment in Longwood School District as a security guard?

A     Well, I only work ten months; so it's September through June.

But I was always employed.  I was never let go.

Q     Did you receive benefits as part of your job?

A     Yes.

Q     Did you ever receive a lapse in benefits at any point while in your employment as a Longwood School District security guard?

A     Not that I'm aware of.

Q     Were you ever terminated or suspended he as a Longwood School security guard?

A     No.

Q     Do you have any reason to believe that your license lapsed while you were a Longwood school security guard?

A     Not to my knowledge, no.

Scott Partlow

207

Q     Have you ever had a problem with your New York State security license?

MS. LINEEN:  Objection to form.

You can answer.

A     Besides that letter, no, not that I know.

Q     I'd like to show you what's been marked -- I'll ask for Plaintiff's 32 back -- what's been marked as Plaintiff's 33.

Thank you.

Do you recognize Plaintiff's 33?

A     Yes.

Q     What is Plaintiff's 33?

A     It looks like my security license.

Q     You carry the security license on you now?

A     I have it.  It's not on me. It's not in my wallet.

Q     Did you drive here today?

A     Yes.

Q     Do you have any you input into had any of the training manuals?

Scott Partlow

208

A     We speak about it.

Q     Who's we?

A     Everybody in the class.

Q     Were you part of creating or correcting any of the training manuals?

A     No.

Q     Did you make any written notes about the speaking about it in class?

A     No.

Q     Ever involved in the meetings involved in the creation of this these books?

A     No.

Q     Any involvement as to what goes into the security manual?

A     No.

Q     Has Mr. Perada ever asked you to contribute to any of the security training materials?

A     To writing it?

Q     Anything?

A     When we're in the class, he asks for comments or questions.

(Whereupon a break was taken at

Scott Partlow

209

this time, to 3:19 p.m.)

Q    Mr. Partlow, I'm handing you what's been marked Plaintiff's Exhibit 34. It bears Bates stamp LCSD 954, spans to LCSD 957.

Do you recognize this document?

A    I recognize what it is.

Q    What is it?

A    Dispatcher's log.

Q    Do you know who the dispatcher was on June 4, 2015?

A    I don't recall who it was.

Q    How do you recognize this as a dispatcher's log?

A    I recognize it from the book.

Q    When you say, the book, what book?

A    Dispatcher's book, the logbook.

Q    To be clear, there's a logbook kept with these exact entries?

A    Yes.

Q    Is it the same or substantially the same as that logbook held by Longwood High School?

Scott Partlow

210

A    Yes.

Q    Do you know who the supervisor was on June 4, 2015?

A    From for my shift?  7:00 to 3:00 shift?

Q    I guess.  Let's do that.

Who was the supervisor during the 7:00 to 3:00 shift on June 4, 2015?

A    Kenny Schall.

Q    As we look on these pages here there's a section, looks like code; is that right?

A    I'm sorry.  What?  Yes.

Q    So, to be clear, more a column?

A    Time?

Q    Column looks like hours, units, code; is that right?

A    This is hours, this is unit, our badge number.

Q    What was your badge number?

A    586.

Q    Do you see any incidents or notations to this document where you were responsible or where you were the unit

Scott Partlow

211

mentioned here?

A    I don't see my name on here.

Q    Certain notations it looks like it says door check.

What is a door check?

A    When we check the exterior doors to make sure they're locked.

Q    Was there any problem with the doors or any problems with the door check on June 4, 2015?

A    Not that I am aware of.

Q    I'd like to put this document aside.

Were you ever reprimanded as a result of June 4, 2015?

A    I'm sorry.  Could you repeat that?

Q    Were you ever reprimanded as a result of your action on June 4, 2015?

A    No.

Q    I'd like to hand you what's been marked Plaintiff's Exhibit 35.

MR. MORRIS:  Counsel, I'm handing you a copy.

Scott Partlow

212

Q    It bears Bates stamp LCSD 581.

Do you recognize this document?

A    Yes, I do.

Q    What is this document?

A    Written up on verbal for what I told the parents.

It's a warning, a warning notice that I was given.

Q    Was there progression of discipline at Longwood High School?

A    For this?

Q    For anything?

A    Me?

Q    Yes?

A    No.

Q    For instance, is there a procedure before dismissal?

MS. LINEEN:  Note my objection.

A    You have to have a few writeups, or something excessive.

Q    How do you recognize Plaintiff's Exhibit 35 as an employee warning?

A    It said it up here, employee warning.

Scott Partlow

213

But I recognize the document.

Q   Is this the same as -- substantially the same as when you signed it?

A   Yes.

Q   Did you receive a handbook as a part of your employment with Longwood Central School District?

A   That not that I remember.  Not when I first got hired.

Q   Did you receive one after you got hired?

A   Not that I recall.

We didn't get one.

Q   When you say, we didn't get one.

A   Talking about the code of conduct?

Q   I'm talking about a handbook that guides your terms and conditions of employment.

Did you receive such a document?

A   I don't remember.

Q   For instance, were you represented by a union representative here?

Scott Partlow

214

A   I don't know.  I don't know if anybody was with me.

I don't think anybody was with me.

Q   Could you read the employee statement on the document?

A   You want me to read it to myself?

Q   Read it out loud, please?

MS. LINEEN:  Note my objection to the form.

Q   The employee statement.

MS. LINEEN:  Employee.

A   I don't see it.

It says employer.

Q   Do you see your handwriting on this document at all?

A   Yes.

Q   Can you read your handwriting?

A   The parent of a High School student contacted me today.  He was upset because he was asked -- I don't know what the word is.

Q   Is that your handwriting?

Scott Partlow

215

A   That looks like my handwriting.  I can't read it.

Asked Scott Partlow if his son could be escorted to the bus following an incident that took place on -- I can't read the date.  Mr. Partlow responded, we're not babysitters.  You have to speak to administrator.  Administration.

Q   You see right next to that statement, the reasons are --

Is that your handwriting next to that?

A   That's where I wrote that I'm -- I waive the right to union representative.

Q   Are you represented by a union?

A   Yes.

Q   What union?

A   CSEA.

Q   As you sit here today, are you still you represented by CSEA?

A   Yes.

Q   Have you received any collective bargaining agreements or terms and conditions of your union membership?

Scott Partlow

216

A   No.

Q   Do you pay union dues?

A   Yes.

Q   Are you aware that there's a collective bargaining agreement between the union and the school, if any?

A   I'm sure there is.  I don't know.

Q   Have you spoken to a union representative with regard to discipline?

A   No.

Q   Who signed this document at the bottom here?  It looks like there's a few signatures.

A   I signed the bottom, very bottom.

The top, I couldn't tell you; I can only assume.

Q   I don't want you to assume.

Aside from this, have you received any other warnings at Longwood High School?

A   No.

Q   You agreed with your employer's

Scott Partlow

217

statement in regard to this warning; is that right?

A    Right.

Q    Were you ever the subject of retraining or any sort of reprimand because of this incident?

A    No, just a verbal warning.
We spoke about how I should act next time it happens.

Q    You ever find out what that incident was that took place with that son, with that student?

A    No.

Q    Do you know if it was a bullying incident?

A    I'm not sure.

Q    What was your tour on June 4, 2015?

A    The location?

Q    What were your hours of work?

A    I think it was 6:30 to 2:30, were -- I think my hours were 6:30 to 2:30 at that time.

Q    Did you complete your shift that

Scott Partlow

218

day?

A    Yes.

Q    I'd like to show you what has been marked Plaintiff's Exhibit 36.
(Whereupon, Plaintiff's 36 for identification was so marked.)

Q    Do you recognize was been marked Plaintiff's Exhibit 36?

A    Looks like punch clock times.

Q    To be clear, this bears Bates stamp 895 to LCSD 896.
You see your name on this document at all?

A    I see it on the bottom, yes.

Q    How do you recognize this document, that being Plaintiff's 36, as punch times?

A    What times?

Q    As employee punch cards?

A    I don't normally see this.

Q    Well, for instance, do you see your name on this document?

A    Yes, I do.

Q    Do you see June 4th on this

Scott Partlow

219

document?

A    Yes.  I do.

Q    Do you see that the punch out is 1 o'clock?

A    I do see that.

Q    You see the comment, doctor's appointment?

A    Right.

Q    Were you at a doctor's appointment?

A    I don't remember.

Q    You just indicated on the record here that had you worked a full day.
Any reason to doubt --

A    As far as I remember, I worked a full day.

Q    You did not go to a doctor's appointment?

A    I don't remember.

Q    I just want to be clear.
As you sit here today, do you know if you left work early on June 4, 2015?

A    I don't remember.

Q    Anything that would refresh your

Scott Partlow

220

recollection?

A    Just the document in front of me.

Q    Do you have a regular doctor that you see?

A    Yes.  Regular doctor's office.

Q    Is there any documentation that would refresh your recollection as to whether you went to the doctor on June 4, 2015?

A    Not that I have.

Q    Was there any anyone else present at your attendance at the doctor?

A    No.

Q    I'm going to show you had what's been marked Plaintiff's 37.
(Whereupon, Plaintiff's 37 for identification was so marked.)

Q    Do you recognize Plaintiff's Exhibit 37?

A    Yes.

Q    What is Plaintiff's Exhibit 37?

A    Time sheet we fill out.

Q    How do you recognize Plaintiff's

Scott Partlow

221

Exhibit 37 as a time sheet you fill out?

A      I'm sorry.  What do you mean?  I don't understand.

Q      How do you recognize this document as what you indemnified it as?

A      By the time I come in, time I leave.

Q      Your signature on the page?

A      Yes.

Q      Is Plaintiff's Exhibit 37 the same as -- essentially the same as when you signed it?

A      Yes.

Q      Was there a physical punch card at the employment?  Was there a physical punch clock at the Longwood High School?

A      I think so.

Q      So, did you use that physical punch clock at Longwood High School?

A      I don't remember -- I don't remember when we switched over to the electronic punch and the card punch.

Q      As you sit here today, you can't recall if you punched in on June 4, 2015?

Scott Partlow

222

A      Correct.

MR. MORRIS:  I'm going to call for the production of all electronic punch cards or any time sheet cards that evidence this deponent's physical presence at work, including but not limited to June 4, 2015.

MS. LINEEN:  Please follow up in writing, clarifying the specific nature and scope.

We will take it under advisement.

Q      You see Tuesday, June 2nd?

A      Correct.

Q      Is that your handwriting, half sick pay?

A      Yes.

Half sick day.

Q      Were you sick on the week of June --

A      I don't recall.

Q      Does this document refresh your recollection?

A      It says I was, but I don't

Scott Partlow

223

remember if I was.

I must have been.

Q      As you sit here today, do you know?

A      No.

Q      Then on June '5th, it looks like 2015, it says, per J. Perada.

Do you understand what that notes was?

A      Yeah.  I was -- I took a day off.

Q      Why did you take the day off on June 5th?

A      Because of what happened the day before.

Q      What happened on the day before?

A      That incident that we're talking about.

Q      When you say incident, what?

A      Edmond.

Q      Why did you take the day off?

A      Because when I was on my post, the kids wouldn't leave me alone about it.

Q      When you say kids?

Scott Partlow

224

A      Students in the school.

Q      Do you know who?

A      Specifically, no.

Q      Did you report them?

A      I just reported I was being asked a lot of questions about it.

Q      How did you do that?

A      I went to my supervisor.

Q      Who was that?

A      Ken Schall.

Q      What did you tell Mr. Schall?

A      That I can't do my job correctly because I'm being questioned by everybody about what happened, what's going on.

Q      What were your responses to those questions?

A      Nothing.  I didn't respond.

Q      Why didn't you respond?

A      Because that's -- I'm not going to give those kids information.

Q      Do you feel you did anything improper on June 4, 2015?

A      No.

We don't talk about anything we

Scott Partlow

225

do.

Q    So you say, we don't talk about anything?

A    **The guards don't speak to the students about the situations or events that happen.**

Q    Was anything done in regard to those students who were asking you a lot of questions?

A    **No one specific, no.**

Q    Were the students doing anything improper?

A    **No, just the harassment of asking me questions.**

Q    You say harassment.

A    **Harassment.  They wouldn't leave me alone about what happened.**

Q    What did they say to you?

A    **I don't remember in detail.**

**I remember them constantly asking me what was going on, what happened, why did I do it.**

Q    You can't remember any specifications, what was said?

Scott Partlow

226

Did you make any note or report this to anyone?

A    **No.**

Q    You got the day off; is that right?

A    **I took the day off, yes.**

Q    So why is the note, per J. Perada?

A    **James approved my taking a day off, gave me the day off.**

Q    You didn't leave early the day before, correct?

A    **I don't recall.**

Q    Anything that would refresh your recollection?

A    **No.**

Q    Was this a sick day a paid day, or something else?

A    **The Friday?**

**I don't recall what they put it down as.**

Q    Were you paid for the Friday work?

A    **Yes.**

Scott Partlow

227

Q    In other words, you were not there on Friday if, June 5, 2015; but you were paid?

A    **Right.**

Q    That was as a result of the students asking you questions; is that right?

A    **Right.**

Q    Regarding the incident?

What incident, again?

A    **I'm sorry?**

Q    What incident were they asking you questions about?

A    **The senior prank and David Edmond.**

Q    As you sit here today, you can't recall a single thing that you were asked from that day?

MS. LINEEN:  Objection.

THE WITNESS:  Not specifically, no.

Q    Anything generally?

A    **Just what I said.  Asked me what was going on, what happened.**

Scott Partlow

228

Q    Anyone else there with you when you were asked those questions?

A    **No.  I was on my post by myself.**

Q    Did you take any notes?

MS. LINEEN:  Objection.

A    **No.**

Q    Was there anything that would refresh your recollection, as we sit here today, what you were asked by those students?

A    **No.**

Q    Before we put this aside, it appears that you were paid for a 40-hour workweek; is that right?

A    **Correct.**

Q    So even the days that you were half sick pay and the day that you took off Friday, you were paid for a full week; is that right?

A    **Correct.**

Q    There's a signature at the bottom here, supervisor approval.

Do you know whose signature that is?

Scott Partlow

229

A    You know, respect think James has to sign our time sheets.

Q    Would be James Perada?

A    James Perada.

Q    Did James Perada sign this time sheet, that being why Plaintiff's Exhibit 37?

A    I couldn't be sure who signed it.  I don't know the signatures.

Q    We'll put this aside for now.

(Whereupon, Plaintiff's 38 for identification was so marked.)

Q    All my questions have to do with June 4, 2015 until I say otherwise.

Do you understand?

A    I understand.

Q    Could we agree on that.

A    I agree.

Q    When did you start your post on June 4, 2015?

A    7 o'clock.

Q    What, if any, correspondence, memorandum, did you receive that day?

MS. LINEEN:  Objection.

Scott Partlow

230

You can answer.

A    We heard rumors of a senior prank.

Q    When you say, we heard rumors?

A    Security.

Q    Was anything disseminated on that date?

A    I don't understand.

Q    Did you receive anything in writing?

A    No.

Q    Did you receive any paperwork at all?

A    On what was rumors?

No.

Q    Did you receive any electronic mail?

A    No.

Q    How did you hear of a senior prank on that day?

A    Just word of mouth.

Q    Do you recall who told you that?

A    No.

Q    Is there anything that would

Scott Partlow

231

refresh your recollection?

A    No.

Q    Who Steve Procida, P-R-O-C-I-D-A?

A    Steve Procida is an 11 to 7 shift guard.

Q    Prior to the incident involving David Edmond, did you have any discussions with anyone about the senior prank?

A    No.  Only the fact that there might be one.

Q    Were you told to act in any specific manner?

A    No.

Keep our eye out.

Q    I'd like to bring you -- again, keeping our time within June 4, 2015, I'd like to bring you right before with the incident occurred.

Around 10:00 a.m. June 4, 2015, what were you doing?

A    I was on my post.

Q    Where was your post?

A    South Commons.

Scott Partlow

232

Q    Did the period end before the incident occurred?

A    I don't recall.

Q    At your post at South Commons, what, if anything, occurred after 10:00 a.m. on June 4, 2015?

A    Just a huge crowd down by the gym.

Q    What, if anything, did you do in response?

A    I just walked down there.

There was another guard down there.

Q    Was this in between class or something else?

A    I don't recall if it was during or after the bell.

Q    Anything that would refresh your recollection?

A    Not that I can think of.

Q    At any point did you receive radio or notice to go anywhere or do anything?

A    I believe I went on the radio,

Scott Partlow

233

says there's a crowd moving down by the gym.

Q    What did you do next?

A    I walked down there to make sure nothing was going on.

Q    When you walked down there, what happened?

A    I was in front of the gym, and I saw another crowd going into the athletic office, like a little foyer by that office.

Q    What was wrong with the gathering, or the crowd?

A    It was a lot bigger than usual.

Q    Was it a crowd of students or something else?

A    Students.

Q    What did you do in response, if anything, to that crowd?

A    I walked down there.  Then I stayed in front of the gym.

Q    Was that away from your post?

A    Yes.

Q    Did anyone tell you to do that?

A    No.

Q    What happened as you stayed in

Scott Partlow

234

front of the gym?

A    I saw the crowd building up in front of the athletic office.

Q    What occurred after that crowd built up in front of the athletic office?

A    I heard a lot of noise, and I walked over there.

And that's when the incident with me and Edmond happened.

Q    Explain.

Before the incident with me and Edmond, as you stated, what did you observe? What did you see?  Take me step by step.

A    When I was walking down there, I saw the crowd go there.

When I turned the corner right there in foyer area, I saw another guard, Jerry Chan, with the student.  I saw Mr. Reese against the wall.

And when Chan was trying to pull him away, that's when I went in.

Q    Did you see the events leading up to Mr. Reese against the wall?

A    No.

Scott Partlow

235

Q    When is the first time you saw Mr. Reese that day?

A    That whole day?

In the morning, I'm sure.

Q    Talking about 10:00 a.m., after the crowd.

A    When I turned into that little foyer area, I saw him against the wall.

Q    What did you do?

A    I went towards him.

That's when I grabbed Edmond.

Q    Explain to me what you did?

A    I went over to put my arms around him.  I pulled him back.

Q    Could you show us what you did?

A    You want me to show you?

I went around and grabbed him like this.

Q    When you say, I grabbed him, looks like your left arm?

A    I went over his shoulder.

Q    So your left arm went over David Edmond's shoulder?

A    Yes.

Scott Partlow

236

Q    Did you speak to David before initiating physical contact?

A    No.  I saw the other guard, Jerry Chan, with him.

Q    Explain to me, when you say Jerry Chan, was Jerry Chan already engaged in physical contact?

MS. LINEEN:  Noted my objection to form.

A    He was involved in a situation.

I saw him trying to get in the middle of them, trying to de-escalate the situation.

Q    Did you see Jerry Chan engage in physical contact with a student?

A    I didn't, no.

Q    So what did you see before you put your arm --

A    I saw David Edmond going towards Mr. Reese.

Q    When you say, going towards?

A    He looked like he was lunging toward him.

Q    I want to back up for a second.

Scott Partlow

237

You stayed you turned up the foyer.

Why did you turn up the foyer?

A That's where the crowd was.

Q Did you see where Mr. Reese came from before he was up against the wall?

A No.

Q Did you see how Mr. Reese got up against the wall?

A No.

Q Did you see Mr. Reese initiate physical contact with David Edmond?

A No.

Q Did you see if anyone else initiated contact with David Edmond?

A No.

Q So, explain to me, the second before you put your arm around David Edmond, tell me, did you speak to anyone before doing that?

A No, I did not.

Q Tell me he where your left arm went on David Edmond's body?

A Left arm went over his shoulder.

Scott Partlow

238

Q Where did it ultimately rest? Where was your hand?

A I remember pulling him back.

Q When you say, pulling him back, your left hand was on what part of his body?

A I would say, his chest.

Q Where is your right hand?

A Around his waist, maybe, on his stomach.

Q At any point, did you stop and see if physical de-escalation was a possibility?

A What I saw was --

MS. LINEEN: Note my objection to form.

A I was preventing David from going after Mr. Reese.

MR. MORRIS: Would you repeat my question, please?

(Whereupon, the last question was read back by the court reporter.)

Q Do you understand that question?

A Yes.

Q Did you stop and see if physical

Scott Partlow

239

de-escalation was a possibility?

A No.

Q So you immediately grabbed David Edmond?

MS. LINEEN: Objection to form.

A Correct.

Q Can you tell me about the left hand -- the right hand was on what part of David Edmond's body?

A I can't clearly say where it was, but it was around the bottom part of his body, under his arms.

Q Tell me exactly what occurred next. What did you do?

A I pulled David Edmond back.

Q What occurred?

A We both fell to the floor.

Q When you say, fell to the floor, were you still holding David as he fell to the floor?

MS. LINEEN: Objection to form.

A When we went down, yes.

Q When you went down, where were your hands when you were both on the ground?

Scott Partlow

240

A I remember one arm being over his shoulder still, and the other hand I think was on the ground.

Q When you say, over his shoulder, was your arm around his neck?

A No.

Q Could you demonstrate where your arm was in relation to David Edmond, and which arm it was?

MS. LINEEN: He can describe by words.

A It was --

Q Can you demonstrate?

MS. LINEEN: Describe it.

I'm not going to allow him to demonstrate.

There's no other person here to demonstrate on.

MR. MORRIS: I could get somebody.

MS. LINEEN: No.

Q Can you demonstrate where your hand was in relation to David's neck?

A It was over his shoulder.

Scott Partlow

241

Q   Did you body come in contact -- your arm come in contact with his neck?

A   No.  Not that I recall.

Q   So you both fell to the ground, and you continued to hold David Edmond; is that right?

A   I didn't hold him; I stayed there on top of him.

Q   When you say you stayed there on top of him, could you explain what you mean by that?

A   I was on the side, holding my arm over him.

Q   When I say on the side, were you sitting on top of him?

A   No.

Q   How were you on top of him?

A   My arm was over him, on top.

Q   Putting your body weight on him?

A   I don't remember that.

Q   What do you remember?

A   I remember being on the side of him, with two other kids coming towards me.

Q   When I say two other kids were

Scott Partlow

242

coming?

A   I don't know the kids' names.

Two students were coming towards me.  I had to put my arm up, tell them to stay back.

Q   What happened next?

A   Another staff member came over.

Q   Who?

A   Bolay Williams.

Q   What happened?

A   Me and him both got up, helped David up to his feet.

Q   Explain that to me.

Before Bolay Williams came, you were holding David?

MS. LINEEN:  Objection to form.

A   I had my arm over him.

Q   You were maintaining physical contact with David; is that right?

A   Yes.

Q   That's prior to Bolay Williams coming?

A   Yes.

Q   How long was it prior to Bolay

Scott Partlow

243

Williams coming that you had physical contact?

A   Two seconds.

Q   What happened when Bolay came?

A   We both got up and helped David up.

Q   What did Bolay say?

A   He said, Scott, I got him.

Q   Anyone tell you to get off of him, or get the F off of him?

A   The kids that were coming towards me.

Q   You're aware this was caught not only on video camera, but also on the school security camera?

A   I've heard, yes.

Q   Have you had the opportunity to review it?

A   No.

Q   When Bolay Williams, you say, helped you get David up --

A   Right.

Q   -- at this point, you had David's best interest in mind?

Scott Partlow

244

MS. LINEEN:  Objection to form.

Q   Do you understand?

A   Yes.  We both got him up.

Q   Did you have David's best interest in mind at this time?

A   Yes.

Q   Was anyone else touching David Edmond while you were on the floor with him?

A   No, not that I'm aware of.

Q   Do you know if anyone grabbed David Edmond by the arms?

A   Not that I'm aware of.

Q   Prior to you touching David Edmond, were you aware that he screamed, get your hand off me?

A   Not that I remember.  I don't remember.

Q   What do you mean?

A   Just what I told you.

Q   Do you remember, when on the ground, if anyone grabbed David Edmond's legs?

A   No, I don't.

Q   Did David say anything when he

Scott Partlow

245

was on the ground?

A    Not that I recall.

Q    You don't recall him saying, get your hand off me?

A    I don't remember that.

Q    Did you ever review the video of this incident?

A    No.

Q    What happened after you helped David Edmond off the ground?

A    We both, me and Bolay, were standing there with him.

And then Bolay took him into the athletic office.

Q    Where did you go?

A    Went down to my post.

Q    At any time did you see another security guard put their hand on David Edmond that day?

A    No.

Q    Did you have discussions with him with regard to this event on that day?

A    Just -- not the actual event, but about what was going on afterwards.

Scott Partlow

246

That's it.

Q    Who did you have discussions with?

A    Kenny Schall, about going home, kids asking me questions in the hallway.

They told I had to write a statement on it, and report on it.

Q    Did you have discussions with anyone else?

A    No.

Q    You said a statement --

A    Like a report.

Q    When did you write a statement?

A    Probably later that day.

Q    To whom was it addressed?

A    It wasn't to anybody.  It was just something I wrote.

Q    To whom did you give it?

A    Exactly who, I don't recall.

Q    Did you speak to anyone on the phone?

A    No.

Q    Did you receive any electronic mail in regard to this event?

Scott Partlow

247

A    No.

Q    Did you attend any meetings regarding this event?

A    No.

(Whereupon, Plaintiff's 38 for identification was so marked.)

Q    Do you recognize Plaintiff's 38?

A    Yes.

Q    What is Plaintiff's 38?

A    It's an incident report log.

Q    How do you recognize this document?

A    From being there.

It says incident report, on top.

Q    Is this maintained in the regular course of business at Longwood High School?

A    Yes.

Q    Do you have any reason to doubt that this is the same, if not an exact reproduction, of that incident report log as maintained by the Longwood High School?

A    Looks like the same.

Q    I'd like to direct your

Scott Partlow

248

attention to -- just to be clear, Plaintiff's Exhibit 38, Bates stamp LCSD 3934 to LCSD 3936.

I'd like to direct your attention to LCSD 3935.

Can you tell me what event that is -- five from the bottom -- from the top, where it says description?

Looks like there are redactions.

A    Looks like 1016, that one?

Q    Yes?

A    That's a fight.

Q    Do you know who was involved in that fight?

A    No, I don't.

Q    Do you know why this document is redacted?

A    I don't know why.

MR. MORRIS:  Call for the unredacted version six this document.  It's been marked as Plaintiff's 38.

MS. LINEEN:  Follow up in writing.

We'll take it under advisement.

Scott Partlow

249

Q    You see underneath that, unknown student call, PD referral?

A    Yes.

Q    Do you know what that's in regard to?

A    I do not know.

Q    Do you know what 1052 is?

A    I know 1049 is security information.

1052, I'm not -- I have got to refresh myself with that.

Q    Do you know what a CC is?

A    It's a report we get from the Suffolk County PD.

Q    Do you see underneath there, 15-332901?

A    Which one are we looking at?

Q    Right next to the unknown student call.  Do you see that?

A    Right there?

Yes.  That's probably their CC number.

Q    Were you involved in this incident at all?

Scott Partlow

250

A    I don't even know what it is.

Q    Do you know who security guard 526 is?

A    Yes.

Q    Who is that?

A    That's Fran.  Fran -- I don't know her last name.

Sheridan.

Q    Who is Fran Sheridan?

A    She's a dispatcher.

She's also a road unit.

Q    Do you see what that says underneath there, under 526?

A    I didn't see it.  I don't know what it says.  Something video, maybe?

Q    Do you know what that would be used to demarcate?

A    No.

Q    Do you see the description of last one on the bottom, it says 1052?

A    Right.

Q    What is that again?

A    I don't recall what that is.

Q    Says Mr. Reese versus David

Scott Partlow

251

Edmond; is that right?

A    Yes.

Q    Security officer 645?

A    Yes.

Q    Do you know who that is?

A    Denise Gibbs.

Q    Supervisor is 605.

Do you know who that is?

A    Kenny Schall.

Q    That was your supervisor that day, correct?

A    Yes.

(Whereupon, Plaintiff's 39 for identification was so marked.)

Q    I'm handing you what was marked as Plaintiff's Exhibit 39.

Do you recognize this document?

A    Looks like a report.

Q    Were you provided this report, in whole or in part?

A    I might have seen it.  I'm not sure.  I'm not clear.

Q    Did you help Mr. Perada create report 15-1318?

Scott Partlow

252

A    No.

Q    Did you speak to Mr. Perada on June 4, 2015?

A    I might have, at one time.

Q    Do you know if James Perada called the police on June 4, 2015?

A    I'm not clear on that, no.

Q    Did he ever ask you for your version of events that occurred on June 4, 2015?

A    I think he read my statement that I wrote.

MR. MORRIS:  Can you repeat my question, please?

(Whereupon, the last question was read back by the court reporter.)

A    I don't remember if he asked me personally, but I remember him asking me to write a report on it, a statement.

Q    Do you see that third paragraph --

A    Yes.

Q    -- In this document, Bates stamped LCSD 593, quote, school session

Scott Partlow

253

guard Jerry Chan was trying to pull Edmond off of Reese, so I assisted him. School session guard Scott Partlow assisted us as well, end quote.

A    Okay.

Q    You have any reason to doubt the veracity of that statement?

A    No.

Q    You just testified earlier you didn't see anybody else pull David Edmond off Mr. Reese; is that right?

MS. LINEEN:  Objection to form.

A    Correct.

Q    Put that document aside for now.

(Whereupon, Plaintiff's 40 for identification was so marked.)

Q    Do you remember giving a statement on the day in question, we're sticking with June 4, 2015 --

A    Yes.

Q    What did you state on that day?

A    Exactly?

Well, for that incident, I saw the student by the athletic office,

Scott Partlow

254

acting -- I can't do word for word.

Q    To the best of your ability?

A    I guess him then lunging towards Mr. Reese. Me pulling him off Reese. Us falling to the ground. Me and him on the ground. Two students coming towards me. And then me and Bolay helping him up. Bolay taking him into the athletic office.

Q    When you wrote those reports up, you wrote the full truth; is that right?

A    Correct.

Q    You had the opportunity to review what you wrote?

A    Correct.

Q    And correct and what you wrote, correct?

MS. LINEEN:  Objection to form.

A    I might have proofread and corrected spellings on my own.

Q    As you sit here today, is there anything you'd like to change in the statement you provided back in June of 2015?

A    No.

Q    Hand you what's been marked as

Scott Partlow

255

Plaintiff's 40.

(Whereupon, Plaintiff's 40 for identification was so marked.)

Q    Do you recognize what's been marked as Plaintiff's Exhibit 40?

A    Yes.

Q    What is Plaintiff's Exhibit 40?

A    It's a statement I wrote. It's part of our report we write.

Q    When was this document created?

A    The day of June 4th.

Q    How do you recognize Plaintiff's Exhibit 40 as a part of your report?

A    It's my handwriting, my signature.

Q    Is Exhibit 40 the same, substantially, as when you signed it?

A    Yes.

Q    Anything about this statement that is untrue?

A    No.

Q    Do you know why there's no school complaint number on this document?

Scott Partlow

256

A    No, I don't.

Q    Do you know why there's no police complaint number on this document?

A    No, I don't.

Q    Do you know now, as you sit here, if the police became involved in regard to this complaint?

MS. LINEEN:  Note my objection to form.

A    They were involved, but I don't know when. Not because of this, but what happened, the situation that happened.

Q    In Plaintiff's Exhibit 40 you say that you seen, quote, David Edmond acting extremely aggressive towards assistant principal, Mr. Reese, end quote.

Could you describe what you mean?

A    He was lunging towards Mr. Reese, going towards Mr. Reese, very angrily.

Q    Could you show me what that looked like?

Scott Partlow

257

A    He was just lunging towards him. Like going towards him, quickly.

Q    Like this, or something else?

A    Quickly, like jumping towards him quickly.

Like quick -- like almost like a -- just lunging towards him.

Q    Moving towards him like that?

A    Quickly, yes.

Q    Just describe for the record, witness moving forward --

A    Aggressively.

Q    -- aggressively.

Is there anything else that you could describe, as you sit here today?

A    Describe his movement?

Q    Yes. How he was acting extremely aggressively?

A    Extremely aggressively. That's the only way I can explain it.

Q    How long did you make that observation?

A    Seconds. Not even a minute.

Q    So let's try and narrow that

Scott Partlow

258

down.

Was it seconds or a minute?

A    Not even a minute. Under a minute.

Q    Was it more or less than 15 seconds?

A    Less.

Q    Was it more than five seconds?

A    More.

Q    More or less than ten seconds?

A    Ten seconds. I don't know.

Q    You say, quote, David lunged towards Mr. Reese in an attempt to hit him, end quote.

You agree with that statement, right?

A    Yes.

Q    Could you show me what he did?

A    He lunged towards him with his hands.

Q    Explain to me, show me.

A    He lunged towards him.

Q    Like this?

A    Right.

Scott Partlow

259

Q    Just to show the witness has raised both hands about chest level and put open hands out.

Anything else?

A    No.

Just Mr. Reese was backed into the corner.

Q    To just be clear, anything else -- beside what you demonstrated here, and how David lunged towards Mr. Reese in an attempt to hit him?

A    No.

He moved towards him aggressively.

Q    Anything else, besides you saying that statement over again, that described his actions?

A    No other way to explain it.

Q    You said Chan are attempted to restrain David.

How did Chan attempt to restrain David?

A    I saw him there, speaking to him. I don't know why he was speaking, but

Scott Partlow

260

he was with him.

Q    Well, what is it? Was he speaking, or something else?

A    I don't know -- I don't know if he was speaking, but I know he was there with him.

Q    Describe what you mean.

A    He was right next to David Edmond.

Only -- I can only assume -- I don't know what he was saying, but assume that he was trying to get David Edmond to stop.

Q    You don't know, because you didn't speak to anybody?

A    Right. I didn't speak to Chan.

Q    You physically acted first?

MS. LINEEN: Objection.

A    Right.

Q    So, explain what you observed Chan doing in his attempt to restrain David?

A    I just saw him saying something to him. I don't know exactly what.

Scott Partlow

261

Q    Did Chan have his hand on David Edmond?

A    **Not that I remember.**

Q    So when you say restrain --
Verbally restrain?

A    **Right.**

Q    You're saying Chan tried to verbally restrain David Edmond?

A    **Right.**

Q    Later you say, after you fell to the floor, in your statement here, Chan had and staff member Eldridge Williams assisted in getting David to his feet and then to the athletic office.
        Did Chan physically assist David Edmond up off the ground?

A    **No.  That was me and Bolay.**
    **It wasn't putting our hands on him; we were there.**

Q    Did Chan assist in getting David to his feet?

A    **Not that I recall.**
    **He was there, though.**

Q    This is your statement, though,

Scott Partlow

262

right, quote, while on the floor, number 525 Chan and staff member Eldridge Williams assisted in getting David to his feet and into the athletic office, end quote; is that your statement?

A    **Yes.**

Q    Is that inaccurate?

A    **He was there.**

Q    Did he assist David getting to his feet?

A    **No.  Physically, no.**

Q    Did he assist David in some other manner, getting to his feet?

A    **Unless he was talking to him.**
    **He was there, trying to take him out.**

Q    You noted everyone was there, correct?

A    **Correct.  Right.**

Q    Did you submit any other security department field reports that day?

A    **I think there was this one; there might have been another one.**

Q    You said there might have been

Scott Partlow

263

another one with the same team.
        Why would you submit two field reports?

A    **I might have been writing down one for SD and for an actual statement for the school.**

Q    Why would you do that?

A    **Because of the situation that happened.**

Q    Is that protocol?

A    **I don't know.**
    **That's something I was asked to do.**

Q    Who asked you to do that?

A    **Supervisor.**
    **I don't remember who it was.**

Q    Your supervisor asked you to do that?

A    **I don't know who it was.**
    **Somebody asked me to.  I assume it was a supervisor.**

Q    How did you know it was a supervisor?

A    **Because a normal guard is not**

Scott Partlow

264

**going to ask me to do this.**

Q    To be clear, when did this occur?

A    **When I was asked to write it?**

Q    Yes?

A    **I don't remember the time frame, what time it was.**

Q    Do you remember if it was a male or female who asked you?

