UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DAVID EDMOND, CAROL EDMOND,
and TOM EDMOND,

                            Plaintiffs,

                  -against-

LONGWOOD CENTRAL SCHOOL DISTRICT,
et al.,

                            Defendants.
-----------------------------------------------------------------X
DEARIE, District Judge

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 3 0 2019   ★

BROOKLYN OFFICE

**MEMORANDUM & ORDER**

16 CV 2871 (RJD)

On the morning of June 4, 2015, an assistant principal and several security guards

physically restrained a student amidst the pandemonium-like conditions developing when the

entire Longwood High School ("LHS") senior class re-entered the school building, en masse,

after a planned senior prank had them all outdoors (the "Incident"). The restrained student is

plaintiff David Edmond "(David)", an African-American, who was at the time of the Incident

one of the students in that highly-energized crowd. His parents, Carol and Tom Edmond, are

also plaintiffs.

Their pleading (the Verified Amended Complaint ("VAC")), spanning nearly fifty pages,

advances sixteen causes of action based on the Incident, including (i) claims under 42 U.S.C. §

1983 for excessive force, false arrest and imprisonment, abuse of process, denial of the due

process rights to bodily integrity and freedom from state-created danger, denial of equal

protection on account of race, negligent supervision, and municipal liability; (ii) claims under

Title VI and 42 U.S.C. §§ 1981, 1985 and 1986 alleging race-based discrimination, racially

hostile environment, selective enforcement and conspiracy; and (iii) state-law claims for negligence, assault and battery, and intentional and negligent infliction of emotional distress.

Defendants move for summary judgment dismissing all claims. Plaintiffs move for partial summary judgment to dismiss defendants' assertion of qualified immunity and for judgment in their favor on their equal protection, Title VI and municipal liability claims. As discussed below,[1] the Court rules as follows.

Defendants' motion is denied with respect to (i) the Section 1983 claims for excessive force, false imprisonment, denial of substantive due process, and denial of equal protection on account of personal animus; and (ii) the state-law claims for assault and battery and emotional distress (both negligent and intentional). These claims shall proceed to trial. Plaintiffs' motion is granted on the question of qualified immunity as to any of these claims and otherwise denied.

Defendants' motion is granted respect to the following claims: Title VI; Section 1983 abuse of process, state-created danger, and equal protection on account of race; Section 1981; Sections 1985 and 1986; municipal liability for the surviving Section 1983 claims; and negligence under state law. These claims are dismissed.

## SUMMARY JUDGEMENT STANDARD

Summary judgment is available "only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). The party seeking summary judgment bears the burden of establishing that the requirements of Rule 56 are satisfied. Sorano v. Taggart, 642 F. Supp. 2d 45, 50 (S.D.N.Y. 2009). This occurs when either

---

[1] The Court writes for the parties, whose familiarity with the voluminous record is assumed and references the facts only as needed in the context of the claims to which they relate.

the non-moving party's evidence is insufficient to establish an essential element of its claim, or

the moving party's evidence negates an essential element. Dixon v. City of New York, 2008 WL

4453201, at *9 (E.D.N.Y. Sept. 30, 2008). If the moving party succeeds in establishing the

absence of a genuine issue of material fact, summary judgment must be granted. Sorano, 642 F.

Supp. 2d at 50. Further, in deciding whether summary judgment is warranted, the record is to be

construed in the light most favorable to the parties opposing summary judgment, all reasonable

inferences must be drawn in their favor, and all ambiguities resolved their way. Sledge v. Kooi,

564 F.3d 105, 108 (2d Cir. 2009).

The party opposing summary judgment "must come forward with specific facts showing

that there is a *genuine issue for trial.*" See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986) (emphasis supplied by Supreme Court) (internal quotation and

citation omitted). And "there is no genuine issue for trial," the Supreme Court further teaches,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party." Id. Accord Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986) ("there is

no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party…If the evidence is merely colorable, or is not significantly

probative … summary judgment may be granted"); Navajo Air, LLC v. Crye Precision, LLC,

318 F. Supp. 3d 640, 674 (S.D.N.Y. 2018) ("[s]ummary judgment is designed . . . to flush out

those cases that are predestined to result in directed verdict") (quoting Lightfoot v. Union

Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997)); O'Hara v. Weeks Marine, Inc., 294 F.3d 55,

64 (2d Cir. 2002) (summary judgment is the appropriate relief "where the facts and the law will

reasonably support only one conclusion"); D'Amico v. City of New York, 132 F.3d 145, 149 (2d

Cir. 1998) ("non-moving party may not rely on mere conclusory allegations nor speculation, but

instead must offer some hard evidence showing that [her] version of the events is not wholly fanciful").