A    **I don't recall.**

Q    Do you recall how you received notice, how you knew how you were asked?

A    **In a situation like that, we always got to write something.**

Q    How were you asked?

A    **Just asked.**

Q    Verbally?

A    **Verbally.**

Q    Nothing in writing?

A    **No.**

Q    No radio?

A    **No.**

Q    No e-mail?

A    **No.**

Scott Partlow

265

Q    Nothing, no notes?

A    No.

Q    You didn't speak to anyone before writing these statements, correct?

A    No.

Q    And you wrote a security department field report, correct?

A    Right.

Q    Then you wrote a second statement; is that right?

A    Correct.

Q    See if this is that second statement.

(Whereupon, Plaintiff's 41 for identification was so marked.)

Q    Show you Plaintiff's Exhibit 41. Do you recognize this document?

A    Yes.

Q    What to you recognize Plaintiff's Exhibit 41 as?

A    Just another report, or statement.

Q    Do you know when this document was created?

Scott Partlow

266

A    The 4th of June.

Q    By whom was this document created?

A    Myself.

Q    Is that your signature at the bottom?

A    Yes, it is.

Q    Plaintiff's 41, bearing Bates stamp LCSD 30, is this the same or substantially the same as when you signed it?

A    Yes.

Q    Anything about this document untrue?

A    No.

Q    Why did you write a second security department field report?

A    I think this one went to the actual report. It has a report number on top.

Q    Do you know where the actual one went?

A    Actual report?

Q    Yes?

Scott Partlow

267

A    No, the --
     This a copy. I don't know where the original is.

Q    Do you know where the other statement went, that Plaintiff's Exhibit 40?

A    No.
     I don't keep those.

Q    Who did you give it to?

A    Security.
     Dispatcher or supervisor, I'm not sure who I gave it to.

Q    As you sit here today, you can't recall?

A    No.

Q    Anything that would refresh your recollection?

A    No.

Q    Was anyone else there?

A    I'm sure one of the supervisors was, but I don't know which one.

Q    Did you take any notes?

A    No.

Q    At any point during this day, did you speak to an attorney?

Scott Partlow

268

A    No.

Q    Any point during this day did you speak to the police?

A    I don't know if it was that day or few days later, when they came and talked to me.

Q    Did you report anything to a shift leader when the police came to talk to you?

A    They came to the school.
     They knew about it.

Q    You didn't make any report in response to that discussion with the police?

A    No.

Q    After the incident with David Edmond, what, if anything, did you learn?

A    I'm sorry?

Q    What did you learn about David Edmond's condition?

A    I didn't know anything about it.

Q    Were you aware if he was injured or not?

A    No.

Q    As you sit here today, do you

Scott Partlow

269

know if he was injured?

A    No, I do not.

Q    Anyone report to you that the police were called, ambulance, or any other state service, for David Edmond?

A    No.

Q    As you sit here today, anything else you recall about the day of the event where you put your hand on David Edmond?

A    No.

Q    Is there anything that would refresh your recollection?

A    No.

Q    Would you like to add anything that you stated before?

A    No.

MR. MORRIS:  Let's take a break to call the court.

And I'm going to ask that you step out, please.

THE WITNESS:  Sure.

(Whereupon, the witness left the room.)

MR. MORRIS:  Good afternoon.

Scott Partlow

270

This is Attorney Cory Morris calling on the Longwood matter, Edmond Vs. Longwood.

THE CLERK:  Yes.  Hi.

MR. MORRIS:  How are you?

THE CLERK:  Good.

Is the other counsel on the line, too?

MS. LINEEN:  Yes, I'm here.

MR. MORRIS:  Defense counsel, Caroline Lineen, is on the line.

We are currently on the record.

THE CLERK:  There is no need for me to be on the record because I'm not the judge; I'm the law clerk.  And the judge is not available at the moment.

There won't be a ruling.

MR. MORRIS:  We're going to go off the record, then, at 4:15.

(Whereupon, there was a discussion held off the record.)

MR. MORRIS:  It's about 4:25.

THE CLERK:  So, you're on the record of the deposition.

Scott Partlow

271

Let me ask the plaintiff, who are you deposing?

MR. MORRIS:  We're deposing on of the main actors here, Scott Partlow.  He's a security guard who engaged in excessive force against the Plaintiff, David Edmond.

THE COURT:  Is he the security guard who is alleged to have used force against plaintiff, child?

MR. MORRIS:  That is correct, Your Honor.

THE COURT:  He's a witness; he's there.  He is an employee of the School District; is that correct?

MR. MORRIS:  That is correct, Your Honor.

THE COURT:  What's the problem?  What are you asking him?

MR. MORRIS:  We have come to learn that his mother-in-law, which led to questions about his ex-wife, was an employee of Longwood School District.

Scott Partlow

272

I was blocked from asking questions.  So I proceeded with the deposition to later ask about the relationship and the divorce.

I later come to learn that his ex-wife was an employee of Longwood School District, the main defendant in this case.

We're asking basic questions, which there is no legitimate reason we cannot ask.

MS. LINEEN:  Your Honor, if I could, Counsel was not blocked from asking questions about the mother-in-law and the ex-wife and their employment with the District.

The question I directed the witness not to answer was why he got a divorce from his ex-wife in 2011, four years before the incident at issue.

I don't see what that has to do with anything.  I think it's overly personal.  I think it's harassing.

Scott Partlow

273

The question was whether there was any history of domestic violence in their relationship.  That followed the question about why did you get a divorce.

I fail to see how that could have anything to do with how he got the job.  The ex-wife didn't even get the job until after he was employed at the District.

And counsel was allowed to ask questions about whether he used his mother-in-law as a reference or anything like that.

The questions I directed the witness not to answer were about his relationship with his ex-wife, which do not relate to this case.

THE COURT:  Is there a question pending?

MR. MORRIS:  There is not, Your Honor.

THE COURT:  So you're asking, in general, whether this witness should

Scott Partlow

274

be required to answer questions about his divorce from his ex-wife?

MR. MORRIS:  To be clear, Your Honor --

THE COURT:  He was divorced in what year?

MS. LINEEN:  2011, I believe he said.  He got married in 2006, he believes he was married for about five years.

MR. MORRIS:  To be clear, Your Honor, I did ask the question, and the witness was instructed not to answer.

MS. LINEEN:  Right.

THE COURT:  I understand that. I understand the witness was instructed not to answer.

But these questions all go to the reasons for his divorce in 2011; is that correct?

MS. LINEEN:  Yes.

THE COURT:  Plaintiff, do you have anything else to add to this?

MR. MORRIS:  Your Honor, we're

Scott Partlow

275

suing Longwood School District.  The mother-in-law, the ex-wife and Mr. Partlow are all members of Longwood School District.  That's the inquiry, and that's why we're asking these questions.

THE COURT:  I don't think that's the inquiry.

I think the inquiry is questions about the divorce.

If the questions are about the divorce, and the reasons for the divorce in 2011, I am going to sustain the objection, and the witness need not answer that.

MR. MORRIS:  Okay.

THE COURT:  They are harassing questions, and they have no relevance to this incident.

MR. MORRIS:  Understood, your Honor.

THE COURT:  Okay.

Anything else?

MR. MORRIS:  Your Honor, I was

Scott Partlow

276

asking questions about what's been marked as Plaintiff's Exhibit --

THE COURT:  Don't repeat.

I want to know if there's any other area of inquiry that you need a ruling on.

MR. MORRIS:  Yes, Your Honor.

Your Honor, I was asking questions related to what we propose is Plaintiff's Exhibit 16.

THE COURT:  What document is that?

MR. MORRIS:  That document is a Longwood CSD Security Department eight-hour in-service training course for security guards.

THE COURT:  Okay.

MR. MORRIS:  Counsel has not allowed me to ask questions relating to this document.

MS. LINEEN:  Your Honor --

THE COURT:  Was this document produced during litigation?

MS. LINEEN:  Yes.

Scott Partlow

277

Your Honor, that's not entirely accurate.

The document was marked as an exhibit. It didn't bear our Bates stamp that we've been Bates stamping production with, so I asked Counsel where the document came from, whether he got it from another source; and he wouldn't answer the question.

I didn't tell the witness he couldn't answer. I didn't say I was going to disallow questions on it; I was trying to figure out where the document came from.

He -- Counsel wouldn't answer that, then said we had to call the Court.

The witness answered questions about that document fine.

THE COURT: Why don't you answer the lawyer's question as to where that document came from, just to clarify the record?

MR. MORRIS: To clarify the

Scott Partlow

278

record, which is why I wanted to make this phone call on the record.

Pursuant to our own investigation, albeit we asked and asked and asked Defense counsel to produce all these documentations, we have recovered this from our own confidential source.

MS. LINEEN: It can't be a confidential source, if you're using it in this litigation.

MR. MORRIS: We don't know if we're -- we're not sure if we're going to use this at trial. We don't know if this was even utilized at the time that he was a security guard, which is why we want to ask him about it; but we were not able to ask, which is unfortunately what necessitated this phone call.

MS. LINEEN: I think it's only fair, if it's being used as an exhibit, for the witness to be questioned on, that we know where it

Scott Partlow

279

came from. I don't think it's fair that it gets to be kept confidential until they decide if they want to use it. They're using it at a deposition.

MR. MORRIS: I just provided to defense counsel.

THE COURT: What did you say?

MR. MORRIS: I provided this document to defense counsel.

MS. LINEEN: Right.

But I don't know where it came from.

THE COURT: You provided it to Counsel in response to something, or in response to a request, or is this the first time anybody's seeing it, at this deposition?

MS. LINEEN: Yes.

MR. MORRIS: This is the first time anybody is seeing it, Your Honor.

THE COURT: Okay.

So, use the document.

Plaintiff, it is not prohibiting

Scott Partlow

280

the witness from inquiring as to the document. You can ask all the questions you want to about it.

And Defendant, you can pose an interrogatory to the plaintiff and ask any questions you want, by way of interrogatories, where the document came from.

If at that point the plaintiff objects to it, then we'll have to have a ruling.

But right now, you're at a deposition; just use the document. Okay?

MR. MORRIS: Your Honor, the last thing, and I --

THE COURT: If you don't want to answer Counsel's question about where it came from. Ask it that way.

MS. LINEEN: That's fine.

Again, I didn't have a problem with the witness answering questions. I was trying to explore --

THE COURT: I understand.

Scott Partlow

281

MR. MORRIS:  Thank you, your Honor.

And lastly, yes.  We're coming towards the end of the day here.  We are entitle to seven hours of this named defendant.  It does not look like we're are going to be able to complete that seven hours of deposition.

In addition, there are outstanding documents we've requested time and time again in this matter.

I am respectfully requesting --

THE COURT:  Have you taken the seven hours yet?  Have you used up the whole seven hours?

MR. MORRIS:  No, Your Honor.

But defense counsel has indicated she will not re-produce this deponent.

MS. LINEEN:  I was indicating Counsel, when he was saying that he was going to call him back because I was refusing to allow him to answer

Scott Partlow

282

questions, among other things, I think there's been plenty of time to get to the issue here.

If it's -- if we have to bring him back --

THE COURT:  How many hours have you taken so far?

MS. LINEEN:  From my calculations -- I was going on and off the record, I don't have the court reporter's notations, but I feel like we're approaching close to five.

THE COURT:  Why don't you finish up the day.  Do the best you can.

Again, if you have a problem with bringing him back, or the plaintiff thinks he needs more, then you're going to have to come back to me.  You have to come back to me for another ruling on that.

MR. MORRIS:  Your Honor, I know we're going to go beyond that time.  We're not going to have enough time to --

Scott Partlow

283

THE COURT:  You don't know, because you talking to me, not deposing the witness.

Is this a situation where you don't have documents; you need to bring back the witness to go over more documents.  That's certainly going to be acceptable to me, and probably to counsel.

But what I'm trying to do is, don't assume you're not going to finish today.  Just keep going; try to finish.

If you can't, you can't.  Okay?

MR. MORRIS:  I understand, Your Honor.

To be clear, I teach a class at Delphi University at 6 o'clock.  This witness was not produced until 11:00.

MS. LINEEN:  Which was agreed upon, despite counsel calling the Court this morning and saying we're supposed to start at ten.

We agreed upon 11 o'clock.

Scott Partlow

284

MR. MORRIS:  And Your Honor, to be clear, we received 700 pages of e-mail last week.  700 pages of e-mail, where none existed.

We need to recall this witness.

MS. LINEEN:  Why?

THE COURT:  Counsel, you are wasting your time right now, that you have with the witness.

Get back to the witness.

When you have finished for the day, then you can make an application for more time, if you can't agree.

MR. MORRIS:  Understood, Your Honor.

MS. LINEEN:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. MORRIS:  Thank you very much.  Have a good day.

It's now 4:35.

MS. LINEEN:  I have 4:40.

MR. MORRIS:  Back on the record.

Scott Partlow

285

Defense counsel said 4:40.

MS. LINEEN:  That's what I have, yes.

Q    I'd like to go back for a second.

I just ask you, did you or your stepmother utilize your relationship with Longwood Central School District to help employ your ex-wife?

A    No.

Q    Did Marcy Sobel utilize her position to employ her daughter?

A    That, I am not aware of.

Q    Do you know if Marcy Sobel submitted any letters or reference on your behalf?

A    No.

Q    Do you know if Marcy Sobel submitted any letters or letters of reference in gaining employment with the Longwood School District?

A    Not that I am aware of.

Q    Do you know if Marcy Sobel had a relationship with any of the security guards

Scott Partlow

286

at Longwood it School District?

A    No.

Q    Do you know if your ex-wife, Jennifer, had a relationship with any of the security guards at Longwood School District?

A    No.

Q    Was there any conflict relating to Longwood School District and you and your ex-wife?

A    No.

Q    After June 4, 2015, did you have any discussions with any of the staff at Longwood Central School District regarding the events of June 4, 2015?

A    No.  Not that I recall.

Q    Is there anything that would refresh your recollection?

A    No.

Q    You ever meet with any of the principals at Longwood High School in regard to the event that occurred on June 4, 2015?

A    No.

Q    Did you ever discuss this matter with James Perada after June 4, 2015?

Scott Partlow

287

A    No.

Q    Anyone from the union speak to you in regard to this event?

A    No.

Q    Did Kenny Schall ever speak to you in regard to this event?

A    No.

Q    You indicated that you didn't work on June 5, 2015; is that right?

A    Correct.

Q    Who allowed you to miss work on June 5, 2015?

A    James Perada.

Q    Was this a paid day?

A    Yes.

Q    Did you have to take sick leave?

A    I don't remember.
      I don't think so.

Q    Was that a normal circumstance?

A    I'm sorry?
      I don't understand.

Q    Was that a normal circumstance, receiving a paid day of work?

MS. LINEEN:  Objection to form.

Scott Partlow

288

A    For what -- for that reason?

Q    Yes?

A    That's the first and only time I've ever done it.

Q    When you say, that for that reason, what was that reason?

A    For the kids questioning me.

Q    Did you report the harassment that you said from the kids to anyone at the school?

MS. LINEEN:  Objection.

A    Yeah, my supervisors, my lead guard.

Q    Was anything done in terms of a reprimand of those students?

A    That not I'm aware of, no.

Q    You ever receive a complaint in regard to the event on June 4, 2015?

MS. LINEEN:  Objection to form.

A    Complaint?
      I don't understand.

Q    Anyone complain about your behavior of June 4, 2015?

A    Students.

Scott Partlow

289

Q   Who?

A   Specifically, no, I don't know who they were.

Q   When did they complain?

A   The day of.

That's why I took a day off.

Q   You say the day of?

A   Day of.

After that, I didn't stay in the school.

Q   I'm sorry.  You say after that, you didn't --

A   Yes.  I went to road unit.

Q   Were you transferred, demoted?

A   No, no.

Moved my post.

Q   Who moved your post?

A   James.

Q   Why did James move your post?

A   Thought it would be better for me.

Q   How did he do that?

A   What do you mean?

I don't understand.

Scott Partlow

290

Q   Any paperwork that had to be --

A   No.  It was just a change of my post.

There's no paperwork.

Q   Was anything reduced to writing as to why your post was changed?

A   No, I don't think so.

Q   Did you receive any change in pay?

A   No.

Q   Did you receive any change in hours?

A   No.

Q   Was there anything done to follow up with the complaints made by students?

A   Not that I'm aware of, no.

Q   Did James Perada do anything in regard to your complaints about these complaints from students?

A   Just he thought it would be better off if I changed my post.

Q   Did he address any of the concerns of the Longwood Central School

Scott Partlow

291

District students?

A   I'm not aware of that knowledge.

I don't know.

Q   Did anyone interview any of these students?

A   No.  I don't know.

Q   Do you know if James Perada spoke to any of these student?

A   Not aware of that.

Q   Did he speak to the school resource officer in regard to this matter?

MS. LINEEN:  I'm sorry.

Did the witness or James Perada?

MR. MORRIS:  Please repeat the question.

(Whereupon, the last question was read back by the court reporter.)

A   No.

Q   Were you ever contacted by the Suffolk County police?

A   I'm sorry?

Q   Were you ever contacted by the Suffolk County Police Department?

MS. LINEEN:  Objection.

Scott Partlow

292

A   Just when they came to do the -- interview me, statement.

Q   Anything after that?

A   No.

Q   How did you learn about that?

A   They just came to the school.

Q   Did you receive any correspondence?

A   No.

Q   Did you give a statement to the Suffolk County Police Department?

A   Yes.

Q   Do you know what day you gave that statement?

A   I'm not clear on the date.

Q   Who was present with you when you gave that statement?

A   I don't remember if it was one or two detectives.

Q   Male, female, something else?

A   It was a male.

Q   Did you provide these detectives your previous statements?

A   No.

Scott Partlow

293

Q   Do you remember telling the police that Jerry Chan held David Edmond?

A   **I don't recall that.**

Q   Do you ever recalling saying that Jerry Chan had trouble restraining David Edmond?

A   **Not physically.**

**I remember him telling him he wasn't -- the situation wasn't getting any better.**

Q   Ever contacted by Internal Affairs?

A   **No.**

Q   Have you ever seen a complaint in this matter?

A   **I don't believe I have.**

Q   You know you've been named in a lawsuit, right?

A   **Yes.**

Q   You've never seen the actual complaint that alleges you did civil wrong against David Edmond, Carol and Tom Edmond?

A   **I don't think I ever went through it.**

Scott Partlow

294

Q   Hand to you. I believe it's marked as Plaintiff's Exhibit 3.

Have you ever seen that document before?

A   **I think I have, yes.**

**I don't think I actually read it.**

Q   When did you see the document?

A   **When meeting with the attorney.**

Q   Which attorney?

A   **Caroline.**

Q   When?

A   **One of the meetings we had.**

Q   2016?

A   **2017.**

Q   So you didn't meet with her in 2016 regarding this document?

MS. LINEEN:  Objection to form.

A   **2016?**

**No.**

**I met with her in 2016.**

**I don't think I saw that.**

Q   You see when this document was filed?

Scott Partlow

295

I represent to you it was filed June 3, 2016.

A   **Okay.**

Q   Do you recall meeting with anyone in June 2016 to answer whether the accusations in this document were true or false?

A   **I don't recall.**

Q   Anything that would refresh your recollection?

A   **No.**

Q   Did you receive notice that you had to speak to counsel?

How did you receive the notice, without telling me any conversation that you might have had with Counsel?

A   **To be honest, I don't remember how I was told.**

Q   Verbally, writing, e-mail, something else?

MS. LINEEN:  Objection.

A   **I don't remember e-mail, so it must have been verbal.**

Q   I'd like to direct your

Scott Partlow

296

attention to page 11 of this document here.

You see that? You see paragraph 35?

A   **Okay.**

Q   Do you agree with that statement?

MS. LINEEN:  Objection.

You can answer.

A   **He was there.**

**I couldn't tell you if he was lawfully or not.**

Q   Do you know if Plaintiff David Edmond was lawfully present and enrolled in Longwood High School on June 4, 2015?

MS. LINEEN:  Objection.

You can answer.

A   **He was there; but I couldn't tell you if he was lawfully there.**

Q   Explain to me why you can't tell me?

A   **I don't know his -- what's going on -- I don't know his personal stuff in the school.**

Q   Do you think he was unlawfully

Scott Partlow

297

in the school?

MS. LINEEN:  Objection.

A  Do I think?

No.  He was there.

Q  Do you know if he was enrolled in Longwood High School on June 4, 2015?

A  As far as I know.

Q  Paragraph 36, would you agree with that paragraph?

A  I didn't see exterior; I saw on the interior, something going on.

Q  Would you agree with paragraph 37?

MS. LINEEN:  Note my objection.

A  I don't know who both students are.

Q  I'm sorry?

A  I don't know who both students are.

Both students and teachers, yes.

Q  You agree with that paragraph?

A  That there was a hallway, yes.

That student and teacher were in the hallway, yes.

Scott Partlow

298

Q  If you could look at page 12, paragraph 40.

Would you agree with that statement?

A  Yes.

Q  41 -- do you agree that, quote, Plaintiff David Edmond was seized, being grabbed, by Assistant Principal Reese, end quote?

A  I can't tell you.

I didn't see it.

Q  Did you see, quote, Defendant Assistant Principal Reese walked towards David Edmond, grabbed him by the shirt collar, in an aggressive manner, and pushed David Edmond back up against the wall, end quote?

A  I can't agree to it.

I didn't see it.

Q  What about, quote, at no time were Defendant Assistant Principal Reese's actions justified because Plaintiff David Edmond was not doing anything to provoke the action, end quote?

Scott Partlow

299

MS. LINEEN:  Objection.

He can answer.

A  Again, I didn't see it.

I can't agree.

Q  What about, quote, Plaintiff David Edmond attempted to remove Assistant Principal Reese's hand from his collar and told Assistant Principal Reese that he could not grab Plaintiff David Edmond in such a manner, end quote?

Did you see that?

A  No, I did not see that.

Q  What about Paragraph 45?

Did you hear Defendant Assistant Principal Reese say to David Edmond, quote, yes, I can.  What are you going to do about it, end quote, on June 4, 2015?

A  I can't agree with it.

I didn't see it.

Q  What about 47?

Do you agree with that, that quote, Plaintiff David Edmond did not authorize or otherwise provide consent to Defendant Reese's actions, end quote?

Scott Partlow

300

MS. LINEEN:  Objection.

A  I can't answer on that.

Q  Do you know if David Edmond protested -- looking at the next page here -- Defendant Reese's actions; I think Scott Reese?

A  Which one are you --

Q  48?

A  I would assume --

I didn't see it.  I didn't see any interaction between him and Reese before I got there.

Q  Would you agree with 49, quote, Defendant security guard Scott, upon seeing Reese's actions towards the Plaintiff, David Edmond, did batter, seize and start to block the passage of air of plaintiff David Edmond by placing David Edmond in a choke hold, end quote?

MS. LINEEN:  Objection.

A  I don't know.

Q  Do you agree with, quote, Defendant Scott did place Plaintiff David Edmond in a choke hold with his arm locked

Scott Partlow

301

around Plaintiff David Edmond's neck, end quote?

A        I don't agree with that.

Q        Do you agree with, quote, Defendant Scott did physically drag Plaintiff David Edmond to the other side of the hallway while he choked and blocked the passage of air of Plaintiff David Edmond, end quote?

A        I don't agree with that.

Q        Now that you see this, to whom, if anyone, are you going to speak to about these statements with which you don't agree?

A        Nobody.

        MS. LINEEN:  Objection.

Q        Did Plaintiff David Edmond protest to both Defendant Scott and Defendant Reese that he was unable to breathe at this time?

A        I don't agree with that.

Q        Is it that you didn't hear it, or is it that you don't know?

A        I don't know.

        I didn't hear anything like

Scott Partlow

302

that.

Q        What about, looking at page 14, would you agree that student Clarence Fenner witnessed the entire event?

A        I don't know who Clarence Fenner is.

Q        Did anyone show you the statement of the student listed in Paragraph 58, starting at page 14, Plaintiff's Exhibit 3; it spans on, page 15, Plaintiff's Exhibit 3.

        MS. LINEEN:  Objection.

A        I have never seen the statement they've given.

Q        Do you agree with Paragraph 60 on page 15, all of this was recorded by Defendant Longwood Central School District security camera, and upon information and believe, provided to Defendant Suffolk County, Suffolk County Police Department, Suffolk County Police Officer Zimmerman, Suffolk County Police Officer Lieutenant Richard Aldridge, Suffolk County Police Officer Sergeant Snardy, and Suffolk County

Scott Partlow

303

Police Officers John and Jane Doe 1-10.

        MS. LINEEN:  Note my objection to form.

A        I can't comment on that because I don't know.

Q        Do you know if there was video capturing the events of June 4, 2015?

A        I think so, yes.

Q        Do you know if you were on that video that was captured on June 4, 2015?

A        I guess.

Q        Do you know if there was social media depicting you and the events of June 4th, 2015, on the Internet?

A        I know that was on the news.

Q        What did you see on the news?

A        What happened.

Q        I'm going show you what was marked Plaintiff's 43.

        Have you ever seen this document before?

A        It does not look familiar to me.

Q        Is that your name on Plaintiff's 43, right where it says name and date and

Scott Partlow

304

time?

A        Yes.

Q        Has anyone presented this document to you?

A        No.

Q        If you look on page two of Plaintiff's 43, I'm going to ask you for correspondence, records, notes, texts and instant messages, social media postings, voice mails, statements, and all memorandum relating to the subject matter which is the basis of this litigation.

A        I'm sorry.  What was the question?

        MS. LINEEN:  Objection.

        MR. MORRIS:  Would you read the question, please.

        (Whereupon, the last question was read back by the court reporter.)

Q        On Plaintiff's 43, has anyone asked you to produce all correspondence, record, notes, texts and instant messages, social media postings, voice mails, statements, all memorandum relating to the subject matter which is the basis of this

Scott Partlow

305

litigation?

A    Yes.  If I had any e-mails.

Q    Who did you produce those e-mails to?

A    I didn't have any.

They asked for it.

Q    Who asked you?

A    Counsel.

Q    On what date?

A    I don't remember what date it was.

Q    Were you asked to provide copies of formal and informal complaints, writeups, reprimands, disciplinary action concerning or involving you, the deponent?

A    No.

Q    Were you asked to provide copies of the school district's policies regarding the use of force and any and all complaints made by Longwood Central School District?

A    I wasn't, no.

Q    Were you asked to produce any video recordings from June 4, 2015?

A    I wasn't asked, no.

Scott Partlow

306

Q    Were you asked to produce all photographs relating to the altercation of Plaintiff David Edmond?

A    I wasn't asked.

Q    Were you asked to produce all copies of the handbooks and/or guidelines concerning your employment?

A    I wasn't asked, no.

Q    Were you asked to produce all training and reference materials, including but not limited to what was given to you when you were hired?

A    I wasn't asked, no.

Q    Were you asked to produce any and all complaints made against security guards involving the June 4, 2015 incident which occurred at Longwood High School?

A    I wasn't asked.

Q    Were you asked to produce any and all written or electronically stored statements given to or produced by Longwood security guards involving in this complaint?

A    Yes.

Q    Who did you give those to?

Scott Partlow

307

A    I didn't have any.

Q    On what date were you asked?

A    I don't remember the date.

Q    Were you asked to produce all communications, memorandum, letters, logs, e-mails and social media posts and text messages or instant messages between the defendants and the school resource officer or Suffolk County Police Department concerning Plaintiffs David, Carol and Tom Edmond?

A    No, I wasn't asked.

Q    I'd like to present to you Plaintiff's Exhibit 16.

Do you recognize this document?

A    Yes.

Q    What is this document?

A    It looks like a one of the booklets we have for the training.

Q    How do you recognize this document as one of the booklets that you have?

A    It looks familiar.

It says the eight-hour class,

Scott Partlow

308

the eight-hour service training course.

Q    Is Plaintiff's Exhibit 16 the same as -- substantially the same as when you received this eight-hour training course?

MS. LINEEN:  Note my objection to form.

A    Yes.

Q    Are you familiar with the content of this document?

A    Not everything specific.

Q    Were you expected to be bound by the contents of this document?

A    Yes.

Q    Is this document held and maintained within the regular course of business at Longwood High School?

MS. LINEEN:  Objection.

THE WITNESS:  I'm sorry.

Can you repeat that?

Q    Is this document held or maintained in the regular course of business at Longwood High School?

A    I'm not sure.

Scott Partlow

309

Q   I'll direct your attention to three pages at the top of Plaintiff's Exhibit 16; looks like 041-3.  Do you see that?

A   Yes.

Q   Do you see Roman numeral lower case xi, period?

A   Yes.

Q   Were you trained in quote, the use of force to include the application of temporary restraining devices and the use of weapons, where applicable, end quote?

A   Am I trained on that?

Q   Yes?

A   No.  We don't uses devices.

Q   Did you ever use weapons at Longwood High School?

A   No.

Q   I'd like to direct your attention, about ten pages in, top of the page, where it says legal powers and limitations PowerPoint.

Do you remember reviewing a PowerPoint about legal powers and

Scott Partlow

310

limitations?

A   I can't recall exactly what was on it, if I saw it.

Q   Do you remember reviewing such a PowerPoint?

MS. LINEEN:  Objection to form.

A   I can't recall.

Q   Do you recall reviewing such a PowerPoint, indicating, among other things, that, quote, if a security guard exceeds his or her authority, he/she can face criminal and civil liability for their actions, end quote?

A   I can't recall if I've seen a PowerPoint on it.

Q   Did you have an EAP program at the District?

A   EAP, I don't know what that is.

Q   Confidential assistance program called EAP?

A   Not sure.

I'm not aware of it.

Q   Were you ever trained in regard to such a program?

Scott Partlow

311

A   Not that I'm aware of.

Q   Was there anyone you could call if you felt that you needed to speak to someone out of the district for whatever it might be:  Complaint, discrimination, unruly use of force?

MS. LINEEN:  Note my objection. You can answer.

A   I'm not aware of anything.

Q   I see you looking forward.

If you can go to report writing.

Keep on going.  It's at the top of the page.

Shortly after that page that you're on now.

A   Okay.

Q   Go down to the second paragraph.

Would you agree that a well-written report must be complete?

A   Yes.

Q   Were you trained that each of these reports must be, quote, detailed and complete on the day of the occurrence, end quote?

Scott Partlow

312

A   Correct.

Q   You were taught to put every detail into that, not leave anything out, correct?

MS. LINEEN:  Objection.

A   As much as we remember, yes.

Q   You were told to provide accurate details, correct?

A   Yes.

Q   You were trained to report honestly and stay objective, correct?

A   Correct.

Q   Were you trained in dealing with law enforcement agencies?

A   I've never worked with them directly.

They talked a little about it.

I don't deal with them directly.

Q   Would you agree that, quote, when a guard has any dealings with the law enforcement agency, it is crucial that the shift supervisor be contacted immediately and the chief of security notified, end quote?

Scott Partlow

313

A    Right.

Q    Is that correct?

A    That's correct.

Q    Did you notify the shift supervisor when you spoke to police in regard to the incident with David Edmond?

A    Yeah, because I think they might have been the one that told me about it.

Q    Did you notify the chief of security?

A    He was notified.

Q    Did you notify him?

A    I don't think I notified him, no.

Q    Did this policy espouse a zero tolerance policy from professional conduct and behavior?

MS. LINEEN:  Objection to form.

A    Could you repeat that?

Q    Did this policy here that we're holding, Plaintiff's Exhibit 16, espouse -- did it show a zero tolerance policy for unprofessional conduct and behavior?

MS. LINEEN:  Objection to form

Scott Partlow

314

again.

A    I can't answer that.

Q    How about this.  Did Longwood, throughout your tenure of employment, maintain a zero tolerance policy for unprofessional conduct and behavior?

A    Yes.

MR. MORRIS:  At this point, shortly after 5 o'clock, unfortunately we're going to have to end this deposition.

We reserve the right to  recall this witness.

MS. LINEEN:  Can I see Exhibit 36, please?

MR. MORRIS:  Counsel, unfortunately I'm going to end this deposition for the reasons already stated to the Court earlier.

MS. LINEEN:  You're not going to allow me to ask questions of the witness?

MR. MORRIS:  Again, for the reasons that we stated to the Court

Scott Partlow

315

earlier.

MS. LINEEN:  Which was?

MR. MORRIS:  That I teach a class at 6 o'clock in Garden City.

MS. LINEEN:  If you're not going to allow me to ask questions of the witness to clarify what was talked about today --

MR. MORRIS:  I'm going to go off the record.

MS. LINEEN:  No, no.  I want this on the record.

MR. MORRIS:  No, no.

Again, this was in front of a judge.

MS. LINEEN:  Okay.

MR. MORRIS:  We're going to go.

We're going to raise our right to recall the witness.

We're going off the record.

MS. LINEEN:  No, no, no.

You're not going to shut --

MR. MORRIS:  Closed.

(Time noted:  5:10 p.m.)

Scott Partlow

316

A C K N O W L E D G E M E N T

STATE OF NEW YORK  )
                                       :ss
COUNTY OF            )

I, SCOTT PARTLOW, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of November 27, 2017; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____
SCOTT PARTLOW

Signed and subscribed to before me, this            day
of                    , 2017.

_____
Notary Public, State of New York

317

------------------I N D E X------------------

WITNESS          EXAMINATION BY          PAGE
SCOTT PARTLOW       MR. MORRIS          5

DIRECTION NOT TO ANSWER:  PAGE 29,29
RULINGS:  PAGE 275
MOTIONS:  None

---------------DOCUMENT REQUEST---------------
PAGE 19   Written application for employment.
PAGE 20   Background check, fingerprints and all
          the documentation with the employment
          application.
PAGE 44   All statements given by this deponent as
          it relates to the Suffolk County Police
          Department and the School.
PAGE 50   These agreements and anything indicating
          whether insurance is covering him or
          indemnifying him.
PAGE 62   All documents signed and the code of
          conduct that this deponent received for
          the 2014-2015 school year.

318

PAGE 122  All uses of force, whether they be SCs
          or something else, where this deponent,
          Mr. Partlow, is present or utilized
          force.
PAGE 144  All signatures acknowledging receipt of
          eight-hour trainings or any security
          training conducted where this deponent
          was a participant in such training.
PAGE 159  CPI training certificate.
PAGE 162  This document as completed by this
          deponent.
PAGE 176  Production of that acknowledgement.
PAGE 182  Video utilized to show proper restraint.
PAGE 185  Signed document, as witness testified,
          all documentation evidencing completion
          of the August 12, 2013 course.
PAGE 194  all training materials for the 16-hour
          on-the-job training course for security
          guards, as this witness has testified in
          Plaintiff's Exhibit 24.
PAGE 222  All electronic punch cards or any time
          sheet cards that evidence this
          deponent's physical presence at work,
          including but not limited to June 4,

319

2015.
PAGE 248  Un-redacted version six this document.

---------INFORMATION TO BE FURNISHED--------
PAGE 15   Any other titles at Walmart.
PAGE 23   School Attended for security license.

------------------EXHIBITS------------------
PLAINTIFF'S FOR I.D.                    PAGE
15   Dignity for All Students Act       84
16   Longwood CSD Security Department   164
     In-Service 8-hour training
17   Longwood CSD Dignity for All       171
     Students Act
18   NYS 8-hour in-service training     175
19   Security guard training certificate, 183
     8/27/12.
20   Security guard training certificate, 184
     8/12/13.
21   Department of State licensure info (11/20/17)
22   Security guard training certificate (9/1/17)
23   Security guard training certificate (7/12/08)
24   Security guard training certificate,

320

     11/4,5/6/2008.
25   Security guard training certificate (8/27/12)
26   Security guard training certificate (8/12/13)
27   Security guard training certificate (8/29/14)
28   Security guard training certificate (8/21/15)
29   Security guard training certificate (8/20/16)
30   Security guard training certificate (7/12/08)
31   Letter from Division of Licensure
     to William Nester, 2/18/15.
32   Department of State Licensure info,
     Bates stamp #1646
33   Security guard license
34   Dispatcher's log
35   Write-up of warning notice
36   Punch clock time sheet
37   Security guard timesheet            220
38   Incident Report log, 3 pages       229/247
39   Field Report 15-1318               251
40   Supplemental field report          255
41   Security Department field report,  265
     6/4/15.
42   PDSC Accredited law enforcement    265
     Agency statement form, 6/10/15.
43   Notice of Deposition of witness    265

321

CERTIFICATE

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

I, RICH MOFFETT, a Notary Public within and for the State of New York, do hereby certify:

That SCOTT PARTLOW, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of December, 2017.