**DISCUSSION**

## I. THE EXCESSIVE FORCE CLAIM UNDER 42 U.S.C. § 1983

Plaintiffs allege that the defendants committed an "unprovoked and unjustified violent assault and battery" against David that "included subjecting him to a chokehold which caused him serious and personal injury and . . . constituted unreasonable and excessive force by state actors" acting "with malice." VAC ¶¶125, 129.

The essence of a Section 1983 claim is deprivation of a federal right by state actors. Gomez v. Toledo, 446 U.S. 635, 640 (1980) (citing Monroe v. Pape, 365 U.S. 167, 171 (1961)). The federal right allegedly denied in a student's excessive force claim is the Fourth Amendment right to be free from an unreasonable seizure by school officials. See New Jersey v. T.L.O., 469 U.S. 325, 333 (1984) (Fourth Amendment prohibition against unreasonable searches applies to public school students); EC ex rel. RC v. County of Suffolk, 882 F. Supp. 2d 323, 345 (E.D.N.Y. 2012) (T.L.O. framework for assessing reasonableness of searches applies to seizures of students) (collecting cases), aff'd, 514 Fed. App'x 28, 30 (2d Cir. 2013). The state action component is not disputed, as the school officials and security guards named as defendants, as employees of a public school, are state actors for purposes of Section 1983. See EC, 882 F. Supp.2d at 344.[2]

---

[2] The qualified immunity question can be put to rest right here. A reasonable person in defendants' position would have known that the constitutional right that David claims the defendants violated during the Incident was clearly established at the time of the Incident. See generally Pearson v. Callahan, 555 U.S. 223, 237 (2009) (courts not bound by two-step sequence of Saucier v. Katz, 533 U.S. 194 (2001) and may "exercise their sound discretion" to jump a step and decide immediately whether a constitutional right is clearly established). The same conclusion applies with respect to the three other surviving Section 1983 claims—false

4

For purposes of summary judgment, "the substantive law will identify which facts are material." Liberty Lobby, 477 U.S. at 248. In a Section 1983 excessive force claim, "the reasonableness of seizures must be determined in light of all the circumstances, with particular attention being paid to whether the seizure was justified at its inception and reasonable in scope." EC, 882 F. Supp. 2d at 345 (internal quotation and citation omitted). The Second Circuit has recognized that "the reasonableness inquiry is usually a fact-intensive one that is often best left for a jury," EC, 514 F. App'x at 30, and that is precisely the course dictated by the record here.

Analytically David's claim involves two distinct seizures: first the initial stop and alleged restraint by Assistant Principal ("AP") Reese, followed immediately by the restraint and alleged chokehold administered by Security Guard Partlow as assisted by Security Guard Chan and Director of School Security ("DSS") James Perrotta. Genuine issues of material fact abound among the many dramatically conflicting accounts of what exactly occurred, and why, that have been furnished by David;[3] by Reese, Chan and Perrotta; by the many students who witnessed part or all of the events; and by other peripherally involved school personnel. The factual conflicts intensify when attempting to reconcile these accounts with the surveillance video clips on which both sides now rely because the clips tell neither the entirety of the story nor

---

imprisonment, due process, and equal protection based on personal animus, see infra at pp. 6-8, 15-17.

[3] David's most contemporaneous account is in the statement he made to police investigators the day after the incident. He testified five months later at his N.Y. General Municipal Law § 50-h examination and was deposed at length in July 2017. Nevertheless, appearing during the summary judgment briefing is yet another statement by David, a lengthy affidavit dated November 7, 2018. Not surprisingly, this obviously attorney-authored document, riddled with sensationalist rhetoric, purports to put a decidedly more pro-plaintiff spin on various portions of David's prior statements.

necessarily only one story. Independent of the many witness accounts, the clips alone unquestionably allow the inferences required for the excessive force claim to proceed to trial.[4]

## II.   THE OTHER NON-RACE-BASED THEORIES OF RECOVERY UNDER 42 U.S.C. § 1983[5]

### A.   False Arrest

The core allegation in this cause of action is that the Incident amounted to the intentional restriction of David's liberty and mobility without justification. To prevail on a Section 1983 claim for false arrest based on the Fourth Amendment right to be free from unreasonable seizures, which is substantively the same as the state-law equivalent, a plaintiff must show that the defendants intentionally confined him without his consent and without justification, *i.e.*, that it was not privileged. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (collecting cases); EC, 882 F. Supp. 2d at 347 ("justified" actions by school security guards are "privileged" for purposes of Section 1983 false imprisonment claims).

Because privilege for false arrest purposes and justification in the excessive force inquiry are, on this record, substantially the same question, the false arrest claim survives summary judgment for the same reasons as excessive force.