-------------------------

RICH MOFFETT

322

**#**

**#1-10** [1] - 1:17
**#1646** [1] - 320:12

**'**
**-**

**'5th** [1] - 223:7
**'hands** [1] - 102:7
**'hands-on'** [1] - 102:7

**/**

**/THRA** [1] - 157:21

**0**

**041-3** [1] - 309:4

**1**

**1** [6] - 52:24, 53:2,
  53:7, 53:11, 63:9,
  219:5
**1-10** [3] - 1:11, 1:16,
  303:2
**10** [3] - 143:7, 143:11,
  148:16
**100** [3] - 5:13, 11:21,
  163:5
**1016** [1] - 248:11
**1049** [1] - 249:9
**1052** [3] - 249:8,
  249:11, 250:21
**10601** [1] - 3:12
**107** [1] - 158:25
**108** [1] - 99:15
**109** [1] - 100:13
**10:00** [3] - 231:21,
  232:6, 235:6
**10:55** [1] - 1:23
**10:56** [1] - 5:16
**11** [7] - 69:2, 158:22,
  158:23, 164:14,
  231:6, 283:25, 296:2
**11/20/17** [1] - 319:22
**11/26/2017** [1] - 186:7
**11/4,5/6/2008** [1] -
  320:2
**110** [4] - 100:23,
  100:25, 102:5,
  105:24
**1102** [1] - 3:11
**112** [2] - 111:19, 112:5
**114** [1] - 2:24
**11501** [1] - 2:25
**11746** [2] - 1:21, 3:6
**118** [1] - 99:15
**119** [2] - 5:14, 115:8
**11953** [2] - 11:22,

**12:16**
**11:00** [2] - 5:18,
  283:20
**11:15** [1] - 29:23
**11:25** [1] - 30:18
**11:55** [1] - 60:24
**11:56** [1] - 61:4
**12** [3] - 185:21, 298:2,
  318:17
**120** [4] - 116:15,
  118:3, 121:5, 123:20
**121** [4] - 128:2, 128:3,
  131:3, 132:14
**122** [3] - 133:9,
  133:15, 318:2
**12:15** [1] - 80:18
**12:28** [1] - 80:22
**12th** [1] - 196:15
**130** [1] - 115:8
**132** [1] - 137:5
**13B** [1] - 67:22
**14** [2] - 302:3, 302:10
**141** [1] - 137:6
**144** [1] - 318:6
**15** [10] - 38:5, 84:7,
  84:8, 84:13, 84:16,
  258:7, 302:11,
  302:17, 319:7,
  319:12
**15-1318** [2] - 251:25,
  320:19
**15-332901** [1] - 249:17
**157** [1] - 143:8
**159** [1] - 318:10
**16** [11] - 164:24,
  164:25, 186:23,
  187:15, 188:22,
  276:11, 307:15,
  308:3, 309:4,
  313:22, 319:13
**16-hour** [7] - 187:6,
  187:15, 192:4,
  192:11, 193:25,
  194:10, 318:18
**160** [2] - 145:3, 145:5
**162** [1] - 318:11
**1637** [1] - 189:22
**1638** [1] - 192:10
**1639** [1] - 195:2
**164** [1] - 319:13
**1641** [1] - 197:13
**1642** [1] - 198:3
**1643** [1] - 199:18
**1644** [1] - 200:21
**1645** [1] - 202:2
**1646** [1] - 205:20
**17** [5] - 171:17, 172:8,
  172:10, 173:2,
  319:15
**171** [2] - 145:20,

**319:15**
**172** [3] - 146:24,
  147:7, 148:8
**173** [1] - 151:14
**175** [1] - 319:17
**176** [1] - 318:13
**18** [4] - 169:7, 175:5,
  175:8, 319:17
**182** [1] - 318:14
**183** [1] - 319:18
**184** [1] - 319:20
**185** [1] - 318:15
**19** [8] - 15:9, 183:4,
  183:7, 183:14,
  183:21, 183:25,
  317:12, 319:18
**194** [1] - 318:18
**1997** [1] - 13:3
**1999** [1] - 15:7
**1:54** [1] - 139:23

**2**

**2/18/15** [1] - 320:10
**20** [8] - 15:9, 76:19,
  184:15, 184:16,
  184:19, 184:21,
  317:13, 319:20
**2004** [1] - 16:2
**2006** [2] - 28:20, 274:9
**2008** [5] - 18:12, 33:8,
  33:10, 33:15, 57:3
**2010** [2] - 33:2, 33:9
**2011** [4] - 272:20,
  274:8, 274:20,
  275:14
**2012** [1] - 55:24
**2013** [6] - 28:4, 185:9,
  185:21, 196:15,
  196:21, 318:17
**2014** [8] - 59:11,
  59:14, 97:17, 139:8,
  197:4, 197:7, 197:8,
  202:18
**2014-2015** [2] - 62:16,
  317:24
**2015** [65] - 37:15,
  39:24, 41:25, 42:7,
  76:11, 90:18, 92:4,
  92:13, 92:17, 92:22,
  93:22, 94:3, 94:7,
  97:17, 120:23,
  124:6, 133:6, 139:3,
  139:8, 145:17,
  155:12, 178:4,
  198:2, 202:18,
  209:12, 210:4,
  210:9, 211:11,
  211:16, 211:20,
  217:19, 219:23,

**220:11, 221:25,**
  222:8, 223:8,
  224:23, 227:3,
  229:15, 229:21,
  231:18, 231:21,
  232:7, 252:4, 252:7,
  252:11, 253:20,
  254:23, 286:12,
  286:15, 286:22,
  286:25, 287:10,
  287:13, 288:19,
  288:24, 296:15,
  297:7, 299:18,
  303:8, 303:11,
  303:15, 305:24,
  306:17, 319:2
**2015-year** [1] - 205:2
**2016** [12] - 10:25,
  199:13, 199:15,
  199:24, 200:3,
  200:7, 294:15,
  294:18, 294:20,
  294:22, 295:3, 295:6
**2017** [7] - 1:22, 10:25,
  144:11, 294:16,
  316:11, 316:22,
  321:22
**204** [1] - 154:10
**21** [3] - 79:10, 186:6,
  319:22
**215** [1] - 143:9
**217** [2] - 155:18,
  155:25
**218** [1] - 157:16
**22** [7] - 79:15, 188:14,
  188:16, 188:18,
  189:5, 189:17,
  319:23
**220** [1] - 320:17
**222** [1] - 318:22
**229/247** [1] - 320:18
**23** [6] - 53:2, 189:16,
  189:18, 189:22,
  319:8, 319:24
**233** [4] - 84:11, 86:9,
  86:14, 89:2
**234** [1] - 90:2
**235** [1] - 84:11
**24** [8] - 191:23,
  191:25, 192:3,
  192:10, 192:17,
  194:4, 318:21,
  319:25
**248** [1] - 319:3
**25** [7] - 194:18,
  194:20, 194:22,
  195:2, 195:6,
  195:13, 320:3
**251** [1] - 320:19
**255** [1] - 320:20

**26** [5] - 196:13,
  199:24, 200:3,
  200:7, 320:4
**265** [3] - 320:21,
  320:23, 320:25
**27** [5] - 1:22, 196:25,
  197:2, 316:11, 320:5
**275** [1] - 317:8
**27th** [2] - 183:20,
  321:21
**28** [5] - 197:23,
  197:24, 198:11,
  199:7, 320:6
**29** [5] - 199:6, 199:9,
  199:11, 199:18,
  320:7
**29,29** [1] - 317:7
**2:15** [1] - 55:10
**2:16-cv-2871** [1] - 1:6
**2:20** [1] - 166:2
**2:30** [3] - 55:13,
  217:22, 217:23
**2nd** [1] - 222:14

**3**

**3** [5] - 294:3, 295:3,
  302:11, 302:12,
  320:18
**30** [6] - 200:11,
  200:13, 200:17,
  200:21, 266:10,
  320:8
**31** [4] - 201:17,
  201:19, 201:25,
  320:9
**310** [2] - 1:21, 3:5
**32** [5] - 205:11,
  205:13, 205:15,
  207:9, 320:11
**33** [6] - 1:21, 3:5,
  207:11, 207:13,
  207:15, 320:13
**34** [2] - 209:4, 320:14
**35** [5] - 147:14,
  211:23, 212:23,
  296:4, 320:15
**36** [7] - 218:5, 218:6,
  218:9, 218:17,
  297:9, 314:16,
  320:16
**37** [9] - 220:17,
  220:18, 220:21,
  220:23, 221:2,
  221:11, 229:8,
  297:14, 320:17
**38** [7] - 229:12, 247:6,
  247:8, 247:10,
  248:3, 248:22,
  320:18

323

**39** [3] - 251:14,
251:17, 320:19
**3934** [1] - 248:4
**3935** [1] - 248:6
**3936** [1] - 248:4
**3:00** [3] - 55:13, 210:5,
210:9
**3:19** [1] - 209:2

## 4

**4** [52] - 41:25, 42:7,
76:11, 90:18, 92:4,
92:13, 92:17, 92:22,
93:22, 94:3, 94:7,
124:6, 133:6, 139:3,
145:17, 155:11,
178:4, 209:12,
210:4, 210:9,
211:11, 211:16,
211:20, 217:18,
219:23, 220:10,
221:25, 222:8,
224:23, 229:15,
229:21, 231:18,
231:21, 232:7,
252:4, 252:7,
252:10, 253:20,
286:12, 286:15,
286:22, 286:25,
288:19, 288:24,
296:15, 297:7,
299:18, 303:8,
303:11, 305:24,
306:17, 318:25
**40** [15] - 56:13, 56:24,
57:2, 57:6, 253:16,
255:2, 255:3, 255:6,
255:8, 255:15,
255:18, 256:15,
267:6, 298:3, 320:20
**40-hour** [1] - 228:14
**41** [6] - 265:15,
265:17, 265:21,
266:9, 298:7, 320:21
**42** [1] - 320:23
**43** [5] - 303:20,
303:25, 304:8,
304:20, 320:25
**44** [1] - 317:16
**445** [1] - 3:11
**45** [1] - 299:14
**47** [1] - 299:21
**48** [1] - 300:9
**49** [1] - 300:14
**4:15** [1] - 270:20
**4:25** [1] - 270:23
**4:35** [1] - 284:23
**4:40** [2] - 284:24,
285:2

**4th** [6] - 39:23, 120:22,
218:25, 255:13,
266:2, 303:15

## 5

**5** [6] - 12:15, 227:3,
287:10, 287:13,
314:10, 317:4
**50** [1] - 317:19
**516-280-4664** [1] -
2:25
**525** [1] - 262:2
**526** [2] - 250:4, 250:14
**53** [1] - 5:14
**58** [1] - 302:10
**581** [1] - 212:2
**586** [1] - 210:22
**593** [1] - 252:25
**5:10** [1] - 315:25
**5th** [1] - 223:14

## 6

**6** [2] - 283:19, 315:5
**6/10/15** [1] - 320:24
**6/4/15** [1] - 320:22
**60** [1] - 302:16
**605** [1] - 251:8
**62** [1] - 317:22
**630** [1] - 2:24
**645** [1] - 251:4
**6:15** [1] - 55:10
**6:30** [3] - 55:13,
217:22, 217:23

## 7

**7** [6] - 99:13, 99:20,
99:22, 104:20,
229:22, 231:6
**7/12/08** [2] - 319:24,
320:8
**700** [2] - 284:3, 284:4
**710** [1] - 173:3
**752** [1] - 173:23
**771** [1] - 173:4
**7:00** [3] - 55:13, 210:5,
210:9

## 8

**8** [7] - 65:24, 66:7,
68:23, 115:7,
115:12, 115:23,
116:3
**8-hour** [2] - 319:14,
319:17
**8/12/13** [2] - 319:21,
320:4

**8/20/16** [1] - 320:7
**8/21/15** [1] - 320:6
**8/27/12** [2] - 319:19,
320:3
**8/29/14** [1] - 320:5
**810** [2] - 177:9, 177:10
**83** [1] - 161:5
**838** [1] - 179:13
**84** [2] - 158:25, 319:12
**878** [2] - 181:6, 181:13
**880** [1] - 181:22
**895** [1] - 218:12
**896** [1] - 218:12

## 9

**9** [7] - 66:7, 69:4,
136:15, 136:16,
136:20, 137:3, 140:5
**9/1/17** [1] - 319:23
**90** [1] - 161:2
**954** [1] - 209:5
**957** [1] - 209:6
**97** [2] - 162:9, 162:10
**98** [1] - 162:17

## A

**a.m** [6] - 1:23, 5:16,
5:18, 231:21, 232:6,
235:6
**abide** [2] - 60:20,
179:8
**ability** [7] - 131:8,
131:25, 132:15,
132:19, 157:2,
181:17, 254:3
**able** [5] - 6:25, 9:22,
125:3, 278:19, 281:8
**absent** [3] - 103:13,
104:5, 110:7
**absolutely** [1] - 74:14
**acceptable** [2] -
162:12, 283:9
**access** [4] - 71:12,
181:2, 181:9, 181:17
**accommodate** [1] -
58:4
**accordance** [2] -
77:21, 95:16
**account** [1] - 58:20
**Accredited** [1] -
320:23
**accurate** [4] - 9:20,
10:11, 277:3, 312:9
**accurately** [1] - 9:23
**accusation** [2] -
68:16, 68:22
**accusations** [1] -
295:7

**accuse** [1] - 38:14
**acknowledge** [4] -
22:24, 61:7, 143:25,
175:21
**acknowledgement** [3]
- 159:21, 176:7,
318:13
**acknowledges** [1] -
186:14
**acknowledging** [4] -
144:14, 175:25,
185:12, 318:6
**act** [6] - 53:19, 63:10,
98:6, 157:8, 217:9,
231:13
**Act** [23] - 82:5, 82:12,
82:19, 83:5, 84:3,
84:17, 84:24, 85:13,
86:6, 87:11, 87:19,
89:22, 91:17, 96:15,
96:23, 97:6, 172:11,
172:13, 173:6,
173:10, 174:5,
319:12, 319:16
**acted** [1] - 260:18
**acting** [26] - 101:5,
101:10, 101:14,
105:16, 105:18,
105:25, 106:3,
106:22, 106:25,
107:24, 109:7,
109:9, 109:10,
109:12, 109:18,
109:23, 110:8,
110:13, 111:5,
111:9, 111:10,
111:13, 111:22,
254:2, 256:17,
257:18
**action** [12] - 80:2,
90:9, 90:13, 90:17,
90:22, 100:2, 118:6,
141:2, 211:20,
298:25, 305:15,
321:17
**actions** [6] - 259:18,
298:23, 299:25,
300:6, 300:16,
310:13
**activate** [1] - 60:3
**actors** [1] - 271:5
**acts** [3] - 95:19, 96:2,
96:10
**actual** [13] - 37:13,
40:11, 58:24, 77:16,
86:17, 86:21,
180:13, 245:24,
263:6, 266:20,
266:22, 266:24,
293:21

**add** [3] - 9:11, 269:15,
274:24
**addition** [1] - 281:11
**additional** [1] - 9:7
**address** [13] - 5:12,
11:18, 11:20, 12:7,
12:12, 12:14, 59:3,
59:6, 59:14, 59:19,
108:15, 152:13,
290:24
**addressed** [2] -
169:19, 246:16
**adhere** [2] - 50:16,
50:21
**administer** [1] - 4:16
**administration** [4] -
79:18, 83:10, 83:12,
215:9
**administrator** [2] -
141:4, 215:9
**advised** [1] - 86:15
**advisement** [17] -
20:2, 20:25, 23:19,
44:13, 50:13, 62:20,
123:9, 144:20,
160:4, 162:7,
176:11, 182:13,
185:24, 194:8,
205:5, 222:13,
248:25
**advisory** [3] - 189:11,
195:18, 196:20
**Affairs** [1] - 293:13
**afternoon** [1] - 269:25
**afterwards** [2] - 40:17,
245:25
**age** [1] - 68:2
**agencies** [2] - 138:7,
312:15
**agency** [2] - 312:22,
320:24
**agenda** [1] - 53:17
**aggression** [3] -
101:6, 112:7, 112:9
**aggressive** [2] -
256:17, 298:16
**aggressively** [5] -
257:13, 257:14,
257:19, 257:20,
259:15
**agitate** [1] - 123:14
**ago** [2] - 49:18, 194:14
**agree** [74] - 28:8, 63:8,
63:15, 85:25, 98:9,
100:14, 101:11,
111:18, 112:13,
116:22, 117:24,
118:8, 118:10,
118:19, 119:5,
119:7, 123:19,

324

124:2, 124:23, 125:11, 125:12, 125:20, 126:3, 130:2, 131:4, 131:13, 132:2, 132:23, 133:14, 133:19, 133:25, 136:5, 140:13, 140:17, 140:20, 140:25, 145:4, 154:14, 157:7, 157:12, 157:18, 157:21, 162:19, 173:17, 173:21, 173:23, 174:3, 178:12, 178:23, 229:18, 229:19, 258:16, 284:14, 296:6, 297:9, 297:13, 297:22, 298:4, 298:7, 298:19, 299:5, 299:19, 299:22, 300:14, 300:23, 301:4, 301:5, 301:11, 301:14, 301:21, 302:4, 302:16, 311:19, 312:20

**agreed** [3] - 216:25, 283:21, 283:25

**AGREED** [3] - 4:3, 4:9, 4:14

**agreement** [3] - 49:14, 216:6

**agreements** [3] - 50:6, 215:24, 317:19

**ahead** [1] - 117:23

**aid** [1] - 133:21

**aide** [4] - 32:2, 32:4, 33:18, 33:21

**air** [2] - 300:18, 301:9

**albeit** [1] - 278:5

**alcohol** [1] - 10:5

**Aldridge** [1] - 302:24

**ALL** [1] - 16:13

**allegation** [2] - 155:10, 155:15

**alleged** [1] - 271:10

**alleges** [2] - 174:13, 293:22

**allow** [4] - 240:16, 281:25, 314:22, 315:7

**allowed** [22] - 64:13, 65:12, 69:16, 101:13, 104:21, 105:9, 105:13, 107:4, 114:15, 114:19, 114:23,

135:24, 141:22, 149:4, 149:10, 150:10, 150:15, 150:20, 190:25, 273:12, 276:20, 287:12

**allowing** [1] - 168:22

**allows** [1] - 112:18

**almost** [2] - 65:19, 257:7

**alone** [2] - 223:24, 225:18

**altercation** [1] - 306:3

**altering** [1] - 67:8

**altogether** [1] - 24:23

**ambulance** [1] - 269:5

**amount** [2] - 74:3, 74:9

**AND** [6] - 1:11, 1:16, 1:16, 4:2, 4:8, 4:13

**angrily** [1] - 256:23

**annual** [8] - 36:17, 56:7, 72:4, 72:7, 97:18, 142:12, 183:15, 185:8

**answer** [66] - 6:21, 8:10, 8:25, 9:4, 9:12, 9:19, 9:20, 9:23, 10:6, 25:14, 29:8, 29:19, 33:4, 37:8, 41:17, 63:14, 65:16, 67:2, 67:5, 87:15, 99:7, 101:16, 101:24, 105:3, 106:5, 107:11, 108:4, 108:13, 110:15, 110:18, 110:20, 110:24, 128:18, 151:4, 156:16, 156:17, 168:8, 168:13, 168:18, 168:20, 169:23, 170:4, 170:8, 171:10, 171:21, 207:5, 230:2, 272:19, 273:17, 274:2, 274:14, 274:18, 275:16, 277:10, 277:12, 277:16, 277:21, 280:19, 281:25, 295:6, 296:9, 296:17, 299:3, 300:3, 311:9, 314:3

**ANSWER** [1] - 317:7

**answered** [1] - 277:19

**answering** [5] - 7:7, 9:17, 22:19, 167:14, 280:23

**answers** [5] - 6:19, 6:22, 7:24, 169:18, 316:13

**anticipate** [5] - 110:13, 111:5, 112:15, 112:19, 118:15

**anticipating** [1] - 118:11

**anticipation** [4] - 117:5, 117:11, 136:10, 161:17

**applicable** [2] - 205:25, 309:13

**application** [13] - 19:5, 19:15, 19:20, 19:23, 20:4, 20:22, 23:3, 26:3, 26:12, 284:13, 309:11, 317:12, 317:15

**applied** [6] - 19:2, 19:11, 19:15, 21:2, 25:10, 25:25

**applies** [1] - 173:6

**apply** [3] - 89:14, 89:16, 145:16

**appointment** [3] - 219:8, 219:11, 219:19

**appreciate** [1] - 193:22

**approach** [15] - 45:3, 45:4, 87:19, 87:23, 94:24, 103:6, 145:22, 145:25, 146:4, 146:8, 146:9, 146:15, 146:17, 174:23

**approached** [5] - 87:10, 89:19, 91:15, 92:20, 155:14

**approaching** [1] - 282:13

**appropriate** [2] - 108:14, 179:21

**approval** [1] - 228:23

**approved** [1] - 226:10

**approximate** [1] - 28:2

**area** [4] - 111:21, 234:18, 235:9, 276:6

**arise** [1] - 30:3

**arm** [16] - 235:21, 235:23, 236:19, 237:19, 237:23, 237:25, 240:2, 240:6, 240:9, 240:10, 241:3, 241:14, 241:19, 242:5, 242:18, 300:25

**arms** [6] - 131:24, 132:11, 133:6, 235:14, 239:13, 244:12

**arrest** [7] - 153:8, 153:12, 153:15, 156:10, 156:14, 156:19, 156:23

**arrested** [1] - 35:17

**arrests** [1] - 156:18

**Article** [1] - 147:14

**aside** [36] - 13:4, 13:9, 20:3, 38:8, 38:12, 76:14, 76:16, 78:15, 78:20, 81:24, 91:12, 95:10, 96:13, 96:21, 97:13, 97:21, 98:5, 136:13, 142:9, 164:22, 170:2, 170:16, 175:4, 184:13, 194:15, 196:23, 197:21, 200:9, 201:6, 201:15, 205:9, 211:14, 216:21, 228:13, 229:11, 253:15

**Aside** [5] - 13:11, 47:13, 57:16, 70:13, 83:25

**asphyxia** [10] - 124:10, 124:14, 124:17, 124:24, 125:19, 126:18, 126:24, 127:5, 130:4, 130:9

**ASPHYXIA** [1] - 124:14

**assault** [3] - 112:10, 140:23

**assessment** [3] - 118:4, 118:10, 118:14

**assignment** [7] - 186:17, 187:18, 188:4, 189:23, 200:15, 200:17, 201:7

**assist** [4] - 261:16, 261:21, 262:10, 262:13

**assistance** [1] - 310:20

**assistant** [2] - 15:15, 256:18

**ASSISTANT** [1] - 1:13

**Assistant** [6] - 298:9, 298:14, 298:22, 299:7, 299:9, 299:15

**assisted** [4] - 253:3,

253:4, 261:13, 262:4

**ASSOCIATES** [1] - 3:9

**assume** [8] - 53:23, 216:19, 216:20, 260:11, 260:12, 263:21, 283:12, 300:10

**athletic** [8] - 233:9, 234:4, 234:6, 245:15, 253:25, 254:9, 261:15, 262:5

**attacks** [1] - 97:5

**attempt** [7] - 102:6, 102:8, 141:2, 258:14, 259:12, 259:22, 260:22

**attempted** [2] - 259:20, 299:7

**attend** [2] - 32:16, 247:3

**attendance** [3] - 57:11, 57:17, 220:14

**attendant** [1] - 17:16

**Attended** [1] - 319:8

**attention** [19] - 65:24, 68:25, 76:19, 79:10, 100:13, 116:15, 145:3, 145:20, 146:24, 155:18, 173:22, 177:9, 181:6, 181:22, 248:2, 248:6, 296:2, 309:2, 309:21

**Attorney** [2] - 169:11, 270:2

**attorney** [15] - 8:17, 11:2, 42:22, 46:20, 46:21, 46:22, 47:14, 48:18, 48:20, 48:21, 49:15, 168:2, 267:25, 294:10, 294:11

**Attorneys** [2] - 3:4, 3:10

**attorneys** [4] - 4:3, 10:20, 11:3, 180:17

**August** [8] - 183:20, 185:9, 185:21, 196:15, 199:24, 200:3, 200:7, 318:17

**authority** [2] - 153:8, 310:12

**authorize** [1] - 299:24

**authorized** [3] - 4:16, 147:19, 148:24

**autism** [1] - 32:11

**available** [2] - 30:13, 270:17

**Avenue** [1] - 3:11

**avoid** [3] - 101:2,

325

133:15, 133:16
**award** [1] - 48:3
**aware** [63] - 11:11, 24:9, 27:12, 31:23, 51:19, 62:21, 71:13, 71:15, 73:8, 73:9, 76:3, 76:8, 77:7, 79:2, 79:8, 79:17, 79:19, 79:25, 80:5, 80:6, 80:11, 80:12, 81:13, 81:18, 82:3, 82:15, 85:24, 87:6, 90:10, 90:14, 91:2, 94:18, 123:16, 151:22, 152:3, 152:8, 152:12, 153:3, 154:3, 154:6, 155:9, 174:12, 174:21, 177:15, 180:25, 202:16, 206:17, 211:12, 216:5, 243:14, 244:10, 244:13, 244:15, 268:22, 285:14, 285:23, 288:17, 290:18, 291:3, 291:10, 310:23, 311:2, 311:10
**awareness** [3] - 73:10, 95:19, 95:25

## B

**babysitter** [1] - 52:7
**babysitters** [1] - 215:8
**backed** [2] - 24:4, 259:7
**background** [8] - 20:6, 20:9, 20:19, 21:23, 21:24, 21:25, 24:3, 317:13
**badge** [2] - 210:20, 210:21
**bare** [2] - 138:9, 138:14
**bargaining** [2] - 215:24, 216:6
**based** [2] - 86:10, 86:16
**basic** [1] - 272:10
**basis** [5] - 67:24, 133:24, 134:4, 304:13, 304:25
**Bates** [27] - 52:25, 86:13, 115:8, 137:3, 143:8, 158:24, 158:25, 173:3, 188:21, 189:22, 192:10, 195:2,

197:13, 198:3, 199:18, 200:21, 201:25, 205:19, 209:5, 212:2, 218:11, 248:3, 252:24, 266:9, 277:5, 277:6, 320:12
**baton** [2] - 70:23, 70:25
**batter** [1] - 300:17
**battery** [1] - 60:24
**BE** [1] - 319:6
**bear** [1] - 277:5
**bearing** [6] - 158:24, 158:25, 186:7, 192:10, 197:13, 266:9
**bears** [13] - 52:25, 99:15, 143:8, 173:2, 195:2, 198:3, 199:18, 200:21, 201:25, 205:19, 209:5, 212:2, 218:11
**became** [2] - 90:9, 256:7
**become** [3] - 90:14, 101:21, 118:16
**becomes** [1] - 101:7
**becoming** [1] - 193:4
**begin** [1] - 7:7
**beginning** [1] - 54:19
**behalf** [4] - 37:4, 38:7, 203:16, 285:17
**behave** [1] - 140:21
**behavior** [25] - 69:6, 69:11, 69:17, 86:10, 86:16, 86:24, 101:10, 101:14, 109:7, 109:10, 111:19, 112:5, 112:16, 112:19, 112:25, 114:10, 157:20, 161:10, 161:15, 161:18, 171:3, 288:24, 313:18, 313:24, 314:7
**believes** [1] - 274:10
**bell** [1] - 232:18
**below** [1] - 15:16
**benefits** [2] - 206:10, 206:14
**bent** [1] - 123:23
**beside** [2] - 16:24, 259:10
**best** [9] - 118:5, 133:15, 140:25, 180:17, 192:20, 243:25, 244:5, 254:3, 282:15

**better** [4] - 8:13, 289:21, 290:23, 293:11
**between** [7] - 4:3, 55:14, 109:16, 216:6, 232:15, 300:12, 307:8
**beyond** [6] - 13:5, 63:3, 63:4, 108:6, 119:16, 282:23
**big** [2] - 112:3, 171:12
**bigger** [1] - 233:13
**bit** [2] - 86:8, 178:19
**blank** [3] - 15:18, 23:10, 23:11
**blanks** [1] - 161:22
**bleeding** [1] - 70:11
**block** [1] - 300:17
**blocked** [3] - 272:2, 272:14, 301:8
**blood** [1] - 321:17
**bodies** [1] - 131:7
**body** [10] - 113:12, 113:15, 135:4, 135:7, 237:24, 238:6, 239:10, 239:13, 241:2, 241:20
**Bolay** [12] - 242:10, 242:15, 242:22, 242:25, 243:5, 243:8, 243:21, 245:12, 245:14, 254:8, 261:18
**book** [7] - 164:18, 178:14, 193:17, 209:16, 209:17, 209:18, 209:19
**booklets** [3] - 200:8, 307:20, 307:22
**books** [1] - 208:13
**bore** [1] - 196:15
**boss** [1] - 26:23
**bottom** [23] - 63:9, 85:15, 85:18, 115:22, 123:21, 185:3, 186:13, 195:10, 197:11, 197:14, 198:7, 198:9, 199:20, 203:21, 216:14, 216:16, 216:17, 218:15, 228:23, 239:12, 248:8, 250:21, 266:7
**bound** [3] - 50:16, 179:4, 308:13
**Bounty** [8] - 55:18, 55:20, 55:23, 56:2, 56:12, 57:5, 57:10,

57:21
**break** [12] - 8:15, 8:19, 25:6, 80:17, 80:19, 122:7, 139:19, 139:24, 140:2, 142:12, 208:25, 269:18
**breaking** [2] - 102:19, 121:18
**breathe** [8] - 123:24, 125:2, 127:10, 131:8, 131:25, 132:16, 132:20, 301:20
**brief** [1] - 60:25
**briefly** [3] - 72:16, 72:18, 72:22
**bring** [6] - 30:10, 138:18, 231:17, 231:19, 282:5, 283:7
**bringing** [1] - 282:17
**building** [1] - 234:3
**built** [1] - 234:6
**bullied** [2] - 82:21, 83:23
**bullying** [24] - 52:12, 82:20, 82:24, 83:18, 85:2, 85:3, 89:4, 90:10, 90:23, 91:24, 92:3, 94:3, 95:20, 95:21, 96:2, 96:10, 96:19, 154:4, 154:7, 154:15, 154:20, 155:8, 173:25, 217:16
**bus** [1] - 215:5
**business** [4] - 205:24, 247:17, 308:18, 308:23
**buy** [1] - 179:5
**BY** [4] - 3:7, 3:13, 5:7, 317:3

## C

**calculations** [1] - 282:10
**calm** [1] - 102:8
**camera** [3] - 243:15, 243:16, 302:19
**cameras** [3] - 181:3, 181:9, 181:18
**cannot** [3] - 125:2, 202:10, 272:12
**capacities** [3] - 1:10, 1:11, 1:17
**capacity** [5] - 1:12, 1:13, 1:14, 1:15, 1:16
**captured** [1] - 303:11

**capturing** [1] - 303:8
**carbon** [1] - 203:22
**card** [2] - 221:15, 221:23
**cards** [5] - 218:20, 222:5, 318:22, 318:23
**care** [1] - 118:6
**careful** [1] - 131:6
**CAROL** [1] - 1:5
**Carol** [3] - 6:11, 293:23, 307:11
**CAROLINE** [1] - 3:13
**Caroline** [2] - 270:12, 294:12
**carry** [2] - 188:10, 207:18
**case** [7] - 8:23, 165:5, 171:13, 174:25, 272:9, 273:19, 309:8
**CASTRO** [1] - 1:13
**categories** [1] - 68:14
**caught** [1] - 243:14
**CC** [3] - 203:22, 249:13, 249:22
**cell** [2] - 37:7, 37:11
**CENTRAL** [1] - 1:8
**Central** [23] - 32:20, 33:14, 33:22, 34:11, 34:17, 35:5, 35:11, 47:19, 51:17, 54:5, 94:15, 94:20, 94:25, 98:7, 103:14, 104:6, 119:13, 213:9, 285:9, 286:14, 290:25, 302:18, 305:21
**certain** [9] - 49:9, 64:24, 97:23, 121:5, 122:8, 122:15, 130:18, 186:14, 211:4
**certainly** [1] - 283:8
**certainty** [1] - 158:5
**certificate** [25] - 22:23, 56:10, 159:22, 159:25, 183:11, 184:23, 185:12, 188:19, 194:24, 195:7, 197:4, 198:2, 199:13, 318:10, 319:18, 319:20, 319:23, 319:24, 319:25, 320:3, 320:4, 320:5, 320:6, 320:7, 320:8
**certificates** [1] - 36:15
**certification** [1] - 4:6
**certify** [3] - 316:8, 321:9, 321:15

326

Chan [19] - 234:19, 234:21, 236:5, 236:7, 236:15, 253:2, 259:20, 259:22, 260:17, 260:22, 261:2, 261:8, 261:12, 261:16, 261:21, 262:3, 293:3, 293:6
chance [1] - 112:2
change [5] - 60:17, 254:22, 290:3, 290:9, 290:12
changed [3] - 139:10, 290:7, 290:23
changing [1] - 60:24
charges [1] - 119:23
check [10] - 20:7, 20:10, 20:20, 24:3, 24:4, 211:5, 211:6, 211:7, 211:10, 317:13
chest [4] - 129:15, 130:20, 238:7, 259:3
chief [3] - 21:18, 312:24, 313:10
child [2] - 163:8, 271:11
children's [2] - 163:9, 163:16
choke [14] - 65:12, 69:21, 113:9, 114:19, 120:7, 120:11, 134:22, 134:25, 149:14, 149:22, 162:17, 162:20, 300:19, 300:25
choked [1] - 301:8
circle [1] - 128:10
circumstance [3] - 108:2, 287:20, 287:23
circumstances [1] - 106:11
citing [1] - 147:13
citizen [5] - 147:13, 147:20, 148:25, 150:9, 150:17
City [1] - 315:5
civil [15] - 48:2, 79:20, 119:23, 120:8, 120:16, 120:23, 151:20, 151:25, 152:5, 152:8, 152:10, 152:14, 153:3, 293:22, 310:13
Clarence [2] - 302:4, 302:6

clarification [1] - 9:8
clarify [8] - 26:15, 38:2, 48:13, 50:19, 156:23, 277:23, 277:25, 315:8
clarifying [4] - 28:12, 44:11, 50:11, 222:10
class [19] - 54:22, 61:12, 65:8, 65:10, 72:22, 76:13, 76:14, 76:15, 76:16, 134:7, 191:3, 191:5, 208:4, 208:9, 208:23, 232:15, 283:18, 307:25, 315:5
classes [4] - 64:25, 75:13, 98:17, 191:6
clear [47] - 33:6, 33:13, 41:4, 43:15, 44:14, 47:10, 48:19, 51:2, 94:19, 97:16, 102:20, 103:13, 111:4, 116:11, 119:10, 128:21, 129:2, 129:10, 134:12, 137:2, 146:16, 153:20, 153:21, 172:24, 188:21, 192:9, 193:11, 193:12, 194:25, 197:12, 200:20, 201:5, 205:19, 209:20, 210:15, 218:11, 219:21, 248:2, 251:23, 252:8, 259:9, 264:3, 274:4, 274:12, 283:18, 284:3, 292:16
clearly [1] - 239:11
CLERK [4] - 270:5, 270:7, 270:14, 270:24
clerk [1] - 270:16
climate [1] - 173:19
clock [4] - 218:10, 221:17, 221:20, 320:16
close [1] - 282:13
closed [1] - 315:24
code [26] - 50:23, 53:3, 53:12, 53:15, 53:20, 53:21, 54:2, 54:5, 54:17, 60:18, 60:21, 61:6, 61:8, 61:22, 62:3, 62:10, 62:15, 79:21, 80:3, 80:7, 80:13, 80:24, 210:12, 210:18, 213:17, 317:22

collaborate [1] - 40:23
collar [2] - 298:16, 299:8
collective [2] - 215:23, 216:6
color [2] - 67:24, 86:18
colored [4] - 129:12, 129:13, 129:15, 129:16
column [2] - 210:15, 210:17
coming [10] - 45:5, 162:14, 241:24, 242:2, 242:4, 242:23, 243:2, 243:12, 254:7, 281:4
comment [2] - 219:7, 303:5
comments [2] - 126:12, 208:24
Commissioner [6] - 77:20, 78:2, 78:17, 78:23, 79:5, 95:18
Commissioner's [1] - 77:22
committed [1] - 173:18
Commons [2] - 231:25, 232:5
communication [1] - 203:10
communications [1] - 307:6
company [1] - 16:9
comparable [2] - 133:21, 136:4
complain [2] - 288:23, 289:5
complaint [39] - 51:21, 52:4, 77:25, 78:16, 78:17, 78:22, 79:4, 81:11, 81:16, 81:21, 87:7, 87:13, 87:20, 87:23, 88:3, 89:20, 91:3, 91:5, 91:19, 91:23, 92:2, 92:9, 92:10, 92:21, 93:7, 93:13, 93:16, 155:9, 174:18, 174:23, 255:25, 256:4, 256:8, 288:18, 288:21, 293:15, 293:22, 306:23, 311:6
complaints [12] - 29:16, 51:16, 77:19, 78:22, 92:13, 92:17, 290:16, 290:20, 290:21, 305:14,