---

[4] For the same reasons, plaintiffs' state law claims for assault and battery (VAC ¶¶216-217) survive. See, e.g., Bastein v. Sotto, 749 N.Y.S.2d 538, 539 (App. Div. 2d Dep't 2002) (assault claim under New York law requires proof of "physical conduct placing the plaintiff in imminent apprehension of harmful contact" and battery requires evidence showing "bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent").

[5] Equal protection under section 1983 (on the basis of racial and personal animus) is discussed *infra* at pp. 15 et seq. Additionally, the Court notes that, with the excessive force claim, which is the heart of this lawsuit, now proceeding to trial, it is questionable whether plaintiffs genuinely needed to expand their already embellishment-riddled pleading with these other theories culled from the corners of section 1983 jurisprudence.

## B.      Bodily Integrity

The core allegation of this claim is that the Incident violated David's substantive due process right to bodily integrity.  VAC¶¶142-144.  To prevail on a such a claim, the plaintiffs must prove that defendants' conduct was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848 n. 8 (1998)).  This element guards against "the Constitution be[ing] demoted to ... a font of tort law."  Id.

Defendants argue because the Fourth Amendment already addresses the alleged misconduct, the due process claim should be dismissed as duplicative.  Although some early case law supports the proposition, see, e.g., Graham v. Connor, 490 U.S. 386, 395 (1989), recent decisions involving physicality in public schools clearly recognize the distinctness of the due process claim.  For example, in Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168 (2d Cir. 2002), the Second Circuit affirmed the district court's denial, under Rule 12(b)(b) of a substantive due process claim alleging that a teacher slapped a student.  The Court "wr[o]te, however, to express [its] disagreement with" the district court's apparent categorical view of the question, explaining that, "We have never adopted a per se rule that a single slap from a teacher or other school official can never be sufficiently brutal to shock the conscience and invoke the protections of the due process clause.  Neither will we adopt such a rule here."  Id. at 172-73 (collecting additional cases).

In short, whether the force used against David was excessive within the meaning of the Fourth Amendment and whether that use of force is conscience-shocking for purposes of due process are distinct inquiries.  Construing the record and its many ambiguities in the light most favorable to the plaintiffs, Sledge, 564 F.3d at 108, particularly the interpretive cloud hanging

7

over the video clips, the Court concludes that there is just enough here for the due process claim to survive.[6]

## C.    State-Created Danger/Due Process

In this claim, plaintiffs allege that school administrators and security staff "created a dangerous condition for students entering and leaving the building" and that they "knew, or should have known, [that] their action with respect to the well-known and traditional 'senior prank' was dangerous." VAC ¶¶ 155, 157.

The law recognizes "a 'substantive due process right' to be free from state created dangers" that is actionable under Section 1983. Pena v. DePrisco, 432 F.3d 98, 102 (2d Cir. 2005) (allowing such a claim to survive a motion to dismiss under Rule 12(b)(6)). Defendants assert that the claim fails as a matter of law because, as they read Pena and the jurisprudence it reviews, liability can be premised only on the state's failure to protect an individual from a *private* actor's misconduct, and here, all the alleged misconduct was committed by *state* actors. But the Court is not convinced that Pena stands for that proposition.[7] Plaintiffs, in opposition, cite to JL v. Eastern Suffolk BOCES, 2018 WL 1882847 (E.D.N.Y. Apr. 19, 2018), but that cases does not concern the state-created danger theory of Section 1983 liability.

---

[6] For these same reasons, and others addressed in the context of the equal protection theory based on personal animus, see *infra* at 15-17, both state-law emotional distress claims survive. See Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993) (for intentional infliction of emotional distress, plaintiff must show, *inter alia*, "extreme and outrageous conduct"); Sacino v. Warwick Valley Cent. Sch. Dist., 29 N.Y.S.3d 57, 60 (2d Dep't 2016) (negligent infliction of emotional distress requires a plaintiff to prove, *inter alia*, the "breach of a duty owed to him which unreasonably endangered his physical safety, or caused him to fear for his own safety.").

[7] Indeed, in a lengthy analysis that lets the claim survive at the 12(b)(6) stage, the Court begins as follows: "in order to proceed, the plaintiffs must demonstrate that they are *not* subject to the rule ... that a State' failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Pena, 432 F.3d at 107-108 (internal citation and quotation omitted) (emphasis added).

Without reaching this question of law, the Court dismisses this claim for lack of evidence. Despite the overblown, sensationalist rhetoric, there is no evidentiary support for plaintiffs' assertion that school officials put David in danger. The unrefuted evidence from school officials establishes that, when alerted to the rumor of a possible senior prank involving the mass exodus of students, school officials acted promptly by stationing personnel at key doorways to attempt to maintain some degree of order and to promote students' safety by regulating the flow of their re-entry into the building. See, e.g., Def. Ex. H (AP Reese Dep.) at 187-88, 192; Def. Ex. I (Principal Castro Dep.) at 242-43, 245-46; Def. Ex. K (DSS Perrotta Dep.) at 39-41.