305:20, 306:16
complete [16] - 7:24, 10:11, 146:25, 147:6, 161:23, 185:7, 186:16, 187:2, 192:21, 202:25, 203:12, 217:25, 281:9, 311:20, 311:24, 316:12
completed [2] - 162:3, 318:11
completely [3] - 9:4, 9:23, 193:10
completing [1] - 201:21
completion [13] - 22:24, 176:2, 183:12, 184:23, 185:20, 187:17, 187:23, 188:5, 188:20, 190:20, 192:12, 202:13, 318:16
complied [1] - 204:17
comply [5] - 53:25, 77:2, 77:6, 86:2, 126:14
compost [2] - 17:13, 17:18
Compost [4] - 17:15, 17:25, 18:4, 18:7
concerned [1] - 108:5
concerning [3] - 305:15, 306:8, 307:11
concerns [2] - 152:13, 290:25
condition [1] - 268:20
conditions [2] - 213:20, 215:25
conduct [34] - 50:23, 53:4, 53:12, 53:15, 53:20, 53:22, 54:2, 54:5, 54:18, 60:19, 60:21, 61:6, 61:8, 61:22, 62:3, 62:11, 62:15, 79:21, 80:4, 80:8, 80:13, 80:24, 94:21, 126:21, 129:6, 135:24, 157:20, 196:6, 201:2, 213:18, 313:17, 313:24, 314:7, 317:23
conducted [20] - 89:9, 94:14, 94:17, 98:2, 144:16, 183:20, 187:5, 189:13, 190:12, 190:16,

192:6, 193:13, 195:3, 195:21, 196:2, 198:16, 199:24, 201:6, 201:8, 318:8
conducting [1] - 171:4
conducts [1] - 72:7
confer [2] - 169:14, 171:7
conference [1] - 30:19
confidence [1] - 116:20
confidential [4] - 278:9, 278:11, 279:3, 310:20
conflict [1] - 286:8
confronted [1] - 132:25
connection [1] - 27:8
consent [1] - 299:24
consequences [1] - 120:24
consequent [1] - 125:5
consider [4] - 116:25, 129:5, 129:18, 133:2
considered [3] - 116:17, 154:20, 176:14
constantly [1] - 225:21
consumed [1] - 10:3
contact [17] - 102:15, 102:22, 103:7, 103:16, 104:7, 105:8, 105:12, 169:13, 236:3, 236:8, 236:16, 237:13, 237:16, 241:2, 241:3, 242:20, 243:3
contacted [6] - 178:2, 214:22, 291:20, 291:23, 293:12, 312:23
contained [3] - 96:24, 100:15, 104:12
containing [1] - 10:4
contains [1] - 85:16
content [1] - 308:11
contents [1] - 308:14
continue [5] - 79:15, 165:6, 167:23, 171:25, 173:18
CONTINUED [1] - 1:25
continued [1] - 241:6
contradict [1] - 132:7
contribute [1] - 208:19
control [16] - 99:2,

101:9, 112:6, 112:8, 114:9, 114:12, 114:17, 114:21, 114:25, 161:6, 161:8, 161:12, 163:9, 163:16, 163:19, 164:4

**conversation** [3] - 47:11, 88:3, 295:16

**conveying** [1] - 125:22

**convicted** [1] - 35:14

**cooperate** [1] - 141:21

**cooperating** [1] - 141:20

**coordinator** [2] - 87:19, 91:18

**copies** [3] - 305:13, 305:18, 306:7

**copy** [3] - 203:22, 211:25, 267:3

**corner** [4] - 137:5, 186:7, 234:17, 259:8

**corporal** [4] - 62:22, 63:9, 76:20, 77:20

**correct** [78] - 34:22, 64:25, 68:11, 77:9, 98:15, 98:17, 103:16, 108:25, 109:2, 109:4, 109:5, 109:7, 117:14, 127:11, 127:14, 127:23, 131:19, 131:21, 132:5, 132:11, 136:7, 136:8, 136:10, 136:12, 140:12, 140:19, 140:24, 142:3, 142:6, 142:8, 143:5, 161:15, 161:16, 161:20, 162:21, 162:22, 163:2, 163:4, 173:12, 185:6, 187:18, 195:24, 196:22, 199:4, 199:25, 201:10, 206:2, 222:2, 222:15, 226:13, 228:16, 228:21, 239:7, 251:12, 253:14, 254:12, 254:15, 254:16, 254:17, 262:19, 262:20, 265:5, 265:8, 265:12, 271:12, 271:16, 271:17, 274:21, 287:11, 312:2, 312:5, 312:9,

312:12, 312:13, 313:3, 313:4, 316:12, 316:14

**corrected** [1] - 254:20

**correcting** [1] - 208:6

**correctly** [1] - 224:13

**correspondence** [5] - 203:11, 229:23, 292:9, 304:9, 304:21

**CORRY** [1] - 3:7

**Cory** [2] - 6:9, 270:2

**CORY** [1] - 3:3

**cough** [1] - 10:3

**council** [1] - 195:18

**counsel** [25] - 48:9, 48:14, 49:24, 50:3, 88:20, 144:12, 167:2, 170:25, 189:11, 195:25, 196:20, 211:24, 270:8, 270:11, 273:12, 276:19, 278:6, 279:8, 279:11, 281:19, 283:10, 283:22, 285:2, 295:14, 305:9

**Counsel** [14] - 5:19, 106:7, 147:5, 167:19, 169:19, 176:7, 272:14, 277:7, 277:16, 279:16, 281:23, 284:8, 295:17, 314:17

**Counsel's** [1] - 280:19

**counselor** [1] - 29:11

**Counselor** [1] - 110:21

**Country** [1] - 2:24

**counts** [1] - 37:3

**COUNTY** [6] - 1:9, 1:9, 1:10, 316:5, 321:5

**County** [24] - 39:13, 40:2, 42:11, 42:14, 43:16, 43:25, 44:8, 44:23, 45:18, 71:11, 181:2, 181:16, 249:15, 291:21, 291:24, 292:12, 302:21, 302:22, 302:23, 302:24, 302:25, 307:10, 317:17

**couple** [2] - 80:17, 139:10

**course** [68] - 22:9, 41:20, 51:16, 61:14, 61:15, 61:19, 61:23, 71:23, 72:5, 72:7, 72:12, 75:10, 81:5,

81:8, 81:25, 82:10, 84:2, 96:7, 96:14, 96:22, 97:12, 118:5, 121:3, 134:19, 135:23, 141:2, 143:16, 143:19, 175:13, 175:16, 176:2, 176:4, 180:6, 180:24, 183:12, 183:19, 185:9, 185:21, 189:19, 189:21, 189:24, 190:16, 192:4, 192:7, 194:2, 194:10, 194:24, 195:3, 195:7, 197:4, 197:6, 198:2, 199:12, 199:15, 199:24, 200:15, 200:18, 201:7, 201:22, 203:12, 247:17, 276:16, 308:2, 308:6, 308:17, 308:23, 318:17, 318:19

**courses** [1] - 65:5

**court** [16] - 7:17, 16:12, 37:3, 38:11, 38:12, 42:4, 80:18, 156:7, 167:25, 168:10, 238:22, 252:17, 269:19, 282:11, 291:18, 304:19

**Court** [20] - 2:5, 2:24, 4:19, 29:15, 29:21, 29:25, 30:20, 108:16, 167:6, 167:24, 168:15, 168:17, 168:22, 169:6, 169:11, 169:13, 277:18, 283:23, 314:20, 314:25

**COURT** [28] - 1:2, 271:9, 271:14, 271:19, 273:20, 273:24, 274:6, 274:16, 274:23, 275:8, 275:18, 275:23, 276:4, 276:12, 276:18, 276:23, 277:21, 279:9, 279:15, 279:23, 280:18, 280:25, 281:15, 282:7, 282:14, 283:2, 284:8, 284:20

**cover** [5] - 48:4, 49:9, 62:6, 96:5, 137:4

**covering** [2] - 50:8, 317:20

**CPI** [36] - 36:18, 63:25, 65:3, 65:8, 65:9, 72:15, 72:21, 72:22, 75:9, 75:13, 76:15, 76:16, 97:23, 97:24, 98:20, 99:3, 99:23, 100:2, 105:20, 106:15, 114:13, 115:13, 115:17, 119:15, 119:17, 134:20, 159:7, 159:10, 159:11, 159:18, 163:9, 164:4, 164:13, 179:13, 179:15, 318:10

**CPR** [4] - 133:21, 135:19, 135:21, 135:24

**create** [2] - 95:15, 251:24

**created** [14] - 54:11, 100:6, 115:19, 143:23, 159:13, 172:16, 175:19, 183:17, 183:19, 189:3, 192:15, 255:12, 265:25, 266:4

**creating** [1] - 208:5

**creation** [2] - 173:11, 208:12

**creed** [1] - 67:25

**crime** [1] - 35:15

**crimes** [2] - 147:18, 148:23

**criminal** [7] - 80:2, 119:23, 120:11, 120:20, 120:24, 157:8, 310:12

**Criminal** [1] - 202:11

**crisis** [10] - 97:25, 98:23, 98:24, 99:23, 100:4, 104:14, 106:18, 108:23, 126:6, 135:16

**criteria** [4] - 189:10, 189:25, 195:17, 196:19

**crowd** [11] - 232:8, 233:2, 233:9, 233:12, 233:14, 233:18, 234:3, 234:5, 234:16, 235:7, 237:5

**crucial** [1] - 312:22

**CSD** [6] - 53:2, 136:17, 276:15,

319:13, 319:15

**CSEA** [2] - 215:19, 215:21

**culture** [1] - 173:20

**current** [1] - 11:18

**cursing** [1] - 109:21

**custodian** [3] - 51:6, 51:8, 51:9

**cut** [1] - 176:25

**cyber** [1] - 85:2

**D**

**damage** [1] - 48:3

**damages** [1] - 49:9

**danger** [8] - 117:19, 121:9, 123:11, 150:7, 150:13, 150:15, 151:5, 151:9

**dangerous** [6] - 123:17, 123:25, 127:13, 161:9, 161:15, 161:18

**dangers** [1] - 121:5

**DASA** [2] - 84:4, 87:19

**date** [22] - 16:16, 32:21, 39:22, 42:15, 51:24, 54:12, 143:24, 185:3, 186:7, 197:11, 198:6, 199:16, 202:21, 205:17, 215:7, 230:8, 292:16, 303:25, 305:10, 305:11, 307:3, 307:4

**dated** [1] - 196:15

**dates** [5] - 10:22, 10:23, 14:11, 14:13, 37:13

**daughter** [1] - 285:13

**David** [81] - 6:11, 38:22, 46:13, 124:5, 133:5, 145:16, 227:15, 231:9, 235:23, 236:2, 236:20, 237:13, 237:16, 237:19, 237:24, 238:17, 239:4, 239:10, 239:16, 239:20, 240:9, 241:6, 242:13, 242:16, 242:20, 243:6, 243:22, 244:8, 244:12, 244:14, 244:22, 244:25, 245:11, 245:19, 250:25, 253:11, 256:16, 258:13,

328

259:11, 259:21, 259:23, 260:9, 260:13, 260:23, 261:2, 261:9, 261:14, 261:16, 261:21, 262:4, 262:10, 262:13, 268:16, 268:19, 269:6, 269:10, 271:8, 293:3, 293:7, 293:23, 296:13, 298:8, 298:15, 298:17, 298:23, 299:7, 299:10, 299:16, 299:23, 300:4, 300:16, 300:18, 300:19, 300:24, 301:2, 301:7, 301:9, 301:17, 306:4, 307:11, 313:7

DAVID [1] - 1:5

David's [3] - 240:24, 243:25, 244:5

days [4] - 40:4, 42:17, 228:17, 268:6

de [6] - 160:17, 179:13, 179:15, 236:13, 238:12, 239:2

de-escalate [1] - 236:13

de-escalating [1] - 160:17

de-escalation [4] - 179:13, 179:15, 238:12, 239:2

deadly [29] - 64:14, 64:19, 65:19, 119:22, 147:12, 147:18, 147:23, 148:3, 148:6, 148:12, 148:15, 148:23, 149:5, 149:10, 149:14, 149:21, 149:22, 150:3, 150:10, 150:20, 150:21, 150:24, 151:6, 151:10, 153:18, 153:24, 162:20, 162:25, 191:10

deal [3] - 138:6, 139:12, 312:19

dealing [5] - 69:5, 69:10, 69:16, 74:7, 312:14

dealings [1] - 312:21

death [5] - 37:23, 38:6, 125:4, 127:3,

127:21

December [1] - 321:22

decide [1] - 279:4

defendant [2] - 272:8, 281:7

Defendant [14] - 2:4, 280:5, 298:13, 298:22, 299:15, 299:25, 300:6, 300:15, 300:24, 301:6, 301:18, 301:19, 302:18, 302:20

defendants [1] - 307:9

Defendants [2] - 1:18, 3:10

Defense [1] - 278:6

defense [6] - 168:2, 270:11, 279:8, 279:11, 281:19, 285:2

define [1] - 111:11

defined [2] - 111:20, 112:6

definition [4] - 73:6, 73:8, 75:4, 154:6

delinquent [1] - 202:17

Delphi [1] - 283:19

demarcate [1] - 250:18

demarcated [1] - 128:9

demean [1] - 140:23

demonstrate [6] - 161:6, 240:8, 240:14, 240:17, 240:19, 240:23

demonstrated [1] - 259:10

demonstrations [3] - 75:14, 75:16, 75:20

demoted [1] - 289:15

Denise [2] - 203:9, 251:7

denoted [4] - 86:25, 121:4, 147:7, 160:12

denotes [2] - 104:20, 137:5

department [4] - 21:7, 262:22, 265:8, 266:18

DEPARTMENT [1] - 1:9

Department [18] - 42:12, 42:14, 43:16, 44:8, 44:21, 181:2, 181:17, 202:12, 276:15, 291:24, 292:12, 302:21,

307:10, 317:18, 319:13, 319:22, 320:11, 320:21

dependent [1] - 106:9

depicted [1] - 182:15

depicting [2] - 178:3, 303:14

deponent [13] - 44:7, 44:15, 62:15, 123:3, 144:16, 162:4, 281:21, 305:16, 317:16, 317:23, 318:3, 318:8, 318:12

deponent's [2] - 222:6, 318:24

deposed [1] - 6:14

deposing [4] - 165:11, 271:3, 271:4, 283:4

Deposition [1] - 320:25

deposition [32] - 4:6, 4:14, 5:17, 6:2, 6:12, 6:17, 8:24, 10:15, 29:12, 46:19, 47:6, 47:16, 165:6, 165:16, 166:4, 166:22, 167:7, 169:17, 170:10, 171:5, 171:23, 270:25, 272:4, 279:5, 279:19, 280:14, 281:10, 314:12, 314:19, 316:10, 321:11, 321:13

describe [8] - 130:11, 240:11, 240:15, 256:19, 257:11, 257:16, 257:17, 260:8

described [2] - 94:11, 259:18

describes [2] - 109:6, 150:16

describing [1] - 130:17

description [2] - 248:9, 250:20

despite [1] - 283:22

destruction [1] - 145:11

detail [4] - 52:14, 72:13, 225:20, 312:4

detailed [1] - 311:23

details [1] - 312:9

detectives [5] - 45:9, 45:10, 45:15, 292:20, 292:23

detention [1] - 156:10

determine [2] - 73:15,

118:5

determines [1] - 64:3

devices [2] - 309:12, 309:16

DeWitt [1] - 58:9

dialing [1] - 169:11

difference [2] - 55:14, 109:15

different [7] - 11:2, 30:4, 31:14, 62:5, 62:7, 108:2, 179:16

differentiate [1] - 146:17

difficult [4] - 10:5, 88:12, 123:24, 127:10

dignity [1] - 53:18

Dignity [23] - 82:4, 82:11, 82:19, 83:4, 84:2, 84:17, 84:23, 85:13, 86:6, 87:10, 87:18, 89:21, 91:17, 96:15, 96:23, 97:6, 172:11, 172:13, 173:6, 173:10, 174:4, 319:12, 319:15

diminution [1] - 176:22

direct [21] - 65:23, 68:25, 76:18, 79:9, 100:12, 107:10, 108:12, 116:14, 145:2, 145:19, 146:23, 155:17, 177:8, 181:5, 181:21, 184:8, 247:25, 248:5, 295:25, 309:2, 309:20

directed [2] - 272:18, 273:16

directing [1] - 173:22

DIRECTION [1] - 317:7

directly [4] - 138:25, 139:13, 312:17, 312:19

director [8] - 19:7, 19:12, 21:3, 21:6, 21:16, 184:12, 196:16, 202:6

director's [2] - 19:4, 19:14

disability [2] - 68:4, 86:20

disagree [3] - 128:15, 164:15, 164:16

disagreement [1] - 126:9

disallow [1] - 277:13

disciplinary [2] - 69:4, 305:15

discipline [6] - 57:10, 57:13, 57:19, 141:4, 212:11, 216:11

discretion [1] - 64:8

discriminate [1] - 67:23

discriminated [1] - 82:22

discriminates [1] - 81:21

discrimination [27] - 38:15, 81:3, 81:7, 81:11, 81:16, 81:20, 81:25, 87:7, 87:24, 88:4, 88:16, 89:5, 89:20, 90:14, 90:23, 91:19, 91:24, 93:22, 93:24, 95:20, 95:22, 96:19, 173:25, 174:13, 174:17, 174:24, 311:6

discuss [3] - 72:23, 139:25, 286:24

discussed [2] - 90:24, 128:2

discussing [3] - 31:11, 113:9, 113:12

discussion [4] - 11:14, 203:7, 268:14, 270:22

discussions [5] - 231:9, 245:22, 246:3, 246:9, 286:13

disengaging [1] - 133:2

dismissal [1] - 212:18

dispatcher [4] - 41:18, 209:11, 250:11, 267:11

Dispatcher's [1] - 320:14

dispatcher's [4] - 204:16, 209:10, 209:15, 209:19

disseminated [1] - 230:7

district [7] - 31:4, 31:25, 54:5, 89:3, 95:14, 166:16, 311:5

DISTRICT [3] - 1:2, 1:3, 1:8

District [57] - 31:22, 32:20, 33:15, 33:22, 34:11, 34:18, 34:22, 35:6, 35:11, 35:23, 36:5, 36:13, 47:19, 50:15, 51:17, 53:24,

77:18, 79:19, 80:2, 80:7, 80:9, 80:13, 89:6, 89:7, 89:10, 89:17, 91:16, 94:16, 94:20, 95:2, 98:7, 103:15, 104:6, 119:14, 154:24, 174:6, 206:5, 206:15, 213:9, 271:16, 271:25, 272:8, 272:17, 273:11, 275:2, 275:5, 285:9, 285:22, 286:2, 286:6, 286:9, 286:14, 291:2, 302:18, 305:21, 310:18

**district's** [1] - 305:19
**disturbance** [1] - 125:5
**Division** [2] - 202:11, 320:9
**divorce** [13] - 29:6, 30:3, 30:7, 34:4, 34:10, 272:5, 272:20, 273:6, 274:3, 274:20, 275:11, 275:13, 275:14
**divorced** [4] - 28:15, 29:9, 31:17, 274:6
**Dix** [2] - 1:21, 3:6
**Docket** [1] - 1:5
**doctor** [3] - 220:5, 220:10, 220:14
**doctor's** [4] - 219:7, 219:10, 219:18, 220:7
**DOCUMENT** [1] - 317:11
**document** [160] - 6:8, 9:18, 53:6, 53:8, 53:15, 54:10, 54:13, 62:2, 84:12, 84:23, 85:4, 85:16, 85:22, 86:3, 99:17, 99:19, 100:2, 100:6, 100:8, 104:12, 104:19, 105:4, 105:5, 105:7, 115:9, 115:17, 115:19, 116:7, 122:9, 122:16, 128:13, 136:13, 136:19, 138:2, 140:10, 143:10, 143:14, 143:18, 143:22, 144:2, 155:22, 158:23, 159:3, 159:6,

159:10, 159:12, 159:15, 160:5, 161:21, 161:23, 162:3, 165:3, 166:8, 166:19, 166:20, 166:25, 168:4, 170:9, 170:18, 170:23, 171:8, 172:7, 172:13, 172:15, 172:18, 175:3, 175:9, 175:11, 175:15, 175:18, 175:22, 181:7, 181:12, 183:3, 183:8, 183:10, 183:14, 183:17, 184:19, 184:25, 185:4, 185:19, 186:8, 186:10, 186:14, 188:15, 189:2, 190:6, 192:14, 195:6, 196:15, 197:5, 197:12, 197:15, 198:5, 199:17, 201:11, 201:24, 209:7, 210:24, 211:13, 212:3, 212:5, 213:2, 213:22, 214:7, 214:18, 216:13, 218:14, 218:17, 218:23, 219:2, 220:3, 221:6, 222:23, 247:13, 248:17, 248:21, 251:18, 252:24, 253:15, 255:12, 255:25, 256:4, 265:18, 265:24, 266:3, 266:14, 276:12, 276:14, 276:21, 276:23, 277:4, 277:8, 277:15, 277:20, 277:23, 279:11, 279:24, 280:3, 280:8, 280:14, 294:4, 294:9, 294:18, 294:24, 295:7, 296:2, 303:21, 304:5, 307:16, 307:18, 307:22, 308:11, 308:14, 308:16, 308:22, 318:11, 318:15, 319:3
**documentation** [11] - 20:21, 137:16, 175:25, 185:20, 187:16, 190:20,

200:6, 204:24, 220:8, 317:14, 318:16
**documentations** [1] - 278:7
**documented** [1] - 164:10
**documents** [8] - 9:21, 10:14, 62:14, 76:4, 281:12, 283:6, 283:8, 317:22
**Doe** [1] - 303:2
**DOE** [1] - 1:17
**DOES** [2] - 1:11, 1:16
**domestic** [2] - 29:16, 273:3
**done** [18] - 56:17, 66:3, 66:17, 76:22, 79:14, 91:11, 93:4, 122:19, 133:11, 135:23, 151:16, 155:20, 163:10, 182:6, 225:8, 288:5, 288:15, 290:15
**door** [3] - 211:5, 211:6, 211:10
**doors** [2] - 211:7, 211:10
**double** [1] - 46:17
**doubt** [3] - 219:15, 247:20, 253:7
**down** [34] - 58:7, 88:25, 90:4, 92:24, 93:2, 95:12, 102:8, 114:24, 117:15, 123:22, 124:5, 127:9, 127:23, 131:2, 131:23, 132:10, 157:18, 202:23, 203:3, 226:22, 232:8, 232:12, 232:13, 233:2, 233:4, 233:6, 233:19, 234:15, 239:23, 239:24, 245:17, 258:2, 263:5, 311:18
**drag** [1] - 301:6
**drive** [3] - 56:3, 56:6, 207:22
**driver's** [3] - 13:12, 13:14, 36:22
**drugs** [2] - 10:3, 53:18
**due** [1] - 161:9
**dues** [1] - 216:3
**duly** [2] - 5:3, 321:12
**during** [18] - 8:24, 51:9, 54:14, 75:23, 81:2, 81:8, 82:9, 98:4, 102:10,

105:15, 121:13, 152:18, 200:2, 210:8, 232:17, 267:24, 268:3, 276:24
**duties** [4] - 41:20, 51:11, 51:16, 176:22
**duty** [1] - 91:23

## E

**e-mail** [10] - 58:19, 59:6, 59:14, 59:19, 205:18, 264:24, 284:4, 284:5, 295:20, 295:23
**e-mails** [4] - 59:2, 305:3, 305:5, 307:7
**EAP** [3] - 310:17, 310:19, 310:21
**early** [2] - 219:23, 226:12
**East** [1] - 12:15
**EASTERN** [1] - 1:3
**Edmond** [65] - 6:10, 6:11, 38:22, 46:13, 124:5, 145:16, 223:21, 227:16, 231:9, 234:10, 234:13, 235:12, 236:20, 237:13, 237:16, 237:19, 239:5, 239:16, 240:9, 241:6, 244:9, 244:12, 244:15, 245:11, 245:20, 251:2, 253:2, 253:11, 256:16, 260:10, 260:13, 261:3, 261:9, 261:17, 268:17, 269:6, 269:10, 270:3, 271:8, 293:3, 293:7, 293:23, 296:14, 298:8, 298:15, 298:17, 298:24, 299:7, 299:10, 299:16, 299:23, 300:4, 300:17, 300:18, 300:19, 300:25, 301:7, 301:9, 301:17, 306:4, 307:12, 313:7
**EDMOND** [3] - 1:5, 1:5
**Edmond's** [7] - 133:6, 235:24, 237:24, 239:10, 244:22, 268:20, 301:2
**Education** [6] - 77:21,

78:2, 78:18, 78:23, 79:6, 95:18
**education** [4] - 12:18, 12:22, 13:5, 36:16
**EDWARD** [1] - 1:10
**effect** [1] - 4:17
**effectively** [1] - 131:25
**effects** [1] - 125:19
**eight** [63] - 61:15, 61:19, 61:23, 71:19, 71:20, 71:21, 71:23, 72:12, 76:13, 76:14, 81:5, 81:25, 82:9, 83:25, 96:7, 96:13, 96:20, 96:22, 96:25, 97:12, 97:14, 97:18, 98:17, 121:3, 134:18, 142:18, 142:23, 143:16, 143:18, 144:14, 157:17, 175:13, 175:16, 176:3, 180:24, 183:12, 183:15, 184:22, 184:25, 185:8, 186:17, 188:4, 188:19, 189:19, 189:21, 189:23, 191:4, 194:23, 195:7, 197:3, 197:6, 197:25, 199:12, 199:15, 200:14, 200:17, 201:7, 201:22, 276:16, 307:25, 308:2, 308:5, 318:7
**eight-hour** [59] - 61:15, 61:19, 61:23, 71:19, 71:20, 71:23, 72:12, 76:13, 76:14, 81:5, 81:25, 82:9, 83:25, 96:7, 96:13, 96:22, 96:25, 97:12, 97:14, 97:18, 98:17, 121:3, 142:18, 142:23, 143:16, 143:18, 144:14, 175:13, 175:16, 176:3, 180:24, 183:12, 183:15, 184:22, 184:25, 185:8, 186:17, 188:4, 188:19, 189:19, 189:21, 189:23, 191:4, 194:23, 195:7, 197:3, 197:6, 197:25, 199:12, 199:15, 200:14, 200:17, 201:7,

330

201:22, 276:16, 307:25, 308:2, 308:5, 318:7

**either** [2] - 57:19, 73:17

**Eldridge** [2] - 261:13, 262:3

**electronic** [6] - 59:3, 221:23, 222:4, 230:17, 246:24, 318:22

**electronically** [1] - 306:21

**elementary** [1] - 31:7

**elements** [3] - 135:16, 147:18, 148:23

**emergency** [5] - 116:21, 132:25, 133:20, 133:22, 136:6

**employ** [5] - 64:13, 65:12, 146:5, 285:10, 285:13

**employed** [2] - 206:8, 273:10

**employee** [25] - 66:13, 67:16, 68:13, 68:17, 80:8, 87:11, 88:18, 103:15, 104:7, 113:19, 113:24, 113:25, 154:24, 155:4, 155:11, 203:24, 212:23, 212:24, 214:6, 214:13, 218:20, 271:15, 271:24, 272:7

**Employee** [1] - 214:14

**employees** [5] - 53:17, 89:6, 89:17, 173:14, 173:25

**employer** [2] - 151:19, 214:16

**employer's** [1] - 216:25

**employment** [23] - 14:15, 16:5, 18:22, 20:11, 20:21, 21:10, 23:24, 30:4, 50:17, 54:18, 55:23, 56:15, 206:4, 206:15, 213:8, 213:21, 221:16, 272:17, 285:21, 306:8, 314:5, 317:12, 317:14

**enable** [2] - 95:21, 96:18

**encounter** [1] - 140:15

**encountered** [1] -

83:17

**encourage** [1] - 140:21

**end** [55] - 30:14, 66:15, 66:22, 68:4, 86:22, 89:10, 95:23, 100:19, 101:10, 102:9, 111:20, 112:12, 116:21, 117:19, 118:7, 118:21, 123:25, 124:8, 125:6, 131:8, 131:12, 131:25, 132:16, 133:3, 133:17, 133:24, 147:14, 147:20, 148:25, 157:20, 161:10, 173:20, 174:2, 202:14, 232:2, 253:5, 256:18, 258:15, 262:5, 281:5, 298:9, 298:17, 298:25, 299:11, 299:18, 299:25, 300:19, 301:2, 301:10, 309:13, 310:13, 311:24, 312:24, 314:12, 314:18

**enforced** [1] - 174:5

**enforcement** [8] - 35:20, 36:2, 79:11, 138:7, 181:9, 312:15, 312:22, 320:23

**enforcing** [3] - 80:7, 80:13, 158:4

**engage** [5] - 128:7, 129:5, 130:15, 130:19, 236:15

**engaged** [2] - 236:7, 271:7

**engaging** [1] - 102:23

**enrolled** [2] - 296:14, 297:6

**entered** [1] - 30:16

**entire** [1] - 302:5

**entirely** [1] - 277:2

**entitle** [1] - 281:6

**entitled** [1] - 170:22

**entries** [1] - 209:21

**enumerated** [2] - 68:19, 68:23

**environment** [3] - 67:12, 67:18, 173:11

**equipped** [3] - 70:2, 70:14, 71:5

**escalate** [1] - 236:13

**escalating** [1] - 160:17

**escalation** [4] - 179:13, 179:15, 238:12, 239:2

**escorted** [2] - 52:10, 215:5

**especially** [1] - 131:6

**espouse** [2] - 313:16, 313:22

**ESQ** [2] - 3:7, 3:13

**essentially** [1] - 221:12

**established** [1] - 101:2

**estate** [1] - 38:7

**estimating** [1] - 28:6

**ethnic** [2] - 67:25, 86:18

**event** [14] - 46:9, 46:11, 46:12, 245:23, 245:24, 246:25, 247:4, 248:7, 269:9, 286:22, 287:4, 287:7, 288:19, 302:5

**events** [14] - 7:21, 11:10, 38:23, 38:24, 39:9, 90:18, 92:3, 120:22, 225:6, 234:23, 252:10, 286:15, 303:8, 303:14

**eventually** [1] - 203:18

**everyday** [2] - 40:13, 40:14

**evidence** [2] - 222:6, 318:23

**evidencing** [3] - 185:20, 187:17, 318:16

**ex** [22] - 25:3, 28:11, 28:14, 31:5, 31:10, 31:21, 31:24, 32:14, 32:19, 33:13, 34:9, 271:23, 272:7, 272:16, 272:20, 273:9, 273:18, 274:3, 275:3, 285:10, 286:4, 286:10

**Ex** [1] - 30:25

**ex-in-laws** [1] - 31:21

**ex-mother-in-law** [3] - 25:3, 28:11, 28:14

**Ex-mother-in-law** [1] - 30:25

**ex-wife** [18] - 31:5, 31:10, 31:24, 32:14, 32:19, 33:13, 34:9, 271:23, 272:7, 272:16, 272:20,

273:9, 273:18, 274:3, 275:3, 285:10, 286:4, 286:10

**exact** [16] - 16:4, 16:16, 27:25, 41:11, 42:15, 46:7, 53:8, 73:6, 73:7, 74:2, 74:9, 96:3, 143:24, 209:21, 247:21

**exactly** [9] - 17:23, 19:12, 32:7, 53:10, 239:14, 246:20, 253:23, 260:25, 310:3

**Examination** [1] - 2:3

**EXAMINATION** [2] - 5:7, 317:3

**examined** [1] - 5:4

**example** [1] - 123:22

**examples** [1] - 130:3

**exams** [1] - 195:21

**exceeds** [1] - 310:11

**Excelsior** [4] - 190:16, 200:25, 201:3, 201:8

**EXCELSIOR** [1] - 190:17

**except** [3] - 4:9, 54:12, 180:17

**excessive** [17] - 72:24, 73:5, 73:11, 74:7, 74:23, 74:25, 75:16, 76:12, 99:3, 99:4, 104:25, 119:22, 120:24, 156:2, 198:24, 212:21, 271:7

**excuse** [3] - 29:22, 165:21, 169:2

**exhausted** [1] - 117:18

**Exhibit** [103] - 52:24, 53:7, 53:11, 84:7, 84:13, 84:16, 99:13, 99:20, 99:22, 104:20, 115:7, 115:23, 116:3, 136:15, 136:20, 137:3, 140:5, 143:7, 143:11, 148:16, 158:22, 164:14, 172:8, 172:10, 173:2, 175:8, 177:9, 181:6, 183:14, 183:21, 183:25, 184:19, 184:21, 186:6, 188:14, 188:16, 188:18, 189:5, 189:16, 189:18, 189:22,

191:23, 191:25, 192:3, 192:10, 192:17, 194:4, 194:18, 194:20, 194:22, 195:2, 195:6, 195:13, 196:13, 196:25, 197:2, 197:23, 197:24, 198:11, 199:6, 199:9, 199:11, 199:18, 200:11, 200:13, 200:17, 200:21, 201:17, 201:19, 201:25, 205:11, 205:13, 209:4, 211:23, 212:23, 218:5, 218:9, 220:21, 220:23, 221:2, 221:11, 229:8, 248:3, 251:17, 255:6, 255:8, 255:15, 255:18, 256:15, 265:17, 265:21, 267:6, 276:3, 276:11, 294:3, 302:11, 302:12, 307:15, 308:3, 309:4, 313:22, 314:15, 318:21

**exhibit** [5] - 167:10, 167:18, 195:12, 277:5, 278:24

**EXHIBITS** [1] - 319:10

**existed** [1] - 284:5

**expected** [11] - 60:20, 77:2, 85:11, 86:2, 108:24, 109:3, 126:19, 126:21, 128:6, 179:4, 308:13

**experience** [1] - 83:18

**expert** [2] - 80:17, 125:18

**explain** [39] - 45:25, 55:9, 60:13, 71:4, 73:10, 73:14, 82:23, 103:21, 104:16, 104:24, 105:5, 105:7, 106:2, 106:10, 106:21, 106:24, 109:18, 109:22, 110:3, 120:3, 120:23, 138:14, 145:24, 146:9, 147:11, 148:7, 148:21, 179:14, 234:11, 235:13, 236:6, 237:18, 241:11,