**D.    Abuse of Process**

Plaintiffs allege that defendants misused legal process to the detriment of the interests of David and his parents. VAC ¶¶ 140-141. The claim appears to relate to the post-Incident period when David was disciplined and his case referred to the Central Hearing Office. No hearing occurred, of course, because under the guidance of retained counsel plaintiffs negotiated a settlement pursuant to which, *inter alia*, David entered a plea of no contest to the disciplinary charges against him, accepted the suspension through the rest of the school year and agreed he could not attend prom in exchange for being permitted to walk at graduation.

A claim for abuse of process requires proof, *inter alia*, that the plaintiffs were subject to "regularly issued legal process compelling performance or forbearance of some act" and that "the person activating the process was moved by an ulterior purpose to cause harm" and to obtain "some collateral advantage ... outside the legitimate ends of the process." Yohay v. Martin, Van De Walle, Guarino & Donohue, 549 N.Y.S.2d 158, 159 (2d Dep't 1989), lv. app.

9

denied, 75 N.Y.2d 710 (1990); see also Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994) (overview of elements and history of this theory of liability).

Plaintiffs' Section 1983 abuse of process claim fails as a matter of law because the discipline of David including the referral to the Central Hearing Office did not involve criminal process. See Green v. Mattingly, 585 F.3d 97, 104 (2d Cir. 2009) ("[S]ection 1983 liability ... may not be predicated on a claim of malicious abuse of ... *civil process*") (emphasis in original) (internal citation and quotation omitted). The state-law claim fails as a matter of law because the relevant process was administrative rather than legal. See Boyle v. Caledonia-Mumford Cent. Sch. Dist., 140 A.D.3d 1619, 1620-1621 (4th Dep't) (holding that school's imposition of various disciplines upon students including suspension was not use of "legal" process for purposes of abuse of process claim), lv. app. denied, 28 N.Y.3d 905 (2016).

In any event, even assuming arguendo that defendants used legal process with respect to David, both the federal and state claims would fail for lack of proof. Other than the bald allegation that school officials had sinister motives, there is no evidence that the defendants sought to obtain a collateral objective outside the legitimate ends of the process. To the contrary, the evidence shows that the process here was used precisely for its intended purpose, namely, student discipline.

## II.  THE RACE-BASED CLAIMS

### A.  The Title VI Claim

Plaintiffs allege that there exists at LHS "a definite pattern of discrimination against Black students" in that they "are referred for disciplinary action at a rate that is disproportionate to their overall school enrollment." VAC ¶¶ 199-200. They further allege that school officials "created" a "racially charged and hostile school environment" and that they allow it to continue

"to exist and flourish" by "selectively and unevenly applying disciplinary rules, with more stringent standards for plaintiff and other African American students." Id. ¶¶ 211-212. Plaintiffs argue causation in their motion papers, asserting that this allegedly racially hostile administrative culture at LHS manifested itself in the series of decisions and actions the various defendants took on the day of the Incident.

The statutory mandate of Title VI is clear: "No person in the United States shall, on the ground of race, color, or national origin, …be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Claims do not lie against individuals because they are not the recipients of federal funds. Russel v. Nassau Cty., 696 F. Supp. 2d 213, 238 (E.D.N.Y. 2010). Instead, the proper claim, under the circumstances here, is against the District on a theory of deliberate indifference to a racially hostile educational environment. See generally N.U. by Amar v. E. Islip Union Free Sch. Dist., 2017 WL 10456860, at *5-6 (E.D.N.Y. Sept. 15, 2017) (collecting cases).

To prevail under Title VI, plaintiffs must show "(1) the alleged harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or benefits provided by the school; (2) the funding recipient had actual knowledge of the harassment; and (3) the funding recipient was deliberately indifferent to the harassment." Id. at 6 (collecting cases). Accord D.T. v. Somers Central Sch. Dist., 588 F. Supp.2d 485, 497 (S.D.N.Y. 2005) (Title VI plaintiffs must show that school "was deliberately indifferent to racial hostility"). Additionally, Title VI plaintiffs must show "that the discrimination was a substantial or motivating factor for the defendant's actions." N.U., 2017 WL 10456860, at *5 (internal quotation and citation omitted).