331

242:14, 257:21, 258:22, 259:19, 260:21, 296:20

**explained** [19] - 71:3, 73:21, 74:6, 74:12, 74:16, 74:24, 75:3, 75:7, 119:16, 120:6, 120:7, 120:10, 120:14, 120:18, 121:8, 153:16, 153:19, 153:22, 179:25

**explains** [2] - 75:12, 176:12

**explanation** [1] - 121:11

**explore** [1] - 280:24

**expose** [5] - 151:19, 151:23, 152:5, 152:9, 152:14

**exterior** [2] - 211:7, 297:11

**extremely** [4] - 123:25, 256:17, 257:19, 257:20

**eye** [1] - 231:16

**eyes** [1] - 107:6

## F

**face** [11] - 74:13, 111:17, 114:24, 123:22, 124:5, 127:9, 127:22, 130:25, 131:23, 132:10, 310:12

**Facebook** [1] - 178:8

**fact** [5] - 106:9, 144:6, 171:13, 179:8, 231:11

**factors** [1] - 151:18

**facts** [1] - 7:22

**fail** [1] - 273:7

**failing** [1] - 77:6

**failure** [4] - 151:22, 152:3, 152:12, 157:7

**fair** [7] - 28:5, 57:4, 103:3, 127:2, 195:20, 278:23, 279:2

**falling** [1] - 254:6

**false** [4] - 156:10, 156:12, 156:14, 295:8

**falsifying** [1] - 157:12

**familiar** [13] - 53:3, 89:11, 99:16, 115:18, 138:2, 140:10, 159:2, 159:4, 163:6,

190:18, 303:23, 307:24, 308:10

**family** [5] - 6:10, 31:4, 31:21, 35:19, 35:22

**far** [7] - 12:21, 34:24, 38:4, 179:2, 219:16, 282:8, 297:8

**fashion** [1] - 71:14

**father** [3] - 31:16, 31:18, 169:4

**father's** [1] - 31:15

**feet** [6] - 242:13, 261:14, 261:22, 262:4, 262:11, 262:14

**fell** [5] - 239:18, 239:19, 239:20, 241:5, 261:11

**felt** [1] - 311:4

**female** [4] - 60:4, 60:6, 264:10, 292:21

**Fenner** [2] - 302:4, 302:6

**fester** [1] - 107:17

**festering** [1] - 107:18

**few** [7] - 40:3, 42:17, 49:18, 49:22, 212:20, 216:14, 268:6

**field** [6] - 262:22, 263:3, 265:8, 266:18, 320:20, 320:21

**Field** [1] - 320:19

**fifth** [1] - 93:2

**fight** [8] - 103:7, 103:13, 103:18, 104:5, 122:7, 171:12, 248:13, 248:15

**fights** [2] - 102:19, 121:18

**Figure** [1] - 163:6

**figure** [3] - 105:24, 165:24, 277:14

**figures** [1] - 129:11

**file** [2] - 77:19, 85:8

**filed** [8] - 78:17, 78:22, 79:5, 87:7, 87:24, 88:4, 294:25, 295:2

**filing** [1] - 4:5

**fill** [7] - 15:19, 19:5, 23:11, 121:22, 121:25, 220:24, 221:2

**fine** [2] - 277:20, 280:21

**fingerprints** [5] - 20:12, 20:14, 20:20, 24:4, 317:13

**finish** [6] - 7:6, 8:17, 193:7, 282:14, 283:13, 283:14

**finished** [2] - 22:19, 284:12

**firearm** [1] - 188:11

**first** [29] - 13:23, 14:2, 14:3, 14:8, 14:9, 14:18, 19:9, 28:18, 55:22, 82:15, 86:12, 100:25, 116:15, 122:5, 129:4, 131:4, 133:10, 133:17, 133:21, 158:24, 187:14, 190:3, 213:11, 235:2, 260:18, 279:18, 279:21, 288:4

**five** [11] - 9:5, 15:25, 29:5, 55:21, 56:18, 57:5, 115:21, 248:8, 258:9, 274:10, 282:13

**flip** [1] - 161:3

**floor** [9] - 123:22, 124:6, 127:9, 239:18, 239:19, 239:21, 244:9, 261:12, 262:2

**follow** [20] - 19:24, 20:23, 23:17, 44:10, 50:10, 62:18, 109:3, 123:6, 144:18, 160:2, 162:5, 174:10, 176:8, 182:11, 185:22, 194:5, 205:3, 222:9, 248:23, 290:16

**followed** [1] - 273:4

**following** [1] - 215:5

**follows** [1] - 5:5

**FOR** [1] - 319:11

**force** [89] - 4:17, 54:14, 63:10, 64:3, 64:14, 64:19, 65:20, 69:9, 69:16, 72:13, 72:24, 73:5, 73:11, 73:12, 73:13, 73:15, 73:22, 74:8, 74:17, 74:23, 74:25, 75:17, 76:12, 77:12, 78:24, 79:4, 99:4, 101:13, 104:25, 117:6, 119:22, 120:24, 121:24, 122:3, 122:10, 122:17, 123:2, 123:5, 146:21, 147:12, 147:19, 147:23, 148:3, 148:6, 148:9,

148:12, 148:15, 148:24, 149:2, 149:5, 149:11, 149:15, 149:21, 149:23, 150:3, 150:11, 150:20, 150:21, 150:25, 151:7, 151:10, 153:17, 153:18, 153:24, 153:25, 156:3, 158:18, 160:10, 160:13, 160:17, 162:12, 162:20, 162:25, 191:10, 198:23, 198:24, 199:2, 271:7, 271:11, 305:20, 309:11, 311:7, 318:2, 318:5

**forklift** [2] - 56:3, 56:6

**form** [100] - 4:10, 18:25, 20:13, 25:13, 33:19, 48:7, 50:18, 51:18, 59:8, 61:24, 63:13, 64:7, 65:14, 69:12, 73:2, 73:25, 74:19, 75:18, 77:13, 79:7, 80:10, 81:12, 87:2, 87:11, 87:14, 88:17, 89:23, 90:20, 90:25, 91:6, 92:6, 93:9, 93:15, 94:22, 95:4, 97:7, 98:18, 101:15, 103:2, 103:9, 104:9, 104:15, 107:2, 107:5, 108:3, 108:12, 109:24, 110:9, 111:12, 113:6, 113:21, 114:4, 115:2, 121:15, 121:23, 122:13, 127:6, 127:20, 129:8, 130:22, 132:21, 146:7, 147:24, 148:5, 148:17, 149:6, 154:15, 154:17, 156:22, 158:15, 163:3, 163:11, 164:7, 172:6, 172:22, 174:8, 195:23, 196:4, 196:9, 202:20, 207:4, 214:12, 236:10, 238:16, 239:6, 239:22, 242:17, 244:2, 253:13, 254:18, 256:10, 287:25, 288:20,

294:19, 303:4, 308:8, 310:7, 313:19, 313:25, 320:24

**formal** [1] - 305:14

**forms** [2] - 82:24, 89:4

**forth** [2] - 104:21, 321:12

**forward** [5] - 48:19, 132:13, 171:23, 257:12, 311:11

**four** [2] - 16:21, 272:21

**fourth** [1] - 118:24

**foyer** [5] - 233:10, 234:18, 235:9, 237:3, 237:4

**frame** [1] - 264:7

**Fran** [3] - 250:7, 250:10

**free** [3] - 8:23, 66:14, 66:21

**Friday** [4] - 226:20, 226:23, 227:3, 228:19

**friend** [2] - 25:21, 27:4

**friends** [3] - 35:25, 36:4, 36:12

**front** [12] - 137:4, 140:6, 162:17, 162:20, 172:3, 220:3, 233:8, 233:20, 234:2, 234:4, 234:6, 315:15

**full** [11] - 5:9, 7:24, 10:11, 56:13, 56:19, 58:5, 127:23, 219:14, 219:17, 228:19, 254:11

**full-time** [2] - 56:19, 58:5

**functions** [2] - 89:8, 145:6

**FURNISHED** [1] - 319:6

**furniture** [1] - 51:12

**FURTHER** [2] - 4:8, 4:13

## G

**gaining** [1] - 285:21

**Garden** [1] - 315:5

**gathering** [1] - 233:12

**gear** [1] - 70:2

**gender** [3] - 68:3, 86:21, 86:22

**general** [3] - 26:9, 107:23, 273:25

**generally** [1] - 227:23

gentleman [3] - 129:11, 129:14, 129:16
Gibbs [2] - 203:9, 251:7
given [11] - 36:25, 37:16, 39:17, 44:6, 212:9, 302:15, 306:12, 306:22, 316:14, 317:16, 321:14
gloves [6] - 70:5, 70:7, 70:9, 70:13, 70:20, 71:3
govern [4] - 118:20, 119:8, 119:12, 119:18
grab [2] - 103:19, 299:10
grabbed [8] - 235:12, 235:18, 235:20, 239:4, 244:11, 244:22, 298:9, 298:15
graduate [1] - 12:23
graduated [2] - 12:20, 14:17
great [1] - 108:18
ground [11] - 120:15, 120:19, 239:25, 240:4, 241:5, 244:22, 245:2, 245:11, 254:6, 254:7, 261:17
grounds [1] - 202:7
group [2] - 68:2, 86:19
grunt [1] - 7:2
guard [63] - 50:22, 51:4, 52:10, 57:25, 69:25, 70:4, 75:24, 77:25, 81:15, 81:22, 131:17, 145:5, 145:7, 149:7, 150:5, 150:8, 150:16, 151:19, 151:20, 153:9, 153:13, 156:11, 157:10, 157:14, 185:9, 189:11, 193:5, 195:18, 196:2, 196:20, 206:5, 206:16, 206:20, 206:24, 231:7, 232:13, 234:18, 236:4, 245:19, 250:3, 253:2, 253:4, 263:25, 271:6, 271:10, 278:17, 288:14, 300:15, 310:11, 312:21,

319:18, 319:20, 319:23, 319:24, 319:25, 320:3, 320:4, 320:5, 320:6, 320:7, 320:8, 320:13, 320:17
GUARD [1] - 1:15
guard/private [3] - 147:13, 147:20, 148:25
guards [12] - 71:6, 180:20, 180:22, 194:2, 201:8, 225:5, 276:17, 285:25, 286:6, 306:17, 306:23, 318:20
GUARDS [1] - 1:15
guess [7] - 78:3, 78:5, 78:7, 84:18, 210:7, 254:4, 303:12
guidelines [3] - 71:17, 95:15, 306:7
guides [1] - 213:20
guilty [1] - 48:2
gun [1] - 36:19
gym [5] - 232:9, 233:2, 233:8, 233:20, 234:2

## H

H-A-M-M-A-R-T-H [1] - 27:2
H-O-F-M-I-E-S-T-E-R [1] - 28:23
Half [1] - 13:8
half [3] - 222:16, 222:19, 228:18
hall [1] - 39:3
hallway [4] - 246:6, 297:23, 297:25, 301:8
Hamilton [1] - 3:11
Hammarth [3] - 27:2, 29:2
hand [32] - 41:5, 52:23, 103:17, 103:23, 110:5, 115:6, 118:25, 123:20, 188:13, 196:12, 196:24, 197:22, 200:10, 201:16, 205:10, 211:22, 238:3, 238:6, 238:8, 239:9, 240:3, 240:24, 244:16, 245:5, 245:19, 254:25, 261:2, 269:10, 294:2, 299:8, 321:21
handbook [2] - 213:7,

213:19
handbooks [1] - 306:7
handed [1] - 175:7
handing [5] - 99:14, 186:5, 209:3, 211:25, 251:16
hands [9] - 104:2, 110:7, 146:3, 146:15, 239:25, 258:21, 259:3, 259:4, 261:19
hands-on [2] - 146:3, 146:15
handwriting [7] - 214:17, 214:20, 214:25, 215:2, 215:12, 222:16, 255:16
handwritten [1] - 41:7
harass [1] - 67:23
harassing [5] - 86:9, 86:16, 86:24, 272:25, 275:18
harassment [15] - 38:17, 38:19, 52:20, 89:5, 90:23, 91:24, 94:7, 95:20, 95:22, 96:19, 173:24, 225:14, 225:16, 225:17, 288:9
hard [4] - 145:22, 145:24, 146:15, 146:16
harm [10] - 63:19, 64:11, 69:18, 69:22, 73:17, 74:21, 74:22, 102:2, 112:11, 145:10
harmful [1] - 149:20
hat [1] - 127:21
he/she [2] - 141:3, 310:12
head [2] - 7:2, 166:18
health [1] - 152:13
healthy [2] - 67:11, 67:18
hear [6] - 6:22, 163:13, 230:20, 299:15, 301:22, 301:25
heard [5] - 158:17, 230:3, 230:5, 234:7, 243:17
heart [1] - 125:6
held [8] - 11:15, 14:9, 33:17, 209:24, 270:22, 293:3, 308:16, 308:22
help [6] - 9:19, 9:23, 60:2, 122:6, 251:24,

285:9
helped [4] - 242:12, 243:6, 243:22, 245:10
helping [1] - 254:8
hereby [2] - 316:8, 321:9
HEREBY [1] - 4:2
herein [1] - 4:4
hereinbefore [1] - 321:11
hereunto [1] - 321:21
hi [1] - 270:5
high [21] - 12:17, 12:20, 12:23, 14:4, 14:6, 14:7, 14:17, 31:6, 53:23, 55:4, 63:17, 68:17, 69:11, 113:19, 113:20, 129:6, 130:3, 130:8, 137:13, 141:24, 163:22
High [167] - 13:4, 15:3, 18:9, 18:11, 18:23, 20:11, 23:24, 25:2, 25:11, 25:21, 26:3, 26:6, 26:13, 27:8, 27:11, 27:14, 27:20, 28:3, 28:9, 28:10, 32:16, 36:16, 45:7, 50:21, 51:3, 53:21, 54:14, 54:25, 56:15, 56:23, 57:2, 57:6, 57:13, 57:25, 58:20, 59:19, 62:23, 64:4, 64:14, 64:18, 66:24, 67:12, 67:16, 67:19, 68:12, 70:4, 70:21, 72:8, 72:14, 73:23, 74:7, 75:24, 77:24, 78:15, 79:3, 81:2, 81:17, 81:22, 82:17, 83:14, 83:19, 83:23, 85:5, 85:12, 87:12, 90:15, 92:16, 93:23, 94:4, 94:8, 94:15, 94:19, 94:25, 96:11, 98:5, 98:6, 98:12, 102:11, 102:21, 103:5, 104:8, 104:22, 105:9, 105:13, 111:6, 113:16, 113:18, 113:23, 113:24, 113:25, 114:8, 114:11, 120:25, 121:14, 122:11, 122:17, 126:23, 130:19, 131:17, 131:18, 135:25,

137:8, 138:8, 140:14, 145:14, 145:22, 146:5, 151:2, 151:7, 151:24, 152:5, 152:9, 152:14, 152:18, 153:4, 153:8, 153:12, 154:3, 154:19, 154:25, 155:3, 155:4, 155:11, 156:20, 157:2, 157:10, 157:14, 158:8, 158:19, 160:18, 172:20, 173:14, 174:13, 174:22, 174:24, 176:19, 176:21, 177:2, 177:6, 177:12, 177:13, 177:17, 181:3, 181:18, 182:22, 186:21, 187:24, 188:4, 190:11, 193:5, 195:22, 196:3, 209:25, 212:11, 214:21, 216:22, 221:17, 221:20, 247:17, 247:23, 286:21, 296:15, 297:7, 306:18, 308:18, 308:24, 309:18
Hills [2] - 1:21, 3:6
himself [5] - 63:19, 64:11, 69:19, 112:9, 112:12
hindered [1] - 156:25
hire [3] - 36:11, 136:17, 187:24
hired [5] - 136:25, 190:10, 213:11, 213:13, 306:13
hiring [1] - 137:8
history [2] - 13:24, 273:3
hit [2] - 258:14, 259:12
Hofmiester [2] - 28:22, 28:24
hold [19] - 13:13, 13:18, 14:11, 15:12, 33:20, 36:15, 36:19, 51:2, 69:21, 120:8, 120:11, 133:5, 138:18, 149:14, 149:22, 241:6, 241:8, 300:19, 300:25
Hold [1] - 165:10
holding [4] - 239:20,

333

241:13, 242:16, 313:22
**holds** [4] - 65:13, 113:9, 134:22, 134:25
**home** [4] - 12:7, 12:12, 12:14, 246:5
**honest** [1] - 295:18
**honestly** [2] - 28:6, 312:12
**Honor** [22] - 271:13, 271:18, 272:13, 273:23, 274:5, 274:13, 274:25, 275:22, 275:25, 276:8, 276:9, 276:22, 277:2, 279:22, 280:16, 281:3, 281:18, 282:22, 283:17, 284:2, 284:16, 284:19
**hostile** [1] - 173:11
**hour** [61] - 61:15, 61:19, 61:23, 71:19, 71:20, 71:23, 72:12, 76:13, 76:14, 81:5, 81:25, 82:9, 83:25, 96:7, 96:13, 96:22, 96:25, 97:12, 97:14, 97:18, 98:17, 121:3, 134:18, 142:18, 142:23, 143:16, 143:18, 144:14, 175:13, 175:16, 176:3, 180:24, 183:12, 183:15, 184:22, 184:25, 185:8, 186:17, 186:24, 188:4, 188:19, 189:19, 189:21, 189:23, 191:4, 194:23, 195:7, 197:3, 197:6, 197:25, 199:12, 199:15, 200:14, 200:17, 201:7, 201:22, 276:16, 307:25, 308:2, 308:5, 318:7
**hours** [21] - 9:6, 55:11, 56:11, 56:13, 56:22, 57:2, 57:6, 71:21, 96:20, 177:4, 187:15, 210:17, 210:19, 217:21, 217:23, 281:6, 281:9, 281:16, 281:17, 282:7, 290:13

**huge** [1] - 232:8
**hurt** [6] - 64:23, 65:2, 65:21, 73:19, 102:2, 162:15
**hyperlink** [1] - 85:17

## I

**I.D** [1] - 319:11
**identification** [14] - 84:9, 165:2, 171:18, 175:6, 183:5, 184:17, 218:7, 220:19, 229:13, 247:7, 251:15, 253:17, 255:4, 265:16
**identify** [1] - 193:21
**identity** [1] - 86:22
**illicit** [1] - 53:17
**immediately** [2] - 239:4, 312:23
**impact** [1] - 131:24
**implemented** [1] - 161:7
**important** [1] - 7:5
**improper** [7] - 47:12, 74:12, 74:16, 75:25, 151:23, 224:23, 225:13
**improperly** [1] - 182:21
**IN** [1] - 321:20
**in-person** [1] - 22:11
**in-service** [3] - 185:8, 276:16, 319:17
**In-Service** [1] - 319:14
**inaccurate** [1] - 262:8
**inappropriate** [1] - 171:3
**Inc** [1] - 2:24
**incidence** [1] - 158:13
**Incident** [1] - 320:18
**incident** [28] - 57:14, 57:17, 158:11, 215:6, 217:7, 217:12, 217:16, 223:18, 223:20, 227:10, 227:11, 227:13, 231:8, 231:20, 232:3, 234:9, 234:12, 245:8, 247:11, 247:15, 247:22, 249:25, 253:24, 268:16, 272:21, 275:20, 306:17, 313:7
**incidents** [2] - 57:16, 210:23

**include** [3] - 110:8, 150:24, 309:11
**includes** [2] - 131:10, 142:5
**including** [9] - 39:8, 86:21, 88:20, 147:12, 148:3, 176:13, 222:7, 306:11, 318:25
**indemnification** [1] - 48:16
**indemnified** [4] - 47:20, 47:23, 49:4, 221:6
**indemnifying** [2] - 50:9, 317:21
**independent** [1] - 78:21
**indicated** [3] - 219:13, 281:20, 287:9
**indicating** [8] - 50:7, 140:9, 142:11, 203:22, 204:2, 281:22, 310:10, 317:19
**individual** [12] - 1:10, 1:11, 1:12, 1:13, 1:14, 1:15, 1:16, 1:17, 102:9, 112:8, 117:18, 123:15
**individual's** [2] - 86:17, 161:9
**individuals** [1] - 27:7
**info** [2] - 319:22, 320:11
**inform** [2] - 83:10, 83:12
**informal** [1] - 305:14
**INFORMATION** [1] - 319:6
**information** [6] - 9:7, 63:24, 125:23, 224:21, 249:10, 302:19
**informed** [1] - 46:25
**infraction** [1] - 37:6
**initiate** [7] - 102:15, 102:22, 103:6, 103:15, 104:7, 112:25, 237:12
**initiated** [1] - 237:16
**initiating** [1] - 236:3
**injured** [2] - 268:22, 269:2
**injury** [1] - 133:16
**input** [1] - 207:24
**inquiring** [1] - 280:2
**inquiry** [4] - 275:6, 275:9, 275:10, 276:6
**INSERT** [1] - 15:22

**INSERT:**

————————

————————[1] - 23:16
**inside** [2] - 102:7
**Instagram** [1] - 178:8
**installing** [1] - 16:7
**instance** [10] - 49:9, 70:14, 73:21, 74:11, 127:8, 151:24, 162:16, 212:17, 213:24, 218:22
**instances** [3] - 122:9, 122:16, 130:18
**instant** [3] - 304:10, 304:22, 307:8
**instinctive** [1] - 100:18
**instruct** [2] - 191:9, 198:23
**instructed** [5] - 59:18, 59:21, 60:14, 274:14, 274:18
**instructing** [1] - 171:20
**instruction** [4] - 60:8, 60:11, 97:3, 198:17
**instructor** [4] - 98:6, 98:11, 126:10, 200:24
**insubordinate** [2] - 141:11, 141:15
**insubordination** [2] - 141:19, 142:5
**insurance** [5] - 48:5, 49:5, 49:8, 50:8, 317:20
**intend** [1] - 112:11
**intentional** [1] - 49:10
**interaction** [1] - 300:12
**interest** [2] - 243:25, 244:6
**interested** [2] - 7:20, 321:18
**interfere** [2] - 132:15, 132:19
**interference** [1] - 67:17
**interfering** [1] - 67:11
**interior** [1] - 297:12
**Internal** [1] - 293:12
**Internet** [1] - 303:15
**interrogatories** [1] - 280:8
**interrogatory** [1] - 280:6
**intervene** [6] - 75:22, 98:22, 101:4, 116:10, 141:8,

141:14
**intervening** [1] - 179:17
**intervention** [22] - 95:23, 97:4, 99:23, 100:5, 101:4, 101:9, 104:14, 105:25, 106:18, 108:23, 113:4, 116:18, 117:2, 117:5, 117:10, 117:16, 118:12, 126:6, 135:17, 160:7, 160:9
**interview** [7] - 21:9, 21:13, 21:21, 21:22, 24:2, 291:5, 292:3
**interviewed** [1] - 23:21
**interviews** [1] - 39:17
**intimidate** [1] - 67:23
**investigated** [2] - 93:6, 93:10
**investigation** [5] - 93:13, 94:12, 94:21, 174:17, 278:5
**involved** [11] - 83:20, 94:10, 94:14, 122:22, 208:11, 208:12, 236:11, 248:14, 249:24, 256:7, 256:11
**involvement** [1] - 208:15
**involves** [1] - 112:7
**involving** [4] - 231:8, 305:16, 306:17, 306:23
**IS** [3] - 4:2, 4:8, 4:13
**Island** [9] - 5:14, 12:16, 14:10, 17:13, 17:14, 17:18, 17:25, 18:3, 18:7
**issue** [2] - 272:22, 282:4
**issued** [2] - 48:3, 202:10
**IT** [3] - 4:2, 4:8, 4:13

## J

**James** [52] - 21:13, 21:15, 23:21, 24:21, 27:17, 43:6, 58:11, 58:13, 72:9, 72:19, 73:14, 75:9, 82:13, 82:14, 98:3, 98:5, 98:10, 116:12, 116:13, 120:2, 143:4, 144:21, 158:6, 158:9,

334

159:18, 179:19, 179:20, 179:23, 184:9, 189:14, 190:8, 192:8, 193:12, 195:4, 195:20, 196:5, 197:16, 198:10, 199:23, 226:10, 229:2, 229:4, 229:5, 229:6, 252:6, 286:25, 287:14, 289:19, 289:20, 290:19, 291:8, 291:14

**James'** [1] - 199:22

**JANE** [3] - 1:11, 1:16, 1:16

**Jane** [1] - 303:2

**Jay** [8] - 16:10, 16:13, 16:14, 16:20, 16:22, 17:2, 17:11, 26:23

**Jennifer** [7] - 28:22, 29:4, 31:11, 31:12, 31:13, 32:14, 286:5

**Jerry** [8] - 234:19, 236:5, 236:7, 236:15, 253:2, 293:3, 293:6

**job** [29] - 8:11, 13:23, 14:2, 14:3, 14:9, 14:12, 17:3, 18:5, 18:18, 21:2, 25:10, 26:6, 26:18, 33:17, 51:11, 55:16, 55:17, 57:19, 58:5, 140:20, 186:24, 192:5, 193:25, 206:11, 224:13, 273:9, 273:10, 318:19

**jobs** [5] - 14:6, 14:7, 56:19, 57:7, 88:12

**Joe** [5] - 27:2, 27:9, 27:10, 28:25, 29:2

**John** [1] - 303:2

**JOHN** [3] - 1:11, 1:15, 1:16

**Josh** [1] - 26:21

**judge** [5] - 30:12, 30:13, 270:16, 270:17, 315:16

**jumping** [2] - 111:16, 257:5

**June** [69] - 39:23, 41:25, 42:7, 76:11, 90:18, 92:4, 92:13, 92:17, 92:22, 93:22, 94:3, 94:7, 120:22, 124:6, 133:6, 139:3, 145:17, 155:11, 178:4, 206:7,

209:12, 210:4, 210:9, 211:11, 211:16, 211:20, 217:18, 218:25, 219:23, 220:10, 221:25, 222:8, 222:14, 222:21, 223:7, 223:14, 224:23, 227:3, 229:15, 229:21, 231:18, 231:21, 232:7, 252:4, 252:7, 252:10, 253:20, 254:23, 255:13, 266:2, 286:12, 286:15, 286:22, 286:25, 287:10, 287:13, 288:19, 288:24, 295:3, 295:6, 296:15, 297:7, 299:18, 303:8, 303:11, 303:15, 305:24, 306:17, 318:25

**junior** [2] - 55:4, 163:22

**Junior** [4] - 57:25, 176:19, 177:2, 177:6

**Justice** [1] - 202:11

**justification** [1] - 147:11

**justified** [1] - 298:23

**justify** [1] - 148:2

## K

**Kaplan** [2] - 13:8, 13:9

**Keep** [1] - 311:13

**keep** [4] - 108:10, 231:16, 267:8, 283:13

**keeping** [2] - 166:6, 231:18

**Ken** [1] - 224:11

**Kenneth** [1] - 24:18

**Kenny** [5] - 42:2, 210:10, 246:5, 251:10, 287:6

**kept** [2] - 209:21, 279:3

**key** [1] - 135:15

**kid** [3] - 37:22, 75:22, 123:14

**kids** [12] - 163:21, 163:24, 223:24, 223:25, 224:21, 241:24, 241:25, 243:12, 246:6, 288:8, 288:10

**kids'** [1] - 242:3

**kind** [1] - 10:3

**knowing** [1] - 112:22

**knowledge** [12] - 34:13, 69:15, 77:23, 78:21, 78:25, 92:18, 179:3, 186:4, 192:20, 201:14, 206:25, 291:3

**known** [1] - 174:10

## L

**labeled** [1] - 84:11

**labor** [1] - 16:24

**laborer** [1] - 16:23

**lack** [3] - 125:4, 127:3, 127:22

**lapse** [2] - 206:4, 206:13

**lapsed** [1] - 206:23

**large** [1] - 128:10

**last** [29] - 19:9, 63:21, 64:11, 69:20, 73:20, 79:10, 86:15, 87:4, 89:3, 116:17, 117:2, 137:6, 142:3, 144:11, 148:9, 156:6, 158:25, 160:13, 161:8, 161:12, 199:2, 238:21, 250:8, 250:21, 252:16, 280:17, 284:4, 291:17, 304:18

**lastly** [1] - 281:4

**latex** [6] - 70:5, 70:6, 70:9, 70:13, 70:19, 71:3

**Law** [2] - 147:14, 153:17

**law** [20] - 25:3, 28:11, 28:14, 30:22, 30:25, 35:19, 35:25, 95:17, 119:12, 138:7, 153:23, 181:8, 270:16, 271:22, 272:16, 273:14, 275:3, 312:15, 312:21, 320:23

**LAW** [1] - 3:3

**lawfully** [3] - 296:12, 296:14, 296:19

**laws** [4] - 31:21, 118:20, 119:8, 119:17

**lawsuit** [22] - 7:22, 11:10, 38:23, 39:9, 47:20, 47:23, 49:15, 79:20, 87:8, 87:13, 87:20, 87:24, 88:4,

88:15, 89:21, 151:25, 152:6, 152:10, 152:15, 174:12, 177:24, 293:19

**lawyer's** [1] - 277:22

**lay** [1] - 113:19

**laying** [2] - 129:23, 130:12

**LCSD** [86] - 63:9, 65:24, 66:7, 67:22, 68:23, 68:25, 76:19, 79:10, 79:15, 84:11, 86:9, 86:13, 89:2, 90:2, 99:15, 100:13, 100:23, 100:24, 102:5, 105:24, 111:19, 112:5, 115:8, 116:15, 118:3, 121:5, 123:20, 128:2, 128:3, 131:3, 132:14, 133:8, 133:15, 137:5, 137:6, 143:8, 143:9, 145:3, 145:5, 145:20, 146:24, 147:7, 148:8, 151:13, 154:10, 155:18, 155:25, 157:16, 158:24, 158:25, 161:2, 162:9, 162:10, 162:16, 163:5, 173:3, 173:4, 173:22, 177:9, 179:13, 181:6, 181:13, 181:22, 188:22, 189:22, 192:10, 195:2, 197:13, 198:3, 199:18, 200:21, 202:2, 205:20, 209:5, 212:2, 218:12, 248:3, 248:4, 248:6, 252:25, 266:10

**lead** [1] - 288:13

**leader** [1] - 268:9

**leading** [1] - 234:23

**learn** [8] - 63:23, 151:18, 161:11, 268:17, 268:19, 271:22, 272:6, 292:6

**learned** [3] - 21:24, 121:2, 148:8

**leave** [15] - 14:18, 14:20, 15:18, 16:5, 17:2, 18:3, 23:10, 33:24, 34:3, 221:8,

223:24, 225:17, 226:12, 287:17, 312:4

**leaving** [1] - 35:12

**lecture** [1] - 169:3

**led** [1] - 271:23

**left** [22] - 14:14, 14:16, 16:17, 33:23, 34:9, 34:10, 35:5, 46:22, 47:14, 48:21, 137:5, 165:22, 186:7, 203:22, 219:23, 235:21, 235:23, 237:23, 237:25, 238:6, 239:8, 269:23

**legal** [6] - 49:23, 50:3, 80:2, 147:7, 309:22, 309:25

**legitimate** [1] - 272:11

**legs** [4] - 131:24, 132:11, 133:6, 244:23

**less** [5] - 34:7, 177:4, 258:6, 258:8, 258:11

**lest** [1] - 177:5

**letter** [6] - 203:19, 204:3, 204:7, 204:25, 205:7, 207:6

**Letter** [1] - 320:9

**letters** [4] - 285:16, 285:20, 307:6

**letting** [2] - 47:4, 186:11

**Letty** [1] - 24:15

**level** [4] - 73:22, 111:20, 112:6, 259:3

**liability** [6] - 120:8, 120:12, 120:16, 120:20, 151:20, 310:13

**license** [48] - 11:23, 12:5, 12:9, 13:12, 13:14, 13:16, 13:19, 13:20, 13:21, 18:14, 19:18, 21:23, 22:4, 22:8, 23:4, 23:8, 23:15, 23:25, 36:19, 36:21, 36:22, 36:23, 56:5, 56:9, 71:24, 72:2, 142:15, 180:5, 180:11, 185:16, 186:12, 187:14, 188:2, 188:8, 191:2, 193:8, 193:9, 203:19, 204:19, 204:21, 204:25, 205:17, 206:23, 207:3, 207:17, 207:18, 319:8, 320:13

335

licensed [1] - 188:10
licenses [1] - 13:18
licensing [3] - 21:24, 22:3, 193:7
licensure [1] - 319:22
Licensure [2] - 320:9, 320:11
lie [1] - 131:18
Lieder [2] - 202:4, 205:7
Lieutenant [1] - 302:23
life [5] - 150:6, 150:13, 150:14, 151:5, 151:9
lighted [1] - 70:25
limit [2] - 77:14, 77:17
limitations [3] - 147:8, 309:23, 310:2
limited [3] - 222:8, 306:12, 318:25
line [4] - 8:17, 79:10, 270:9, 270:12
Lineen [1] - 270:12
LINEEN [271] - 3:13, 5:15, 11:19, 12:4, 12:8, 12:11, 14:3, 18:24, 19:24, 20:13, 20:23, 23:17, 24:16, 25:4, 25:12, 26:14, 29:7, 29:13, 29:18, 30:2, 30:11, 32:5, 33:3, 33:19, 34:23, 37:8, 40:16, 41:16, 44:10, 44:17, 47:2, 47:6, 48:6, 48:12, 50:10, 50:18, 51:18, 52:18, 54:6, 58:14, 59:7, 61:24, 62:18, 63:13, 64:6, 65:14, 69:12, 72:25, 73:24, 74:18, 75:2, 75:18, 77:13, 78:6, 78:9, 79:7, 80:10, 81:12, 84:25, 86:11, 87:2, 87:14, 88:17, 88:20, 89:23, 90:20, 90:25, 91:6, 92:5, 93:8, 93:15, 94:22, 95:4, 97:7, 98:14, 98:18, 99:6, 100:20, 101:15, 101:23, 103:2, 103:9, 104:9, 104:15, 105:2, 106:4, 106:8, 107:2, 107:4, 107:10, 107:15, 107:18, 107:22, 108:11, 108:18, 109:24, 110:9, 110:17, 110:23, 111:12,

111:21, 111:25, 113:6, 113:21, 114:3, 115:2, 117:7, 117:13, 117:22, 118:17, 119:3, 121:15, 122:12, 123:6, 124:3, 125:7, 125:10, 125:13, 125:16, 126:2, 127:6, 127:15, 127:19, 128:17, 129:8, 129:20, 130:22, 131:20, 132:4, 132:21, 136:11, 142:7, 144:18, 146:6, 147:3, 147:24, 148:4, 148:17, 149:6, 149:12, 149:16, 149:24, 150:12, 151:3, 154:17, 154:21, 156:15, 156:22, 158:14, 160:2, 161:19, 162:5, 163:3, 163:10, 164:6, 164:20, 165:3, 165:7, 165:12, 165:17, 165:23, 166:3, 166:9, 166:11, 166:14, 166:24, 167:3, 167:8, 167:16, 167:21, 167:25, 168:11, 168:16, 169:2, 169:7, 169:21, 170:3, 170:7, 170:17, 170:21, 171:2, 171:19, 172:5, 172:21, 174:7, 176:8, 178:13, 178:25, 179:6, 179:10, 182:11, 185:22, 194:5, 195:23, 196:4, 196:9, 201:9, 202:19, 205:3, 207:4, 212:19, 214:11, 214:14, 222:9, 227:20, 228:6, 229:25, 236:9, 238:15, 239:6, 239:22, 240:11, 240:15, 240:22, 242:17, 244:2, 248:23, 253:13, 254:18, 256:9, 260:19, 270:10, 272:13, 274:8, 274:15,