The principal evidence on which plaintiffs rely is a report prepared by their expert, Dr. Edward Fergus, and produced after the discovery deadline during the summary judgment briefing. The Court will nevertheless assume for purpose of the summary judgment analysis that the report is admissible

Dr. Fergus analyzed an administrative data set of almost 10,000 LHS infraction referrals, spanning the years 2011-2015, taking account of factors such as infraction/incident type, consequence, gender, and ethnicity, and concludes that, school-wide, for the years 2011-2015, black LHS students were "receiving infraction referrals at a rate that is disproportionate to their overall school enrollment." ECF 110, Ex. GG at p. 6. More specifically, he first reports that slightly more of the total disciplinary referrals were issued to white students than to black students. But because the student population is 50% white and 20% black, he concludes that black students are significantly over-represented in the disciplinary referrals.[8]

Notably, the report offers no basis for ascertaining whether the referral or discipline imposed in any particular case was unjustified—which could arguably allow the inference that

---

[8] Plaintiffs also place great weight on Superintendent Lonergan's admission that he knew that for several years LHS was cited by state auditors for disciplining black special education students at a higher rate than white special education students. Lonergan Dep. at pp. 239 et seq. The Court, however, finds this evidence non-probative on the Title VI inquiry. First, according to Lonergan's testimony, the numbers involved were small. See Lonergan Dep. at 240 ("...we get to that tipping point of the threshold for the number of students within our School District versus the number of minority students that are suspended with IEP's. I think our number [was] in excess of four to six a year, something like that."). Second, the numbers have no meaningful connection to the Incident because David was not a special education student. Finally, Lonergan's testimony concerning the District's response to the numbers negates any claim of deliberate indifference. See id. at 239-242 (many of the affected students have "emotional disabilities, not so much learning disabilities" due to "difficult[ies] with their families" and when they "become frustrated, they act out"; additionally, the audit numbers were a subject of "[c]onstant conversation with all [ ] administrators for the last five years" who together "try so hard every year to come up with more intervention plans").

racial bias might account for the referral or discipline. Mindful, of course, that explanations of individual cases is not what statistical analyses of large databases are intended to do in discrimination litigation, and mindful as well of the traditional arguments about the manipulability of statistics and what they do and do not establish, the Court finds that the report has some probative value on the threshold question of whether racial imbalances exists in the disciplining of students at LHS and, arguably, inferential potential with respect to the more relevant Title VI question of whether racial bias could account for the imbalances.

The more difficult question is whether this report gets plaintiffs past summary judgment. Even if the report, appropriately interpreted for a jury of laypersons, allows the inference that racial bias has tainted the LHS discipline system, there remains the fact that, to prevail, plaintiffs must establish that the alleged racially discriminatory discipline scheme was "so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or benefits provided by the school." N.U., 2017 WL 10456860, at *5-6. There's a point at which reasonable inferences deteriorate into speculation and that point occurs, for the plaintiffs here, somewhere in this Title VI requirement. The Fergus report cannot be mined that far.[9]

Additionally, the record contains significant evidence tending to refute the allegation that David was the victim of racial discrimination in AP Reese's decision to stop and restrain him, in the degree of force used against him by Partlow, Chan and Perrotta, and in the ensuing disciplinary process. First, David admitted that before the Incident, he never felt, or complained

---

[9] Further still, plaintiffs would also have to establish that the District had "actual knowledge" of the racially flawed disciplinary scheme and was "deliberately indifferent" to it. N.U., 2017 WL 10456860, at *6. Even if it is arguably inferable that the District must have had prior knowledge of what the report only now discloses, there is absolutely no evidence of deliberate indifference.

to the District, to his parents, or to anyone, that he was treated differently or unfairly, or targeted, because of his race. Notably, during the time period covered by this admission, David himself was the subject of innumerable behavior referrals and disciplines.[10]

Second, it is unrefuted that neither Reese, Partlow, Chan or Perrotta was ever previously accused of racially-based misconduct. Together with David's admission, the only reasonably supported conclusion is that the Incident was a *sui generis* event,[11] which in turn further diminishes the relevance of the Fergus report.

Third, the Incident resulted in a total of four behavioral referrals and imposition of discipline. To be sure, of the four, three, including David, were black, but the fourth was white, and that white student engaged in less egregious conduct than what the school says David did yet he received the exact same discipline (upon a no contest plea, suspension for the remainder of the school-year and prohibited from attending prom but allowed to participate in graduation).

Finally, the premise of David's claim here is that he committed none of the misconduct with which he was charged—indeed, he insists that, though surrounded by the throng of students chanting asshole he was not chanting—and so race necessarily must be the reason he was allegedly selected for restraint and discipline.[12] Of course it is not the function of the Court at summary judgment to make credibility findings; nevertheless, the Court must consider whether

---

[10] David's disciplinary record has been filed under seal.

[11] The same tenor of evidence exists with respect to the excessive force metric. See Monell discussion *infra* at pp. 20 et seq.