274:22, 276:22, 276:25, 278:10, 278:22, 279:12, 279:20, 280:21, 281:22, 282:9, 283:21, 284:7, 284:18, 284:24, 285:3, 287:25, 288:12, 288:20, 291:13, 291:25, 294:19, 295:22, 296:8, 296:16, 297:3, 297:15, 299:2, 300:2, 300:21, 301:16, 302:13, 303:3, 308:7, 308:19, 310:7, 311:8, 312:6, 313:19, 313:25, 314:15, 314:21, 315:3, 315:6, 315:12, 315:17, 315:22
lines [5] - 20:10, 25:18, 74:15, 157:17, 176:23
list [3] - 66:7, 147:17, 148:22
listed [1] - 302:9
listen [1] - 140:16
litigation [4] - 276:24, 278:12, 304:13, 305:2
located [1] - 22:22
location [1] - 217:20
locked [2] - 211:8, 300:25
lodged [3] - 81:21, 153:3, 174:24
log [6] - 209:10, 209:15, 247:11, 247:22, 320:14, 320:18
logbook [3] - 209:19, 209:20, 209:24
logo [1] - 54:7
logs [1] - 307:6
LONERGAN [1] - 1:12
Longwood [241] - 5:13, 11:21, 12:25, 13:4, 15:3, 18:9, 18:10, 18:16, 18:23, 20:11, 21:10, 23:24, 24:25, 25:11, 25:21, 26:3, 26:6, 26:8, 26:12, 27:8, 27:11, 27:14, 27:20, 27:24, 28:3, 28:9, 28:10, 31:18, 31:22, 31:25, 32:16, 32:20, 33:14,

33:21, 34:11, 34:17, 34:21, 35:5, 35:11, 35:22, 36:5, 36:12, 47:18, 50:14, 50:21, 51:3, 51:17, 52:25, 53:2, 53:21, 54:5, 54:7, 54:8, 54:14, 54:25, 56:15, 56:23, 57:2, 57:6, 57:13, 58:2, 58:20, 59:19, 62:23, 63:16, 64:4, 64:14, 64:17, 66:12, 66:24, 67:12, 67:16, 67:19, 68:12, 68:17, 69:11, 69:25, 70:4, 70:20, 72:8, 72:13, 73:23, 75:23, 77:24, 78:15, 79:3, 80:8, 81:2, 81:17, 81:22, 83:14, 83:19, 83:23, 85:5, 85:12, 87:12, 88:18, 89:16, 90:15, 92:16, 93:23, 94:4, 94:8, 94:14, 94:15, 94:17, 94:19, 94:20, 94:25, 96:11, 98:4, 98:6, 98:7, 98:12, 102:10, 102:21, 103:5, 103:14, 104:6, 104:7, 104:22, 105:9, 105:13, 111:5, 113:16, 113:18, 113:20, 113:23, 113:24, 113:25, 114:8, 114:11, 119:13, 120:25, 121:14, 122:10, 122:17, 126:23, 130:19, 131:17, 131:18, 135:25, 136:17, 137:8, 138:8, 140:14, 141:23, 145:14, 145:22, 146:5, 150:25, 151:7, 151:24, 152:5, 152:9, 152:14, 152:18, 153:4, 153:8, 153:12, 154:3, 154:18, 154:23, 154:24, 155:3, 155:4, 155:11, 156:11, 156:20, 157:2, 157:10, 157:14, 158:8, 158:18, 160:18, 172:20, 173:13, 173:18, 174:5, 174:13, 174:22, 174:24,

176:20, 177:2, 177:5, 177:12, 177:13, 177:17, 181:3, 181:18, 182:22, 186:21, 187:4, 187:10, 187:24, 188:3, 190:11, 193:4, 195:22, 196:3, 206:4, 206:15, 206:19, 206:24, 209:24, 212:11, 213:8, 216:22, 221:17, 221:20, 247:17, 247:23, 270:3, 270:4, 271:24, 272:7, 275:2, 275:5, 276:15, 285:9, 285:22, 286:2, 286:6, 286:9, 286:14, 286:21, 290:25, 296:15, 297:7, 302:18, 305:21, 306:18, 306:22, 308:18, 308:24, 309:18, 314:4, 319:13, 319:15
LONGWOOD [5] - 1:8, 1:12, 1:13, 1:14, 1:15
look [20] - 62:4, 66:3, 69:3, 76:22, 79:13, 88:25, 90:3, 93:3, 133:11, 151:15, 155:20, 162:8, 187:20, 193:20, 194:17, 210:11, 281:7, 298:2, 303:23, 304:7
looked [3] - 203:5, 236:23, 256:25
looking [12] - 7:23, 8:2, 66:11, 130:10, 131:3, 151:17, 155:22, 161:5, 249:18, 300:5, 302:3, 311:11
looks [34] - 53:12, 62:6, 84:17, 110:10, 115:13, 115:18, 129:11, 159:4, 159:7, 172:9, 172:11, 175:12, 175:17, 197:16, 198:10, 199:22, 201:20, 205:16, 207:16, 210:12, 210:17, 211:4,

215:2, 216:14, 218:10, 223:7, 235:21, 247:24, 248:10, 248:11, 251:19, 307:19, 307:24, 309:4
**loss** [1] - 112:6
**loud** [1] - 214:10
**lower** [1] - 309:7
**lunch** [1] - 139:19
**lunged** [4] - 258:13, 258:20, 258:23, 259:11
**lunging** [5] - 236:23, 254:4, 256:21, 257:2, 257:8
**lying** [5] - 131:11, 131:23, 132:10, 135:9, 135:13

## M

**mail** [12] - 58:19, 59:6, 59:14, 59:19, 205:18, 230:18, 246:25, 264:24, 284:4, 284:5, 295:20, 295:23
**mailbox** [5] - 54:22, 54:24, 54:25, 204:14, 204:15
**mailing** [1] - 59:3
**mails** [6] - 59:2, 304:11, 304:23, 305:3, 305:5, 307:7
**main** [4] - 45:12, 45:14, 271:5, 272:8
**maintain** [5] - 58:19, 118:6, 142:15, 177:20, 314:6
**maintained** [5] - 59:5, 247:16, 247:23, 308:17, 308:23
**maintaining** [1] - 242:19
**maintenance** [2] - 202:7, 202:8
**male** [6] - 46:4, 46:5, 60:4, 264:9, 292:21, 292:22
**man** [4] - 15:11, 129:3, 129:10
**manage** [2] - 100:17, 116:21
**manager** [1] - 15:15
**mandated** [1] - 143:2
**mandatory** [3] - 134:9, 134:12, 134:15
**manner** [6] - 113:5, 126:22, 231:14,

262:14, 298:16, 299:11
**manual** [6] - 113:8, 113:11, 154:8, 160:16, 176:12, 208:16
**manuals** [4] - 175:12, 175:15, 207:25, 208:6
**Marcy** [6] - 30:24, 31:14, 285:12, 285:15, 285:19, 285:24
**MARIA** [1] - 1:13
**marked** [49] - 52:24, 84:7, 84:9, 99:12, 115:7, 136:15, 143:7, 158:22, 164:24, 165:2, 171:18, 175:6, 183:5, 183:7, 184:15, 184:17, 186:6, 188:13, 191:22, 194:17, 196:24, 197:22, 199:6, 200:11, 201:17, 205:10, 207:9, 207:10, 209:4, 211:23, 218:5, 218:7, 218:8, 220:17, 220:19, 229:13, 247:7, 248:22, 251:15, 251:16, 253:17, 254:25, 255:4, 255:6, 265:16, 276:3, 277:4, 294:3, 303:20
**marriage** [1] - 321:17
**married** [11] - 18:20, 28:14, 28:17, 28:18, 28:19, 29:3, 29:17, 34:16, 34:20, 274:9, 274:10
**material** [3] - 125:22, 193:18, 198:17
**materials** [8] - 75:11, 193:16, 193:25, 198:18, 198:22, 208:20, 306:11, 318:18
**matter** [9] - 49:24, 270:3, 281:13, 286:24, 291:12, 293:16, 304:12, 304:25, 321:19
**mean** [15] - 37:5, 103:21, 110:4, 126:3, 128:19, 141:18, 150:6,

152:21, 178:16, 221:3, 241:11, 244:19, 256:20, 260:8, 289:24
**means** [1] - 47:24
**meant** [1] - 120:3
**measure** [1] - 199:3
**media** [10] - 177:14, 177:18, 177:21, 177:24, 178:3, 178:6, 303:14, 304:10, 304:23, 307:7
**medication** [1] - 10:2
**medicine** [1] - 10:4
**meet** [11] - 24:11, 24:19, 32:13, 40:5, 40:9, 40:12, 42:19, 169:14, 171:7, 286:20, 294:17
**meeting** [6] - 21:19, 24:23, 47:13, 64:18, 294:10, 295:5
**meetings** [3] - 208:11, 247:3, 294:14
**member** [7] - 63:16, 102:15, 102:21, 103:5, 242:8, 261:13, 262:3
**members** [4] - 92:15, 131:5, 133:23, 275:4
**membership** [1] - 215:25
**memorandum** [4] - 229:24, 304:11, 304:24, 307:6
**mention** [1] - 88:15
**mentioned** [6] - 27:17, 37:18, 39:20, 100:3, 152:23, 211:2
**messages** [4] - 304:10, 304:22, 307:8
**met** [7] - 10:19, 11:5, 11:8, 23:20, 24:12, 47:18, 294:22
**method** [1] - 69:10
**methods** [1] - 69:5
**MICHAEL** [1] - 1:12
**middle** [3] - 8:18, 103:25, 236:13
**Middle** [3] - 5:13, 12:15, 14:10
**might** [42] - 7:3, 9:18, 9:19, 10:5, 38:6, 39:2, 49:21, 53:9, 59:15, 67:2, 76:5, 118:15, 118:16, 120:8, 120:11, 120:15, 120:19,

127:9, 128:22, 140:14, 140:17, 153:19, 153:22, 164:8, 180:7, 180:14, 185:14, 187:9, 190:22, 194:12, 196:10, 204:6, 231:12, 251:22, 252:5, 254:19, 262:24, 262:25, 263:5, 295:17, 311:6, 313:8
**mind** [4] - 9:13, 115:5, 243:25, 244:6
**mine** [1] - 37:5
**Mineola** [1] - 2:25
**minimum** [5] - 138:9, 138:15, 189:9, 195:16, 196:19
**minute** [5] - 80:17, 257:24, 258:3, 258:4, 258:5
**minutes** [1] - 9:5
**misconduct** [1] - 48:2
**miss** [1] - 287:12
**missed** [1] - 202:21
**mistaken** [1] - 62:8
**MOFFETT** [2] - 321:7, 321:24
**Moffett** [4] - 2:5, 2:24, 6:18, 7:3
**mom** [1] - 28:9
**moment** [2] - 11:13, 270:17
**moments** [1] - 118:4
**money** [1] - 48:3
**monitor** [2] - 177:13, 177:17
**month** [3] - 176:13, 176:14, 176:17
**months** [1] - 206:6
**morning** [4] - 5:20, 5:21, 235:5, 283:23
**MORRIS** [132] - 3:3, 3:7, 5:8, 5:19, 6:4, 11:12, 11:16, 12:6, 12:10, 12:13, 15:18, 19:22, 20:18, 23:9, 29:11, 29:20, 30:8, 30:18, 44:5, 44:14, 44:19, 48:10, 48:17, 50:5, 60:23, 61:3, 62:13, 80:16, 80:21, 106:6, 107:8, 107:12, 107:16, 107:20, 108:5, 108:15, 108:19, 110:21, 111:22, 122:24, 125:8, 125:14, 125:24,

139:21, 144:12, 147:4, 159:23, 161:25, 164:23, 165:5, 165:10, 165:15, 165:18, 166:2, 166:6, 166:10, 166:12, 166:17, 167:2, 167:5, 167:13, 167:19, 167:22, 168:9, 168:14, 168:21, 169:5, 169:9, 169:12, 169:25, 170:5, 170:14, 170:19, 170:24, 171:24, 176:5, 182:8, 184:14, 185:17, 193:23, 204:23, 211:24, 222:3, 238:19, 240:20, 248:20, 252:14, 269:18, 269:25, 270:6, 270:11, 270:19, 270:23, 271:4, 271:12, 271:17, 271:21, 273:22, 274:4, 274:12, 274:25, 275:17, 275:21, 275:25, 276:8, 276:14, 276:19, 277:25, 278:13, 279:7, 279:10, 279:21, 280:16, 281:2, 281:18, 282:22, 283:16, 284:2, 284:15, 284:21, 284:25, 291:15, 304:16, 314:9, 314:17, 314:24, 315:4, 315:10, 315:14, 315:18, 315:24, 317:4
**Morris** [4] - 6:9, 29:24, 171:2, 270:2
**mother** [14] - 25:3, 25:17, 27:13, 28:5, 28:11, 28:14, 30:22, 30:25, 31:14, 31:16, 271:22, 272:16, 273:14, 275:3
**mother-in-law** [5] - 30:22, 271:22, 272:16, 273:14, 275:3
**MOTIONS** [1] - 317:9
**mouth** [1] - 230:22
**move** [6] - 30:15,

337

153:6, 157:2,
158:21, 189:15,
289:20
**moved** [8] - 55:4,
55:5, 55:7, 57:24,
176:20, 259:14,
289:17, 289:18
**movement** [3] - 66:14,
66:21, 257:17
**moving** [5] - 51:12,
132:13, 233:2,
257:9, 257:12
**MR** [130] - 5:8, 5:19,
6:4, 11:12, 11:16,
12:6, 12:10, 12:13,
15:18, 19:22, 20:18,
23:9, 29:11, 29:20,
30:8, 30:18, 44:5,
44:14, 44:19, 48:10,
48:17, 50:5, 60:23,
61:3, 62:13, 80:16,
80:21, 106:6, 107:8,
107:12, 107:16,
107:20, 108:5,
108:15, 108:19,
110:21, 111:22,
122:24, 125:8,
125:14, 125:24,
139:21, 144:12,
147:4, 159:23,
161:25, 164:23,
165:5, 165:10,
165:15, 165:18,
166:2, 166:6,
166:10, 166:12,
166:17, 167:2,
167:5, 167:13,
167:19, 167:22,
168:9, 168:14,
168:21, 169:5,
169:9, 169:12,
169:25, 170:5,
170:14, 170:19,
170:24, 171:24,
176:5, 182:8,
184:14, 185:17,
193:23, 204:23,
211:24, 222:3,
238:19, 240:20,
248:20, 252:14,
269:18, 269:25,
270:6, 270:11,
270:19, 270:23,
271:4, 271:12,
271:17, 271:21,
273:22, 274:4,
274:12, 274:25,
275:17, 275:21,
275:25, 276:8,
276:14, 276:19,
277:25, 278:13,

279:7, 279:10,
279:21, 280:16,
281:2, 281:18,
282:22, 283:16,
284:2, 284:15,
284:21, 284:25,
291:15, 304:16,
314:9, 314:17,
314:24, 315:4,
315:10, 315:14,
315:18, 315:24,
317:4
**MS** [270] - 5:15, 11:19,
12:4, 12:8, 12:11,
14:3, 18:24, 19:24,
20:13, 20:23, 23:17,
24:16, 25:4, 25:12,
26:14, 29:7, 29:13,
29:18, 30:2, 30:11,
32:5, 33:3, 33:19,
34:23, 37:8, 40:16,
41:16, 44:10, 44:17,
47:2, 47:6, 48:6,
48:12, 50:10, 50:18,
51:18, 52:18, 54:6,
58:14, 59:7, 61:24,
62:18, 63:13, 64:6,
65:14, 69:12, 72:25,
73:24, 74:18, 75:2,
75:18, 77:13, 78:6,
78:9, 79:7, 80:10,
81:12, 84:25, 86:11,
87:2, 87:14, 88:17,
88:20, 89:23, 90:20,
90:25, 91:6, 92:5,
93:8, 93:15, 94:22,
95:4, 97:7, 98:14,
98:18, 99:6, 100:20,
101:15, 101:23,
103:2, 103:9, 104:9,
104:15, 105:2,
106:4, 106:8, 107:2,
107:4, 107:10,
107:15, 107:18,
107:22, 108:11,
108:18, 109:24,
110:9, 110:17,
110:23, 111:12,
111:21, 111:25,
113:6, 113:21,
114:3, 115:2, 117:7,
117:13, 117:22,
118:17, 119:3,
121:15, 122:12,
123:6, 124:3, 125:7,
125:10, 125:13,
125:16, 126:2,
127:6, 127:15,
127:19, 128:17,
129:8, 129:20,
130:22, 131:20,

132:4, 132:21,
136:11, 142:7,
144:18, 146:6,
147:3, 147:24,
148:4, 148:17,
149:6, 149:12,
149:16, 149:24,
150:12, 151:3,
154:17, 154:21,
156:15, 156:22,
158:14, 160:2,
161:19, 162:5,
163:3, 163:10,
164:6, 164:20,
165:3, 165:7,
165:12, 165:17,
165:23, 166:3,
166:9, 166:11,
166:14, 166:24,
167:3, 167:8,
167:16, 167:21,
167:25, 168:11,
168:16, 169:2,
169:7, 169:21,
170:3, 170:7,
170:17, 170:21,
171:2, 171:19,
172:5, 172:21,
174:7, 176:8,
178:13, 178:25,
179:6, 179:10,
182:11, 185:22,
194:5, 195:23,
196:4, 196:9, 201:9,
202:19, 205:3,
207:4, 212:19,
214:11, 214:14,
222:9, 227:20,
228:6, 229:25,
236:9, 238:15,
239:6, 239:22,
240:11, 240:15,
240:22, 242:17,
244:2, 248:23,
253:13, 254:18,
256:9, 260:19,
270:10, 272:13,
274:8, 274:15,
274:22, 276:22,
276:25, 278:10,
278:22, 279:12,
279:20, 280:21,
281:22, 282:9,
283:21, 284:7,
284:18, 284:24,
285:3, 287:25,
288:12, 288:20,
291:13, 291:25,
294:19, 295:22,
296:8, 296:16,
297:3, 297:15,

299:2, 300:2,
300:21, 301:16,
302:13, 303:3,
308:7, 308:19,
310:7, 311:8, 312:6,
313:19, 313:25,
314:15, 314:21,
315:3, 315:6,
315:12, 315:17,
315:22
**must** [7] - 101:2,
101:7, 131:5, 223:3,
295:24, 311:20,
311:23

## N

**name** [20] - 5:9, 6:9,
15:15, 19:9, 27:17,
30:23, 31:14, 31:15,
59:25, 82:16, 141:3,
186:19, 205:24,
211:3, 218:13,
218:23, 250:8,
303:24, 303:25
**named** [6] - 37:25,
38:3, 38:6, 159:15,
281:7, 293:18
**names** [2] - 24:14,
242:3
**narrow** [1] - 257:25
**NASSAU** [1] - 321:5
**national** [2] - 67:25,
86:18
**naturally** [1] - 100:18
**nature** [4] - 44:12,
50:12, 123:7, 222:11
**Nature's** [8] - 55:18,
55:20, 55:23, 55:25,
56:12, 57:5, 57:10,
57:21
**necessary** [8] - 40:22,
63:21, 100:17,
118:5, 118:11,
118:15, 148:10,
161:8
**necessitated** [1] -
278:20
**neck** [4] - 240:6,
240:24, 241:3, 301:2
**need** [19] - 6:20, 8:15,
8:23, 8:24, 12:4,
12:8, 64:9, 117:23,
119:4, 133:16,
133:23, 138:18,
170:21, 171:7,
270:14, 275:15,
276:6, 283:6, 284:6
**needed** [3] - 17:3,
60:2, 311:4

**needs** [2] - 32:10,
282:18
**Nester** [1] - 320:10
**never** [13] - 48:20,
59:16, 83:20, 103:4,
103:14, 138:20,
140:22, 150:2,
206:9, 293:21,
302:14, 312:16
**NEW** [3] - 1:3, 316:4,
321:3
**new** [2] - 136:17,
137:8
**New** [31] - 1:21, 2:6,
2:25, 3:6, 3:12, 5:14,
11:21, 12:16, 13:11,
13:13, 13:19, 23:4,
23:14, 36:22, 71:25,
119:19, 142:16,
142:20, 142:25,
147:14, 180:4,
180:10, 180:15,
188:8, 189:10,
190:2, 195:17,
196:19, 207:3,
316:23, 321:8
**news** [2] - 303:16,
303:17
**next** [14] - 89:25,
127:25, 133:8,
151:13, 157:16,
215:10, 215:12,
217:10, 233:3,
239:15, 242:7,
249:19, 260:9, 300:5
**NEXT** [1] - 1:25
**Nieder** [2] - 19:10,
21:3
**night** [1] - 15:11
**nine** [1] - 36:10
**nobody** [4] - 82:21,
82:22, 98:16, 301:15
**noise** [1] - 234:7
**non** [10] - 100:4,
101:14, 104:14,
106:18, 108:23,
126:6, 135:16,
160:7, 160:8, 160:17
**non-physical** [2] -
101:14, 160:17
**non-violent** [8] -
100:4, 104:14,
106:18, 108:23,
126:6, 135:16,
160:7, 160:8
**None** [1] - 317:9
**none** [1] - 284:5
**normal** [4] - 99:2,
263:25, 287:20,
287:23

| | | | | |
|---|---|---|---|---|
| **normally** [1] - 218:21 | **numbers** [1] - 138:17 | 148:17, 149:6, | 39:23, 231:20, | 160:23, 175:12, |
| **NOT** [1] - 317:7 | **numeral** [2] - 76:20, | 149:12, 149:16, | 232:3, 232:6, 234:5, | 175:15, 175:17, |
| **Notary** [4] - 2:6, 5:4, | 309:7 | 149:24, 150:12, | 239:14, 239:17, | 180:8, 180:13, |
| 316:23, 321:7 | **nurturing** [1] - 173:19 | 151:3, 154:17, | 252:10, 286:22, | 180:14, 180:15, |
| **notations** [3] - 210:24, | **NYS** [1] - 319:17 | 154:21, 156:15, | 306:18 | 180:21, 184:11, |
| 211:4, 282:12 | | 156:22, 158:14, | **occurrence** [1] - | 185:14, 190:3, |
| **note** [43] - 5:15, 18:24, | **O** | 161:19, 163:3, | 311:24 | 193:19, 213:12, |
| 25:12, 33:3, 48:6, | | 164:6, 164:20, | **occurs** [1] - 124:24 | 213:15, 213:16, |
| 58:14, 59:7, 64:6, | **o'clock** [6] - 219:5, | 166:23, 172:5, | **OF** [6] - 1:3, 3:3, | 225:11, 231:12, |
| 72:25, 73:24, 74:18, | 229:22, 283:19, | 172:21, 174:7, | 316:4, 316:5, 321:3, | 240:2, 248:11, |
| 92:5, 114:3, 122:12, | 283:25, 314:10, | 178:13, 178:25, | 321:5 | 249:18, 250:21, |
| 124:3, 125:13, | 315:5 | 179:6, 179:10, | **office** [17] - 19:4, | 252:5, 262:23, |
| 127:19, 128:17, | **oath** [8] - 4:17, 7:11, | 195:23, 196:4, | 19:14, 41:10, 41:13, | 262:24, 263:2, |
| 146:6, 147:3, 148:4, | 7:16, 8:3, 167:15, | 196:9, 201:9, | 45:12, 45:14, | 263:6, 266:19, |
| 154:21, 156:15, | 170:6, 170:8, 316:10 | 202:19, 207:4, | 204:16, 220:7, | 266:22, 267:20, |
| 158:14, 164:6, | **object** [3] - 107:5, | 212:19, 214:11, | 233:10, 234:4, | 267:21, 271:4, |
| 164:20, 171:19, | 108:6, 163:11 | 227:20, 228:6, | 234:6, 245:15, | 292:19, 294:14, |
| 172:5, 172:21, | **objected** [1] - 195:25 | 229:25, 236:9, | 253:25, 254:9, | 300:8, 307:19, |
| 178:13, 178:25, | **objecting** [3] - 108:3, | 238:15, 239:6, | 261:15, 262:5 | 307:22, 313:9 |
| 179:6, 202:19, | 167:20, 167:21 | 239:22, 242:17, | **OFFICER** [1] - 1:10 | **one-on-one** [5] - 32:2, |
| 212:19, 214:11, | **Objection** [1] - 29:18 | 244:2, 253:13, | **officer** [14] - 4:16, | 32:4, 32:8, 33:18, |
| 226:2, 226:8, | **objection** [164] - | 254:18, 256:9, | 45:19, 45:25, 46:4, | 33:21 |
| 238:15, 256:9, | 18:24, 20:13, 25:12, | 260:19, 275:15, | 138:23, 139:2, | **one-to-one** [2] - 32:5, |
| 297:15, 303:3, | 29:7, 33:3, 33:19, | 287:25, 288:12, | 139:7, 139:12, | 32:6 |
| 308:7, 311:8 | 34:23, 37:9, 40:16, | 288:20, 291:25, | 251:4, 291:12, | **ones** [2] - 39:20, |
| **Note** [2] - 174:7, | 41:16, 48:6, 50:18, | 294:19, 295:22, | 302:22, 302:23, | 193:19 |
| 179:10 | 51:18, 52:18, 54:6, | 296:8, 296:16, | 302:25, 307:9 | **oneself** [2] - 69:22, |
| **noted** [3] - 236:9, | 58:14, 59:7, 61:24, | 297:3, 297:15, | **officers** [1] - 303:2 | 77:15 |
| 262:18, 315:25 | 63:13, 64:6, 65:14, | 299:2, 300:2, | **OFFICERS** [1] - 1:11 | **online** [3] - 13:8, |
| **notes** [14] - 10:17, | 69:12, 72:25, 73:24, | 300:21, 301:16, | **OFFICES** [1] - 3:3 | 22:10, 22:13 |
| 24:10, 43:9, 191:16, | 74:18, 75:2, 75:18, | 302:13, 303:3, | **official** [8] - 1:10, | **oOo** [1] - 4:21 |
| 192:24, 194:9, | 77:13, 79:7, 80:10, | 308:7, 308:19, | 1:11, 1:12, 1:13, | **open** [1] - 259:4 |
| 200:2, 208:8, | 81:12, 84:25, 87:2, | 310:7, 311:8, 312:6, | 1:14, 1:15, 1:16, | **operation** [1] - 202:7 |
| 223:10, 228:5, | 87:14, 88:17, 89:23, | 313:19, 313:25 | 1:17 | **opportunity** [7] - |
| 265:2, 267:22, | 90:20, 90:25, 91:6, | **objections** [1] - 4:9 | **often** [1] - 142:19 | 83:13, 121:12, |
| 304:9, 304:22 | 92:5, 93:8, 93:15, | **objective** [1] - 312:12 | **old** [2] - 15:8, 17:21 | 163:18, 164:3, |
| **nothing** [6] - 7:13, | 94:22, 95:4, 97:7, | **objects** [1] - 280:11 | **Old** [1] - 2:24 | 177:17, 243:18, |
| 29:9, 29:14, 233:5, | 98:14, 98:18, 99:6, | **obligated** [2] - 53:25, | **ON** [1] - 1:25 | 254:13 |
| 264:20, 265:2 | 100:20, 101:15, | 126:14 | **on'** [1] - 102:7 | **option** [1] - 133:2 |
| **Nothing** [1] - 224:18 | 101:23, 103:2, | **observation** [1] - | **on-the-job** [3] - 192:5, | **options** [1] - 117:17 |
| **Notice** [1] - 320:25 | 103:9, 104:9, | 257:23 | 193:25, 318:19 | **order** [3] - 97:4, |
| **notice** [10] - 81:19, | 104:15, 105:2, | **observe** [1] - 234:13 | **once** [7] - 65:25, 66:3, | 170:20, 170:22 |
| 83:22, 161:22, | 106:4, 106:7, 107:2, | **observed** [1] - 260:21 | 93:3, 133:11, | **Order** [1] - 2:5 |
| 205:24, 212:8, | 108:6, 108:10, | **obstruct** [2] - 66:14, | 142:21, 142:22, | **ordinary** [2] - 67:12, |
| 232:23, 264:13, | 108:12, 109:24, | 66:21 | 151:16 | 67:18 |
| 295:13, 295:15, | 110:9, 111:12, | **obtain** [9] - 18:13, | **one** [85] - 31:10, 32:2, | **orientation** [5] - 68:3, |
| 320:15 | 113:6, 113:21, | 20:11, 22:7, 23:14, | 32:4, 32:5, 32:6, | 86:20, 136:18, |
| **notified** [3] - 312:24, | 114:3, 115:2, 117:7, | 23:23, 55:22, 141:3, | 32:8, 32:9, 33:18, | 137:8, 137:17 |
| 313:12, 313:14 | 117:13, 118:17, | 166:14, 191:2 | 33:21, 39:22, 45:18, | **oriented** [1] - 137:12 |
| **notify** [3] - 313:5, | 121:15, 122:12, | **obtained** [1] - 166:8 | 45:21, 49:2, 51:20, | **origin** [2] - 67:25, |
| 313:10, 313:13 | 124:3, 125:7, 125:9, | **occasion** [2] - 8:6, | 52:10, 57:17, 68:18, | 86:18 |
| **November** [2] - 1:22, | 125:13, 125:15, | 182:20 | 69:22, 78:6, 79:3, | **original** [1] - 267:4 |
| 316:11 | 125:16, 127:6, | **occasionally** [1] - | 100:16, 102:5, | **otherwise** [2] - |
| **number** [14] - 86:11, | 127:19, 128:17, | 102:5 | 105:24, 109:9, | 229:15, 299:24 |
| 86:13, 107:25, | 129:8, 129:20, | **occasions** [1] - | 110:6, 114:7, | **Otherwise** [1] - 30:14 |
| 148:8, 176:12, | 130:22, 131:20, | 121:19 | 114:10, 122:5, | **outcome** [1] - 321:18 |
| 202:23, 203:3, | 132:4, 132:21, | **occur** [4] - 37:12, | 129:11, 129:12, | **outlined** [1] - 147:2 |
| 210:20, 210:21, | 136:11, 142:7, | 127:22, 140:18, | 144:11, 146:20, | **outset** [1] - 6:5 |
| 249:23, 255:25, | 146:6, 147:3, | 264:4 | 154:18, 158:11, | **outside** [2] - 181:9, |
| 256:4, 262:2, 266:20 | 147:24, 148:4, | **occurred** [11] - 21:20, | 158:13, 160:19, | 181:18 |

339

outstanding [3] - 6:7, 9:2, 281:12
over-reacting [1] - 102:6
over-reaction [2] - 101:3, 102:12
overly [1] - 272:24
overtime [1] - 177:5
own [6] - 64:8, 105:19, 131:6, 254:20, 278:4, 278:8
oxygen [4] - 125:4, 125:5, 127:4, 127:22

## P

P.C [1] - 3:3
p.m [3] - 139:23, 209:2, 315:25
PA [2] - 39:14, 40:2
packet [1] - 164:19
page [39] - 79:11, 86:12, 89:2, 89:25, 92:25, 95:13, 100:13, 100:22, 102:5, 112:3, 123:21, 124:9, 127:25, 132:24, 133:8, 137:4, 137:6, 145:4, 151:13, 151:15, 155:19, 157:16, 158:24, 158:25, 161:3, 162:11, 177:18, 221:9, 296:2, 298:2, 300:5, 302:3, 302:10, 302:11, 302:17, 304:7, 309:22, 311:14, 311:15
PAGE [22] - 1:25, 317:3, 317:7, 317:8, 317:12, 317:13, 317:16, 317:19, 317:22, 318:2, 318:6, 318:10, 318:11, 318:13, 318:14, 318:15, 318:18, 318:22, 319:3, 319:7, 319:8, 319:11
pages [7] - 177:14, 210:11, 284:3, 284:4, 309:3, 309:21, 320:18
paid [7] - 226:18, 226:23, 227:4, 228:14, 228:19, 287:15, 287:24
pamphlet [1] - 160:21

pamphlets [1] - 62:9
paperwork [4] - 175:24, 230:13, 290:2, 290:5
paragraph [17] - 86:15, 89:3, 90:3, 93:2, 100:16, 116:16, 118:3, 118:25, 131:4, 133:9, 252:22, 296:3, 297:10, 297:13, 297:22, 298:3, 311:18
Paragraph [4] - 297:9, 299:14, 302:9, 302:16
paragraphs [1] - 133:10
parent [3] - 51:22, 57:18, 214:21
parents [1] - 212:7
parents' [2] - 37:22, 38:6
parking [1] - 70:22
part [36] - 21:9, 31:3, 31:20, 50:16, 61:18, 70:3, 70:20, 73:3, 85:5, 96:12, 116:19, 137:16, 138:7, 147:8, 155:23, 157:25, 159:7, 159:10, 159:19, 182:6, 190:20, 192:22, 192:24, 193:4, 193:16, 194:9, 200:6, 206:10, 208:5, 213:8, 238:6, 239:9, 239:12, 251:21, 255:10, 255:15
participant [2] - 144:17, 318:9
particular [2] - 128:22, 160:19
parties [2] - 4:4, 321:16
Partlow [23] - 5:11, 5:20, 11:17, 12:17, 30:22, 58:24, 62:21, 66:6, 69:9, 80:23, 84:10, 123:4, 139:25, 159:2, 175:7, 184:18, 209:3, 215:4, 215:7, 253:4, 271:6, 275:4, 318:4
PARTLOW [7] - 1:25, 2:4, 5:2, 316:8, 316:18, 317:4, 321:10

passage [2] - 300:18, 301:9
passing [1] - 39:2
password [3] - 59:17, 60:16, 60:17
past [3] - 55:6, 57:4, 132:13
pay [6] - 176:22, 176:25, 216:3, 222:17, 228:18, 290:10
paying [2] - 49:23, 50:3
PD [3] - 43:25, 249:3, 249:15
PDSC [1] - 320:23
Penal [2] - 147:14, 153:17
penalties [1] - 69:4
pending [1] - 273:21
people [6] - 24:22, 112:11, 145:10, 145:13, 145:15, 191:20
per [4] - 126:19, 203:19, 223:8, 226:8
Perada [48] - 21:14, 21:15, 23:21, 43:6, 58:11, 58:13, 72:9, 72:19, 73:14, 98:3, 98:5, 98:10, 116:12, 116:13, 120:2, 143:4, 144:21, 158:6, 158:9, 159:18, 179:19, 179:20, 179:23, 184:9, 189:14, 190:8, 192:8, 193:12, 195:4, 195:21, 196:5, 197:16, 198:16, 199:23, 208:18, 223:8, 226:9, 229:4, 229:5, 229:6, 251:24, 252:3, 252:6, 286:25, 287:14, 290:19, 291:8, 291:14
Perada's [1] - 195:9
perceived [2] - 86:17, 86:22
perhaps [3] - 9:7, 104:3, 139:14
period [2] - 232:2, 309:8
permitted [1] - 63:17
person [24] - 22:11, 22:14, 41:12, 52:19, 66:15, 66:22, 67:24, 70:11, 101:5,

103:24, 104:13, 110:2, 110:4, 111:10, 112:10, 123:15, 123:23, 124:25, 127:10, 129:24, 130:11, 130:14, 141:17, 240:18
person's [5] - 130:21, 131:8, 131:24, 132:19, 156:25
personal [3] - 30:6, 272:25, 296:23
personally [2] - 83:21, 252:19
personnel [1] - 85:7
persons's [3] - 86:21, 131:11, 132:15
peruse [2] - 155:19, 161:21
perusing [1] - 162:9
phone [5] - 37:7, 37:11, 246:22, 278:3, 278:21
photographs [1] - 306:3
phrase [1] - 107:9
physical [97] - 52:20, 63:2, 63:3, 63:5, 63:7, 63:10, 75:22, 77:11, 82:25, 101:7, 101:8, 101:10, 101:14, 102:15, 102:22, 102:24, 103:6, 103:10, 103:15, 104:13, 104:14, 104:21, 105:8, 105:12, 105:25, 106:2, 106:10, 106:24, 109:12, 109:22, 109:25, 110:3, 110:8, 111:5, 111:13, 112:7, 112:10, 113:4, 113:7, 114:10, 116:18, 116:25, 117:4, 117:6, 117:9, 117:10, 117:12, 117:16, 118:12, 118:16, 121:23, 122:3, 122:10, 125:18, 133:20, 134:3, 135:16, 136:3, 136:5, 141:16, 141:22, 141:23, 142:2, 147:12, 148:24, 149:5, 149:11, 149:14, 149:22,