[12] This insistent premise of innocence almost explains the overblown nature of the pleadings. If David was, as he says, walking peaceably and engaging in no conduct that could justify intervention by AP Reese, then the far-fetched allegations of conspiracy and the like take on a kind of logical necessity. But allegations are all they are: there is simply no proof that everything bad that allegedly happened to David in connection with the Incident was the result of a plot among school staff to target him because of the color of his skin.

*"the record as a whole* could . . . lead a rational trier of fact to find for the non-moving party."
Matsushita, 475 U.S. at 587 (emphasis added). That record, as noted, includes David's
disciplinary history, which shows a pattern of disruptive and volatile behavior including
addressing teachers and others with profanity. The record also shows David did not challenge
the Incident-related misconduct he was charged with committing and that when he entered that
plea of no contest he did so under the guidance of counsel (the same lawyer who filed this
lawsuit).

In sum, while speculation abounds on the question of race, there is no "hard evidence"
that David was the victim of racially-motivated District-sanctioned conduct. The Title VI claim
is therefore dismissed.

**B.      The Section 1983 Equal Protection Claim (VAC ¶¶ 134-138)**

As a threshold matter, defendants urge the Court to dismiss the Equal Protection claim
because it is based on the same basic facts as the Title VI claim and should therefore be deemed
subsumed by that statute's comprehensive scheme. See, e.g., Chandrapaul v. City Univ. of New
York, 2016 WL 1611468, at *23 (E.D.N.Y. Apr. 20, 2016); J.E. ex rel. Edwards v. Ctr. Moriches
Union Free Sch. Dist., 898 F. Supp. 2d 516, 528 (E.D.N.Y. 2012); DT v. Somers Cent. Sch.
Dist., 588 F. Supp. 2d 485, 498 (S.D.N.Y. 2008) (Section 1983 equal protection claim subsumed
by Title VI claim that shares the same underlying facts).

The Court declines to do so. Although the Equal Protection and Title VI claims are
similar, they are not identical. Pruning away the pleading's overblown rhetoric, two distinct
theories of recovery can be identified. The Title VI claim, as just discussed, emphasizes racial
animus of a systemic nature, whereas the Equal Protection claim focuses on the Incident to

emphasize the theory that David was "similarly situated" to other non-misbehaving students reentering the building.

These allegations make available a "selective enforcement" theory of recovery *not* based on race or found under Title VI and, in this Court's view, might well be a better fit for the facts than one emphatically based on race.[13] That theory, recently revisited by the Second Circuit in Hu v. City of New York, 927 F.3d 81 (2d Cir. 2019), is what that Court labels a "class of one" or "non-class" claim based on *personal* rather than racial animus. In Hu, the Circuit explains:

> We first articulated a theory of Equal Protection based on the selective enforcement of the law in LeClair v. Saunders, a case decided nearly four decades ago... To prevail on such a claim, a plaintiff must prove that (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. . . . As this test makes clear, "[t]he LeClair type of equal protection claim requires proof of disparate treatment and impermissible motivation. A plaintiff cannot merely rest on a demonstration of different treatment from persons similarly situated. Instead, he must "prove that the disparate treatment was caused by the impermissible motivation. As evident from LeClair's broad definition of "impermissible considerations," LeClair protects against *both discrimination on the basis of a plaintiff's protected status (e.g., race or a constitutionally-protected activity) and discrimination on the basis of a defendant's personal malice or ill will towards a plaintiff.*

927 F.3d at 91 (internal quotations, citations, and alterations omitted) (emphasis added).

The feature of this jurisprudence that Hu clarifies is the degree of similarity required. Hu holds that, because a LeClair class-of-one claim requires proof of actual impermissible motivation by the alleged wrongdoer, a plaintiff can establish similarity by showing that his "and

---

[13] For the reasons discussed with respect to the Title VI claim, however, the Court dismisses the Equal Protection claim to the extent it seeks recovery for racially-motivated conduct.

[the] comparator's circumstances ... bear a reasonably close resemblance." Id. at 96. He "need not" show that they are "identical." Id.[14]

At this stage the Court cannot predict to what degree a jury would credit David's testimony that he was not misbehaving. But with respect to the important question of why AP Reese first stopped David, the record essentially permits a rational factfinder to say the answer lies somewhere—or perhaps at a specific point—in the gap between their conflicting accounts. That possibility, coupled with the volume of students in the hallway at the time, presents David with ample candidates for "reasonably close resemblance" purposes. Additionally, a rational juror could well conclude that one of the video clips depicts AP Reese essentially making a beeline for David, a view that is consistent with investigators' notes of some of the student accounts of what occurred and enough, at this stage, for a LeClair-based selective enforcement claim based on personal rather than racial animus to survive.[15] (Reese also allows countless other black students to walk by, which is another reason why a race-based selective enforcement claim is untenable here.