150:3, 150:11, 150:20, 151:6, 160:10, 160:12, 160:17, 161:6, 161:8, 161:12, 162:20, 162:25, 179:13, 179:15, 221:15, 221:16, 221:19, 222:6, 236:3, 236:8, 236:16, 237:13, 238:12, 238:25, 242:19, 243:2, 318:24
physically [19] - 101:20, 101:22, 103:19, 105:16, 105:17, 105:18, 107:24, 114:12, 114:16, 114:20, 114:24, 141:8, 141:13, 141:14, 260:18, 261:16, 262:12, 293:8, 301:6
picture [4] - 129:22, 130:10, 130:16
place [8] - 66:15, 66:22, 133:17, 186:18, 215:6, 217:12, 300:24
placed [4] - 124:25, 127:4, 129:3, 172:3
placing [2] - 130:20, 300:19
Plains [1] - 3:12
Plaintiff [14] - 271:8, 296:13, 298:8, 298:23, 299:6, 299:10, 299:23, 300:16, 300:24, 301:2, 301:7, 301:9, 301:17, 306:4
plaintiff [9] - 38:22, 271:2, 271:11, 274:23, 279:25, 280:6, 280:10, 282:18, 300:18
Plaintiff's [131] - 52:24, 53:7, 53:11, 84:7, 84:8, 84:13, 84:15, 99:12, 99:20, 99:22, 104:19, 115:7, 115:12, 136:15, 136:16, 136:20, 137:3, 140:4, 143:7, 143:11, 148:16, 158:22, 158:23, 164:14, 164:25, 171:17, 172:8,

172:10, 173:2, 175:5, 175:8, 183:4, 183:13, 183:21, 183:25, 184:15, 184:16, 184:19, 184:21, 186:6, 188:14, 188:16, 188:18, 189:5, 189:16, 189:18, 189:21, 191:23, 191:24, 192:3, 192:9, 192:17, 194:4, 194:17, 194:20, 194:22, 194:25, 195:6, 195:12, 196:13, 196:25, 197:2, 197:23, 197:24, 198:11, 199:6, 199:8, 199:11, 199:17, 200:11, 200:12, 200:16, 200:20, 201:17, 201:18, 201:25, 205:11, 205:12, 205:15, 207:9, 207:10, 207:13, 207:15, 209:4, 211:23, 212:22, 218:5, 218:6, 218:9, 218:17, 220:17, 220:18, 220:20, 220:23, 220:25, 221:11, 229:7, 229:12, 247:6, 247:8, 247:10, 248:3, 248:22, 251:14, 251:17, 253:16, 255:2, 255:3, 255:6, 255:8, 255:14, 256:15, 265:15, 265:17, 265:21, 266:9, 267:6, 276:3, 276:11, 294:3, 302:10, 302:11, 303:20, 303:24, 304:8, 304:20, 307:15, 308:3, 309:3, 313:22, 318:21
PLAINTIFF'S [1] - 319:11
Plaintiffs [3] - 1:6, 3:4, 307:11
platforms [1] - 178:6
plenty [1] - 282:3
point [12] - 15:8, 64:17, 188:11, 205:21, 206:14,

232:22, 238:11, 243:24, 267:24, 268:3, 280:10, 314:9
POLICE [3] - 1:9, 1:9, 1:11
Police [12] - 42:11, 42:14, 43:16, 44:8, 44:20, 181:2, 181:16, 291:24, 292:12, 302:21, 307:10, 317:17
police [18] - 44:23, 45:3, 45:19, 71:11, 252:7, 256:4, 256:7, 268:4, 268:9, 268:14, 269:5, 291:21, 293:3, 302:22, 302:23, 302:24, 303:2, 313:6
policies [7] - 50:15, 50:20, 68:23, 71:16, 85:12, 98:11, 305:19
policy [33] - 49:5, 49:8, 62:22, 62:25, 76:24, 77:3, 77:6, 77:9, 77:12, 79:17, 86:5, 86:23, 89:12, 89:14, 90:19, 90:24, 93:14, 132:7, 156:4, 157:9, 157:19, 157:22, 157:25, 158:4, 173:15, 178:11, 179:5, 179:9, 313:16, 313:17, 313:21, 313:23, 314:6
pools [3] - 16:8, 16:10, 26:24
Pools [5] - 16:13, 16:15, 16:20, 17:2, 17:12
pose [1] - 280:5
position [16] - 18:18, 19:16, 25:10, 33:21, 51:3, 125:2, 128:9, 128:19, 129:2, 129:4, 129:19, 130:15, 163:9, 163:16, 163:19, 285:13
positional [10] - 124:9, 124:13, 124:17, 124:24, 125:19, 126:18, 126:24, 127:5, 130:4, 130:8
positions [13] - 15:12, 123:23, 128:3, 128:7, 128:11, 128:16, 128:21,

128:24, 130:3, 132:14, 132:18, 161:7, 164:5
positive [2] - 32:24, 37:13
possibility [2] - 238:13, 239:2
possible [5] - 48:15, 69:5, 69:9, 110:14, 111:3
post [16] - 36:16, 177:24, 223:23, 228:4, 229:20, 231:23, 231:24, 232:5, 233:21, 245:17, 289:17, 289:18, 289:20, 290:4, 290:7, 290:23
postings [2] - 304:10, 304:23
posts [1] - 307:7
potentially [1] - 149:20
PowerPoint [5] - 309:23, 309:25, 310:6, 310:10, 310:16
powers [3] - 147:8, 309:22, 309:25
practice [7] - 68:2, 86:19, 133:23, 134:2, 156:3, 157:9, 157:13
prank [5] - 40:15, 227:15, 230:4, 230:21, 231:10
pre [4] - 188:4, 200:15, 200:17, 201:7
pre-assignment [4] - 188:4, 200:15, 200:17, 201:7
premises [1] - 89:9
preparation [1] - 10:15
prepared [1] - 125:21
presence [2] - 222:7, 318:24
present [11] - 45:8, 99:11, 123:4, 180:16, 180:23, 187:22, 220:14, 292:17, 296:14, 307:14, 318:4
presentation [1] - 182:6
presented [2] - 181:24, 304:4
pressure [3] - 130:13, 131:23, 132:10

prevent [2] - 95:21, 96:18
prevented [1] - 173:10
preventing [1] - 238:17
prevention [1] - 97:25
previous [1] - 292:24
previously [6] - 52:24, 55:12, 99:12, 115:7, 136:14, 158:22
Principal [6] - 298:9, 298:14, 298:22, 299:8, 299:9, 299:16
principal [2] - 58:9, 256:18
PRINCIPAL [2] - 1:13, 1:14
principals [1] - 286:21
principle [1] - 100:25
printed [1] - 205:22
private [2] - 150:9, 150:17
problem [5] - 207:2, 211:9, 271:19, 280:22, 282:16
problems [1] - 211:10
procedure [4] - 133:21, 133:22, 136:6, 212:18
procedures [1] - 116:18
proceed [4] - 166:21, 167:7, 168:23, 169:17
proceeded [1] - 272:3
Procida [2] - 231:4, 231:6
PROCIDA [1] - 231:5
produce [13] - 165:8, 165:24, 278:7, 281:20, 304:21, 305:4, 305:23, 306:2, 306:6, 306:10, 306:15, 306:20, 307:5
produced [6] - 44:18, 165:4, 166:12, 276:24, 283:20, 306:22
production [17] - 6:8, 19:22, 20:19, 23:13, 44:6, 50:6, 122:25, 144:13, 159:24, 162:2, 176:6, 182:9, 185:18, 193:24, 222:4, 277:7, 318:13
professional [1] - 313:17
program [10] - 106:19, 108:24, 108:25,

109:3, 109:6, 116:19, 126:6, 310:17, 310:20, 310:25
progression [1] - 212:10
prohibited [3] - 69:6, 69:10, 69:17
prohibiting [1] - 279:25
prohibition [3] - 134:25, 135:7, 135:13
prohibits [1] - 89:4
promulgated [2] - 154:7, 156:4
proofread [1] - 254:19
proper [3] - 182:3, 182:10, 318:14
properly [3] - 125:3, 140:22, 152:4
property [1] - 89:7
propose [1] - 276:10
protect [3] - 77:14, 145:10, 148:10
Protection [1] - 190:17
protest [1] - 301:18
protested [1] - 300:5
protocol [1] - 263:11
prove [1] - 188:7
provide [10] - 95:16, 95:22, 97:4, 116:19, 173:18, 292:23, 299:24, 305:13, 305:18, 312:8
provided [8] - 84:10, 137:16, 251:20, 254:23, 279:7, 279:10, 279:15, 302:20
provisions [1] - 98:12
provoke [1] - 298:24
psychological [2] - 121:9, 123:10
public [2] - 85:23, 173:7
Public [4] - 2:6, 5:4, 316:23, 321:7
pull [4] - 165:25, 234:21, 253:2, 253:11
pulled [2] - 235:15, 239:16
pulling [3] - 238:4, 238:5, 254:5
Punch [1] - 320:16
punch [12] - 74:12, 218:10, 218:18, 218:20, 219:4,

341

221:15, 221:17,
221:20, 221:23,
222:5, 318:22
**punched** [1] - 221:25
**punishing** [1] - 63:11
**punishment** [7] -
62:22, 63:3, 63:6,
63:7, 63:10, 76:20,
77:20
**purpose** [1] - 63:11
**pursuant** [4] - 2:4,
93:13, 132:6, 278:4
**pursuing** [2] - 79:20,
80:2
**push** [3] - 154:18,
154:24, 155:4
**pushed** [2] - 155:10,
298:16
**pushing** [1] - 154:14
**put** [35] - 97:21,
103:17, 104:2,
110:5, 114:23,
126:22, 130:25,
132:10, 136:13,
142:9, 164:22,
169:25, 170:16,
175:3, 184:13,
191:21, 194:15,
196:23, 197:21,
200:9, 201:15,
205:9, 211:13,
226:21, 228:13,
229:11, 235:14,
236:19, 237:19,
242:5, 245:19,
253:15, 259:3,
269:10, 312:3
**putting** [7] - 70:11,
103:23, 110:7,
127:8, 130:13,
241:20, 261:19

## Q

Q-U-I-N-T-A-N-I-L-L-
A [1] - 24:17
**q2uestion** [1] - 107:21
**quadrant** [1] - 118:24
**questioned** [2] -
224:14, 278:25
**questioning** [2] - 8:18,
288:8
**questions** [39] - 6:18,
6:19, 8:12, 9:2, 10:6,
30:9, 208:24, 224:7,
224:17, 225:10,
225:15, 227:7,
227:14, 228:3,
229:14, 246:6,
271:23, 272:3,

272:10, 272:15,
273:13, 273:16,
274:2, 274:19,
275:7, 275:10,
275:12, 275:19,
276:2, 276:10,
276:20, 277:13,
277:19, 280:4,
280:7, 280:23,
282:2, 314:22, 315:7
**quick** [1] - 257:7
**quickly** [4] - 257:3,
257:5, 257:6, 257:10
**quiet** [1] - 169:9
**Quintanilla** [1] - 24:15
**quit** [5] - 14:21, 14:22,
17:4, 17:5, 17:7
**quote** [102] - 66:14,
66:16, 66:21, 66:22,
67:22, 68:4, 86:9,
86:15, 86:22, 89:3,
89:10, 95:14, 95:23,
100:16, 100:19,
100:25, 101:10,
102:5, 102:7, 102:9,
111:19, 111:20,
112:5, 112:12,
116:17, 116:21,
117:16, 117:19,
118:3, 118:7,
118:19, 118:21,
123:19, 123:25,
124:24, 125:6,
131:5, 131:8,
131:10, 131:12,
131:22, 131:25,
132:14, 132:16,
132:24, 133:3,
133:14, 133:15,
133:17, 133:19,
133:24, 147:11,
147:15, 147:17,
147:20, 148:22,
148:25, 157:18,
157:20, 161:6,
161:10, 173:17,
173:20, 173:23,
174:2, 202:9,
202:14, 252:25,
253:5, 256:16,
256:18, 258:13,
258:15, 262:2,
262:5, 298:7,
298:10, 298:13,
298:18, 298:21,
298:25, 299:6,
299:11, 299:16,
299:18, 299:23,
299:25, 300:14,
300:20, 300:23,

301:3, 301:5,
301:10, 309:10,
309:13, 310:11,
310:14, 311:23,
311:25, 312:20,
312:25
**quoting** [1] - 89:2

## R

**race** [2] - 67:24, 86:17
**radio** [10] - 70:16,
70:18, 71:5, 71:9,
71:12, 71:14, 71:17,
232:23, 232:25,
264:22
**raise** [3] - 95:19, 96:9,
315:19
**raised** [1] - 259:3
**raising** [1] - 95:25
**rarely** [1] - 59:10
**rather** [1] - 78:5
**Razill** [1] - 26:21
**re** [2] - 189:23, 281:20
**re-assignment** [1] -
189:23
**re-produce** [1] -
281:20
**reach** [2] - 25:9, 26:2
**reacting** [1] - 102:6
**reaction** [4] - 101:3,
102:12, 102:24
**read** [42] - 53:5, 66:2,
66:9, 68:9, 69:4,
69:7, 76:21, 79:12,
86:8, 86:14, 90:5,
93:3, 95:13, 116:15,
117:15, 117:23,
119:3, 128:13,
132:18, 133:9,
136:3, 151:15,
155:23, 156:7,
163:7, 178:16,
178:18, 178:21,
214:6, 214:8,
214:10, 214:20,
215:3, 215:6,
238:22, 252:12,
252:17, 291:18,
294:7, 304:16,
304:19, 316:9
**reading** [13] - 100:24,
102:4, 105:21,
105:22, 111:18,
112:3, 117:21,
118:2, 118:23,
123:20, 131:22,
132:24, 157:17
**ready** [2] - 46:19,
47:15

**realize** [1] - 171:6
**reason** [14] - 7:23, 8:8,
8:10, 8:16, 10:10,
202:17, 206:22,
219:15, 247:20,
253:7, 272:11,
288:2, 288:7
**reasonable** [1] - 77:11
**reasons** [6] - 30:6,
215:11, 274:20,
275:13, 314:19,
314:25
**recalling** [1] - 293:5
**receipt** [6] - 61:8,
144:2, 144:14,
175:21, 185:11,
318:6
**receive** [50] - 18:22,
22:23, 51:21, 54:17,
58:16, 59:2, 59:13,
61:18, 62:10, 71:16,
81:7, 81:19, 82:7,
85:8, 86:23, 95:25,
96:11, 96:14, 96:17,
97:4, 115:14, 137:7,
139:16, 159:20,
175:25, 176:25,
177:4, 190:19,
193:15, 196:14,
198:16, 200:6,
204:3, 206:10,
206:13, 213:7,
213:12, 213:22,
229:24, 230:10,
230:13, 230:17,
232:22, 246:24,
288:18, 290:9,
290:12, 292:8,
295:13, 295:15
**received** [31] - 51:15,
60:8, 60:11, 61:5,
61:22, 62:3, 62:16,
76:10, 85:4, 97:19,
97:23, 100:10,
115:24, 116:4,
172:19, 176:21,
183:23, 184:3,
189:7, 192:18,
195:14, 197:18,
198:13, 201:12,
204:8, 215:23,
216:22, 264:12,
284:3, 308:5, 317:23
**receiving** [1] - 287:24
**recently** [1] - 178:18
**receptionist** [1] -
41:14
**recess** [1] - 60:25
**recognize** [69] - 53:6,
53:14, 54:4, 84:12,

84:14, 84:19, 84:22,
99:19, 99:25,
104:11, 115:9,
115:11, 115:16,
136:19, 143:10,
143:13, 143:17,
143:20, 159:5,
159:9, 172:7,
172:12, 175:9,
175:14, 183:8,
183:13, 184:18,
184:24, 186:8,
188:15, 189:20,
191:24, 192:11,
194:19, 195:5,
197:5, 197:9, 198:4,
198:8, 199:8,
199:14, 199:21,
200:12, 200:16,
201:18, 201:24,
205:12, 207:13,
209:7, 209:8,
209:14, 209:16,
212:3, 212:22,
213:2, 218:8,
218:16, 220:20,
220:25, 221:5,
247:8, 247:12,
251:18, 255:5,
255:14, 265:18,
265:20, 307:16,
307:21
**recollection** [24] -
24:8, 76:5, 88:8,
88:14, 95:7, 137:23,
154:12, 160:25,
180:17, 181:8,
181:14, 191:14,
194:13, 220:2,
220:9, 222:24,
226:16, 228:9,
231:2, 232:20,
267:17, 269:13,
286:18, 295:11
**recommended** [3] -
189:10, 195:17,
196:19
**record** [39] - 5:10,
5:16, 6:5, 6:19, 6:25,
9:14, 11:12, 11:15,
11:16, 30:19, 61:3,
80:21, 107:13,
128:14, 132:18,
139:22, 163:8,
165:20, 166:7,
171:20, 219:13,
257:11, 270:13,
270:15, 270:20,
270:22, 270:25,
277:24, 278:2,
278:3, 282:11,

342

284:25, 304:22, 315:11, 315:13, 315:21, 316:12, 316:14, 321:13
**recorded** [4] - 39:7, 71:14, 166:5, 302:17
**recording** [1] - 166:4
**recordings** [1] - 305:24
**records** [4] - 67:8, 76:4, 202:12, 304:9
**recovered** [1] - 278:8
**redacted** [3] - 44:20, 248:18, 319:3
**redactions** [1] - 248:10
**reduced** [1] - 290:6
**Reese** [26] - 234:20, 234:24, 235:3, 236:21, 237:6, 237:9, 237:12, 238:18, 250:25, 253:3, 253:12, 254:5, 256:18, 256:22, 258:14, 259:7, 259:11, 298:9, 298:14, 299:9, 299:16, 300:7, 300:12, 301:19
**REESE** [1] - 1:14
**Reese's** [5] - 298:22, 299:8, 299:25, 300:6, 300:16
**refer** [2] - 84:3, 179:12
**reference** [7] - 26:6, 26:12, 27:14, 273:14, 285:16, 285:21, 306:11
**referenced** [1] - 93:7
**references** [1] - 26:18
**referral** [1] - 249:3
**referred** [1] - 141:4
**referring** [7] - 43:15, 44:16, 71:22, 97:18, 105:23, 134:18, 201:21
**refers** [1] - 77:12
**refresh** [22] - 24:7, 76:5, 88:8, 95:7, 137:22, 154:11, 181:8, 181:13, 191:13, 194:12, 219:25, 220:9, 222:23, 226:15, 228:9, 231:2, 232:19, 249:12, 267:16, 269:13, 286:18, 295:10
**refresher** [2] - 71:21,

135:23
**refreshes** [1] - 160:24
**refuses** [1] - 140:16
**refusing** [1] - 281:25
**regard** [26] - 11:9, 26:2, 47:19, 78:16, 78:23, 87:12, 91:18, 95:25, 96:15, 203:11, 205:7, 216:11, 217:2, 225:8, 245:23, 246:25, 249:6, 256:8, 286:21, 287:4, 287:7, 288:19, 290:20, 291:12, 310:24, 313:7
**regarding** [8] - 79:4, 81:20, 94:13, 227:10, 247:4, 286:14, 294:18, 305:19
**regardless** [1] - 89:8
**register** [1] - 203:18
**registration** [2] - 202:10, 204:18
**regular** [8] - 41:20, 133:24, 134:3, 220:5, 220:7, 247:17, 308:17, 308:23
**regulation** [2] - 77:22, 119:12
**regulations** [4] - 95:18, 118:20, 119:8, 119:18
**relate** [1] - 273:19
**related** [16] - 25:20, 27:10, 28:25, 38:23, 39:9, 88:15, 124:9, 124:13, 124:17, 124:24, 126:17, 127:5, 130:4, 130:8, 276:10, 321:16
**relates** [12] - 44:7, 83:3, 85:13, 86:24, 89:20, 90:18, 90:24, 92:3, 104:12, 153:17, 153:24, 317:17
**relating** [6] - 97:5, 276:20, 286:8, 304:12, 304:24, 306:3
**relation** [2] - 240:9, 240:24
**relationship** [6] - 272:5, 273:4, 273:18, 285:8, 285:25, 286:5

**release** [1] - 162:17
**relevance** [1] - 275:19
**religion** [2] - 68:2, 86:19
**religious** [2] - 68:2, 86:19
**remember** [102] - 9:6, 9:19, 14:13, 15:14, 15:17, 16:17, 17:6, 17:17, 17:19, 17:21, 19:9, 23:2, 27:6, 32:23, 34:24, 38:5, 40:3, 40:18, 41:24, 42:15, 42:16, 42:18, 43:23, 44:2, 45:5, 45:21, 46:7, 49:21, 49:23, 50:2, 51:24, 51:25, 52:3, 53:10, 58:24, 59:9, 60:7, 60:10, 85:6, 87:3, 87:4, 88:5, 88:7, 95:5, 95:8, 105:6, 120:5, 124:19, 126:13, 137:11, 137:18, 137:19, 137:21, 138:4, 144:23, 160:21, 160:22, 172:23, 186:18, 186:19, 188:6, 204:5, 213:10, 213:23, 219:12, 219:16, 219:20, 219:24, 221:21, 221:22, 223:2, 225:20, 225:21, 225:24, 238:4, 240:2, 241:21, 241:22, 241:23, 244:17, 244:18, 244:21, 245:6, 252:18, 252:19, 253:18, 261:4, 263:17, 264:7, 264:9, 287:18, 292:19, 293:2, 293:9, 295:18, 295:23, 305:11, 307:4, 309:24, 310:5, 312:7
**remove** [1] - 299:7
**renew** [1] - 185:15
**renewal** [2] - 71:24, 204:25
**renewed** [4] - 186:12, 204:21, 204:22, 205:17
**repeat** [8] - 156:5, 211:17, 238:19, 252:14, 276:4, 291:15, 308:21,

313:20
**repertoire** [1] - 101:8
**rephrase** [2] - 87:17, 147:4
**report** [41] - 40:22, 92:2, 92:12, 93:22, 94:3, 94:7, 122:6, 122:21, 152:17, 152:20, 155:5, 157:8, 224:5, 226:2, 246:8, 246:13, 247:11, 247:15, 247:22, 249:14, 251:19, 251:20, 251:25, 252:20, 255:10, 255:15, 265:8, 265:22, 266:18, 266:20, 266:24, 268:8, 268:13, 269:4, 288:9, 311:12, 311:20, 312:11, 320:20, 320:21
**Report** [2] - 320:18, 320:19
**reported** [6] - 90:22, 92:16, 92:21, 122:20, 152:24, 224:6
**reporter** [9] - 6:21, 16:12, 42:4, 80:18, 156:7, 238:22, 252:17, 291:18, 304:19
**reporter's** [1] - 282:12
**reporters** [2] - 39:8, 39:11
**reporting** [4] - 91:23, 95:23, 97:5, 97:8
**Reporting** [1] - 2:24
**reports** [9] - 41:22, 121:25, 138:17, 157:13, 254:10, 262:22, 263:4, 311:23
**represent** [3] - 6:10, 49:15, 295:2
**representative** [6] - 11:6, 11:9, 43:4, 213:25, 215:15, 216:11
**represented** [3] - 213:25, 215:16, 215:21
**reprimand** [4] - 68:13, 158:10, 217:6, 288:16
**reprimanded** [13] - 66:13, 66:20, 67:7, 67:10, 67:17, 67:21,

68:7, 75:25, 77:5, 157:24, 158:18, 211:15, 211:19
**reprimands** [1] - 305:15
**reproduction** [1] - 247:22
**request** [8] - 44:12, 50:12, 62:14, 108:9, 123:8, 176:6, 193:24, 279:17
**REQUEST** [1] - 317:11
**requested** [1] - 281:12
**requesting** [2] - 169:16, 281:14
**require** [1] - 56:5
**required** [9] - 121:22, 142:14, 142:19, 142:22, 190:2, 193:3, 195:22, 202:13, 274:2
**requirement** [1] - 180:11
**requirements** [2] - 95:17, 180:5
**requires** [1] - 7:12
**res** [1] - 179:17
**reserve** [3] - 6:6, 108:20, 314:13
**reserved** [1] - 4:11
**resort** [12] - 63:22, 64:12, 69:20, 73:20, 116:18, 117:2, 142:3, 148:10, 160:13, 161:9, 161:12, 199:2
**resource** [6] - 138:22, 139:2, 139:7, 139:12, 291:12, 307:9
**respect** [1] - 229:2
**respectfully** [7] - 159:23, 162:2, 169:16, 176:5, 185:17, 193:23, 281:14
**respective** [1] - 4:4
**respects** [1] - 146:18
**respond** [4] - 113:4, 149:4, 224:18, 224:19
**responded** [1] - 215:7
**response** [8] - 9:8, 133:22, 161:14, 232:11, 233:17, 268:14, 279:16, 279:17
**responses** [4] - 22:2, 100:18, 135:17, 224:16

343

responsibilities [3] - 53:18, 83:3, 145:6
responsible [4] - 90:9, 90:13, 158:3, 210:25
responsive [1] - 204:24
rest [2] - 7:8, 238:2
restrain [12] - 75:21, 99:9, 105:17, 133:16, 140:22, 157:4, 259:21, 259:22, 260:22, 261:5, 261:6, 261:9
restrained [4] - 124:25, 126:23, 182:18, 182:21
restraining [2] - 293:6, 309:12
restraint [27] - 75:25, 116:9, 119:9, 119:10, 119:13, 119:18, 124:9, 124:13, 124:17, 124:23, 126:17, 127:4, 127:23, 130:4, 130:8, 133:20, 134:3, 136:4, 136:6, 141:23, 142:3, 161:7, 163:8, 179:21, 179:24, 182:10, 318:14
restraints [11] - 114:14, 118:21, 121:6, 121:9, 121:13, 123:11, 123:16, 123:22, 127:13, 127:15, 182:3
restrict [1] - 131:7
result [9] - 119:22, 120:11, 120:16, 120:20, 125:4, 127:3, 211:16, 211:20, 227:6
resulted [1] - 120:8
results [1] - 114:13
retainer [1] - 49:13
retrained [1] - 131:7
retraining [1] - 217:6
return [1] - 15:6
returned [2] - 35:10, 171:15
reverts [1] - 100:18
review [6] - 10:14, 43:12, 43:19, 243:19, 245:7, 254:14
reviewed [1] - 203:6
reviewing [6] - 140:4,

181:7, 181:12, 309:24, 310:5, 310:9
rhythm [1] - 125:6
RICH [2] - 321:7, 321:24
Rich [2] - 2:5, 2:24
Richard [1] - 302:24
right-hand [2] - 118:25, 123:20
rights [2] - 152:9, 153:3
risk [2] - 130:3, 130:8
Road [5] - 1:21, 2:24, 3:5, 5:13, 11:21
road [2] - 250:12, 289:14
roles [1] - 145:5
roll [1] - 107:6
Roman [2] - 76:19, 309:7
Ronkonkoma [1] - 57:22
room [4] - 30:17, 165:22, 171:16, 269:24
rules [1] - 157:9
ruling [6] - 30:12, 30:21, 270:18, 276:7, 280:12, 282:21
RULINGS [1] - 317:8
rumors [3] - 230:3, 230:5, 230:15
running [1] - 111:15
runs [1] - 143:8

## S

S-C-H-A-L-L [1] - 42:5
safe [10] - 67:11, 67:18, 101:8, 128:24, 129:5, 129:19, 130:7, 130:9, 130:17, 173:19
safely [1] - 116:20
safety [2] - 118:7, 152:13
satisfied [1] - 196:18
satisfy [5] - 180:4, 180:10, 189:9, 189:25, 195:16
saw [17] - 233:9, 234:3, 234:16, 234:18, 234:19, 235:2, 235:9, 236:4, 236:12, 236:20, 238:14, 253:24, 259:24, 260:24, 294:23, 297:11,

310:4
SC [1] - 121:25
scale [1] - 17:16
Schall [8] - 24:18, 42:2, 210:10, 224:11, 224:12, 246:5, 251:10, 287:6
schedule [1] - 55:8
scheduled [2] - 5:17, 45:22
school [70] - 11:20, 12:18, 12:20, 12:24, 14:4, 14:7, 14:17, 14:23, 14:25, 15:2, 22:5, 22:6, 22:7, 22:13, 22:15, 22:25, 23:6, 23:7, 23:12, 31:4, 31:6, 31:25, 35:7, 39:13, 53:23, 62:16, 71:7, 87:22, 89:3, 89:9, 91:11, 95:14, 97:16, 97:17, 113:19, 129:6, 137:13, 138:22, 139:2, 139:6, 139:7, 139:8, 139:12, 166:15, 173:19, 181:10, 184:7, 184:12, 196:16, 200:24, 204:9, 206:24, 216:7, 224:2, 243:15, 252:25, 253:3, 255:25, 263:7, 268:11, 288:11, 289:11, 291:11, 292:7, 296:24, 297:2, 305:19, 307:9, 317:24
SCHOOL [1] - 1:8
School [231] - 13:4, 15:3, 18:9, 18:11, 18:23, 20:11, 23:24, 25:2, 25:11, 25:22, 26:3, 26:7, 26:13, 27:8, 27:11, 27:15, 27:20, 28:3, 28:9, 28:10, 31:22, 32:17, 32:20, 33:14, 33:22, 34:11, 34:17, 34:21, 35:6, 35:11, 35:23, 36:5, 36:12, 36:16, 40:9, 40:20, 42:8, 44:9, 45:7, 47:19, 48:4, 50:2, 50:15, 50:22, 51:3, 51:17, 53:21, 54:15, 54:25, 56:15, 56:23, 57:2, 57:6, 57:13, 57:25, 58:9, 58:20, 59:20,

62:23, 63:17, 64:5, 64:14, 64:18, 66:24, 67:13, 67:16, 67:19, 68:13, 68:17, 69:11, 70:4, 70:21, 72:8, 72:14, 73:23, 74:8, 75:24, 77:24, 78:15, 79:3, 79:25, 80:6, 80:9, 80:12, 81:2, 81:17, 81:22, 82:17, 83:15, 83:19, 83:23, 85:5, 85:12, 87:12, 89:5, 89:6, 89:7, 89:17, 90:15, 91:16, 92:16, 93:23, 94:4, 94:8, 94:15, 94:20, 94:25, 95:2, 96:11, 98:5, 98:7, 98:12, 102:11, 102:21, 103:5, 103:14, 104:6, 104:8, 104:22, 105:9, 105:13, 111:6, 113:16, 113:18, 113:23, 113:24, 113:25, 114:8, 114:11, 119:13, 120:25, 121:14, 122:11, 122:17, 126:23, 130:19, 131:17, 131:18, 135:25, 137:9, 138:8, 140:14, 141:24, 145:14, 145:22, 146:5, 151:2, 151:7, 151:24, 152:5, 152:10, 152:14, 152:19, 153:4, 153:9, 153:12, 154:4, 154:19, 154:24, 154:25, 155:4, 155:11, 156:20, 157:2, 157:10, 157:14, 158:9, 158:19, 160:18, 172:20, 173:14, 174:6, 174:14, 174:22, 174:25, 176:20, 176:21, 177:6, 177:12, 177:13, 177:18, 181:3, 181:18, 181:19, 182:22, 186:21, 187:24, 188:4, 190:11, 193:5, 195:22, 196:3, 206:4, 206:15, 206:19, 209:25, 212:11, 213:9,

214:21, 216:23, 221:17, 221:20, 247:18, 247:23, 271:16, 271:24, 272:8, 275:2, 275:5, 285:9, 285:22, 286:2, 286:6, 286:9, 286:14, 286:21, 290:25, 296:15, 297:7, 302:18, 305:21, 306:18, 308:18, 308:24, 309:18, 317:18, 319:8
school's [3] - 46:21, 49:5, 49:8
schools [2] - 31:7, 173:7
scope [1] - 222:11
SCOTT [8] - 1:14, 1:15, 2:4, 5:2, 316:8, 316:18, 317:4, 321:10
Scott [11] - 5:11, 58:23, 215:4, 243:9, 253:4, 271:5, 300:7, 300:15, 300:24, 301:6, 301:18
scott.partlow@lsd [1] - 58:23
screamed [1] - 244:15
screaming [1] - 109:20
SCs [2] - 123:2, 318:2
SD [1] - 263:6
sealing [1] - 4:5
seasonal [1] - 18:5
second [12] - 58:5, 86:14, 100:13, 100:15, 137:4, 236:25, 237:18, 265:10, 265:13, 266:17, 285:6, 311:18
seconds [7] - 243:4, 257:24, 258:3, 258:7, 258:9, 258:11, 258:12
Section [3] - 66:2, 68:9, 69:3
section [3] - 146:25, 147:7, 210:12
secured [1] - 204:15
Security [21] - 190:17, 200:25, 201:3, 202:23, 203:3, 276:15, 319:13, 319:18, 319:20, 319:23, 319:24, 319:25, 320:3,

344

320:4, 320:5, 320:6, 320:7, 320:8, 320:13, 320:17, 320:21

**security** [101] - 13:19, 13:21, 18:14, 19:15, 21:16, 21:18, 22:8, 23:14, 36:18, 36:23, 41:10, 41:13, 50:22, 51:4, 57:25, 69:25, 70:4, 75:24, 77:24, 81:15, 81:22, 118:7, 131:17, 136:17, 137:7, 137:13, 142:15, 143:2, 144:15, 145:5, 145:7, 147:13, 147:19, 148:24, 150:8, 150:16, 151:19, 151:20, 153:9, 153:13, 156:11, 157:10, 157:14, 158:7, 177:12, 180:5, 180:11, 180:20, 180:22, 185:9, 188:2, 188:8, 189:11, 190:21, 191:2, 193:5, 193:9, 194:2, 195:18, 195:21, 196:2, 196:20, 201:8, 203:17, 204:11, 204:12, 206:5, 206:16, 206:19, 206:24, 207:3, 207:16, 207:18, 208:16, 208:19, 230:6, 243:16, 245:19, 249:9, 250:3, 251:4, 262:22, 265:7, 266:18, 267:10, 271:6, 271:9, 276:17, 278:17, 285:25, 286:6, 300:15, 302:19, 306:16, 306:23, 310:11, 312:24, 313:11, 318:7, 318:19, 319:8

**SECURITY** [2] - 1:14, 1:15

**see** [82] - 8:19, 13:16, 66:7, 83:9, 85:2, 85:15, 101:25, 102:6, 108:13, 110:14, 112:2, 117:8, 128:3, 133:5, 155:3, 160:24, 162:9, 162:10,

162:16, 186:13, 186:23, 188:9, 202:9, 202:15, 203:21, 210:23, 211:3, 214:15, 214:17, 215:10, 218:13, 218:15, 218:21, 218:22, 218:25, 219:4, 219:6, 219:7, 220:6, 222:14, 234:14, 234:23, 236:15, 236:18, 237:6, 237:9, 237:12, 237:15, 238:12, 238:25, 245:18, 249:2, 249:16, 249:20, 250:13, 250:15, 250:20, 252:21, 253:11, 265:13, 272:23, 273:7, 294:9, 294:24, 296:3, 297:11, 298:12, 298:13, 298:20, 299:4, 299:12, 299:13, 299:20, 300:11, 301:12, 303:17, 309:4, 309:7, 311:11, 314:15

**seeing** [3] - 279:18, 279:22, 300:15
**seek** [1] - 30:21
**seize** [1] - 300:17
**seized** [1] - 298:8
**self** [1] - 117:19
**semester** [1] - 13:8
**senior** [5] - 40:15, 227:15, 230:3, 230:20, 231:10
**sense** [1] - 156:19
**sensitivity** [2] - 95:19, 96:10
**September** [2] - 55:6, 206:7
**Sergeant** [1] - 302:25
**Service** [1] - 319:14
**service** [5] - 185:8, 269:6, 276:16, 308:2, 319:17
**Services** [1] - 202:12
**session** [2] - 252:25, 253:4
**set** [3] - 59:17, 321:11, 321:21
**seven** [4] - 281:6, 281:9, 281:16, 281:17
**several** [1] - 128:3