## III. THE CLAIMS UNDER 42 U.S.C. §§ 1981, 1985 and 1986

42 U.S.C. § 1981, which by its terms protects the right "to make and enforce contracts," has been construed to "forbid all racial discrimination in the making of private as well as public

---

[14] Returning to qualified immunity, see note 2 supra, any assertion with respect to this claim would be denied because, as Hu makes clear, the basic LeClair personal animus claim has been clearly established for decades.

[15] See, e.g., Def. Exhibit V at pp. 24-5, 29 (Reese "must know him as he veered directly at him"; "Reese coming other way walks past kids chanting asshole goes straight for David"; "saw Reese go directly at David"); Plf. Exhibit 8 (student "thinks prior issue between David and Mr. Reese"). In short, it is for a jury to decide whether the video clip supports Reese's assertion on the material question of the personal animus claim, i.e., why the physical contact began.

contracts." Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609, (1987). Independent of the inadequate proof of racial bias, the claim must be dismissed as a matter of law because where, as here, the alleged discrimination was committed by state actors, Section 1983 constitutes the exclusive federal remedy. Duplan v. City of New York, 888 F.3d 612, 621 (2d Cir. 2018)

42 U.S.C. § 1985(3) provides a cause of action for persons deprived of "equal protection of the laws" at the hands of a conspiracy between "two or more persons." To prevail, a plaintiff must establish "(1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). To satisfy the conspiracy element, a plaintiff must show a "meeting of the minds." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) ("[U]nder Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation and citation omitted).

The Court agrees with defendants that the intra-corporate conspiracy doctrine requires dismissal of these claims because each of the alleged conspirators is an employee of the same municipal entity. See Varricchio v. Cty. of Nassau, 702 F. Supp. 2d 40, 62 (E.D.N.Y. 2010) ("intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other"). Even if the intra-corporate doctrine did not bar the section 1985 claim as a matter of law, the Court would still dismiss the claim because it is supported only by conclusory allegations and overblown rhetoric rather than any hard evidence.

## IV. MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983[16]

A municipality may not be held liable under a *respondeat superior* theory of liability for the acts of its employees. Monell v. Dep't of Social Services, 436 U.S. 658, 691 (2d Cir. 2003). Rather, "[d]emonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees." Amnesty America v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004). This is typically done by showing that the alleged unconstitutional actions resulted from an official policy, custom or practice of the municipality. Monell, 436 U.S. at 691. The policy or custom requirement can be satisfied where the municipality "is faced with a pattern of misconduct and does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions." Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007). Thus, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." Amnesty, 361 F.3d at 126 (internal citation and quotation omitted).

Inadequate training or supervision of municipal employees can establish deliberate indifference to the rights of those with whom those employees interact. City of Canton v. Harris, 489 U.S. 378, 388 (1989). A three-part test applies to such claims:

> First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation.... Thus, a policymaker does not

---

[16] Section 1983 liability against the District as a municipal entity is asserted in the Second, Seventh and Ninth Causes of Action. The Second and Seventh relate to excessive force while the Ninth speaks predominantly of racial discrimination. The Ninth is dismissed: there can be no municipal liability because the Court has held that plaintiffs cannot establish the underlying race violation.

> exhibit deliberate indifference by failing to train employees for rare or unforeseen events. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.... [Third], the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992).

Finally, regardless of the policy theory advanced, plaintiffs must prove a direct causal link between the policy and the alleged constitutional violation. Id., 498 US 378 at 385

The Court concludes that the record as a whole forecloses Monell liability for the Incident.

First, plaintiffs admit that the District has a policy against corporal punishment and the bullying and harassment students by District staff; that District employees are not permitted to choke students; and that school personnel are permitted to physically contact and restrain a student when that student poses a danger to self or others. See Defendants' Local Civil Rule 56.1 Statement of Facts at pp. 13-14; Plaintiffs' Local Rule 56.1 Response, et al. at pp. 30-31.

Second, on the theory of deliberate indifference to a pattern or practice of unjustified excessive force, much less something comparable to a chokehold, plaintiffs simply have no evidence, while the record as a whole essentially negates the claim. Neither AP Reese, Partlow, nor Chan had previously been accused of assault or excessive force by parents or students.[17] Dr.

---

[17] Representative of the tenor of plaintiffs' disputes is the following. In response to defendants' assertion of this fact in their 56.1 statement, plaintiffs' counsel lodges a "denial" with citation to portions of David's deposition (Def. Ex. B at 98:18-25 and 100: 2-25). David testified there, in pertinent part, as follows:

> Q: Are you aware of any other physical incidents between [ ] Reese and any other students?
> A: I heard. …
> Q: Did you ever witness any?