**sex** [3] - 68:3, 86:20, 86:22
**sexual** [3] - 38:19, 68:3, 86:20
**shake** [1] - 7:2
**shall** [2] - 4:11, 173:24
**sheet** [6] - 220:24, 221:2, 222:5, 229:7, 318:23, 320:16
**sheets** [1] - 229:3
**Sheridan** [2] - 250:9, 250:10
**shift** [10] - 41:23, 41:24, 210:5, 210:6, 210:9, 217:25, 231:7, 268:9, 312:23, 313:5
**shirt** [5] - 129:12, 129:13, 129:15, 129:17, 298:15
**short** [1] - 139:24
**Shortly** [1] - 311:15
**shortly** [1] - 314:10
**shoulder** [6] - 235:22, 235:24, 237:25, 240:3, 240:5, 240:25
**Show** [1] - 265:17
**show** [27] - 84:6, 136:14, 138:10, 143:6, 179:20, 179:23, 180:2, 182:10, 183:6, 187:25, 188:3, 191:22, 199:5, 202:13, 207:8, 218:4, 220:16, 235:16, 235:17, 256:24, 258:19, 258:22, 259:2, 302:8, 303:19, 313:23, 318:14
**showed** [6] - 162:23, 179:18, 180:3, 180:8, 180:14, 187:25
**showing** [3] - 167:17, 170:9, 203:11
**shown** [2] - 179:16, 182:2
**shows** [1] - 75:21
**shut** [1] - 315:23
**sick** [7] - 10:8, 222:17, 222:19, 222:20, 226:18, 228:18, 287:17
**side** [11] - 118:25, 123:21, 138:12, 138:21, 191:21, 241:13, 241:15, 241:23, 301:7

**sign** [11] - 49:13, 49:16, 61:13, 134:11, 144:3, 144:4, 144:6, 159:20, 175:24, 229:3, 229:6
**sign-in** [1] - 144:3
**signal** [1] - 108:7
**signature** [10] - 144:2, 195:9, 196:16, 197:14, 198:8, 221:9, 228:22, 228:24, 255:17, 266:6
**signatures** [5] - 144:13, 199:19, 216:15, 229:10, 318:6
**Signed** [1] - 316:21
**signed** [28] - 4:15, 4:18, 39:6, 49:19, 61:9, 61:11, 61:14, 61:15, 61:16, 61:23, 62:14, 134:7, 183:22, 184:8, 185:11, 185:18, 190:5, 200:22, 213:4, 216:13, 216:16, 221:13, 229:9, 255:19, 266:11, 317:22, 318:15
**signing** [1] - 49:17
**signs** [1] - 134:10
**SILVERMAN** [1] - 3:9
**simple** [3] - 167:3, 168:13, 171:8
**simply** [1] - 141:2
**single** [2] - 180:21, 227:18
**sit** [23] - 35:4, 49:3, 88:13, 103:4, 113:25, 114:7, 124:20, 131:17, 153:2, 187:11, 191:12, 215:20, 219:22, 221:24, 223:4, 227:17, 228:9, 254:21, 256:6, 257:16, 267:13, 268:25, 269:8
**sits** [2] - 47:14, 138:2
**sitting** [3] - 46:22, 131:11, 241:16
**situation** [22] - 40:11, 40:21, 70:10, 94:10, 94:13, 98:22, 98:23, 98:24, 114:6, 114:7, 116:10, 132:25,

141:8, 141:9, 141:10, 236:11, 236:14, 256:14, 263:9, 264:14, 283:5, 293:10
**situations** [5] - 75:22, 116:21, 132:12, 160:18, 225:6
**six** [4] - 128:23, 132:17, 248:21, 319:3
**skills** [6] - 100:17, 101:4, 101:8, 116:20, 133:23, 134:2
**slam** [2] - 113:15, 114:15
**slamming** [2] - 120:15, 120:19
**slams** [3] - 113:12, 135:4, 135:7
**slash** [1] - 128:10
**smaller** [2] - 163:20, 163:24
**Snardy** [1] - 302:25
**Sobel** [5] - 30:24, 285:12, 285:15, 285:19, 285:24
**Social** [2] - 202:23, 203:2
**social** [11] - 82:16, 177:14, 177:18, 177:21, 177:23, 178:3, 178:6, 303:13, 304:10, 304:23, 307:7
**soft** [3] - 146:8, 146:9, 146:17
**solid** [2] - 129:12, 129:14
**someone** [14] - 25:23, 32:11, 83:11, 93:21, 101:25, 102:3, 103:20, 116:12, 125:17, 127:4, 127:8, 131:23, 132:9, 311:5
**sometime** [1] - 33:10
**sometimes** [6] - 9:3, 9:17, 25:5, 105:16, 108:7, 157:4
**somewhere** [1] - 165:25
**son** [4] - 52:9, 52:11, 215:4, 217:12
**sorry** [34] - 37:10, 42:25, 47:9, 49:19, 67:4, 71:20, 78:10, 83:6, 84:21, 116:2, 117:20, 118:22,

122:14, 124:12, 135:20, 139:6, 156:5, 163:13, 170:12, 171:5, 177:10, 183:24, 210:14, 211:17, 221:3, 227:12, 268:18, 287:21, 289:12, 291:13, 291:22, 297:18, 304:14, 308:20

**sort** [7] - 49:14, 53:13, 53:15, 121:23, 172:19, 198:17, 217:6

**sounds** [1] - 190:18

**source** [6] - 165:9, 166:10, 166:15, 277:9, 278:9, 278:11

**south** [1] - 231:25

**South** [1] - 232:5

**space** [1] - 16:13

**spanning** [1] - 137:6

**spans** [3] - 173:3, 209:5, 302:11

**speaking** [6] - 34:25, 208:9, 259:24, 259:25, 260:4, 260:6

**speaks** [1] - 72:21

**special** [1] - 32:10

**specific** [15] - 44:11, 50:11, 111:21, 118:20, 119:7, 119:17, 147:18, 148:23, 155:24, 174:9, 174:19, 222:10, 225:11, 231:14, 308:12

**specifically** [11] - 44:3, 76:19, 120:5, 120:9, 120:13, 120:17, 122:20, 179:12, 224:4, 227:21, 289:3

**specifications** [1] - 225:25

**specify** [2] - 77:16, 123:7

**spectrum** [1] - 32:11

**speeding** [2] - 37:7, 37:11

**spell** [2] - 16:11, 42:3

**spelling** [1] - 58:25

**spellings** [1] - 254:20

**spoken** [4] - 39:8, 78:14, 95:11, 216:10

**ss** [2] - 316:4, 321:4

**staff** [26] - 63:16, 71:7, 92:15, 95:16, 95:21, 96:18, 102:6,

102:11, 102:14, 102:21, 103:5, 112:10, 116:20, 131:5, 133:23, 134:8, 176:13, 176:15, 176:17, 180:18, 180:19, 242:8, 261:13, 262:3, 286:13

**stages** [1] - 104:11

**stamp** [19] - 137:4, 143:8, 158:25, 173:3, 192:10, 195:2, 197:13, 198:3, 199:18, 200:21, 201:25, 205:20, 209:5, 212:2, 218:12, 248:3, 266:10, 277:6, 320:12

**stamped** [5] - 115:8, 158:24, 188:22, 189:22, 252:25

**stamping** [1] - 277:6

**stamps** [1] - 52:25

**standing** [1] - 245:13

**stands** [1] - 162:11

**start** [9] - 5:17, 16:14, 18:10, 32:19, 33:7, 108:22, 229:20, 283:24, 300:17

**started** [13] - 16:7, 17:18, 18:8, 18:16, 25:16, 31:9, 32:22, 33:14, 60:15, 60:16, 70:17, 97:22, 186:21

**starting** [3] - 12:17, 13:23, 302:10

**State** [27] - 2:6, 13:11, 13:13, 13:19, 23:4, 23:14, 36:21, 71:25, 119:19, 142:16, 142:20, 143:2, 147:14, 180:5, 180:11, 180:15, 188:8, 189:10, 190:2, 195:17, 196:20, 202:12, 207:3, 316:23, 319:22, 320:11, 321:8

**STATE** [2] - 316:4, 321:3

**state** [6] - 5:9, 6:4, 8:7, 95:17, 253:22, 269:6

**statement** [66] - 40:8, 40:19, 40:24, 41:3, 41:9, 42:7, 42:11, 42:13, 42:20, 42:23, 43:4, 43:7, 43:10,

43:13, 43:17, 43:19, 43:21, 43:24, 44:15, 44:20, 44:22, 44:25, 46:16, 52:15, 52:21, 63:9, 92:11, 95:3, 100:15, 116:23, 131:14, 132:3, 201:21, 214:7, 214:13, 215:11, 217:2, 246:8, 246:12, 246:14, 252:12, 252:20, 253:8, 253:19, 254:23, 255:9, 255:21, 258:16, 259:17, 261:12, 261:25, 262:6, 263:6, 265:11, 265:14, 265:23, 267:6, 292:3, 292:11, 292:15, 292:18, 296:7, 298:5, 302:9, 302:14, 320:24

**statements** [13] - 39:7, 39:10, 39:20, 40:6, 44:6, 265:5, 292:24, 301:14, 304:11, 304:24, 306:22, 317:16

**STATES** [1] - 1:2

**stay** [5] - 14:25, 165:19, 242:6, 289:10, 312:12

**stayed** [5] - 233:20, 233:25, 237:2, 241:8, 241:10

**steady** [1] - 17:3

**step** [3] - 234:14, 269:21

**stepmother** [1] - 285:8

**Steve** [2] - 231:4, 231:6

**sticking** [1] - 253:20

**still** [10] - 6:7, 82:13, 118:4, 118:11, 118:15, 140:6, 176:17, 215:21, 239:20, 240:3

**STIPULATED** [3] - 4:2, 4:8, 4:13

**stock** [1] - 15:11

**stomach** [3] - 131:12, 131:19, 238:10

**stop** [4] - 103:18, 238:11, 238:25, 260:14

**stopped** [4] - 27:23, 28:3, 34:16, 34:21

**stored** [1] - 306:21

**strategy** [1] - 102:8

**Street** [1] - 12:15

**strictly** [1] - 89:4

**student** [88] - 32:10, 53:18, 63:11, 63:12, 63:18, 64:5, 64:18, 64:23, 65:2, 65:13, 65:22, 69:4, 69:6, 69:10, 69:17, 74:13, 74:17, 74:21, 74:23, 76:2, 78:16, 80:14, 92:12, 92:16, 92:21, 99:9, 99:10, 102:16, 102:22, 102:23, 103:6, 103:16, 103:24, 104:8, 104:22, 105:10, 105:14, 111:6, 113:3, 113:16, 113:20, 114:2, 114:8, 114:16, 114:20, 114:23, 116:10, 117:5, 117:11, 118:16, 120:15, 120:19, 120:25, 122:11, 122:18, 123:15, 126:23, 130:20, 135:10, 135:13, 135:25, 140:15, 140:21, 140:23, 141:11, 141:14, 141:21, 141:24, 151:8, 154:19, 154:25, 155:5, 155:10, 157:3, 173:23, 182:17, 182:21, 214:22, 217:13, 234:19, 236:16, 249:3, 249:20, 253:25, 291:9, 297:24, 302:4, 302:9

**student's** [2] - 131:19, 141:3

**Students** [18] - 82:5, 82:12, 82:19, 83:4, 84:3, 84:23, 85:13, 86:6, 87:11, 87:18, 89:22, 91:17, 97:6, 173:6, 173:10, 174:5, 319:12, 319:16

**students** [29] - 64:15, 72:14, 73:23, 74:8, 89:6, 129:7, 151:2, 173:15, 174:2, 179:17, 224:2, 225:6, 225:9, 225:12, 227:7,

228:11, 233:14, 233:16, 242:4, 254:7, 288:16, 288:25, 290:17, 290:21, 291:2, 291:6, 297:16, 297:19, 297:21

**students'** [2] - 177:13, 177:18

**stuff** [3] - 40:13, 40:14, 296:23

**subject** [17] - 52:12, 52:20, 57:9, 57:12, 68:21, 77:25, 81:10, 81:16, 91:5, 93:12, 157:22, 173:14, 174:16, 177:24, 217:5, 304:12, 304:25

**subjected** [2] - 57:18, 173:24

**submit** [3] - 23:3, 262:21, 263:3

**submitted** [5] - 23:13, 95:2, 203:15, 285:16, 285:20

**subordinate** [1] - 140:15

**subscribed** [1] - 316:21

**subsection** [1] - 67:22

**Subsection** [1] - 69:5

**substance** [2] - 46:8, 52:3

**substantially** [16] - 100:9, 115:24, 116:4, 183:22, 184:2, 189:6, 192:18, 195:13, 197:18, 198:12, 201:12, 209:23, 213:4, 255:19, 266:11, 308:4

**successfully** [1] - 185:7

**sued** [3] - 37:20, 37:25, 38:9

**suffered** [1] - 68:13

**Suffolk** [24] - 39:13, 40:2, 42:11, 42:14, 43:16, 43:25, 44:8, 44:23, 45:18, 71:11, 180:25, 181:16, 249:15, 291:21, 291:24, 292:12, 302:20, 302:21, 302:22, 302:23, 302:24, 302:25, 307:10, 317:17

**SUFFOLK** [4] - 1:9,

1:9, 1:10
**suing** [1] - 275:2
**Suite** [4] - 1:21, 2:24, 3:5, 3:11
**sum** [1] - 46:8
**summer** [3] - 17:10, 51:7, 51:10
**summers** [1] - 51:5
**SUPERINTENDANT** [1] - 1:12
**superintendent** [1] - 91:17
**supervise** [2] - 152:4
**supervisor** [17] - 41:23, 41:25, 158:7, 210:3, 210:8, 224:9, 228:23, 251:8, 251:11, 263:16, 263:18, 263:22, 263:24, 267:11, 312:23, 313:6
**supervisors** [4] - 24:12, 24:20, 267:20, 288:13
**Supplemental** [1] - 320:20
**supportive** [1] - 173:19
**supposed** [4] - 50:21, 74:21, 145:10, 283:24
**suspended** [1] - 206:19
**sustain** [1] - 275:14
**swear** [1] - 44:25
**switched** [1] - 221:22
**sworn** [6] - 4:15, 4:18, 5:3, 36:25, 37:16, 321:12
**syrup** [1] - 10:4

# T

**taught** [8] - 82:11, 98:16, 116:11, 116:19, 143:4, 144:21, 144:24, 312:3
**teach** [7] - 98:20, 99:3, 116:7, 160:16, 199:23, 283:18, 315:4
**teacher** [4] - 25:19, 112:24, 180:23, 297:24
**teacher's** [1] - 113:4
**teachers** [1] - 297:21
**teaching** [1] - 35:9
**team** [1] - 263:2
**technically** [1] -

129:23
**techniques** [1] - 101:9
**teenager** [2] - 13:25, 15:4
**temporary** [1] - 309:12
**ten** [8] - 176:13, 176:14, 176:17, 206:6, 258:11, 258:12, 283:24, 309:21
**ten-month** [3] - 176:13, 176:14, 176:17
**tenure** [11] - 54:14, 75:23, 81:2, 83:14, 85:5, 98:4, 102:10, 121:13, 152:18, 158:8, 314:5
**terminated** [2] - 18:17, 206:18
**terms** [6] - 74:8, 74:17, 179:24, 213:20, 215:24, 288:15
**test** [1] - 61:10
**testified** [8] - 5:5, 38:11, 110:23, 185:19, 194:3, 253:10, 318:15, 318:20
**testify** [2] - 7:17, 125:18
**testifying** [1] - 110:22
**testimony** [7] - 10:12, 37:2, 37:16, 140:2, 316:10, 316:13, 321:14
**tests** [1] - 192:21
**text** [2] - 131:3, 307:7
**texts** [2] - 304:9, 304:22
**THE** [39] - 15:21, 47:4, 47:8, 81:13, 179:2, 227:21, 269:22, 270:5, 270:7, 270:14, 270:24, 271:9, 271:14, 271:19, 273:20, 273:24, 274:6, 274:16, 274:23, 275:8, 275:18, 275:23, 276:4, 276:12, 276:18, 276:23, 277:21, 279:9, 279:15, 279:23, 280:18, 280:25, 281:15, 282:7, 282:14, 283:2, 284:8, 284:20, 308:20

**theft** [1] - 145:11
**themself** [1] - 148:11
**themselves** [4] - 73:18, 73:19, 102:2, 102:24
**therefore** [2] - 7:5, 100:25
**they've** [1] - 302:15
**thinks** [1] - 282:18
**third** [2] - 90:3, 252:21
**thousand** [1] - 115:21
**threatening** [2] - 101:20, 101:22
**three** [3] - 16:21, 24:22, 309:3
**throughout** [2] - 54:18, 314:5
**timesheet** [1] - 320:17
**title** [1] - 15:16
**titles** [1] - 319:7
**TO** [2] - 317:7, 319:6
**today** [34] - 5:23, 6:13, 10:6, 10:8, 10:12, 10:20, 11:6, 11:24, 35:5, 49:3, 88:13, 103:4, 124:20, 138:3, 150:19, 153:2, 169:15, 187:12, 191:12, 207:22, 214:22, 215:20, 219:22, 221:24, 223:4, 227:17, 228:10, 254:21, 257:16, 267:13, 268:25, 269:8, 283:13, 315:9
**today's** [1] - 47:16
**tolerance** [7] - 154:4, 157:19, 157:25, 158:4, 313:17, 313:23, 314:6
**Tom** [3] - 6:10, 293:23, 307:11
**TOM** [1] - 1:5
**took** [13] - 8:4, 64:24, 65:6, 186:19, 190:4, 190:15, 215:6, 217:12, 223:11, 226:7, 228:18, 245:14, 289:7
**top** [31] - 54:8, 54:12, 56:14, 86:11, 86:13, 100:5, 113:20, 118:24, 129:3, 129:15, 130:11, 132:17, 136:16, 137:5, 166:18, 186:6, 189:24, 205:18, 216:18, 241:9, 241:11,

241:16, 241:18, 241:19, 247:15, 248:8, 266:21, 309:3, 309:21, 311:13
**torts** [1] - 49:10
**total** [1] - 112:6
**touch** [1] - 63:17
**touching** [2] - 244:8, 244:14
**tour** [1] - 217:18
**toward** [1] - 236:24
**towards** [31] - 92:7, 103:24, 111:15, 111:16, 123:21, 124:8, 162:14, 235:11, 236:20, 236:22, 241:24, 242:4, 243:13, 254:4, 254:7, 256:17, 256:21, 256:22, 257:2, 257:3, 257:5, 257:8, 257:9, 258:14, 258:20, 258:23, 259:11, 259:14, 281:5, 298:14, 300:16
**town** [2] - 22:17, 22:22
**traffic** [3] - 37:3, 37:6, 38:12
**train** [2] - 151:23, 160:5
**trained** [45] - 71:8, 73:4, 80:25, 98:11, 106:15, 106:17, 108:25, 119:11, 119:15, 124:16, 125:24, 126:2, 126:5, 126:10, 132:6, 134:21, 134:24, 135:3, 135:6, 135:9, 135:12, 135:15, 135:19, 135:21, 135:22, 138:6, 145:21, 147:10, 147:17, 147:22, 148:2, 148:22, 153:7, 160:23, 163:15, 178:20, 178:24, 179:5, 179:15, 309:10, 309:14, 310:24, 311:22, 312:11, 312:14
**training** [134] - 22:11, 22:14, 36:17, 36:18, 56:7, 64:2, 71:19, 71:20, 71:21, 76:10,

81:6, 82:7, 82:12, 84:2, 95:15, 95:16, 95:24, 96:3, 96:9, 96:14, 96:17, 96:25, 97:8, 97:11, 97:14, 97:18, 97:23, 98:2, 99:24, 100:2, 106:18, 108:24, 112:18, 112:20, 113:8, 113:11, 114:13, 115:13, 115:14, 115:17, 119:15, 119:17, 125:22, 126:7, 126:19, 126:20, 134:13, 138:8, 139:11, 139:17, 142:13, 142:17, 142:18, 142:23, 143:2, 144:7, 144:15, 144:17, 146:2, 148:18, 150:3, 151:23, 159:8, 159:10, 159:18, 159:19, 160:16, 164:14, 172:19, 179:17, 185:8, 186:12, 186:14, 186:17, 187:3, 187:5, 187:18, 189:13, 190:13, 190:16, 190:21, 192:5, 192:22, 192:25, 193:4, 193:13, 193:16, 193:24, 194:2, 194:10, 194:23, 195:7, 196:2, 197:3, 197:6, 197:25, 198:17, 198:22, 199:12, 199:15, 200:3, 200:7, 201:3, 201:6, 202:13, 202:18, 207:25, 208:6, 208:19, 276:16, 306:11, 307:20, 308:2, 308:5, 318:8, 318:9, 318:10, 318:18, 318:19, 319:14, 319:17, 319:18, 319:20, 319:23, 319:24, 319:25, 320:3, 320:4, 320:5, 320:6, 320:7, 320:8
**trainings** [7] - 144:15, 187:22, 187:23, 196:7, 198:15, 200:5, 318:7
**transcript** [4] - 15:19,

347

23:10, 316:9, 316:11
**transferred** [1] - 289:15
**Trial** [1] - 2:3
**trial** [2] - 4:12, 278:15
**tried** [1] - 261:8
**trouble** [2] - 7:4, 293:6
**true** [4] - 295:7, 316:12, 316:14, 321:13
**truth** [5] - 7:12, 7:13, 8:3, 254:11
**try** [8] - 24:16, 30:13, 134:8, 140:21, 146:8, 146:14, 257:25, 283:13
**trying** [15] - 26:14, 64:23, 65:21, 151:10, 162:15, 165:23, 234:21, 236:12, 236:13, 253:2, 260:13, 262:16, 277:14, 280:24, 283:11
**Tuesday** [1] - 222:14
**turn** [1] - 237:4
**turned** [3] - 234:17, 235:8, 237:2
**turns** [1] - 112:9
**twice** [1] - 10:21
**two** [22] - 9:6, 18:2, 24:12, 24:19, 45:19, 56:19, 57:16, 88:12, 109:6, 109:16, 115:21, 129:11, 133:10, 147:8, 148:8, 241:24, 241:25, 242:4, 254:7, 263:3, 292:20, 304:7
**Two** [1] - 243:4
**type** [4] - 41:5, 76:20, 104:13, 109:12
**types** [2] - 109:6, 109:9
**typical** [1] - 21:22

## U

**ultimately** [1] - 238:2
**un-redacted** [1] - 319:3
**unable** [2] - 169:12, 301:19
**unarmed** [1] - 188:9
**unavailable** [1] - 169:11
**unclear** [1] - 181:25
**under** [27] - 20:2, 20:25, 23:19, 44:13,

50:13, 62:20, 69:3, 101:3, 123:9, 144:20, 160:4, 161:5, 162:7, 167:15, 170:6, 170:8, 176:10, 182:13, 185:24, 194:7, 205:5, 222:12, 239:13, 248:25, 250:14, 258:4, 316:10
**under-reaction** [1] - 101:3
**undergo** [3] - 20:6, 21:8, 193:3
**underlie** [1] - 7:22
**underneath** [3] - 249:2, 249:16, 250:14
**understandable** [1] - 8:11
**understood** [3] - 150:23, 157:6, 275:21
**Understood** [1] - 284:15
**unethical** [6] - 156:3, 156:8, 156:11, 156:20, 157:9, 157:13
**unfortunately** [3] - 278:20, 314:11, 314:18
**uniform** [6] - 70:3, 70:15, 70:16, 70:17, 70:20, 146:12
**union** [12] - 11:5, 11:8, 43:3, 213:25, 215:15, 215:16, 215:18, 215:25, 216:3, 216:7, 216:10, 287:3
**unit** [4] - 210:19, 210:25, 250:12, 289:14
**Unit** [1] - 161:5
**UNITED** [1] - 1:2
**units** [1] - 210:17
**University** [1] - 283:19
**unknown** [2] - 249:2, 249:19
**unlawfully** [1] - 296:25
**unless** [2] - 166:22, 262:15
**unnecessary** [1] - 63:5
**unprofessional** [3] - 157:19, 313:24, 314:7

**unredacted** [1] - 248:21
**unruly** [2] - 99:10, 311:6
**unsafe** [4] - 128:16, 128:20, 128:22, 129:22
**unsigned** [2] - 185:4, 186:2
**untrue** [2] - 255:22, 266:15
**up** [65] - 6:21, 8:23, 19:24, 20:23, 23:17, 44:10, 50:10, 59:17, 62:18, 66:3, 66:11, 76:22, 79:13, 93:3, 102:19, 103:17, 103:23, 104:2, 121:18, 122:7, 123:6, 133:11, 134:7, 134:10, 134:11, 138:10, 144:18, 151:16, 151:17, 155:20, 160:2, 162:5, 176:8, 178:19, 182:11, 185:22, 194:5, 205:3, 212:6, 212:24, 222:9, 234:3, 234:6, 234:24, 236:25, 237:2, 237:4, 237:7, 237:9, 242:5, 242:12, 242:13, 243:6, 243:7, 243:22, 244:4, 248:23, 254:8, 254:10, 261:17, 281:16, 282:15, 290:16, 298:17, 320:15
**upset** [1] - 214:22
**URL** [1] - 85:17
**username** [1] - 58:22
**uses** [5] - 75:11, 122:25, 162:12, 309:16, 318:2
**usual** [1] - 233:13
**utilities** [1] - 70:3
**utilize** [12] - 69:21, 73:22, 113:15, 145:21, 160:16, 161:11, 163:19, 172:18, 179:21, 179:24, 285:8, 285:12
**utilized** [6] - 123:4, 146:4, 182:9, 278:16, 318:4, 318:14

## V

**various** [1] - 161:22
**varying** [1] - 106:11
**vendor** [2] - 191:7, 191:9
**veracity** [1] - 253:8
**verbal** [10] - 82:25, 101:4, 101:19, 106:22, 109:10, 109:18, 112:9, 212:6, 217:8, 295:24
**verbally** [9] - 75:12, 101:5, 140:22, 141:12, 261:6, 261:9, 264:18, 264:19, 295:20
**version** [3] - 248:21, 252:10, 319:3
**versus** [1] - 250:25
**vest** [1] - 70:23
**video** [13] - 166:3, 178:3, 182:3, 182:9, 182:14, 182:18, 243:15, 245:7, 250:16, 303:7, 303:11, 305:24, 318:14
**violating** [4] - 66:14, 68:22, 79:21, 80:3
**violation** [5] - 68:14, 89:21, 152:9, 153:3, 157:8
**violations** [2] - 68:18, 83:4
**violence** [3] - 29:17, 100:17, 273:3
**violent** [8] - 100:4, 104:14, 106:18, 108:23, 126:6, 135:16, 160:7, 160:8
**voice** [3] - 126:9, 304:11, 304:23
**Vs** [1] - 270:3

## W

**waist** [1] - 238:9
**wait** [1] - 7:6
**waive** [1] - 215:15
**waived** [1] - 4:7
**walk** [1] - 103:24
**walked** [6] - 232:12, 233:4, 233:6, 233:19, 234:8, 298:14
**walking** [1] - 234:15
**wall** [6] - 234:20, 234:24, 235:9, 237:7, 237:10,

298:17
**wallet** [1] - 207:21
**Walmart** [11] - 14:10, 14:15, 14:19, 15:6, 15:10, 15:13, 15:24, 16:6, 16:18, 32:15, 319:7
**Walt** [2] - 1:21, 3:5
**wants** [1] - 78:6
**warehouse** [1] - 56:4
**warning** [7] - 212:8, 212:23, 212:25, 217:2, 217:8, 320:15
**warnings** [1] - 216:22
**warranted** [2] - 73:13, 73:16
**wasting** [1] - 284:9
**water** [1] - 8:22
**ways** [2] - 131:7, 179:16
**weapons** [2] - 309:13, 309:17
**wear** [1] - 146:11
**web** [1] - 177:18
**week** [4] - 56:13, 222:20, 228:19, 284:4
**weight** [3] - 67:25, 86:18, 241:20
**welfare** [1] - 118:6
**well-written** [1] - 311:20
**WHEREOF** [1] - 321:20
**White** [1] - 3:12
**white** [2] - 129:13, 129:16
**Whitman** [2] - 1:21, 3:5
**whole** [15] - 7:12, 8:3, 53:24, 134:8, 164:18, 164:19, 178:14, 178:16, 178:18, 178:21, 180:18, 180:19, 235:4, 251:21, 281:17
**wife** [18] - 31:5, 31:10, 31:24, 32:14, 32:19, 33:13, 34:9, 271:23, 272:7, 272:16, 272:20, 273:9, 273:18, 274:3, 275:3, 285:10, 286:4, 286:10
**William** [3] - 202:4, 205:6, 320:10
**Williams** [7] - 242:10, 242:15, 242:22, 243:2, 243:21,

348

261:13, 262:3
**Wisconsin** [1] - 22:16
**witness** [47] - 5:3, 6:7, 30:16, 99:14, 108:8, 108:21, 165:22, 167:17, 168:19, 170:10, 170:14, 170:25, 171:15, 171:21, 185:19, 194:3, 257:12, 259:2, 269:23, 271:14, 272:19, 273:17, 273:25, 274:14, 274:17, 275:15, 277:11, 277:19, 278:24, 280:2, 280:23, 283:4, 283:7, 283:20, 284:6, 284:10, 284:11, 291:14, 314:14, 314:23, 315:8, 315:20, 318:15, 318:20, 320:25, 321:10, 321:14
**WITNESS** [10] - 15:21, 47:4, 47:8, 81:13, 179:2, 227:21, 269:22, 308:20, 317:3, 321:20
**witnessed** [1] - 302:5
**word** [9] - 54:9, 154:9, 156:20, 214:24, 230:22, 254:2
**words** [12] - 8:2, 46:7, 75:15, 99:2, 105:19, 110:12, 131:16, 137:25, 141:7, 160:15, 227:2, 240:12
**worker** [1] - 82:16
**works** [3] - 32:9, 170:11, 171:14
**workweek** [1] - 228:15
**Write** [1] - 320:15
**write** [12] - 40:19, 40:22, 41:2, 41:6, 122:6, 246:7, 246:14, 252:20, 255:11, 264:5, 264:15, 266:17
**Write-up** [1] - 320:15
**writer** [1] - 126:4
**writeups** [2] - 212:20, 305:14
**writing** [27] - 19:25, 20:24, 23:18, 44:11, 50:11, 58:17, 62:19, 81:20, 123:7, 144:19, 160:3,

162:6, 176:9, 182:12, 185:23, 194:6, 205:4, 208:21, 222:10, 230:11, 248:24, 263:5, 264:20, 265:5, 290:6, 295:20, 311:12
**Written** [1] - 317:12
**written** [15] - 19:20, 20:4, 39:6, 39:10, 137:15, 159:20, 190:19, 193:15, 193:18, 202:23, 203:3, 208:8, 212:6, 306:21, 311:20
**wrote** [13] - 42:9, 92:11, 95:9, 215:14, 246:18, 252:13, 254:10, 254:11, 254:14, 254:16, 255:9, 265:7, 265:10

## X

**xi** [1] - 309:8
**XII** [1] - 76:20

## Y

**Yaphank** [1] - 19:5
**year** [36] - 10:24, 16:4, 17:6, 17:17, 18:15, 27:25, 28:7, 32:23, 32:24, 32:25, 34:6, 34:10, 37:14, 51:25, 54:20, 59:9, 60:10, 62:17, 97:16, 97:17, 97:19, 134:14, 134:18, 139:8, 142:21, 142:22, 144:9, 144:10, 144:23, 144:25, 176:4, 196:21, 204:18, 274:7, 317:24
**yearly** [1] - 134:5
**years** [16] - 15:25, 16:21, 17:19, 17:20, 18:2, 29:5, 34:2, 36:10, 49:18, 49:22, 55:21, 56:18, 57:5, 272:21, 274:11
**yelling** [1] - 109:21
**YORK** [3] - 1:3, 316:4, 321:3
**York** [31] - 1:21, 2:7, 2:25, 3:6, 3:12, 5:14, 11:22, 12:16, 13:11, 13:13, 13:19, 23:4,

23:14, 36:22, 71:25, 119:19, 142:16, 142:20, 142:25, 147:14, 180:4, 180:10, 180:15, 188:8, 189:10, 190:2, 195:17, 196:19, 207:3, 316:23, 321:8
**yourself** [12] - 29:23, 66:2, 69:7, 76:22, 79:13, 83:18, 90:6, 93:3, 126:22, 133:10, 165:21, 177:20

## Z

**zero** [7] - 154:4, 157:19, 157:25, 158:4, 313:16, 313:23, 314:6
**ZIMMERMAN** [1] - 1:10
**Zimmerman** [1] - 302:22

## CORRECTION / ERRATA SHEET

Scott Partlow_____, being duly sworn, deposes and says: I have reviewed the transcript of
my deposition/hearing take on _____11/27/2017_____. The following changes are necessary to correct
my testimony.

CASE CAPTION: Edmond v. Longwood CSD, et al                    DATE:

| Page: | Line: | Should read/Corrected testimony: | Reason for Change: |
|---|---|---|---|
| | | THE NAME PERADA IS | |
| | | INCORRECTLY SPELLED | |
| | | THROUGH OUT THE TRANSCRIPT | |
| | | IT SHOULD BE READ AS | |
| | | JAMES PERROTTA. | |
| 15 | 14 | SUPPORT MANAGER | FILL IN BLANK |
| 16 | 10 | ALL · J Pools | CORRECT SPELLING |
| 16 | 13 | ALL J Pools | CORRECT SPELLING |
| 16 | 19 | ALL J Pools | CORRECT SPELLING |
| 16 | 22 | ALL J Pools | CORRECT SPELLING |
| 22 | 16 | NESCONSET | WRONG TOWN |
| 26 | 21 | JOSH BRAZIL | CORRECT SPELLING |
| 27 | 13 | MOTHER IN LAW | READS MOTHER |
| 39 | 14 | P. D | READS P.A |
| 58 | 23 | Scott.Partlow @Longwood CSD.ORG | CORRECT E-MAIL |
| 159 | 15 | TRAINED | READS NAMED |
| 202 SP | 4 SP | WILLEAM SP | NE WILLEAM NEATER SP |
| 205 | 7 | NEATER | CORRECT NAME |
| 202 | 4 | NEATER | CORRECT NAME |

Sworn to before me this ___16th___
day of ___June___, __2018__

_____
NOTARY PUBLIC

Testimony Deposition/Hearing Witness:

X _____

Scott Partlow
_____
Print

MICHAEL PEPPE
Notary Public, State of New York
No. 01PE6369389
Qualified in Suffolk County
Commission Expires January 8, 2022

**Rich Moffett Court Reporting**
114 Old Country Road, Suite 630, Mineola, NY 11501
516-280-4664   Fax: 516-294-0670

## CORRECTION / ERRATA SHEET

Scott Partlow _____ , being duly sworn, deposes and says: I have reviewed the transcript of

my deposition/hearing take on _____ 11/27/2017 _____ . The following changes are necessary to correct

my testimony.

CASE CAPTION: Edmond v. Longwood CSD, et al                    DATE:

| Page: | Line: | Should read/Corrected testimony: | Reason for Change: |
|-------|-------|----------------------------------|--------------------|
| 262 | 16 | TRYING to TAKE HIM out OF THE SITUATION. | SENTENCE WASNT FINISHED |
| 300 | 22 | I DON'T , NO | READS WRONG |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Sworn to before me this _____ 20th _____

day of _____ June, 2018 _____

_____
NOTARY PUBLIC

Testimony Deposition/Hearing Witness:

X_____

_____ Scott Partlow _____
Print

MICHAEL PEPPE
Notary Public, State of New York
No. 01PE6369389
Qualified in Suffolk County
Commission Expires January 8, 2022

**Rich Moffett Court Reporting**
114 Old Country Road, Suite 630, Mineola, NY 11501
516-280-4664   Fax: 516-294-0670