20

Castro, the Principal, never received a complaint that excessive force was used against an LHS student. And David admits that he was not involved in any physical incidents with AP Reese or Partlow previously and never witnessed any physical incidents between AP Reese or Partlow or any other LHS students. In short, no rational juror could conclude that anything approaching a "pattern" or "practice" of unjustified and improper use of force was occurring at LHS. *A fortiori* there is no evidence that the District tolerated, failed to prevent or was otherwise deliberately indifferent to any such pattern or practice.

The failure to train and supervise theory likewise fails for simple lack of proof and is negated by defendants' evidence (which, except for semantic quarrels, plaintiffs do not dispute). *Inter alia*, when guards begin employment with the District, they are paired with an experienced guard to be trained on the job; new hires undergo an orientation and participate annually in an eight-hour comprehensive refresher course; they also participate in mandated training and are offered additional training in Nonviolent Crisis Prevention Intervention; and during their training, DSS Perrotta explains their accountability if they violate District policy or the law. Of

---

A: No.

Q: What about security guard [Partlow],did you ever witness any physical incidents between him and other students?

A: Yes.

Q: How many times?

A: I don't know. I don't know how many times....It was just a fight in school is what I'm referring to.

Q: There was a fight?

A: No, I'm just saying, like if there was a fight in school, yeah.

Q: Do you recall any specific incidents as you sit here today?

A: No.

Beyond the portion cited by plaintiffs' counsel, David testified that he "heard that [Reese] would like snatch students like [he] got snatched. Pull students to the side," and that he heard these things from "[s]tudents" but could not identify any student he had heard that from. Ex B 101:13-102:12. In the parlance of summary judgment jurisprudence, this is the epitome of a dispute that is *not* "genuine."

note, Crisis Prevention Intervention training including how to restrain a student is covered in an eight-hour refresher course that Chan and Partlow completed annually. Both guards were also trained in avoiding high risk positions for restraint related to positional asphyxia and on the Dignity for All Students Act. From time to time, the District also brings in the Department of Mental Health and legal counsel to further educate guards. See Defendants' Local Civil Rule 56.1 Statement of Facts at pp. 14-15; Plaintiffs' Local Rule 56.1 Response, et al. at p. 32-35.

In sum, even construing the record in the light most favorable to plaintiffs and resolving any arguable ambiguities in their favor, the "hard evidence" required to proceed to trial on the municipal liability claim is simply not here. D'Amico, 132 F.3d at 149 ("non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [her] version of the events is not wholly fanciful"). Accordingly, summary judgment is awarded in favor of defendants on their municipal liability claim. Matsushita, 475 U.S. at 56 (at summary judgment the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts"); Navajo Air, 318 F. Supp. 3d at 674 ("[s]ummary judgment is designed . . . to flush out those cases that are predestined to result in directed verdict"); Weeks Marine, 294 F.3d at 64 (summary judgment is the appropriate relief "where the facts and the law will reasonably support only one conclusion").[18]

---

[18] The Thirteenth Cause of Action, captioned as a claim for negligence under state law, asserts that negligence in failing to properly train and supervise employees was the proximate cause of David's injuries. See Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (to establish negligent supervision, a plaintiff must show, inter alia, that "the employer knew or should have known of the employee's propensity for the conduct that caused the injury prior to the injury's occurrence")(internal quotation and citation omitted). This claim fails for the same reason as the § 1983 Monell claim. To the extent that claim also asserts a claim for negligent investigation, it also fails because the theory is not cognizable under New York law. Coleman v.

## CONCLUSION

For all of the foregoing reasons, the Court grants in part and denies in part the defendants' motion for summary judgment and denies in part and grants in part the plaintiffs' cross-motion for partial summary judgment. To recap the resulting fate of the claims and parties:

The excessive force, substantive due process and false imprisonment claims under Section 1983, along with the state-law claims for assault and battery and emotional distress (both negligent and intentional), shall proceed to trial as against defendants Reese, Perrotta, Partlow and Chan. The personal involvement of any other named defendants in the conduct these claims allege has not been established so to the extent they are named in these claims judgment in their favor shall be entered. The claim for denial of equal protection claim on account of personal animus shall proceed to trial as against defendant Reese only.

The remaining claims are dismissed in their entirety: Title VI; Section 1983 abuse of process; Section 1983 denial of equal protection on account of race; Section 1983 state-created danger; Section 1981; Sections 1985 and 1986; municipal liability for the surviving Section 1983 claims; and negligence under state law.

**SO ORDERED.**

Dated: Brooklyn, New York
      September 30, 2019

s/Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge

---

Corp. Loss Prevention Assocs., Inc., 724 N.Y.S.2d 321, 322(2d Dep't 2001) ("There is no cause of action in the State of New York sounding in negligent prosecution or investigation").